IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

---

REBECCA SCOFIELD,

Plaintiff,

vs.

ASHLEY GUILLARD,

Defendant.

Case No. 3:22-CV-00521-REP

Volume I of IV

Boise, Idaho

February 24, 2026
11:44 a.m.

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE RAYMOND E. PATRICCO
CHIEF UNITED STATES MAGISTRATE JUDGE

---

APPEARANCES:

For the Plaintiff: MS. WENDY OLSON
MR. CORY MICHAEL CARONE
Stoel Rives, LLP
101 S. Capitol Boulevard, Suite 1900
Boise, Idaho 83702

For the Defendant: MS. ASHLEY GUILLARD
3262 Westheimer Rd, 942
Houston, Texas 77098

Court Reporter: MS. ANNE BOWLINE, RMR, CRR
Anne_Bowline@id.uscourts.gov

*Proceedings recorded by stenography; transcript produced by computer-aided transcription.*

# INDEX


| JURY INSTRUCTIONS | PAGE |
|---|---|
| preliminary instructions read by the Court | 4 |

| OPENING STATEMENTS | PAGE |
|---|---|
| Ms. Olson | 18 |
| Ms. Guillard | 26 |

| PLAINTIFF'S WITNESS | PAGE |
|---|---|
| REBECCA SCOFIELD | |
| Direct Examination by Ms. Olson | 31 |
| Cross-Examination by Ms. Guillard | 107 |

| PLAINTIFF'S EXHIBITS | RECEIVED |
|---|---|
| 19 | 57 |
| 20 | 62 |
| 21 | 66 |
| 25 | 73 |
| 26 | 75 |
| 32 | 93 |
| 35 | 102 |
| 36 | 104 |
| 40 | 45 |

(The following took place outside the presence of the jury.)

THE COURT: Please be seated.

Ms. Olson, Ms. Guillard, my intention was -- or is to go ahead and instruct the jury now, before we break for lunch. But I'm happy to hear the parties' positions if they want to wait to do that. I just thought that with a little extra time -- we got done early -- we could instruct them before lunch. And then you'll have time to work on your opening statements, and we'll start right in with opening statements right after lunch. Ms. Olson?

MS. OLSON: That's fine with plaintiff, Your Honor.

THE COURT: Ms. Guillard?

MS. GUILLARD: No problem, sir.

THE COURT: All right. Then summon the jury back in.

(The jury entered the courtroom at 11:47 a.m.)

THE COURT: Please be seated.

All right. Members of the jury, what we're going to do now is I'm going to give you some preliminary legal instructions that are going to apply to the case, and then we'll break for lunch. We'll have an hour for lunch after that, and we have a little bit of extra time now, so I want to give these instructions now, before lunch. This way, after lunch we can get started right with opening statements in the case.

All right. Members of the jury, you are now the jury in this case. It is my duty to instruct you on the law that applies in the case. It is your duty to find the facts from all of the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not, and you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means you must decide the case solely on the basis of the evidence before you. You will recall that you took an oath to do so.

At the end of the trial I will give you final instructions. It is the final instructions that will govern your duties. Please do not read into these instructions or anything that I may do or say that I have an opinion regarding the evidence in this case or what your verdict should be.

Now, to help you follow the evidence, I'm going to give you a brief summary of the positions of the parties. I already did this to an extent in my welcome remarks. But as I mentioned earlier, on December 21, 2022, plaintiff, Rebecca Scofield, filed this civil lawsuit alleging defamation. She alleged that defendant, Ashley Guillard, her statements on TikTok about plaintiff's alleged romantic relationship with one of the victims and her participation in the murders were false and defamatory.

Earlier in the case, it was resolved that defendant's

statements on this subject on the TikToks were false. Thus, Ms. Guillard is liable to Ms. Scofield for defamation. So that issue will not be decided by you. The only question that you will be asked to decide is whether plaintiff has proven that she was damaged by those false statements and, if so, in what amount.

Plaintiff claims that she is entitled to compensatory damages to compensate her for the harm to her professional reputation, present and future mental and emotional pain and suffering, present and future medical expenses, and present and future lost earnings and professional opportunities.

Plaintiff has the burden of proving compensatory damages by a preponderance of the evidence, and I'll tell you what that means in a moment. Defendant denies that plaintiff is entitled to compensatory damages.

Plaintiff also claims that she's entitled to punitive damages because defendant's conduct was oppressive, fraudulent, malicious, or outrageous. Plaintiff has the burden of proving punitive damages by clear and convincing evidence, which I'll talk to you about in a moment as well. Defendant denies that plaintiff is entitled to punitive damages.

When a party has the burden of proving compensatory damages by a preponderance of the evidence, it means that you must be persuaded by the evidence that the claim of damages is

more probably true than not true. You should base your decision on all of the evidence regardless of which party presented it.

When a party has the burden of proving damages by clear and convincing evidence, it means that the party must present evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the damages are true. This is a higher standard of proof than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt, the standard that applies in criminal cases.

Now, as I said, you are the judges of the facts in this case. The evidence you are to consider in deciding what the facts are consists of the sworn testimony of any witness who testifies, the exhibits that are admitted into evidence, any facts to which the lawyers or defendant when she is acting in her own capacity as her own representative have agreed to, and any facts that I may instruct you to accept as proved.

Now, in reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them when deciding what the facts are. I'll list them for you now.

Arguments and statements by lawyers or the defendant when she is acting in her capacity as her own representative are not evidence. The lawyers are not witnesses and the

defendant is not a witness unless she testifies from the witness stand. What they may say in their opening statements, closing arguments, and at other times during trial is intended to help you interpret the evidence, but it is not evidence itself.

If the facts as you remember them differ from the way the lawyers have stated them, other than what the defendant testifies as a witness, your memory of them controls.

Questions and objections by lawyers or the defendant when she is acting in her own capacity as her own representative are also not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or the Court's ruling on it.

Testimony that is excluded or stricken or that you are instructed to disregard by me also is not evidence and must not be considered. In addition, some evidence may be received only for a limited purpose. When I instruct you to consider evidence only for that limited purpose, you must do so, and you may not consider the evidence for any other purpose.

And lastly, anything that you see or hear when the court is not in session is not evidence. You are to decide this case solely on the evidence received at trial.

Now, evidence may be both direct and circumstantial.

Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw, heard, or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It's for you to decide how much weight to give any evidence.

By way of an example of what circumstantial evidence and direct evidence is, if you wake up in the morning and you see that the sidewalk is wet, you may find the fact that it rained during the night. However, evidence such as a turned on garden hose may provide a different explanation for water on the sidewalk. Therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all evidence in light of reason, experience, and common sense.

There are rules of evidence that control what can be received into evidence. When a lawyer or the defendant, acting in her capacity as her own representative, asks a question or offers into evidence an exhibit and the lawyer or defendant on the other side thinks it's not permitted by the rules of evidence, that lawyer or defendant may object. If I overrule the objection, the question may be answered or the exhibit may be received. If I sustain the objection, the question cannot be answered and the exhibit cannot be

received. Whenever I sustain an objection to a question, you must ignore the question, and you must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you're deciding the case, you must not consider the stricken evidence for any purpose.

Now, in deciding the facts of the case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it. In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to, the witness's memory, the witness's manner on the stand while testifying, the witness's interest in the outcome of the case if any, the witness's bias or prejudice if any, whether other evidence contradicted the witness's testimony, the reasonableness of the witness's testimony in light of all of the evidence, and any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make a mistake when trying to remember. Also, two people may see the same event

but remember it differently. You may consider those differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think that the witness testified untruthfully about some things but told the truth about others, you may accept the part that you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

I'll say a few words now about your conduct as jurors in this case. First, please keep an open mind throughout the trial and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty. Thus, until the end of the case or until I tell you otherwise, do not communicate with anyone

in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.

This includes discussing the case in person, in writing, by phone, tablet, or computer or any electronic means; via email, text messaging; or Internet chat room, blog, website, or application, including, but not limited to, Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media.

This applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else, including your family members, your employer, the media or the press, the people involved in the trial, although you may notify your family and your employer that you've been seated as a juror in this case and how long you expect the trial to last.

But if you're asked or approached in any way about your jury service or anything else in this case, you must respond that you have been ordered by the Court not to discuss the matter and then report the contact to me.

And because you will receive all of the evidence and legal instruction you properly may consider to return a verdict, I want you to -- do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it. Although I have no information that

there will be such news reports about this case, I don't want you to do any research about it, such as consulting dictionaries, searching the Internet, or using other reference materials. And do not make any investigation or in any other way try to learn about the case on your own beyond what happens in this courtroom.

Do not visit or view any place discussed in this case and do not use the Internet or any other resource to search for or view any place discussed during this trial. Also, do not do any research about the case, the law, or the people involved -- including the parties, witnesses, or lawyers -- until you've been excused as a juror in this case. If you happen to read or hear anything touching on the case in the media, turn away and report it to me as soon as possible.

If you need to communicate with me, simply give a signed note to the law clerk, Mr. Gordon, and he will then give it to me.

These rules that I've just discussed protect each party's right to have its case decided only on the evidence that has been presented here in the courtroom. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research outside the courtroom or any investigation outside of the courtroom or gain any information through improper communications, then your verdict may be influenced

by inaccurate, incomplete, and misleading information that has not been tested by the trial process.

Each of the parties is entitled to a fair and impartial jury, and if you decide the case based on information not presented in the courtroom, you'll have denied the parties a fair trial. Remember that you've taken an oath to follow the rules, and it's very important that you do follow these rules. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over again. If any juror is exposed to any outside information, again, please notify the Court immediately.

Publicity during trial: This case may garner some media attention. If there is any news media account or commentary about the case or anything to do with it, again, you must ignore it. You must not read, watch, or listen to any news media account or commentary about the case or anything to do with it. This case, again, must be decided solely by you and exclusively on the evidence that is received in the courtroom and on my instructions as to the law that applies. Again, if any juror is exposed to outside information, please notify me immediately.

Now, I urge you to pay close attention to the trial testimony that is given from the witness stand in this case because during deliberations you will not have a transcript of

the trial testimony. You'll not get a written record of what happens, so pay close attention to the oral testimony in the courtroom.

If you wish, however, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you go to the jury room and decide the case with your fellow jurors. Do not take -- let note-taking distract you, though, from listening to the testimony. When you leave, your notes should be left in the jury room. No one will read your notes.

Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only there to assist your memory. You should not be overly influenced by your notes or the notes of other jurors.

Now, only the lawyers and the defendant when she is acting in her capacity as her own representative and I are allowed to ask questions of the witnesses. A juror is not permitted to ask questions of the witnesses. If, however, you are unable to hear a witness or a lawyer, please raise your hand, and I'll correct the situation.

From time to time during trial, it may be necessary, as we did during jury selection, for me to talk to the lawyers and Ms. Guillard out of the hearing of the jury at what's called a sidebar conference. Please understand that while you're waiting, we are working. The purpose of these

conferences is not to keep relevant information away from you but to decide how certain evidence is to be treated under the rules of evidence and to avoid any confusion or legal error.

Of course, we'll do what we can to keep the number and length of these sidebar conferences to a minimum. I may not always grant an attorney's request for a sidebar conference. Do not consider my granting or denying a request for a sidebar conference as any indication of my opinion about the case or what your verdict should be.

Now let me give you a brief outline of how the trial is going to proceed. Trials proceed in the following way. First, when we get back from lunch, which we'll take an hour break shortly, each side may make an opening statement. An opening statement is not evidence. It is simply an outline to help you understand what the party expects the evidence will show. The party is not required to make an opening statement.

The plaintiff will then begin its case in chief. Plaintiff will then present evidence through testimony of witnesses, and Ms. Guillard, acting in her capacity as her own representative, may cross-examine those witnesses. Then the plaintiff will rest, and the defendant may present evidence in her case in chief, and counsel for the plaintiff may cross-examine any witnesses she calls.

After the evidence has been presented, I will instruct you on the law that applies to the case, and counsel

and plaintiff -- counsel for plaintiff and the defendant will make closing arguments. After that you will go to the jury room to deliberate on your verdict.

Again, as I mentioned earlier, Ms. Guillard as the defendant is representing herself in this trial. This fact must not affect your consideration of the case. Self-represented parties and parties represented by an attorney are entitled to the same fair consideration of their case.

Because the defendant is acting as her own lawyer, you will hear her speak at various times during the trial. She may make an opening statement and closing argument and may ask questions of witnesses, make objections, and argue legal issues to the Court. She may also testify and ask herself questions which she will answer. That is completely normal.

I want to remind you that when the defendant speaks as her representative or as a lawyer in this case, she is acting as her own advocate, and her words are not evidence. The only evidence in this case comes from witnesses who testify under oath on the witness stand or by deposition or from evidence that -- or exhibits that are admitted into evidence. Again, Ms. Guillard might testify in this trial and likely will. When a self-represented party testifies, you should treat this testimony just as you would the testimony of any other witness.

All right. Those are my instructions before we start the trial. We're now going to break for lunch. It is 12:10. I will have the parties and the jurors return to the courtroom by 1:10, and we will start back with opening statements at 1:15.

Ms. Trumbull, can you please excuse the jury.

THE COURTROOM DEPUTY: Yes, Your Honor.

(The jury exited the courtroom at 12:10 p.m.)

THE COURT: Please be seated.

All right. Ms. Olson, any matters to take up before we break for lunch?

MS. OLSON: Not on behalf of Professor Scofield, Your Honor.

THE COURT: Thank you.

Ms. Guillard?

MS. GUILLARD: No, sir.

THE COURT: Okay. Then we will be in recess until 1:15, at which time we will start plaintiff's opening statement. With that, court will be in brief recess.

(At 12:11 p.m., a recess was taken until 1:15 p.m.)

THE COURT: Please be seated.

Mr. Gordon, please bring in the jury.

(The jury entered the courtroom at 1:16 p.m.)

THE COURT: Please be seated.

All right. Members of the jury, I hope you had a

nice and relaxing lunch and were able to get ahold of your family and let them know you're stuck here for the next few days. As I said, next we're going to proceed to opening statements of the parties.

Ms. Olson, are you prepared to deliver the plaintiff's opening statement?

MS. OLSON: I am, Your Honor.

THE COURT: You may proceed.

MS. OLSON: May it please the Court, Ms. Guillard, ladies and gentlemen of the jury. Good afternoon.

Thanksgiving Day in Moscow, Idaho, in November of 2022 was already sullen and somber. 11 days earlier, four University of Idaho students were killed in a house just off campus. No suspect had been identified, and no one had been caught. Rumors were rampant in Moscow and online.

Rebecca Scofield, an associate professor and chair of the history department at the University of Idaho, and her husband and their in-laws had decided that they were keeping their Thanksgiving tradition of holding the celebration in Moscow. They were hoping to provide some stability for themselves and for their children. And that is when Professor Scofield's personal nightmare began, and it has never ended.

On Thanksgiving Day Professor Scofield, her husband John, and her sister-in-law, as they walked down to the park with their combined three young children, Professor Scofield

looked at an email on her phone. It was a work -- it was her work email account, and the email was from a University of Idaho alumna, and the alumna in the email said, "You should look at this link," and sent a link. And so Professor Scofield did. She watched the video, and she watched it again and again. And that video and others like it brought the life she had so carefully built with her family and her career and her reputation to a screeching halt.

This is Professor Scofield's life and her story, and you'll hear it from her. And you will see that video. It will be Exhibit 40. You will see that Exhibit 40 falsely states that Professor Scofield orchestrated the murders, the execution, of the four students and that she possibly did it because she was dating or wanted to date one of the murdered female students.

The video has Professor Scofield's picture. It has her contact information at the University of Idaho history department. It has her official university biography. And it has the defendant, Ashley Guillard. Ms. Guillard made the video on the social media application TikTok, and she posted it and others like it again and again and again.

Again and again and again Ms. Guillard told her TikTok followers and others who could find the content online using hashtags over search engines that Professor Scofield orchestrated the murders of the four students and that she did

so because she was having a relationship, an affair, with one of the murdered female students. It was a salacious story, and it brought lots of clicks in the social media frenzy that followed.

Now, this trial, as His Honor has told you, is not about whether Ms. Guillard's accusations are true. They are not. Professor Scofield didn't even know the students. Ms. Guillard's statements are false statements that this Court, His Honor, has already found as a matter of law are defamatory. This trial is only about damages and how much in damages Ms. Guillard should be ordered to pay Professor Scofield as a remedy for Ms. Guillard's persistent and false accusations that shattered Professor Scofield's life. That is the decision that you will have to make.

Now, as His Honor has told you, there were two defamation claims, two false statements, the false statements that Professor Scofield orchestrated the murders and the false statement that Professor Scofield had an affair with one of the murdered students.

In this trial Professor Scofield is asking for two kinds of damages in relation to those two false statements. First, she is asking you to award her compensatory damages, damages that are to compensate her for the harm done by Ms. Guillard.

And there are two parts of that. There are economic

damages and noneconomic damages. The economic damages are for reasonable out-of-pocket costs for things like increased security and mental and medical health care. Her noneconomic damages are to compensate her for the emotional harm caused by Ms. Guillard's false statements, and that harm is immeasurable.

Second, Professor Scofield is asking you to award her punitive damages, damages that are designed to deter Ms. Guillard and others from engaging in similar conduct.

The evidence you will hear and see in this trial will focus primarily on the emotional harm to Professor Scofield and to the impact on her career, on her ability to function, on her relationships with her family, the impact on how she teaches her classes. And you'll see evidence that, unsurprisingly, the emotional harm, the emotional toll also affected her physical health. You will see, quite frankly, that Professor Scofield is not the same person today that she was on November the 23rd of 2022, the day before Ms. Guillard's false statements turned her life upside down.

You will hear about the damages to Professor Scofield caused by Ms. Guillard's false statements through nine witnesses. You'll of course hear from Professor Scofield. This is her story. And you'll hear from three other people close to her who knew her before November the 24th of 2022, before the TikToks were posted, and have stayed close to her

since. Those three people are her husband John, who she met when they were both growing up in Emmett, Idaho; her best friend, Chris Hanson, who she met when they were both at college in Oregon; and her mother, Margie Scofield.

You'll hear from the dean of Professor Scofield's college at the University of Idaho, Sean Quinlan. He was one of the first people that Professor Scofield talked to on the evening of November 24, 2022, after watching the TikTok in Exhibit 40. He will describe the Professor Scofield that he knew then and the Professor Scofield -- the person Professor Scofield became when she watched the video.

And you will hear from two professionals. You'll hear from Rebecca Bohn, a Moscow licensed mental health counselor who has been treating Professor Scofield for nearly three years. She will tell you that she diagnosed Professor Scofield with posttraumatic stress disorder, PTSD, that Professor Scofield still suffers from PTSD as a result of Ms. Guillard's false statements, and that Professor Scofield will need that ongoing mental health treatment for the foreseeable future.

You will also hear from Rebecca Tallent, a retired professor emerita from the University of Idaho who has more than 50 years of experience in public relations, journalism, and academia. Based on her experience and training, Professor Tallent will testify about the impact that negative online

statements can have on a person's reputation and career, and she will testify about how hard it is for a person whose reputation and career have been attacked to repair that reputation. After all, online statements last forever.

And you'll hear from Ms. Guillard, and you will see several TikToks. You will not see all the TikToks that Ms. Guillard began posting on November 23, 2022, and falsely stating that Professor Scofield orchestrated the murders and falsely stating that Professor Scofield had a relationship with one of the murdered female students. There are many of them, over 100, and His Honor has already ruled as a matter of law that the statements Professor Scofield [sic] made are defamatory. But you will see several of them, and you will see that over and over and over again, in both her own voice and in the text she displayed on the screen for the TikTok, Ms. Guillard made these false statements.

Now, I anticipate that Ms. Guillard will elicit testimony and will argue that although Judge Patricco found these statements to be false, she subjectively believed them. There are two important things to consider if you hear that evidence in this case. First, whether Ms. Guillard subjectively believed her statements is only relevant to whether or not Professor Scofield should be awarded punitive damages. It is not relevant to whether or not Professor Scofield should be awarded compensatory damages. It's not

relevant to whether or not Professor Scofield was harmed and damaged by the statements.

And second, while Ms. Guillard may elicit evidence that she subjectively believed her false statements, you'll also see evidence that Ms. Guillard did not stop making those false statements even when she was provided with facts that told her they were false or provided with facts that told her she should exercise some caution when accusing someone of ordering murders and having an affair with a student.

You will see that she did not stop when Professor Scofield sent her a cease and desist letter on November 28, 2022. And she did not stop when Professor Scofield sent her a cease and desist letter on December 8, 2022. And she did not stop when Professor Scofield filed this lawsuit. And she did not stop on December 27, 2022, when the Moscow Police Department issued a press release saying they did not believe that the professor who had sued the TikTok artist had anything to do with the murders of the four students.

And she did not stop when Bryan Kohberger was arrested for the murders. She did not stop throughout the entire time that Bryan Kohberger and Bryan Kohberger alone was being prosecuted for the murders. And she did not stop when she was told by the University of Idaho that it had no record of Professor Scofield having any communication ever with any of the murdered students or with Bryan Kohberger. And you

will hear that she did not begin gathering any facts regarding any of her allegations until well after this lawsuit was filed.

To be certain, Ms. Guillard moved from TikTok to YouTube, and she sometimes spoke on other social media personalities' shows, but she did not stop. Ms. Guillard is a smart woman, and she is social-media savvy. The evidence will show that she billed herself as someone who could solve mysterious deaths. The evidence you will see will show that she knew where to find Professor Scofield's University of Idaho picture and biography. She knew how to track down pictures and information about the murdered students. She knew how to use TikTok to maximum effect to share her false statements far and wide.

And the evidence will show that she spent at least the last four months living abroad, traveling to other countries, including countries in Europe and Asia, shopping, snorkeling, going to the beach, and telling that story on her social media platforms while Professor Scofield remains tarnished forever by Ms. Guillard's false statements.

To be certain, Professor Scofield knows that her trauma and her tragedy are not -- are different from the trauma and tragedy of the four University of Idaho students who were killed. She still has her life and her family and her job. But Professor Scofield's life and her career are now

inextricably intertwined with those murders because of Ms. Guillard. Professor Scofield will tell you that in the aftermath of Ms. Guillard posting her first TikToks, if you Googled Professor Scofield's name, you got "Moscow murders" right away in the search results.

And so now that the Court has held as a matter of law that Ms. Guillard defamed Professor Scofield, she asks you to listen to the evidence and to award her damages for the harm done to her by Ms. Guillard. At the end of the trial, after you have heard the evidence, we will get the chance to address you again. You'll have a verdict form to fill out, and I will ask you to award an amount based on the evidence that you hear that will begin to compensate Professor Scofield for the damage Ms. Guillard caused and to award an amount that will make Ms. Guillard stop, finally. Thank you.

THE COURT: Thank you, Ms. Olson.

Ms. Guillard, do you wish to make an opening statement?

MS. GUILLARD: Yes, sir.

THE COURT: All right. You may proceed.

MS. GUILLARD: Good afternoon. We're gathered here today not because I made a TikTok video regarding the murder of the four University of Idaho students and my attempt to find who did it, who, what, when, where, and why. We're here today because Rebecca Scofield is pretending to be a victim.

Rebecca Scofield, you will see by the evidence, will present evidence that -- or attempt to present evidence that she is severely mentally damaged from a TikTok video. The evidence will also show that's impossible.

The evidence will show that I did not act in an attempt to ruin Rebecca Scofield's life for no reason. The evidence will show that my attempt was to get justice for the four University of Idaho students who were brutally murdered and that even strangers, to include myself, were touched across the world and wanted to help. The evidence will show that despite not having any damages, Rebecca Scofield, instead of focusing on helping the students to find out who murdered them, what, when, where, and why, and get more information instead made this all about her.

The evidence will show she was not defamed -- let me retract that, because the judge determined that she was defamed. The evidence will show that the social media audience revered Professor Scofield, called her a hero, gave her money. At the University of Idaho, she didn't lose a job. She didn't lose wages. She didn't lose promotion opportunities. Instead, they paid her legal fees, also giving her money. The evidence will also show the news media instead blasted me, not Rebecca Scofield. So she did not suffer any reputational harm; instead, I did.

But I'm not here today to pretend to be a victim.

That's a bad word in my life. I'm here today because I made a decision to put myself on the line to get more information regarding who, what, when, where, and why the four University of Idaho students were murdered. I put myself on the line because someone asked me. I was a tarot and oracle card reader on TikTok. I did readings through my audience on TikTok regarding mysterious deaths or deaths that occur under mysterious circumstances and that were not solved.

My audience requested me to do the -- to do readings on the murders of the four University of Idaho students because I had no idea that it occurred, because I'm not from Idaho. At the time I was doing readings on Tiffany Valiante, Tamla Horsford, Shanquella Robinson, cases that were not solved and that did not bring the families justice. On that day a concerned citizen asked me, "I'm waiting on your --" or told me, "I'm waiting on you to do a reading on the murder of the four University of Idaho students."

When I started doing tarot readings and oracle card readings -- which I firmly believe in the truth and accuracy of -- it started to give me messages about a professor, a student, and someone having two options regarding ordering and orchestrating the murder of the student.

So I had to ask myself, okay, do I release this information? And the reason why I asked myself that is because, who am I in Idaho? I didn't perceive myself to be

someone who could make a difference in law enforcement because I didn't live in Idaho. I didn't have connections in Idaho. I didn't have friends and family in Idaho. I did -- the evidence will show that I submitted to the tip line, but I wanted to do more. So I asked myself, what can I do to make a difference? Again, because I believed in my statements that Professor Scofield was involved with the murders, as well as others.

The evidence will show, yes, I did post those videos. I'm not going to lie about that. I have no reason to lie about that. And the evidence will show I was very passionate about it, not because I got extra attention, because I already had a platform. I put myself and my platform on the line to get justice for the students.

As it pertains to damages, punitive damages, the evidence will show and I have objective evidence of my motives, because during my spiritual journey which I was on for about seven years, I documented everything. I wrote books. I wrote on why I was doing the things, and I attempted to motivate others. I have concrete proof of why I started the *Solving Mysterious Deaths* series and what my purpose was, proof that I published way before the murder of the four University of Idaho students and way before I accused the professor of being involved in their murders.

The evidence will show that none of Professor

Scofield's compensatory damages have anything to do with the TikTok video that I posted that had absolutely no effect on her life. The evidence will also show the noneconomic damages that Professor Scofield is seeking for severe mental health disorders does not directly connect with a TikTok video because the APA standards under the *DSM-V* does not allow it. The evidence will show that even though the judge has determined as a matter of law that I defamed Professor Scofield, the evidence will not show that I did it with intent to harm.

That's all. Thank you.

THE COURT: Thank you, Ms. Guillard.

Members of the jury, now we're going to begin the presentation of evidence in this case with the plaintiff's case in chief.

Ms. Olson, please call your first witness.

MS. OLSON: Yes. Plaintiff calls Professor Scofield.

THE COURT: Ms. Scofield, if you'll approach the witness stand.

(The witness was sworn.)

THE COURTROOM DEPUTY: If you'll take a seat. If you'll please state and spell your full name for the record.

THE WITNESS: Rebecca Scofield, R-E-B-E-C-C-A S-C-O-F-I-E-L-D.

THE COURT: Ms. Olson, you may inquire.

MS. OLSON: Thank you, Your Honor. And may we have the evidence presentation system switched over to Ms. Bibb's computer?

THE COURT: Ms. Trumbull, please.

REBECCA SCOFIELD, PLAINTIFF'S WITNESS

DIRECT EXAMINATION

BY MS. OLSON:

Q. Professor Scofield, what city do you live in?

A. Moscow, Idaho.

Q. What work do you do there?

A. I'm an associate professor of American history and chair of the Department of History.

Q. Are you currently working?

A. I'm still employed at the University of Idaho, but I'm currently on medical leave.

Q. Are you originally from Idaho?

A. I'm from Emmett, Idaho.

Q. Did you go to Emmett High School?

A. I did.

Q. Did you go to college after graduating from Emmett High School?

A. Yes. I attended Willamette University in Salem, Oregon.

Q. Did you receive a degree from Willamette University?

A. Yes. I received a bachelor's in history.

Q. After receiving your bachelor's in history, did you obtain

any postgraduate degrees?
A. Yes. I attended -- or I received a master's degree in regional studies, East Asia at Harvard University and a Ph.D. in American studies at Harvard University.
Q. Is there any area that you specialized in in your postgraduate studies?
A. Yeah -- yes. I'm a cultural historian of the U.S. West.
Q. What does it mean to be a cultural historian?
A. So I mainly study things like performance or popular culture. In my field we call it the imagined American West, so I study a lot about cowboy culture across a lot of different populations.
Q. Professor Scofield, how long have you been a professor at the University of Idaho?
A. Ten years.
Q. When did you start?
A. January 2016.
Q. Did you teach anywhere before getting your current position at the University of Idaho?
A. Yes. I TA'd when I was in graduate school at Harvard, and then I also adjuncted for a summer course at Boise State University.
Q. Did you adjunct in a history course at Boise State University?
A. I did. It was a U.S. West course.

Q. Are you in a specific college or department at the University of Idaho?
A. Yes. I'm in the Department of History, which is part of the College of Letters, Arts, and Social Sciences.
Q. As a professor of history at the University of Idaho, do you teach classes to students?
A. Yes. As a chair, I'm on a reduced teaching load, which means I teach one class per semester.
Q. What courses do you teach at the University of Idaho?
A. I'm our modern Americanist, which means I cover most of our 20th century U.S. history courses on everything from our intro course, 1877 to the present, to more specific upper-division courses.
Q. Do you also teach graduate students?
A. I do also have several graduate students.
Q. In the courses that you teach, does that include both freshmen and upper-level students?
A. Yes. I work with students across their college careers.
Q. Professor Scofield, have you written any books or articles?
A. Yes. I am author of one book, coauthor of another book, and I have several articles or chapters in edited collections.
Q. Professor Scofield, what role does publishing have in your career as a professor?
A. It's a very famously -- in academia there's a line that

says publish or perish. Publications are how we qualify ourselves to be working historians and then, therefore, to teach at the college level. If we are not publishing, we cannot establish a reputation in our field, and therefore, we're not qualified to be teaching.
Q. Professor Scofield, next I want to ask you some questions about your family background. Are you married?
A. I am.
Q. What is your husband's name?
A. John Carlsen.
Q. And how long have you been married to Mr. Carlsen?
A. 13 years.
Q. Do you and Mr. Carlsen have any children?
A. Yes.
Q. How many?
A. Two.
Q. How old are they now?
A. Seven and nine.
Q. Professor Scofield, I'd like to direct your attention to the fall of 2022. Is that a time period when you were teaching history at the University of Idaho in Moscow?
A. Yes, I was.
Q. What was your position at that time?
A. I was an associate professor and chair of the Department of History.

Q. The same positions you hold now?
A. Correct.
Q. What were your duties as chair of the history department?
A. So a chair is like a manager of the department, so we are in charge of doing everything from student recruitment, enrollment, retention, scheduling courses, sponsorships, scholarships, budgeting, assessment, pretty much everything to kind of keep a department running smoothly.
Q. In the fall of 2022, were you teaching any classes?
A. Yes, I was. I was teaching one course.
Q. What was that course called?
A. The Long 1960s.
Q. What was The Long 1960s history course about?
A. It covers about a 20-year time span between 1955 and 1975, and we go over the social and political changes happening in the United States at that time.
Q. How many days a week did you teach that class?
A. Twice, Tuesday-Thursdays.
Q. And for how long?
A. 75 minutes.
Q. Professor Scofield, I want to direct your attention to the second week of November in 2022. Were you in Moscow that weekend?
A. I was not.
Q. Where were you?

A. I was in Portland, Oregon.
Q. When did you go to Portland, Oregon?
A. On Thursday, November 10.
Q. What for?
A. My spouse and I went to Portland to see one of our high school friends get married, and John was a groomsman in the wedding.
Q. Did you go to Portland for any other purpose?
A. I was hoping to see my good friend from college, Chris Hanson.
Q. And why were you hoping to see him there?
A. Well, he lives there, and we didn't get to see each other very much at the time.
Q. What day was the wedding that you and your husband attended where he was the groomsman?
A. That was on Friday, November 11.
Q. What did you do on Saturday, November the 12th?
A. We met up with the newlyweds for breakfast, and then we spent the afternoon and evening visiting with my friend Chris.
Q. Professor Scofield, when did you return to Moscow, Idaho, from your trip to Portland?
A. We left early in the morning on Sunday the 13th.
Q. And by "early in the morning," approximately what time do you mean?
A. 7 a.m.

Q. Professor Scofield, approximately how many hours is the drive from Portland, Oregon to Moscow, Idaho?
A. It's about six hours.
Q. Professor Scofield, did your children go with you and your husband to Moscow, Idaho, for the wedding and to see your friend Chris?
A. To Portland.
Q. Sorry. I misspoke. To Portland to see -- for the wedding and to see your friend Chris?
A. No. They stayed in Moscow. My parents had come up from Emmett to stay with them at our house to keep their routine.
Q. Did there come a time on that Sunday, November the 13th when you learned that there had been a serious crime on or near campus?
A. Yes. At about 1 p.m. I received what's called a Vandal Alert, which is a campus-wide messaging system that security or upper administration can reach the entire campus community quickly. And I received a message that said that there had been a homicide on King Road, which they said in the text message was near campus.
Q. Where were you when you received that Vandal safety alert?
A. We were not quite home yet.
Q. Were you still in the car?
A. Yeah. We were still driving.
Q. Were there any other details that you received from the

Vandal safety alert other than those you've described?
A. I think they sent some other alerts throughout the day to just say that there's no further information and that they would keep people updated.
Q. Did you and John drive home, get to your home?
A. Yeah. We got home and checked in with my parents and sort of made sure everyone was safe and in the house. We pulled the kids back in.
Q. On that day, November the 13th, after you got back to your house, did you have any contact with anyone from the university?
A. I did have a couple of students reach out via email. They said that they knew one of the victims and that they were going home immediately so that they would not be in class that week.
Q. Professor Scofield, when did you learn what had happened in that house on King Road?
A. I did not learn any more details until it was released to the public over the next couple of days.
Q. On Monday the 14th, was there anything that happened that day with respect to your duties at the university?
A. Yes. We had an emergency chairs meeting with everyone in my college, all the chairs in my college, to talk about sort of security protocols and how to guide other faculty on whether or not to hold class. And it was very obvious that

nobody knew many details yet. We didn't know the identities of the student -- the students at that meeting, but they did say that one of the students was in our college.
Q. Professor Scofield, did you have your regular class, the one that met on Tuesdays and Thursdays, on that Tuesday the 15th?
A. I did.
Q. Why did you do that?
A. Based on the advice we were getting from upper administration, we were told some students either didn't want to or couldn't leave campus yet and that they needed a sense of community and so, as far as possible, to hold classes just for the students who wanted to attend or could attend.
Q. On that Tuesday when you held your class, did you know anything more about the students who had been killed?
A. I think that the announcement had been made by then, because it was very obvious in the class that the students knew -- they knew they were in Greek life. I had a lot of students in Greek life that semester, and people -- students were devastated, and it was a very emotional class.
Q. You said your class was emotional and students were upset. Did you make any decisions in that class about whether to continue and have class on Thursday?
A. Yeah. So we discussed it as a class, and based on what the students wanted, we decided to just go ahead and cancel

Thursday class so they could all go home early.
Q. And the Thursday class would have been November the 17th, the Thursday before Thanksgiving; is that correct?
A. That's correct.
Q. Professor Scofield, do you remember when you learned the identity of the students who were killed?
A. I don't remember the exact moment that I did. Like I said, I think I must have known before my class on Tuesday, but I don't have a strong memory of that.
Q. When you learned the names of those students, it was obviously before Thanksgiving; is that correct?
A. That's correct.
Q. And did you know any of the students once you learned their names? Did you know any of the students?
A. I did not.
Q. To your knowledge, had you ever taught any of them?
A. I had not.
Q. In that week before Thanksgiving, what was it like being in Moscow, Idaho?
A. Moscow's a really small town, small college town. And in late November it starts getting dark at like 3:30 in the afternoon, and there was just this sort of oppressive atmosphere that settled over the campus. Everyone was really upset, really scared, and it just felt very dark and frightening.

Q. Were you beginning to hear speculation about what had gone on and who might be responsible?
A. Yes. Within a couple of days, online speculation started to increase rapidly, and there was already a lot of theories being bandied about in that week prior to Thanksgiving.
Q. And is that part of what made everything feel on edge?
A. Absolutely.
Q. Professor Scofield, did you have plans for the Thanksgiving holiday?
A. Yes. My in-laws always come up to Moscow to celebrate Thanksgiving with us, and we discussed potentially shifting it. But we had scheduled family photos for that weekend, which is hard to do sometimes, and then I was scheduled to have a full hysterectomy on December 1. So we decided to keep our tradition of staying in Moscow and have my in-laws come up for that.
Q. And when you refer to your in-laws, that's your husband John's parents; correct?
A. Yes.
Q. Anyone else?
A. John's sister, her husband, and their child also came up.
Q. All right. Professor Scofield, I'm next going to direct your attention to Thanksgiving Day, November 24, 2022. Do you recall that day?
A. I do.

Q. What happened?
A. The morning was pretty busy. John and his sister really love to cook together, and we were all getting ready for the meal. And about midmorning the kids were getting stir-crazy, and so we decided that John, his sister, and I were all going to walk them down the street to a park to kind of get the wiggles out.
Q. When you were doing that, what, if anything else, did you do?
A. I checked my work email, and we were almost to the park when I sort of pulled it up on my phone and looked at it. And I saw an unfamiliar name, and so I clicked on it. In the body of the email, it just said, "Hi, I'm an alumna. I think you should watch this."
Q. What did you do when you read that email saying, "I think you should watch this"?
A. I actually handed the phone to my husband, because he's an IT professional, and I have been known to click on not great links. And I showed it to him and I asked, "Does this look okay to click on?"
Q. And what was his response, if any?
A. He clicked on the link and watched it first, and I saw his face.
Q. What did you see in his face?
A. Alarm. And he immediately closed it, handed the phone

back to me, and said, "Don't watch that."
Q. Did you follow your husband's direction?
A. No, I did not.
Q. What did you do?
A. My sister-in-law and I decided to watch it anyways, and we clicked on the link, and a video came up.
Q. What was your reaction when you saw the video in the link?
A. I was shocked and stunned, speechless.
Q. Did you watch the video in the link one time?
A. We watched it many times.
Q. And when you say "we," who do you mean?
A. My sister-in-law, my husband, and I.
Q. And where were you when you were watching this video in the link over and over again?
A. We were standing in the park.
Q. Why did you watch it over and over again?
A. I think I was just so confused. I didn't understand what was happening. I didn't understand who this person was, why they had my photo, why they thought I knew the students at all, why they were saying these things.
Q. You've said a few things that sound like details from the video you saw.
A. Yeah -- yes.
Q. What do you recall about the video that you watched?
A. So when I clicked on it, the video started, and it was a

person obviously referencing the killings of our students. And she simply said, "And this is the teacher who ordered the execution of the students," and she sort of steps aside, and it's my photo.
Q. Did you recognize the person who made the video?
A. I did not.
Q. What impact did this video have on your Thanksgiving?
A. For me, it derailed the day. John and Jenny worked really hard on the meal, and I tried to just seem normal in front of my in-laws and my kids while also trying to figure out what next steps I should take.
Q. And how was your -- what were your emotions like at the time?
A. It was already a really dark and scary time, and my initial emotions were pretty panicked of how do I make this stop as fast as possible.
Q. Professor Scofield, I'm going to direct your attention to that screen in front of you, and then Ms. Bibb will be bringing up what we've marked for identification purposes as Exhibit Number 40 and just sort of the front part of that. Professor Scofield, do you recognize the initial picture here on Exhibit Number 40?
A. Yes. This is a screenshot from that first video I saw.
Q. And how do you recognize this as the -- as a screenshot from the first video that you saw?

A. Because I will never forget it.
Q. And this is the screenshot from that TikTok video attached to the email that you looked at on November 24, 2022; correct?
A. Correct.
Q. Prior to your testimony here at trial, Professor Scofield, have you watched Exhibit 40 all the way through?
A. Yes, I have.
Q. And is Exhibit 40 a true and correct copy of the TikTok video you watched --
A. Yes, it is.
Q. -- from the link in the email on November 24, 2022?
A. Yes, it is.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 40.
THE COURT: Ms. Guillard, any objection?
MS. GUILLARD: No objection.
THE COURT: Exhibit Number 40 will be admitted.
(Plaintiff's Exhibit 40 received.)
THE COURT: Do you wish to publish it?
MS. OLSON: Yes, Your Honor.
THE COURT: All right. You may.
(Playing video.)
Q. (BY MS. OLSON) And, Professor Scofield, was that the entirety of the video that you saw on November 24, 2022?
A. Yes. That was the entirety of that video.

Q. Professor Scofield, you've described a little bit of what you did when you got back to your house. What else did you do?
A. After I talked about it a little more with John and his sister, I decided I needed to do something, so I forwarded the message to my dean, Sean Quinlan, and simply said, "This is really scary. I don't know what to do."
Q. What happened after you forwarded the video in Exhibit Number 40 to Dean Quinlan?
A. Dean Quinlan called pretty quickly afterwards, and we discussed next steps.
Q. Based on your conversation with Dean Quinlan, what did you do as next steps?
A. I immediately called the Moscow Police Department. I informed them of the allegations in the video, and then I called the UI security office.
Q. Did you actually talk to anyone when you called the Moscow Police Department?
A. I initially just left a message, and then a little bit later a police officer called back.
Q. And did you talk to that police officer when he called you back?
A. Yeah -- yes. He called and said that he had watched all ten videos, which I didn't know there were already ten videos, so that was very shocking. He simply said that they would

keep an eye on it and that they would reach out to me if they had any further questions.
Q. And do you know whether or not contact was made with the University of Idaho IT security?
A. Yes. Both Dean Quinlan and I reached out, and they immediately removed all of my information from all of UI's various websites. So that's the department web page but including a lot of my research projects and other web pages that the university had.
Q. And did you have any conversations with the UI security about what other steps you could take at that point with respect to your security?
A. Yes. They suggested I lock down my social media.
Q. Did you have any social media at the time?
A. I did not have much. I just had Facebook, which was mostly pictures of my children, and then a LinkedIn.
Q. And what does it mean, if you know, to lock down your Facebook?
A. So they helped me walk through how to move my privacy settings so that only my friends could see my posts on Facebook.
Q. Did you do anything else or talk to anyone else that night, November 24, 2022?
A. Yes. After we had dinner and we got the kids to bed, I reached out to a friend who's a lawyer with the ACLU and asked

if she would watch the videos and give me her opinion.
Q. And after you talked to her, did she suggest that you take any other action?
A. She suggested that I do not go on social media and try to combat it by just posting my own TikToks. She suggested I reach out for legal advice, and she suggested you, Wendy Olson.
Q. Did you talk to anyone other than your friend the lawyer from the ACLU that night?
A. Yes. I called my good friend Chris.
Q. Your friend Chris in Portland?
A. Chris in Portland.
Q. And did you have a conversation with him about what had happened?
A. Yes. So I filled him in on what had happened. He's much more tech savvy than I was. He sounded extremely upset, and he said that he would help start monitoring stuff online for us.
Q. Do you recall approximately what time it is that you reached out to Mr. Hanson?
A. I think it was pretty late, like 10 p.m.
Q. Professor Scofield, were you able to sleep that night?
A. No, I was not.
Q. Why not?
A. I felt like I was having a panic attack.

Q. How did that feel?
A. Racing heart, sweating, blood rushing. I couldn't breathe. Yeah, I just felt like my heart was going to explode.
Q. What did you do?
A. I went -- I went and laid in my son's bed because his bedroom is the closest to an entrance to our house. And I was so afraid for him, so I just sat there at the end of his bed all night and watched him.
Q. Professor Scofield, what happened the next day, the day after Thanksgiving?
A. My in-laws were staying for another day, so we -- I just got up with everybody, tried to be a good hostess and daughter-in-law and mom, and we watched the Boise State game in the morning. And then in the afternoon, you know, I made sure the kids looked nice and we went and had family portraits taken.
Q. Professor Scofield, when did your in-laws leave to return to Emmett?
A. They left early the next morning, on Saturday.
Q. Had you told your in-laws, meaning your mother-in-law and your father-in-law, about the video in Exhibit 40 when they left Moscow for Emmett the morning of November 26?
A. No, we had not.
Q. Why not?

A. We wanted them to enjoy the weekend and to have those memories and to not scare them, and we were very hopeful that we could stop it.
Q. What did you do then that Saturday after your in-laws left to drive back to Emmett?
A. As soon as everybody left, John and I sat down, talked about everything, sort of reviewed the number of videos, and we decided some very radical security changes needed to happen.
Q. Professor Scofield, what security did you have at the time?
A. Barely any. We had grown up in Emmett. We lived in Moscow. These were really safe places, so we barely locked our doors.
Q. Did that change?
A. It did.
Q. How?
A. We immediately started locking the doors. I locked them day and night, anytime we were in the house, I mean, just all the time. And then we also -- John looked into getting a security system for our entire property.
Q. Was it hard for you to make those changes?
A. It was. I mean, I think John and I still had a small town perception of the world, and it was hard for us. But it was even harder for our kids, who were very young at the time.

And we were doing all of a sudden all of these not normal things, and so we had to explain them away, you know, talking about the security system like, "Oh, we're going to watch the foxes," and things like that and just trying to make sure everything seemed as stable and normal for them as possible.
Q. What happened next with respect to the TikTok videos?
A. There were just so many of them by that afternoon, and they were being watched hundreds of thousands of times. It felt like the hope that we had to contain it quickly was very rapidly slipping away.
Q. Were you communicating on that day with your husband, John, and your friend Chris?
A. Yes. They were trying to figure out who this person was and why she was targeting me.
Q. Did you learn anything more about her?
A. All we learned is that she promoted herself as an online sleuth. That was really all we knew.
Q. And in that small amount of additional information, could you tell if this was someone you knew?
A. We knew that she was not someone we knew, and sort of her basic information was very, very clear she was not in Moscow.
Q. Did you tell your parents?
A. Yes. After we did our risk assessment that day, we decided we couldn't really keep it from our families anymore. So I reached out to my parents and told them and to my

siblings. And then when Tom and LeAnn got home later, we called and let them know as well.
Q. Who are Tom and LeAnn?
A. My in-laws.
Q. Why didn't you tell your parents right away?
A. I think when you're in the middle ages, you try really hard to protect your parents as much as your kids, and I just didn't want them to be afraid. They were already afraid that we were in Moscow and that this horrific thing had just happened. We didn't want to add to that.
Q. Other than telling your parents and John's parents and your brothers, did there come a time when you told other family members?
A. We didn't reach out to any other immediate family right away. It was much -- well, not much later. It was a few more days until we told many other people. But we did tell our neighbors.
Q. You told your neighbors that weekend?
A. Yes, just to let them know what was going on in case they saw anything suspicious that they could let us know. In the neighborhood we live in, there were no fences, so we just wanted them to keep an eye on the kids and just look out for each other.
Q. How were you feeling about your security at the time?
A. Just very vulnerable and exposed.

Q. Why?
A. Already the speculation was just growing and growing and people's concerns about the fact that there were no suspects or even no leads, and all of a sudden my name was being shouted into a world where four young people had just been killed and there was a person who had done it still possibly in our community. It just felt like any security blanket I had ever had had been ripped off.
Q. Did you talk to anyone else in that time, that weekend after Thanksgiving?
A. I talked to you, Wendy Olson.
Q. And did you make any decisions about what to do after your conversation with me?
A. I decided we needed to send a cease and desist letter before my hysterectomy that next week.
Q. Why did you feel like you needed to send a cease and desist letter before your upcoming hysterectomy?
A. I was just trying to get everyone stable and protected, and I felt that maybe if we sent a letter, this person would realize that I was a human who had a family. And it seemed to be a respectful and responsible way to approach it.
Q. In addition to deciding to send the cease and desist letter in those days leading up to your scheduled hysterectomy, what other steps did you take regarding managing your life around the TikToks online?

A. I was really focused on getting the household ready for my hysterectomy and major surgery. I was really trying to not spiral and watch all the videos and read all the comments, and so I was trying to practice avoidance and just trying to act normal in front of the kids. They already knew about the murders, and we didn't want to scare them even more.
Q. Did you have communications with people at the university regarding what was going on and particularly in light of your upcoming hysterectomy and the TikToks?
A. Yes. As soon as Monday rolled around, we were sort of in constant contact, regular check-ins with my dean to manage the situation on campus. And then we also reached out to our kids' schools. I talked to their teachers and principals and also counselors to make sure that there were increased security protocols in place for them.
Q. And what did those increased security protocols consist of?
A. We had a pretty long list of approved pickups previously, and we narrowed those down to just myself, my husband, or my mom. And we asked that they just monitor the kids very closely outside. A lot of the playgrounds in Moscow don't have fences, and to let us know if they saw anything suspicious. And then also with regards to their teachers and counselors, letting us know if they were having any increased mental health issues or concerns or anxiety.

Q. Did you continue to teach your classes?
A. I did, but I moved the rest of the semester online.
Q. Why did you do that?
A. Campus just no longer felt safe. A lot of people were being accused, and some of the people were talking about arming themselves publicly. It felt just like everything was teetering on the edge, and I think especially as an American historian, I just know that it only takes one person to believe someone and take justice into their own hands, and I just didn't feel like I could be there safely anymore.
Q. Professor Scofield, did your parents travel to Moscow to provide help when you had your surgery?
A. Yes. So they were going to come up a couple days later, but after they learned about the false accusations, they decided to come up earlier. They came up on Tuesday the 29th just to help me and also to keep an eye on the kids.
Q. Was there anything different about their visit when they arrived that time?
A. Yes. This time they brought a legally owned, properly secured firearm with them.
Q. And were you aware that they were doing that?
A. Yes. We had talked about it before. It wasn't their standard practice, but we agreed that was -- with safety procedures, that it would make us all feel better.
Q. And, Professor Scofield, you mentioned that you decided to

send a cease and desist letter. Do you recall the date of the first cease and desist letter?
A. That was sent on November 28.
Q. Of 2022?
A. 2022.
Q. And how do you know the first cease and desist was sent on that date?
A. Because I reviewed it before it was sent.
Q. I'm going to direct your attention either to the screen in front of you or I think you have a book in front of you or a binder. You can go to tab 19, and I'll have Ms. Bibb bring up Exhibit 19. Professor Scofield, do you recognize Exhibit 19?
A. Yes. This is a copy of the first cease and desist letter that we sent to Ms. Guillard.
Q. And how do you recognize Exhibit 19 as the cease and desist letter, the first one sent to Ms. Guillard?
A. Because I reviewed it before we sent it.
Q. And did you authorize it to be sent?
A. I did.
Q. And is Exhibit Number 19 a true and correct copy of that first cease and desist letter?
A. It is.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 19.
THE COURT: Ms. Guillard, any objection?

MS. GUILLARD: No objection.
THE COURT: Exhibit 19 will be admitted.
(Plaintiff's Exhibit 19 received.)
MS. OLSON: And may we publish it to the jury, Your Honor?
THE COURT: You may.
Q. (BY MS. OLSON) Professor Scofield, why did you authorize this letter to be sent?
A. We just wanted her to stop.
Q. What was your purpose?
A. To just illustrate that I was a person that was also seeing these and they were doing damage.
Q. Professor Scofield, do you know why this -- well, I'll direct your attention, I guess, to the very top. Do you see where it says "via email only"?
A. Yes, I see that.
Q. Do you know why this cease and desist letter was sent by email?
A. Because her physical address was not known at the time.
Q. What action did you request that Ms. Guillard take through this cease and desist letter?
A. We asked that she remove all previous content, that she stop making content, and that she apologize.
Q. To your knowledge, did Ms. Guillard do that?
A. She did not.

Q. How did you learn that she didn't stop making those?
A. On Wednesday, November 30, the day before my surgery, all of the videos hit Emmett, our hometown.
Q. How did you learn that the videos hit Emmett, your hometown?
A. My mom's and John's and my cell phones all started getting many phone calls and messages from family and friends in the area.
Q. And are you aware of any impact on your family members in Emmett when the videos hit there?
A. Yes. So we have a pretty big combined family, and a lot of them work for the school district, so we knew it was making its way through the schools. And so my sister-in-law had to go take my niece and nephew out of school that day so they wouldn't learn about it from their phones or from their friends.
Q. What impact did that have on you, Professor Scofield?
A. It was pretty devastating. I think we're very much proud of where we come from and have worked really hard to be someone that my hometown's proud of. And all of a sudden everyone we knew was just seeing these horrific statements saying that I was abusing my students and ordering murders. And I -- I just wanted to disappear.
Q. Professor Scofield, did you have your scheduled hysterectomy on December 1?

A. I did.
Q. Did you have any thoughts going into that knowing that these videos were out there?
A. I remember very distinctly John driving me to the hospital and I just remember thinking if something goes wrong and I don't wake up, these are just what's out there. This is just what's being said, and I will have never gotten the chance to stop them.
Q. Professor Scofield, after your surgery did the TikTok videos have any impact on your ability to recover at home?
A. Yes. I mean, in early December it almost became a full-time job. We just had sort of waves of inquiries coming in from friends and family. I was doing routine check-ins with my university, with my kids' school, with our parents. I was getting phone calls from, you know, friends all the way in the UK who were having this just crop up in their feeds.
And then I also started to get really strange calls and messages, sometimes to my personal phone. Sometimes they were just random people, you know, asking if this was true. Other times it was journalists. And it just felt like there was no -- there was no time in which I just healed.
Q. Professor Scofield, did you have any professional projects at the time aside from teaching the class that we've discussed?
A. Yes. So I was also working on a coauthored book. I was

revising a coauthored play. We were hiring a director for that and working with a museum. I was still working on my oral history project. I had numerous articles and chapters in edited collections out for review. So just a lot of things up in the air.

Q. Did you have to do anything at the time to let the others that you were working with on those projects know about the TikToks that were being posted online falsely stating that you had orchestrated the murders and falsely stating that you had had an affair with a student?

A. Yes. I had to reach out individually to my publisher, to my coauthor, to every collaborator on every project and let them know of these horrific allegations that I had engaged in sexual misconduct or in orchestrating the murders of our students.

Q. Why did you think you had to reach out to those people and let them know?

A. Because at the time if you typed "Rebecca Scofield" into Google, it autopopulated "Moscow murders." And it was very obvious that people -- throughout our campus and community and nationally, people were just finding out about it on their TikTok feeds.

Q. And what concerns did you have at that time for your professional work?

A. In particular the -- it put at risk anything that was

public facing, anything that had my name on it. I had to find out whether collaborators were still willing to work with me on it. I also knew that this obliterated any hope I had of having an online presence, so I wouldn't be able to promote any of this work that I'd been working on for years with collaborators.

Q. Professor Scofield, at this time did you know anything more? Had you learned anything more about who Ashley Guillard was?

A. We hadn't really learned anything more, only that her selection of me seemed extremely arbitrary.

Q. Professor Scofield, in December, after your surgery, did you take any other action?

A. We decided to send a second cease and desist letter.

Q. Why did you decide to do that?

A. Because we were still hoping she would stop.

Q. I'll next direct your attention to Exhibit 20, and you can either look at the screen in front of you or in the book at tab 20. Do you recognize Exhibit 20?

A. I do.

Q. And what do you recognize it, Exhibit 20, to be?

A. It's a copy of the second cease and desist letter that we sent.

Q. And how do you recognize it as a copy of the second cease and desist letter?

A. Because I reviewed it.
Q. And did you authorize this cease and desist letter to be sent?
A. I did.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 20.
THE COURT: Any objection, Ms. Guillard?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 20 will be admitted.
(Plaintiff's Exhibit 20 received.)
THE COURT: Do you wish to publish?
MS. OLSON: Yes, please, Your Honor.
THE COURT: You may.
MS. OLSON: And, Ms. Bibb, if you would again sort of zoom in on that top left portion.
Q. (BY MS. OLSON) The second cease and desist letter, what is the date on that?
A. December 8, 2022.
Q. And why did you authorize this cease and desist letter to be sent?
A. Because she hadn't stopped after the first one.
Q. And was your purpose the same in sending this one?
A. Yes.
Q. What action did you request Ms. Guillard take?

A. That she remove all existing content, that she stop making new content, and that she apologize.
Q. To your knowledge, did she do that?
A. No, she did not.
Q. And this letter, Exhibit Number 20, was sent also to a street address in addition to the email; is that right?
A. That's correct.
Q. Professor Scofield, do you know if Ms. Guillard received the second cease and desist letter?
A. Yes, she did receive it.
Q. How do you know that?
A. Because she made a TikTok video where she put the letter on a roll of toilet paper.
Q. Did the TikTok videos continue after December 8, 2022?
A. Yes, they did.
Q. And was there anything new and concerning about them?
A. Yes. They became more elaborate and detailed. It was like listening to a plot of a movie or a book but somehow my name was the -- one of the main characters. It was a moment when I felt like I had lost ownership of my face and my name, that they were no longer stitched to my body. It became increasingly obvious that she was seeking out information about my family, including my husband's name, and it was utterly terrifying.
Q. Did you have concerns at this time about your physical

safety?
A. Yes, we did -- I did.
Q. Why was that?
A. By this time there still wasn't any news in the case, and the entire town was pretty on edge. People again were just desperate for answers and looking for anyone to provide those.
Q. How did those concerns and that fear affect your behavior?
A. I essentially stopped sleeping at all, and I just wandered the hallway outside my kids' rooms, just like back and forth, because I think one of my greatest -- maybe the greatest fear I had was that this person was still out there and that they would take an interest in my family. And I didn't want my kids to die first, so I just wanted to be there, present.
Q. At the time, Professor Scofield, were you generally aware of what was going on with the investigation of the murders?
A. No. They weren't making anything public at the time, so it just very much felt like it was spiraling in those weeks in Moscow.
Q. And did that have any impact on you?
A. This was a huge rupture in our town. It was this horrific event that had happened, and it was the worst thing in living memory. And it felt like a lot of people were finding ways to connect and to grieve and to process this tragedy, and when it had first occurred that felt like something I could be a part of. And then after the false allegations, it felt like all of

a sudden I was pulled into that orbit and I needed to internalize all that fear that was part of that crime and that I could no longer be a part of the wider community.

Q. Professor Scofield, after you knew Ms. Guillard had received the second cease and desist letter but didn't stop posting the TikToks with the false accusations, what did you do?

A. John and I talked about it, and we saw this as a direct threat to our children, to the career I had built, and we decided someone had to take a public stand against this type of false statements. So we decided to file the lawsuit.

Q. And, Professor Scofield, did you ever talk to any officer or to people at the Moscow Police Department other than that first night that you saw the TikTok?

A. I called back a couple of times and just updated their file and said that there were more and more allegations and more and more videos and that they were, you know, being watched and circulated. But I never talked to another police officer. They never reached out.

Q. And so when you would call and update the file, what were you actually doing?

A. I was just talking to the person they had in charge of the nonemergency line at the time. So I would just state to her, you know, "I talked to an officer, you know, a while back. These are the allegations being made. Here's the information

on how to find them on TikTok," and just giving a sort of basic update to the police department.

Q. Professor Scofield, did you come to learn that the Moscow Police Department issued a press release regarding the statements that were being made about you and whether you were likely involved in the murders?

A. Yes. That happened, I believe, on December 27.

Q. I'm going to direct your attention to Exhibit Number 21. And do you recognize Exhibit 21?

A. Yes. This is the press release that the Moscow Police Department distributed.

Q. Dated December 27, 2022?

A. Correct.

MS. OLSON: Your Honor, at this time I'd offer Exhibit 21.

THE COURT: Ms. Guillard, any objection?

MS. GUILLARD: No objection.

THE COURT: Plaintiff's Exhibit Number 21 will be admitted and published if you wish.

(Plaintiff's Exhibit 21 received.)

MS. OLSON: Yes, please, Your Honor.

Q. (BY MS. OLSON) And, Professor Scofield, I'll have Ms. Bibb zoom in on the top of it and then the first bullet point. And, Professor Scofield, will you please read aloud that first bullet point.

A. "At this time in the investigation, detectives do not believe that the female associate professor and chair of the history department at the University of Idaho suing a TikTok user for defamation is involved in this crime. The Moscow Police Department will not provide a statement about the ongoing civil process."
Q. And, Professor Scofield, to your knowledge, did the TikToks continue after this press release was issued?
A. Yes, they did.
Q. Professor Scofield, what was the impact on you as you were heading into the holidays?
A. I think, like most parents, I wanted to cocoon my kids and have all the sugar and the *Muppets Christmas Carol* and give them a magical Christmas, but I was constantly being pulled away, stepping out of the room to answer phone calls about the false accusations, whether from journalists, university colleagues, friends, family, random people who found my number online.
Q. Professor Scofield, did you travel at all after the -- over the Christmas holidays?
A. Yes. So on -- we spent Christmas Day at home, and then the next day we drove down to Emmett to spend time with our extended families.
Q. What was that like for you?
A. We were -- we were really excited to go because Moscow

felt so hard and everything felt so hard. But Emmett is a really, really small town too, so everywhere we went, you know, the Dollar Store or Albertsons, to dinner, people would ask. It was just omnipresent. We couldn't escape it. And this had been going on for a month at the time, and it was like a stone on my chest. It wasn't even just crushing me; it was dissolving me. I was unravelling underneath the weight of it.
Q. Professor Scofield, with how you were feeling while you were there in Emmett and what had gone on before, did you consider options about what to do with respect to the spring semester at the University of Idaho?
A. Yes. John and I talked about the kids and I moving to Emmett for a while.
Q. Did you decide to do that?
A. We didn't. It was very hard, but we just wanted the kids to maintain normalcy at their own school.
Q. What impact, if any, did all of that have or what options were you considering regarding your upcoming teaching responsibilities?
A. So I was scheduled to teach in the spring our Intro to U.S. History course, 1877 to the Present, and that's a really large, 100-level course. So it has about anywhere from 70 to 100 students in it. And as we were going through that last week of December, I just didn't know that I could face

students and colleagues and be in front of that many people. So I reached out to my dean, and we talked about whether it was an option to move my course online if necessary. He was supportive and said if that was something like we felt we had to do for our security, that he would support that.

Q. Professor Scofield, did there come a time that you learned that someone had been taken into custody with respect to the murders of the four students?

A. Yes, on December 30.

Q. How do you recall that it was December 30 that you learned that information?

A. Because I was driving my father to the emergency room with RSV and immediately dropping him off and then driving my mom over for a significant doctor's appointment in the Nampa-Caldwell area. So I was actively driving at the time that we got the news.

Q. What was your reaction?

A. Elation, relief for the families, for our community. I thought that it was over.

Q. What do you mean by "I thought it was over"?

A. I thought the accusations towards me would stop.

Q. Did they stop?

A. They did not.

Q. What happened?

A. As we went into January, we went back up to Moscow, and I

resumed teaching in person. But Ms. Guillard just kept making statements. Stories changed, but I was still always named as an abuser, as a murderer. And even though Moscow felt so much better, it just kept getting worse in a lot of ways for us, for me.
Q. What impact did it have on you that -- these TikToks or other video content still identifying you as someone involved in the murders, what impact did that have on you?
A. It just felt mired, like I was stuck in mud, not moving forward. And I started to have conversations with other moms who had their children going through similar things or through other people who had had similar experiences. And I just -- I just cried with a lot of people about this overwhelming sense of hopelessness and inability to make the -- these things stop.
Q. At that point did you attempt to get any medical or mental health treatment?
A. Yes. Dean Quinlan and I had talked about mental health options with our insurance. At the end of December and in January, once we were back, I started reaching out. But Moscow is a small place, so after many rounds of attempts, I was finally able to get a therapy appointment for May 2023.
Q. Professor Scofield, describe your physical condition in January of 2023.
A. My physical health had started on a downward spiral. I

started having debilitating headaches and shooting pains down my left leg, hip problems, shoulder problems. I developed new tingling in my hands and feet. And I just felt like my body was giving out.
Q. Were you continuing to have trouble with sleep?
A. I essentially didn't sleep unless I was taking over-the-counter sleep medication. And a lot of those, of course, come with side effects, like grogginess. So I was kind of in this cycle of either being exhausted or being groggy, which then made me less optimal of a mom. I was quite irritable and sad and would cry, which obviously was very scary for my kids.
Q. Professor Scofield, you're aware that Bryan Kohberger not only has pleaded guilty but has been sentenced; correct?
A. Correct.
Q. To your knowledge, has Ms. Guillard ever stopped referring to you as the person who orchestrated the murders?
A. To my knowledge, she has not.
Q. Professor Scofield, you have talked a little bit about the impact on your ability to teach and your concern with having to discuss the TikToks with your publisher and coauthors and others who were involved in projects with you. Did you also have concerns about whether those TikToks might affect the University of Idaho employing you?
A. Yes, I did.

Q. What concerns did you have?
A. The allegations, these false statements about sexual misconduct and murder, were horrible. And I was concerned that once there's a perception of misconduct by a faculty member, that impacts our wider reputation. And by our bylaws in the Department of History, a faculty member cannot be promoted without what's called a national or international reputation in their field of study. And I just knew that rumor has as much power as reality and that if I lost the trust of my colleagues or students, then my career was in serious jeopardy.
Q. Professor Scofield, were there policies at the University of Idaho that prohibited the conduct that Ms. Guillard had accused you of in the videos?
A. Absolutely, yes.
Q. Professor Scofield, I'm going to direct your attention to Exhibit 25, which will come up on the screen, or you can look at it in the book in front of you. Professor Scofield, do you recognize Exhibit 25?
A. Yes. This is policy number 3205 from the Faculty-Staff Handbook for the University of Idaho that covers consensual romantic or sexual relationships.
Q. And how do you recognize Exhibit 25 as policy 3205 of the University of Idaho's Faculty-Staff Handbook concerning consensual romantic or sexual relationships?

A. Because we review it annually.
Q. And you've seen this version before?
A. I have.
Q. Do you recall when you first saw it?
A. It would have been at onboarding new employee training.
Q. Back in 2016?
A. Yeah -- yes.
Q. And was this policy in place in November of 2022?
A. Yes, it was.
Q. And how do you know that?
A. Because it was last updated in 2012.
Q. And did you also review this that fall of 2022?
A. Yes. We have annual training where we review the Faculty-Staff Handbook.
Q. And you had done that prior to November of 2022?
A. Yes. That usually happens in September or October.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 25.
THE COURT: Ms. Guillard, any objection to Plaintiff's Exhibit Number 25?
MS. GUILLARD: No objection.
THE COURT: That'll be admitted and published if you wish.
(Plaintiff's Exhibit 25 received.)
MS. OLSON: Yes, please, Your Honor.

Q. (BY MS. OLSON) And, Professor Scofield, with respect to Exhibit 25, I'm going to direct your attention to the third page of the exhibit and under paragraph C. And does paragraph C set out what the penalty might be for not complying with the policy on consensual romantic or sexual relationships?
A. Yes. It says that it can constitute adequate cause for discipline up to and including dismissal.
Q. And would a professor having a romantic or sexual relationship with a student violate this policy?
A. Yes, it would.
Q. I'm next going to direct your attention to Exhibit Number 26. And, Professor Scofield, do you see Exhibit 26 now on the screen in front of you?
A. I do.
Q. And do you recognize Exhibit 26?
A. Yes. It's a copy of policy 3220, which covers sexual harassment, from the Faculty-Staff Handbook at the University of Idaho.
Q. And how do you recognize Exhibit 26 as policy 3220 of the University of Idaho's Faculty-Staff Handbook concerning sexual harassment?
A. Because I reviewed it.
Q. You've seen it before?
A. I have.
Q. When did you first see Exhibit 26?

A. It would have been at employee onboarding in 2016.
Q. And did you similarly receive training on this policy each fall?
A. Yes.
Q. And was this policy as set forth in Exhibit 26 in place in November of 2022?
A. Yes, it was.
Q. How do you know that?
A. Because this one was last updated in 2019.
Q. And do you also remember it from your training?
A. I do.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 26.
THE COURT: Ms. Guillard, any objection?
MS. GUILLARD: No objection.
THE COURT: Exhibit 26 will be admitted and published if you wish.
(Plaintiff's Exhibit 26 received.)
MS. OLSON: Yes, please, Your Honor.
Q. (BY MS. OLSON) And, Professor Scofield, with respect to Exhibit 26, I'm going to first direct your attention to paragraph C-2, which begins at the bottom of page 2. Do you see that?
A. I do.
Q. And would you please read aloud paragraph C-2.

A. "Because damage could result to the career and reputation of any person who is accused of sexual harassment falsely or not in good faith, all investigations of and hearings on such matters will be conducted insofar as possible to protect the privacy of and minimize suspicion toward the accused as well as the complainant until the matter is impartially resolved. Only those persons who are responsible for investigating or enforcing civil rights matters will have access to confidential communications."
Q. And then paragraph or section D refers to the resolutions of complaints; is that right?
A. Correct.
Q. And in paragraph D-2, what sanction could be placed on a faculty member if they violate this policy on sexual harassment?
A. Up to dismissal.
Q. And, Professor Scofield, would having a sexual relationship with a student potentially violate the sexual harassment policy?
A. Yes, it would.
Q. Professor Scofield, were there other impacts on your career?
A. This has touched all aspects of my career.
Q. Were you concerned about whether or not you would be promoted?

A. Absolutely.
Q. Why?
A. As the policy just said, all you need is the suspicion of misconduct. Whether there's any basis for that accusation, that rumor can implant itself in people's perception of you. If students think there's a reason you needed to be investigated, they are not going to trust you. It becomes almost impossible to do your job let alone do your job well.
Q. And that would be the case even if a student heard you were being investigated?
A. Absolutely. If they think there's a reason for you to be investigated, then it already casts suspicion on you.
Q. Professor Scofield, did you weigh the worth of your reputation as you were going through this?
A. Yes, almost daily. But each time John and I talked about it or I thought about it, my reputation was everything. It was everything we had worked for since high school, since -- every scholarship dollar, every fellowship dollar, every penny of my current salary and future salary and everything that I had poured into teaching, work trips, and prep. It was my entire career.
Q. Professor Scofield, how would you describe the reputation that you had built to that point?
A. It was excellent. I had worked for 15 years by that point with not only my colleagues in grad school and at UI but with

granting agencies and publishers and collaborators and community members with the communities I worked with. I had worked very hard.
Q. How was that reputation you'd worked hard to build at risk from Ms. Guillard's TikTok false statements?
A. In many ways that reputation was harmed irrevocably. I've had many conversations with colleagues who will tell me that they had a colleague or a family member or someone reach out to them and ask about me, ask if there was any truth to the allegations, ask if maybe I knew the person who was accusing me or had done something to make myself a target. That simply has stitched itself to my name.
Q. Professor Scofield, over what time period did you receive these inquiries?
A. The last one happened in October this year -- I'm sorry -- 2025, this fall -- last fall.
Q. Professor Scofield, has this affected how you do your job?
A. Yes, in all ways.
Q. How has it affected how you do your job?
A. It has made me less than I could have been. All of the mental exhaustion that has come into managing these horrific allegations took creative energy away from my research, from my teaching prep, from managing my department. It simply changed who I was as an academic.
Q. Professor Scofield, are you worried about the impact on

the research that you're doing or that you were doing?
A. Yes. A lot of the research I do is -- could already make me or my family a target, and every time I went to publish something over the last three years, whether it was an op-ed or a book or anything, I had to wonder, was this just making my family less safe? Was this just drawing more notice? Was I recklessly endangering my children by publishing?
Q. Has it had an ability -- excuse me. Has it had an impact on your ability to promote your work?
A. Yes. I essentially don't exist online anymore. I didn't have a huge presence previously, but even my personal website that my husband built me does not have my contact information on it. At this point when I'm asked in interviews how people can find me online, I simply say they can't.
This is extremely important because in academia, when you go to publish a book, most academic scholars aren't going to get large book deals with, like, $50,000 advances and large marketing packages. Instead, the press really depends on authors to promote our own work through our own online networks but then also going to conferences or doing in-person talks, working with colleagues on course adoptions, those sorts of things.
So I've had to have multiple conversations with presses to simply say that I can't do those things that other authors would do and to try to find ways to still be useful.

But I'm simply not able to promote my work in the same way that I would have been previously.
Q. Has it affected your relationship with potential collaborators and publishers?
A. Yes. I mean, every -- I mean, for the longest time if you typed my name into Google, it would associate me with murder. And so I had to let anyone who would be a potential collaborator know that they would just have to field more questions about me, about my work, that I wouldn't be as publicly visible as someone else, and that they would have to pick up some of that additional labor. So it has made it more difficult to seek out those collaborations.
Q. Has it affected your decision about what other public things you would do related to your work?
A. Yes. In 2023, which is when my coauthored book came out, I essentially stopped doing all in-person presentations. Even the very few that I did do, journalists would show up to those presentations, which just made it feel like I could not do my job. So I have tried to work on anxiety around safety, but it has been very hard to travel and to promote my work in person.
MS. OLSON: Your Honor, I'm moving into a slightly different area. We've been going about an hour and 45 minutes. Is this a good time to take a break?
THE COURT: It is. You read my mind. I was just going to ask if you had a natural breaking point.

What we'll do, members of the jury, is we'll take a ten-minute recess to stretch your legs, use the restroom, get a snack. And then we'll come back here, let's say, a little after 2:10 -- or 3:10.

With that, the Court will be in brief recess.

(At 2:57 p.m., a recess was taken until 3:11 p.m.)

THE COURT: Mr. Gordon, if you will please bring in the jury.

(The jury entered the courtroom at 3:11 p.m.)

THE COURT: Please be seated.

Ms. Olson, are you ready to resume your direct examination?

MS. OLSON: I am. Thank you, Your Honor.

THE COURT: You may inquire.

MS. OLSON: Thank you.

Q. (BY MS. OLSON) Professor Scofield, before the break we were talking some about the impact of the TikTok videos on various aspects of your professional career. Did those TikTok videos have an impact on your teaching?

A. Yes, they did.

Q. How did they have an impact on your teaching?

A. They made me very hesitant to deliver course content in person. And I still have to every semester think very carefully about what I'm teaching, how I'm teaching it, and what modality. I think also it really -- students are going

to Google their professors, so I have to talk about this with each of my classes every semester, and that just becomes part of the story of my career now. So it's really shaped the classroom for me.

Q. Has it affected how you deal with students?

A. Yes. When I first became chair particularly, I was very open and engaged and excited to work with students, and I feel like this has made me feel hyperscrutinized all the time. I'm constantly second-guessing myself for thinking about appearances, how anything could be perceived.

So I feel like it has built a wall between me and students, which it's very hard to be not only an effective educator but an effective chair if I can't deal with students in an open and honest way. And I feel like that's also been unfair to students, because these allegations weren't made by students, but they were still about sexual misconduct about students. And it has just made me hypervigilant about my interactions.

Q. Has it had an impact on your relationships with your faculty colleagues?

A. Yes. When it first happened, I would say within the first six months, a lot of my colleagues were worried that I simply wouldn't be able to continue in my position as chair just because of the additional mental strain and emotional strain. It also was mentioned multiple times that faculty were worried

that this would taint the entire department, not just me, but because I was in a position of leadership, that perhaps I was no longer the best person to be the face of the department.

Q. And were there times when your colleagues or other faculty members expressed those concerns to you?

A. Yes, many times, directly.

Q. Professor Scofield, you've described some of the emotional impacts on you from Ms. Guillard's TikToks containing the false statements that you orchestrated the murders and that you had a relationship with one of the murdered female students. I'd like to talk to you a bit more about that. Professor Scofield -- and I think you mentioned earlier. You did seek treatment for that; is that correct?

A. That's correct.

Q. And when did that treatment begin?

A. May 2023.

Q. And I think you testified earlier that that was the earliest appointment you could get; is that right?

A. Yes. I spent about two months just trying to get an appointment, and that was the earliest one I could get.

Q. Who did you begin receiving treatment from or seeing for your emotional harm?

A. A local therapist named Rebecca Bohn.

Q. And how were you able to connect with Ms. Bohn?

A. I just went through a lot of lists of providers in the

region and did cold calls. She eventually answered one of my calls. It seemed like she was not taking new patients, but then I called again a couple months later to see if anything had opened up, and she had an opening.
Q. In addition to seeing Rebecca Bohn, have you worked with any other health care providers regarding your mental health?
A. Yes. I've seen my PCP at Gritman Medical Center very regularly since spring 2023.
Q. And by PCP, do you mean primary care provider?
A. I do.
Q. Professor Scofield, did you know Rebecca Bohn before you reached out to her?
A. I did not.
Q. Had you met her before she actually started providing therapy services to you?
A. Not to my knowledge.
Q. How long did you receive treatment from Ms. Bohn?
A. It's ongoing.
Q. And do you plan to continue seeking treatment from her?
A. I do. She is retiring, so I will have to find a new provider within the next year.
Q. What does your treatment from Ms. Bohn consist of?
A. Usually weekly or biweekly therapy sessions of about an hour.
Q. And in the course of those therapy sessions, did Ms. Bohn

ever administer to you or have you gone through anything that was a diagnostic test?
A. Yes. I've done diagnostic tests with both Ms. Bohn and also with my primary care provider as well.
Q. And with respect to the diagnostic tests that you did with Ms. Bohn, do you remember what those were about?
A. Mostly anxiety, depression, and PTSD.
Q. And to your knowledge, did Ms. Bohn ever diagnose you with any specific mental health diagnosis?
A. Yes, a PTSD diagnosis.
Q. And have you also been treated by her and others for depression?
A. Yes. I've worked really closely with my PCP on depression and anxiety.
Q. Since the time the TikToks began appearing around Thanksgiving of 2022, have you taken any medications to help you manage the mental health issues that you've described?
A. Yes. So prior to being able to connect with Ms. Bohn, I was just doing sort of blunt force over-the-counter sleep aids. Once I started seeing her and working with my PCP in tandem with her, I was able to get better sleep medication, including Ambien and Lunesta. And currently I'm on antidepressants and specific sleep medication for PTSD-related nightmares.
Q. Professor Scofield, do you have any concern about taking

those medications?
A. I do. I fought going on antidepressants for a long time. I was -- I've never been on antidepressants before, and I was really worried that I would either flatline and just have no emotions or that it would increase suicidal ideation. And I was trying really hard to be present for my kids, and I was scared that if I either had no emotions or if it increased feelings of sadness, that I just wouldn't be able to be there for them.
But it just got to the point, working with both Ms. Bohn and my primary care provider, that it became really obvious I needed to go on medications. I've tried a couple of different ones and just have dealt with all the side effects and -- and the difficulties that come with being on them as well.
Q. Professor Scofield, are there particular things that you're working on in your sessions with Ms. Bohn?
A. Yes. When I first went in, my first question was, "Can you turn back time and make this not have happened?" And that really set up our conversations around grief and denial and that I saw my life on a trajectory, and when I was 37 that trajectory seemed very straightforward and upward and the sky was the limit. And through no fault of my own, that trajectory changed, and that came with a lot of loss.
And so I've worked for three years to just come to a

level of acceptance of those changes and to deal with my life as it is instead of as it was. I've really worked through a lot of humiliation and shame of being forcibly connected with this horrific crime that four people were killed and millions of people heard my name in connection to it.

And that -- that wasn't just me experiencing that humiliation, but every person that I loved, every family, friend, every person who knew and loved me had to go through that, that embarrassment. And while we've been able to shield my kids from it now, they'll have to know someday and they'll have to be embarrassed as well.

I think we've also worked a lot on the fact that I did not suffer the most in this. Four families lost their kids. That's the exact thing we were trying to forestall with this lawsuit and the fact that I've just never been able to directly process that community pain and what it meant for our whole town and for the university and our students, because in doing so, I would have to process the pain of being made part of that horrific story.

Q. And you mentioned that you felt humiliated that your name was associated with this story. What about that was humiliating?

A. I've worked very hard to build a good career. I just studied so much for so many years. And instead of having millions of people hear or read my name in association with

the work that I take so much pride in, they were watching videos about how horrible of an abuser and a murderer I was, and I had no ability to stop those accusations from happening.
Q. Did you have any feelings of guilt?
A. Especially initially, I think it's one of the things I struggled with the most, especially talking to my husband. If our children die because of this, it'll be my fault because I had a job that had my picture on the Internet, that I put them at risk for my dream of being a professor. And I still feel like ultimately they'll bear the weight of this and that everything John and I worked for decades for will just not be enough to protect them from this.
Q. And are -- those feelings and those struggles that you've described with your mental health, are those the things you would talk to Ms. Bohn about?
A. Yes, on a very regular basis.
Q. And are those the things that you were seeking treatment from your primary care provider for?
A. Yes.
Q. Including the medications that you've described?
A. Yes.
Q. And do you have these as ongoing struggles with your mental health?
A. Yes. I definitely still struggle with hypervigilance, like checking locks and window latches and wandering the house

at night with anxiety about safety all the time and depression and anxiety about my job and certainly overwhelming feelings of hopelessness and vulnerability.
Q. And, Professor Scofield, I know you testified that Ms. Bohn is retiring or has retired, but do you plan to continue receiving mental health treatment counseling services similar to those provided by Ms. Bohn?
A. Yes, I do. I'm already working to try to find a new provider as soon as possible.
Q. Professor Scofield, you testified earlier about some of the impacts on your physical health. I'd like to talk to you a little bit more about that. Have there been physical manifestations of the emotional trauma that you've described in your testimony?
A. Yes. The -- just the strain of this exacerbated the whole slew of new symptoms that I think I began to mention earlier.
Q. What issues did you develop physically?
A. Headaches that are severe and persistent, neuropathy, tingling, nerve compression, just general body clamping down on itself and not being able to release.
Q. When did those symptoms begin?
A. They started in mid-December, after my surgery, and became really, really a sort of hindrance to everyday life by about mid-January.
Q. And what did you do to address the physical impacts from

the strain that exacerbated those issues?
A. So I took steps to get in to doctors right away in January and February. Again, it's Moscow, so it took some time. Throughout the spring and summer of 2023, I was just continually going in to doctors to try to find out what was happening, and there was not a lot of answers. I eventually sought massage therapy over the summer based on my doctor's advice, and then I was eventually able to get a referral for physical therapy.
Q. Between November of 2023, so the year after the murders, and today, were there things that you saw your primary care provider for that were associated with the symptoms you've just described and with the mental health struggles that you described earlier in your testimony?
A. Yes. I was going in on a pretty routine basis to work through all of our -- you know, all of the physical and mental issues I was having -- or I am having.
Q. Do you continue to experience any of those conditions?
A. Yes. They are ongoing daily.
Q. Finally, Professor Scofield, I'd like to talk to you about the financial impact and some of the out-of-pocket expenses that you have incurred with respect to some of the treatment that you've received to deal with the emotional trauma and the physical pain. Professor Scofield, I think you mentioned earlier you have insurance; is that right?

A. That is correct.
Q. And you had discussed insurance with Professor -- with Dean Quinlan; is that right?
A. Yes, particularly about therapy because we -- yeah, we have to find someone who'll take our insurance.
Q. And is it fair to say that for some of the expenses that you've incurred, insurance has paid a significant portion of that?
A. Yes, that's correct.
Q. All right. I'm first going to direct you to Exhibit 32, and Ms. Bibb will put it up on your screen, but it might also be easy to look at the book in front of you because it's a multipage exhibit. And if you'd go ahead and sort of page through those. And, Professor Scofield, do you recognize the documents that are within Exhibit 32?
A. Yes. These are receipts and explanation of benefits, EOBs, for physical therapy and other medical appointments related to the pain that I'm having.
Q. And are those physical therapy receipts and the receipts and explanation of benefit forms for services that you received from providers affiliated with Gritman Medical Center?
A. They are.
Q. I think you testified, but just to make sure, they relate to services you received in connection with both the pain and

the emotional harm that you felt?
A. Yes.
Q. And that's the pain and emotional harm you felt after seeing Ms. Guillard's TikToks accusing you of the murders and accusing you of having an affair with one of your students; is that right?
A. Correct.
Q. Professor Scofield, how are you able to recognize the documents within Exhibit 32 as your receipts and explanation of benefit forms related to the certain services you received to help you deal with the damage -- to deal with the physical and mental health injuries you incurred?
A. Because I reviewed and paid them.
Q. And did you obtain those to -- for us to present as an exhibit here at trial?
A. I did. I worked with Gritman Medical Center on that.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 32.
THE COURT: Ms. Guillard, any objection?
MS. GUILLARD: I'm assuming that I don't have to authenticate this document because she can authenticate it herself? If so, I would object to authenticity and relevance.
THE COURT: Ms. Olson?
MS. OLSON: Yeah. Your Honor, with respect to authenticity, she can recognize these as invoices and EOBs she

received and paid, and they're relevant to show her economic damages.

THE COURT: Ms. Guillard, what is your specific objection?

MS. GUILLARD: I can address it during cross-examination if that's better, but my specific objection is it's not relevant to the TikTok videos.

THE COURT: Well, I think the exhibit is being offered as expenditure of medical expenses. You can certainly cross-examine as to what those expenses were related to during your cross-examination of Ms. Scofield.

So the objection will be overruled. Plaintiff's Exhibit Number 32 will be admitted.

(Plaintiff's Exhibit 32 received.)

THE COURT: Do you wish to publish it?

MS. OLSON: Yes, Your Honor.

THE COURT: You may.

Q. (BY MS. OLSON) And we're going to have on the screen the first page of Exhibit 32. I believe there are 23 pages within Exhibit 32. Is that correct, Professor Scofield?

A. I believe that's correct.

Q. And if you need to, you can sort of page through, and the document has numbers in the very bottom center.

A. Yes. 23 pages is correct.

Q. Yeah. And do you recall what time period are covered by

the invoices and explanation of benefit forms within Exhibit 32?
A. Yes. These ones cover January 2024 through August 2025.
Q. And most of them are for physical therapy; correct?
A. That's correct.
Q. And what was the purpose of the physical therapy that you received?
A. To work on nerve compression and relieve neuropathy and pudendal compression.
Q. And was that symptoms you began experiencing after viewing the TikToks that Ms. Guillard had posted and after hearing people's response to them?
A. Yes.
Q. Were all of the medical visits within Exhibit 32 related to the physical impact of the strain you felt based on Ms. Guillard's false statements?
A. Yes.
Q. I'm now going to direct you to a few pages that are not related to physical therapy visits, so if you could next go to page 9. Page 9 is an explanation of benefit form; correct?
A. Correct.
Q. And do the ones that are explanation of benefits forms, based on your recollection, reflect amounts that you were charged and the amounts that you paid in connection with these visits?

A. Yes.
Q. And what is the visit that is reflected on page 9 of Exhibit 32?
A. This is a lab visit, so we were running labs to try to figure out why I was having these symptoms.
Q. And with respect to the location of this, it says Gritman Medical Center Lab. That's in Moscow, I take it?
A. Yes. Gritman Medical Center is our local hospital that has clinics and labs in the area.
Q. And then just to sort of orient us to how this exhibit shows what the total charges were and how much you paid out of pocket, can you see where it says what the total charges are?
A. Yes.
Q. How much are they?
A. $309.
Q. And then below that there's a section with insurance payments and adjustments; is that right?
A. Correct.
Q. And what was the amount that you paid for this particular visit?
A. My patient payment was $22.
Q. And 20 cents?
A. And 20 cents.
Q. All right. If I could next direct your attention to page 14. And what medical care is reflected on page 14 of

Exhibit 32?
A. This is also another visit, again doing other lab tests to try to figure out what is happening.
Q. And this one -- this one on page 14 is actually dated July the 11th of 2024; is that correct?
A. Correct.
Q. And what is the total amount that you paid with respect to the visit on page 14?
A. $45.26.
Q. Let's next look at page 15. And what care is reflected in the office visit on page 15 of Exhibit 32?
A. This is when I had another surge of pain and went to our quick care to discuss this with a provider.
Q. And what is the date of this visit?
A. 7/15/2024.
Q. And what is the amount that you paid?
A. $20.
Q. Was that your typical copay under the insurance you had at that time?
A. Yes.
Q. If I could next direct your attention to page 20 -- excuse me -- page 18.
MS. OLSON: Sorry, Ms. Bibb.
Q. (BY MS. OLSON) And, Professor Scofield, are you on page 18 of the exhibit?

A. I am.
Q. And what kind of medical visit is reflected on page 18 of Exhibit 32?
A. This is an office visit with my PCP to discuss medication checks.
Q. And what is the date of that visit?
A. 10/24/24.
Q. And what was the amount that you paid?
A. $20.
Q. If we could next look at page 20 of Exhibit 32. And, Professor Scofield, what kind of medical care is reflected on page 20?
A. This again was an office visit with my PCP for another med check.
Q. And by "med check," you mean medication check?
A. I do.
Q. What is the date of this visit?
A. 12/10/24. December 10, 2024.
Q. And does it also reflect that same $20 copay?
A. It does.
Q. If we could next look at page 21 of Exhibit 32. And what is the date of the visit reflected on page 21 of Exhibit 32?
A. This is an office visit to my PCP. This one was for both medication and to discuss ongoing physical therapy.
Q. What is the date of this visit?

A. 3 -- March 7, 2025.
Q. And does it also reflect that same $20 copay?
A. It does.
Q. Was $20 the typical copay you paid when you were seeing providers with Gritman Medical Center?
A. Yes.
Q. Has that changed at all?
A. We had to change insurance, and that has gone up.
Q. If I could next direct your attention to page 23 of Exhibit 32. And on page 23 of Exhibit 32, what is reflected there?
A. Another outpatient office visit with my PCP.
Q. And what was the purpose of that visit?
A. Again, medication checks and check in on physical therapy progress.
Q. And do you recall -- it doesn't reflect it here, but do you recall the purpose of that visit from your own personal memory?
A. Yes. I remember going in and -- right before the semester was getting going in 2025.
Q. This was just late last summer; is that right?
A. Yes.
Q. I would note on this one --
MS. OLSON: If you'd zoom back out, Ms. Bibb.
Q. (BY MS. OLSON) -- it doesn't reflect that there's any

amount that you've paid. Do you know why?
A. I don't know why. It may be because we had hit our deductible.
Q. Thank you, Ms. -- Professor Scofield. We're going to stop -- we'll be done with Exhibit 32, and I'm next going to direct your attention to Exhibit 34. And, Professor Scofield, do you recognize the documents within Exhibit 34?
A. Yes. These are another summary of payments to Gritman Medical Center.
Q. And do they reflect different payments that you made for services to Gritman Medical Center?
A. Yes, they do.
Q. What do these payments relate to?
A. Similar payments but a different date range.
Q. Do they also reflect at times who the provider was?
A. Yes.
Q. And are these -- this information you received from Gritman Medical Center in Exhibit 34, how do you recognize this as another set of invoices or payments that were made?
A. Because I reviewed and paid them and also worked with Gritman Medical Center to receive them to enter into evidence here.
Q. And to provide to counsel?
A. Correct.
Q. And do you remember about what time of year that you

obtained the information from Gritman Medical Center?

A. Yes. Back in August 2025 the date for this trial was set and exhibits were requested, so I was working with Gritman throughout September to locate all my records.

Q. And with respect to Exhibit 34 there are some black bands there; is that right?

A. Yes.

Q. Do you -- do you know what the black bands are over?

A. I think those are redacted information about my children.

Q. So services that are not related?

A. That are not related.

Q. And otherwise do the charges that are reflected in Exhibit 34 relate to medical care services that you received to address either physical or mental health issues that you experienced after Ms. Guillard posted her TikToks accusing you of murdering the students and accusing you of having an affair with one of the murdered female students?

A. Yes.

MS. OLSON: Your Honor, at this time I'd offer Exhibit 34.

THE COURT: Ms. Guillard, any objection?

MS. GUILLARD: I object to the authenticity of the document, and the reason why I object to it is because it is a patient receipt for Rebecca Scofield. It's not a patient receipt for her children. So I doubt that whatever is

redacted on there has anything to do with anything other than Rebecca Scofield, because that's the patient receipt form.

THE COURT: So is your objection to what has --

MS. GUILLARD: Authenticity.

THE COURT: -- to what has been redacted?

MS. GUILLARD: She stated that the redactions were for her children's fields, but this statement is specifically for her as a patient. So I just question what actually is redacted and if it pertains to misinformation.

MS. OLSON: Your Honor, I could certainly ask a couple of additional questions.

THE COURT: My concern, Ms. Olson, is that Ms. Guillard hasn't received an unredacted version of this.

MS. OLSON: We can certainly provide that to her, Your Honor. She's had our exhibits since October.

THE COURT: All right. I'll take that under advisement. I'm not going to admit this quite yet, but we can discuss this later.

MS. OLSON: Thank you, Your Honor.

Q. (BY MS. OLSON) Professor Scofield, are your children on your insurance plan?

A. Yes, they are.

Q. Professor Scofield, I'm next going to direct your attention to Exhibit 35. And, Professor Scofield, do you recognize the documents within Exhibit 35?

A. Yes, I do.
Q. And with respect to those documents, that's also a multiple-page exhibit; is that right?
A. Yes.
Q. What is the total number of pages within Exhibit 35?
A. 38 pages.
Q. And what are the 38 pages within Exhibit 35?
A. They're invoices and receipts for therapy sessions with Rebecca Bohn.
Q. And how do you recognize them as invoices and receipts for therapy services from Rebecca Bohn?
A. Because I paid them.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 35.
THE COURT: Ms. Guillard, any objection?
MS. GUILLARD: No, sir.
THE COURT: All right. Plaintiff's Exhibit Number 35 will be admitted and published if you wish.
(Plaintiff's Exhibit 35 received.)
MS. OLSON: Thank you.
Q. (BY MS. OLSON) Professor Scofield, what time period are covered by the documents that are within Exhibit 35?
A. These cover May 2023 to September 2025.
Q. Have you seen Ms. Bohn since then?
A. Yes.

Q. How often?
A. Every other week or so.
Q. And with respect to the invoices that we see in Exhibit 35, I would note that those typically say that there's only $20 due; is that correct?
A. That's correct. That was my copay.
Q. Was that the total amount of the services?
A. No. The rest was billed to insurance.
Q. And, Professor Scofield, for the services that you've received since September of 2025, have you also had a $20 copay for those services?
A. Yes. As Ms. Bohn has shifted towards retirement, when we switched insurances, our insurance was no longer accepted. So for some of the sessions I've been paying the full fee.
Q. And how much is that?
A. $130.
Q. Professor Scofield, I'm next going to direct your attention to Exhibit 36. And, Professor Scofield, do you recognize the documents within Exhibit 36?
A. Yes.
Q. What do you recognize these documents to be?
A. These are receipts for massage therapy that I received for headaches.
Q. And how do you recognize them as your massage therapy receipts for headaches?

A. I paid them.
Q. And do they relate to services you received and paid for related to your physical pain and suffering after seeing Ms. Guillard's TikToks?
A. Yes.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 36.
THE COURT: Ms. Guillard, any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 36 will be admitted and published if you wish.
(Plaintiff's Exhibit 36 received.)
MS. OLSON: Yes, please, Your Honor.
Q. (BY MS. OLSON) And, Professor Scofield, Exhibit 36 is also a multiple page document. Do you recall how many pages are -- can you tell how many pages are within Exhibit 36?
A. 32.
Q. And what time period is covered by the receipts for the massage therapy services in Exhibit 32?
A. These run from August 2023 through June 2024.
THE COURT: And, Ms. Olson, you referred to Exhibit 32 --
MS. OLSON: I apologize. Thank you, Your Honor.
Q. (BY MS. OLSON) Professor Scofield, we're on Exhibit 36, I think.

A. Yes.
Q. And I misspoke. So Exhibit 36 --
A. Yes.
Q. -- what is the time period within Exhibit 36?
A. They run from August 2024 -- 2023 through June 2024.
Q. Are you still receiving massage therapy services?
A. No, I'm not.
Q. Why not?
A. It was too expensive to keep doing it.
Q. Did your insurance cover those?
A. No.
Q. So that amount was entirely out of pocket; is that correct?
A. Correct.
Q. Professor Scofield, it's been more than three years since you first looked at Exhibit 40; is that correct?
A. Yes.
Q. What is the current state of that TikTok and those like it impact on your career and teaching?
A. These allegations reshaped my career. They reshaped how I teach classes, how I reach out to publishers. It has touched every aspect of my life as an academic.
Q. What is the current impact -- what is the current state of the TikToks' impact on your physical health?
A. I -- my body just crumpled in on itself after the

allegations and especially as they were ongoing and ongoing and ongoing. And now every day I am managing a lot of things I simply was not managing before: headaches and leg pain and neuropathy and going to PT and making sure to keep myself as stable as possible. I look back and I just think how young I felt when I was 37 and how very old I feel now.
Q. What is the current state of the TikToks' impact on your emotional health?
A. It's a daily struggle against a sense of hopelessness and vulnerability that at the end of the day, there's no protection. There's nothing that shielded me from these attacks, that this could have happened to anyone. I feel like that has made it difficult to be present as a parent, as an educator, as a spouse, as a daughter, as a daughter-in-law. It has been overwhelming in rearranging my perspective on the world and my day-to-day mentality.
Q. Professor Scofield, did you ever meet Ms. Guillard before this trial?
A. No.
Q. Ever speak with her?
A. No.
Q. See her in person before this trial?
A. No.
Q. To your knowledge, did she ever try to contact you?
A. No, not to my knowledge.

MS. OLSON: Thank you, Professor Scofield.

THE COURT: Ms. Guillard, now is the time for cross-examination. Do you have any electronics or anything that you need to set up, or do you just wish to ask questions from the lectern?

MS. GUILLARD: I can ask questions from my notes but -- and I can also use this to use the paper exhibits instead of --

THE COURT: Yes. We refer to that as the ELMO.

MS. GUILLARD: ELMO.

THE COURT: The ELMO. So you can put paper exhibits on there and focus in and out on it. And Ms. Trumbull will help you do that if you'll ask questions from the lectern.

MS. GUILLARD: Yes, sir.

THE COURT: All right. Ms. Guillard, you may inquire.

CROSS-EXAMINATION

BY MS. GUILLARD:

Q. Can I call you Ms. Scofield? Professor Scofield? What would you prefer?
A. Professor Scofield.
Q. Professor Scofield. How are you doing?
A. (No response.)
Q. No word?
A. I'm doing fine.

Q. You stated that prior to -- I'm going to ask you a series of questions based on your testimony that I took notes on. You stated that life was different before my TikTok videos regarding your role, alleged role. And how was life before the videos?
A. It was great. I had gotten tenure the year before and was immediately elected chair of my department, which spoke a lot to my colleagues' belief in me. I was married to someone I grew up with who's the love of my life. We had kids. We were living this life that we had worked really hard to build in the place in Idaho that we wanted to be.
Q. And how was life -- you said prior to November 23, that week prior, how was life for you?
A. Good. We went to a wedding. We danced with our friends. We saw one of my best friends in the world. We had my parents up to help take care of my kids, and I got to spend time with them.
Q. And Moscow, you said, is a small town; correct?
A. Correct.
Q. And it was a safe town because -- it was perceived to be safe, and you didn't lock your doors?
A. Yes.
Q. Prior to November 23 did you feel the need to get locks or surveillance or anything?
A. No.

Q. When were you diagnosed with anxiety?
A. I honestly cannot recall because things have been ongoing, and I resisted going on antidepressants and anxiety medications, but I've taken assessments that showed in the aftermath increased anxiety.
Q. You don't know when you were formally diagnosed with anxiety, what year? As a child? As an adult?
A. Like, in 2023. I am not certain whether that happened when I first started working with Ms. Bohn or at subsequent appointments with my PCP.
Q. The week prior to my videos, as we all know, was the murder of the students. After the murder of the students in the small town of Moscow, you didn't feel the need to get locks or put locks on your door or a security system?
A. No. We -- it certainly changed the tenor of the community. It was darker. It was scarier. But we personally hadn't made those changes.
Q. The week prior to my videos after the murders, you acknowledged there was no suspect?
A. Correct.
Q. And that in the small town of Moscow, how far were you from the homicides?
A. So King Road is on the south side of campus, and my home is on the north side of campus, like on the edges of town.
Q. With your home being -- so what is that, 10 minutes?

A. Maybe 15.
Q. With your home being 15 minutes away from the quadruple homicide, why didn't you feel the need to get a security system and locks at that time?
A. I think because of our upbringing, our perspective on life, that we still were not directly threatened and that we could be okay.
Q. How did you know you were not a direct threat without --
A. I didn't know. We didn't know. But it's how we felt. We still felt like it was our home.
Q. Did you have any symptoms of anxiety or fear after the quadruple homicides?
A. After the killings?
Q. Yes.
A. Not formal symptoms. I would say that everyone felt fear, but not hypervigilant behaviors of anxiety.
Q. So you felt safe?
A. We felt safe.
Q. After my TikTok videos, you stated everything changed?
A. Correct.
Q. Everything like what?
A. Everything I've just testified on, on how we felt personally targeted, how it felt like our children's lives were now directly threatened, that my name was being thrown around by you saying horrific accusations that were fully

baseless and not even from the community we were settled in. It felt like an attack from the outside.
Q. Thank you.
Regarding your feelings of not being safe and the feelings that your children would be targeted, did you have any feelings that your children would be targeted after four other children were killed 15 minutes away from you?
A. We were afraid, but we didn't feel directly targeted.
Q. Can you clarify? You said you felt safe, and now you're saying you felt afraid.
A. I think there's a difference. You can still feel scared and still have a fundamental belief that things will be okay.
Q. Did you feel safe at home after the murders, or were you afraid?
A. I felt afraid that this had happened in my community, but I still felt safe in my home with my husband and my kids.
Q. You were aware or made aware within a couple of days, you stated, that the person, me, posting the videos was not an Idaho resident or in your community at all?
A. Correct.
Q. Your feelings of not being safe after the videos, were they direct? Did I threaten you? Were you afraid of me?
A. Yes, I was afraid of you.
Q. Why?
A. Because you thought that I had done incredibly horrific

things and were targeting my family. So, yes, I was afraid of you.
Q. You were afraid of me in Texas?
A. Yes, I was.
Q. Can you explain why you were afraid of a stranger on TikTok in Texas that lived -- I don't know how many miles away Texas is from Idaho, but it was a long flight for me -- but you were not afraid when four people were killed 15 minutes away from you?
A. Again, I did say I felt afraid that four people had been killed. I didn't not feel afraid. I didn't feel threatened directly. And as you just said, Texas is one flight away.
Q. Two. Maybe two. It took me two.
A. Two flights away.
Q. But did you -- I'm sorry. Are you done? Did you receive any direct threats from me?
A. What type of threats?
Q. Did I call you? Did I email you? Did any of my TikTok videos threaten your life?
A. You did not attempt to contact me at all. To my knowledge, you never once attempted to have any grounds for the accusations you were making.
Q. My question was, did I threaten you directly through calls, emails, texts, or TikTok videos? Did I threaten your safety or that of your children?

A. I would say, yes, you threatened my children. Every day you spoke lies into a camera you threatened them and me and my husband and --

Q. How was I threatening you? What did I say?

A. You were saying that I was directly responsible for the deaths of students at my university. You were saying that I had conducted sexual misconduct with a student.

Q. Yes, Ms. Scofield. I know the statements I made regarding what I accused you of regarding your role in the murder of the four University of Idaho students and relationship with one of the victims, but my question is regarding your state of mind and alleged fear. And by threats, you said I threatened you, and you were afraid of me even though I was in Texas and you were in Idaho. I'm trying to understand what specific threat to your life and your children's life -- not defamation, physical threats -- did I do, in your mind.

A. Again, it's only a flight away. And you were making hundreds of videos about me, someone you had never met, someone you had never talked to, someone you had no connection to whatsoever. I don't know how anyone could not feel threatened by that level of interest from someone they had never met.

Q. Thank you for that.

My hundreds of videos, the hundreds of videos that you're referring to, are they about you or were they about the

Idaho four?
A. I do not know the specific number of videos that I am in. I know that it is dozens and dozens and dozens, more than I would have ever wanted to experience.
Q. So speculation? You're just speculating that it's dozens of videos?
A. Well, I have seen -- I have experienced dozens of videos of you saying horrific lies about me, and those made me feel afraid.
Q. Thank you for that.
Regarding your parents, you said your parents came to visit you and help you with your children during that time?
A. Correct.
Q. And that they decided to exercise their right to bear arms during that time?
A. Correct.
Q. Do you know when they purchased the weapon?
A. I do not.
Q. Is it possible they purchased the weapon after four students were killed --
A. No.
Q. -- around 15 minutes from your home?
A. No. But they're longstanding gun owners. It's Idaho.
Q. So it was way before --
A. Yes. They owned weapons before, legally owned firearms.

Q. The reason I'm asking that is because you testified that after my videos, your parents came to visit you. Your parents felt the need to purchase a weapon.
A. No, not purchase. To bring a weapon with them from their home in Idaho to my home in Moscow, which is not standard procedure for their visits. They don't normally bring weapons with them when they visit our family.
Q. What was the communication like with your parents after the students were murdered? You said they were worried about you?
A. After the students were murdered, in between -- before you started making your accusations, you mean?
Q. Yes.
A. Yes, I think I spoke with both my parents-in-law and my parents, and everyone was worried. But no one was saying, you know, "You've got to get out of town." There was still a sense that the community would bounce back and move forward.
Q. I'm going to shift my questions now based on your health. You said life was good prior to -- or everything was good prior to my videos, but you also stated that you were getting a hysterectomy.
A. Yes.
Q. When was your hysterectomy scheduled, and what symptoms did you have prior to?
A. Yeah. My hysterectomy was scheduled on December 1 for --

sort of immediately following giving birth to my daughter in 2019, I had had on-and-off symptoms of essentially irregular bleeding and irregular menstrual periods, and I had worked with my doctor for a while. It was not incapacitating, but over the summer when I went in for my routine check-in, my routine Pap smear, I spoke to the doctor about the kind of ongoing -- we had tried different birth controls, different ways to try to stabilize my menstrual cycles, and it wasn't working.

So they decided there was enough cause for an ultrasound, and they conducted an ultrasound and found a fibroid. And after a long discussion with them, it was decided that surgery would be best, and it was scheduled for December 1. And obviously that's a difficult surgery to undergo, but it -- yeah.

Q. You were -- were you experiencing pain in your body prior to your hysterectomy?
A. No.
Q. The fibroid that you state you had --
A. Uh-huh.
Q. -- did not cause you pain?
A. No. Just irregular cycles.
Q. The purpose of your hysterectomy was only to heal irregular cycles?
A. Well, there was a fibroid, so it was going to grow and

become painful and potentially dangerous to my life if we didn't surgically remove it at the time.
Q. Why did they make the decision to give you an ultrasound?
A. Because my cycles had been irregular for years at that point, and the medication options were not working to stabilize them.
Q. What were your projected symptoms after your hysterectomy?
A. Full recovery. There shouldn't be any symptoms after a full hysterectomy.
Q. Your hysterectomy was around the same time as the TikTok videos; correct?
A. Correct.
Q. And the filing of the lawsuit, which was the 21st? The hysterectomy was the 30th?
A. My hysterectomy was the 1st.
Q. The 1st. When did you start experiencing symptoms? You said you were getting shackles, is what you -- your body wasn't working; it was breaking down. You said that. When did that start happening?
A. As I testified earlier, many of those symptoms, like the nerve compression and headaches, began mid-December.
Q. Mid-December?
A. Uh-huh.
Q. After -- two weeks after your hysterectomy?
A. Correct. I even followed up with the doctor to see if

they could be related, and he said there -- that a hysterectomy should not cause headaches.
Q. And pain in your body?
A. And nerve pain.
Q. Did you get a diagnosis for the cause of the nerve pain and headaches?
A. So I've been undergoing MRIs and lab work, working with my physical therapist. They refer to it as pudendal nerve compression. It is essentially ways in which muscles contract around your nerves, and my physical therapist has said that stress and emotional strain is unsurprisingly directly linked to the muscles. After my last MRI came back with no tumor, my doctor once again suggested going back to massage therapy or seeking acupuncture. But neither of those things are covered by my insurance, so I have not been able to pursue relief of the headaches in those ways.
Q. Is this doctor at, you said, Gritman Medical Center?
A. Gritman Medical Center, yes.
Q. What kind of doctor is this?
A. This would be my PCP, my primary care provider.
Q. So like internal medicine?
A. Yeah, general practice.
Q. A general practice doctor. Did your general practice doctor directly -- or do you have evidence to support that your general practice doctor stated that your symptoms were

directly related to my TikTok videos?
A. Yes. Like, almost every doctors' appointments I've been in for three years, we have gone over the accusations and the threats and the fear, and that has become an established aspect of my medical record.
Q. Your doctor stated that it was from stress. Did the doctor directly connect your nerve damage, your headaches, migraines, and feeling that your body was breaking down to a TikTok video?
A. First of all, it wasn't a TikTok video. You have been stating "a TikTok."
Q. I asked a question.
THE COURT: Please let her answer before you ask the next one.
Q. (BY MS. GUILLARD) Please answer the question that I asked.
A. The hundred TikTok videos, yes, my doctors have said that form of traumatic emotional stress will exacerbate any form of muscle strain. And they have tried to locate underlying issues, hence lab work and MRIs and lots of doctors' appointments and many things.
Q. Did you tell your doctor there were a hundred TikTok videos about you?
A. Most of the doctors in Moscow are well aware of the situation, because it was widely reported on at the time.

Q. And the reason why I'm asking is because it was not a hundred TikTok videos about you. It was videos about the murders, and only a few of them were about you.

MS. OLSON: Your Honor, I'm going to object with respect to Ms. Guillard's currently testifying.

MS. GUILLARD: I want to get to -- that's why I asked her if she told her doctor there were a hundred TikTok videos about her to get a reason why she would be diagnosed -- or why they would correlate her stress to nerve damage.

THE COURT: Ms. Guillard, the objection's overruled. Just please restate the question.

Q. (BY MS. GUILLARD) Are you saying that your doctor assumed there were a hundred TikTok videos about you and then correlated stress to be a trigger for your nerve damage?

A. I don't believe so. I think that when we discussed the accusations, we did not tally up -- we didn't talk about the number of videos. We simply went over the types of allegations that were made, the widespread attention that it garnered, and my resulting depression, anxiety, nightmares, stress, emotional strain, irritability.

Q. Your anxiety and depression was diagnosed, you said, by your PCP and not a mental health doctor? You said it was Bohn at first.

A. I did not say Dr. -- or Ms. Bohn diagnosed me with depression and anxiety. We have covered depression and

anxiety, and she suggested that I went on antidepressants and anxiety medication for years. It was my PCP, who can prescribe medication, who ultimately decided to put me on that medication.
Q. Your primary care provider, like internal medicine or family medicine doctor, diagnosed you with your mental health condition instead of referring you?
A. So she was working closely with Ms. Bohn, and this was the conclusion. I have taken many diagnostic tests over the years. It's standard at my PCP's office to take depression and anxiety diagnostics tests every time you visit.
Q. Your primary care doctor, you started going to your primary care doctor when?
A. So I had been seeing a doctor since I moved to Moscow in 2016. I saw him a few times in 2023. He was nearing retirement, and so I switched to a new PCP in fall 2023.
Q. And your alleged symptoms of stress, nerve damage that you say is connected to stress, that was -- you said that began after your hysterectomy or after the videos, around this time?
A. Correct.
Q. And you started seeing Ms. Bohn, according to your testimony, around May of 2023?
A. Correct.
Q. So how is it possible that your doctor, your primary care doctor, was working with Ms. Bohn when they diagnosed you with

anxiety and depression?
A. They didn't. I stated earlier in my testimony I did not go on antidepressants and anxiety medication until well into this last couple of years. I believe I went on them in 2024, after resisting for a very long time.
Q. Two minutes ago you said your primary care doctor was working closely with Ms. Bohn regarding your diagnosis of severe headaches and nerve damage related to stress. You also said that began in 2022, which is when my videos were posted. But you also stated that you didn't even -- did you meet Ms. Bohn prior to May 2023, when you allege you began treatment from her?
A. It --
Q. I just need clarification.
A. Can you repeat the question?
Q. Can you clarify? I asked you who diagnosed you with anxiety and depression.
A. So that was my second PCP doctor. That was after I made the change to a new PCP doctor in 2023. And as I stated with Ms. Olson, it takes a very long time to get doctors' appointments in Moscow, so I was trying and slowly getting into doctors over the spring and summer of 2023. I started therapy in the spring of 2023, and then the -- both the physical and mental health diagnoses followed.
Q. Who's your second PCP? Is it Gritman Medical still?

A. Yes. They were both at Gritman Medical.
Q. After my TikTok videos and your hysterectomy, were you working with Gritman Medical Center?
A. Yes.
Q. When did they formally diagnose you with anxiety and depression?
A. I went on antidepressants and anxiety medication in 2024. But again, I don't remember the exact date of the diagnoses.
Q. Your answers keep changing, and I'm just trying to get clarity.
THE COURT: Ms. Guillard, you can't comment on -- that's argumentative. So just please ask your question.
MS. GUILLARD: Okay. I'll take a break from that question, and I'll go to something else.
Q. (BY MS. GUILLARD) You also stated that your career was impacted. Do you receive performance standards at your job?
A. I do.
Q. How was your performance standards prior to the TikTok videos?
A. Our performance evaluations, which I'm sure my dean can speak to, are -- they are broken down into different categories of our job, so research, teaching, services, and outreach. And I had met standards prior to.
Q. Can you inform us of the levels? Is it met standards fully, satisfactory, or is it just met or unmet?

A. Met or unmet.
Q. After my TikTok videos -- it's been about three years, 2022, so let's start with 2023, 2024, 2025. What was your performance standards on those years?
A. I continued to meet standards through great effort on my part.
Q. So there was no change in your performance after my TikTok videos?
A. I would say there was a great deal of difference in what I was able to accomplish, what I saw for myself, what I wanted to accomplish. In terms of did I meet standards on my performance evaluation, yes, I met standards.
Q. Okay. You stated that you were receiving phone calls and texts from threats. Do you know who these threats came from?
A. No. They were -- I mean, I think what I learned very quickly is how very available information is. So they were not people I knew.
Q. And they contacted you, you said. Did they text you?
A. I received some phone calls to my personal phone, and then I know that the university received phone calls. And I received other forms of messages on various apps and email through a couple -- both work email and an email I had connected to my oral history project.
Q. Can you tell me when these texts, emails, or threats started?

A. Immediately after the TikToks. After you started posting TikToks, I would receive ones that would say things like, "Is this true?" And they got worse over time.
Q. How worse? What were they -- did they threaten you? What were they -- what was being said to you? I'm sorry.
A. Yes. They called me horrific names. They called my kids horrific names.
Q. Is this on email?
A. Some of them were on email and, like I said, other apps over the phone.
Q. Did you plan to submit evidence to support your statement that random people were threatening you?
MS. OLSON: Objection, Your Honor, as to the --
Q. (BY MS. GUILLARD) Do you have evidence to support your claim that people were --
MS. GUILLARD: That's not good?
THE COURT: What's the objection, Ms. Olson?
MS. OLSON: Objection; relevance and argumentative.
MS. GUILLARD: I'm trying to see if she has evidence to support her claim. I don't know -- is that argumentative?
MS. OLSON: Your Honor, her testimony is evidence.
THE COURT: Maybe rephrase the question as to if she has any evidence other than her testimony.
Q. (BY MS. GUILLARD) Do you have any evidence other than your testimony to support your claim that you were threatened?

A. I do have some of the messages still, but my lawyers decided -- for which I'm grateful -- to not make them part of the evidence today beyond my testimony.
Q. My next question is, how did you feel after those people threatened you?
A. As I stated many times in my testimony with Ms. Olson, it felt like I was dissolving, that I had somehow put my kids at risk and that they would be harmed because I existed in the world and you decided to tell lies.
Q. Did you receive any direct threats about your kids?
A. Yes.
Q. What was being said?
A. One in particular just -- one in particular I think referred to me as an inbred bitch and my kids as ugly and just horrific things that no one should ever have to hear about themselves or their children.
Q. And I don't want to be repetitive, but I just want to clarify. You don't know who this person is that you -- that sent you that alleged email? Do you have an email address?
A. No.
Q. Did you press charges or file a report after being allegedly threatened by these --
A. I actually worked with UI's security team on reporting it. Unfortunately, that particular one, because it was associated with my oral history project instead of my formal UI account,

they could not help me. And it just --
Q. Can you tell us about your oral history -- what is that?
A. Yes. I work with a variety of rodeo communities, and I've worked very closely with -- well, my oral history project has most to do with the International Gay Rodeo Association, and I work with gay and lesbian cowboys and cowgirls who rodeo on that circuit.
Q. How long have you been doing that?
A. I've worked with the community since 2013, while in grad school; and I began my oral history project in 2016, when I started at the University of Idaho.
Q. When did you start getting threats pertaining to that work?
A. After the TikToks. I had not received threats or hate mail previously.
Q. In these emails, were they attacking you for your work with the LGBTQ community, or were they attacking you regarding the TikToks?
A. They were attacking me regarding the TikToks. I have worked on LGBTQ issues in Idaho for a decade and have not ever received hate mail regarding that work.
Q. And if you know the answer to this, if those alleged emails were not about your work with the gay rodeo and were more so about my TikTok videos, why was your -- why were you advised not to introduce that into evidence?

THE COURT: You don't have to answer that.

Go ahead, Ms. Olson. You can object.

MS. OLSON: Your Honor, my objection was going to be that it would be calling for attorney-client privileged communications.

THE COURT: And that'll be sustained.

Q. (BY MS. GUILLARD) Okay. So you have no evidence to support that the email from a stranger that you got was directly related to my TikTok videos from 2022?

A. Beyond my testimony.

Q. Beyond your -- thank you. Beyond your testimony.

A. Which is evidence.

Q. My next question, I want to pivot to support regarding your work. You stated that you had anxiety and fear that you would not be supported or your book would not be supported?

A. Yes. I was worried that this would shift everything public facing and how I approached the world with what I publish and what I research on.

Q. What book were you going to publish?

A. I was working on a book on gay rodeo called *Slapping Leather: Queer Cowfolks at the Gay Rodeo* with a coauthor.

Q. Did you ultimately publish that book?

A. Yes, we did ultimately publish that book.

Q. When was it published?

A. It was published in December 2023, almost a year later.

Q. How did it do?
A. Like, I'm not certain how to answer that question because academics evaluate books in different ways.
Q. I can rephrase -- I can ask another question.
A. Okay.
Q. So did you publish books prior to that book?
A. Yes.
Q. How do you grade your performance on those books prior to that book?
A. I certainly sold more of my first book than this one.
Q. So you based your performance on sales for your first book?
A. My first book was what we refer to as our tenure book. It's the book that establishes our reputation in the field. And that work is something I'm very proud of and worked on for a very long time. But certainly I think the fact that I was not able to promote my second book online or in person did have an impact certainly on what we were hoping for for sales, though, again, the academic market is much different than trade book publishing.
Q. Why weren't you able to promote your book? Were you forced? Was there a decision?
A. As stated in my testimony with Ms. Olson, I no longer had access to social media. Even my LinkedIn was just -- I could no longer be just a scholar in those online spaces. I had to

be connected to the allegations that you were making. So I felt like I could not be present in those online spaces for my second book. And as I stated previously, I also pulled back from in-person presentations due to stress, anxiety, and the few that I did I had adverse experiences at. So I did not.
Q. Prior to the TikTok videos, what social media platforms did you use?
A. Mostly Facebook. I was pretty active on Facebook, mostly with book promotion stuff, academic stuff, and then photos of my children. I also used LinkedIn just for professional networking, which, of course, doesn't -- you know, I wasn't creating content for that. And then I had an Instagram account that I was not active on at the time.
Q. When did you stop using your Facebook account?
A. All of those I stopped -- I stopped using them for professional promotions in any real meaningful way after the allegations.
Q. Are you familiar with the social media content regarding this defamation case on YouTube or TikTok?
A. I'm -- as in am I familiar with what you were posting?
Q. No. Are you familiar with the content that's being posted regarding this case, or are you --
MS. OLSON: Objection, Your Honor, as to the form of the question. I'm quite frankly not sure where she's going, so maybe a sidebar would be appropriate.

MS. GUILLARD: I can explain. I'm trying to connect she -- her knowledge of popularity now and social media with her decision not to publish her books on social media. She said she could not promote her books on social media, so I'm asking her if she's aware of her popularity on YouTube and TikTok.

THE COURT: I'm going to sustain the objection. If you'll ask another question.

Q. (BY MS. GUILLARD) Okay. Well, the second book that you just published, the standard for success is not commercial; correct? It's academic?

A. Correct.

Q. So the promotion of it would be within academic realms, not commercial realms?

A. Correct. Those often overlap, particularly when it comes to sales for college classrooms and book adoption, that sort of stuff. And I -- yeah, I'm not certain I fully grasp the question.

Q. I'm trying to measure -- how do you measure success for your academic book?

A. Part of that is, yeah, book adoptions, the ability to go promote it in person at book stores, things like that.

Q. Is your market within the circle of academia?

A. Yes. I would say that this was not a trade press. We worked with a university press.

Q. After my TikTok videos, within the academic realm, University of Idaho, how were you treated by staff, students?
A. At the wider academic realm or at the University of Idaho or --
Q. I'm still trying to get more information regarding your published work that you said you couldn't publish for -- until December 2023. You said your market was within academia. You work for the University of Idaho, so what -- whatever market that you would typically expect to receive support from regarding your book, how did they treat you after my TikTok videos?
A. Well, we had to work much harder with the publisher themselves to figure out how to market the book, especially because I was not able to participate as much. So the University of Idaho, even within our department, everyone has a different specialty in -- as faculty, so what I write on is not necessarily what my colleagues write on.
So really I would be looking at other universities, other faculty who work on American history, particularly cultural history of the U.S. West. And certainly that was much harder to connect with people in that realm without having LinkedIn and Facebook and going to conferences and doing the things that I would have normally done.
THE COURT: Ms. Guillard, we have about 15 minutes left in the trial day. If there's a natural breaking point

for you coming up, maybe we could end at that natural breaking point. I'm not trying to stop you now. You can keep going if you wish, but if there's a natural breaking point before you get on to another point, we can stop then if that's okay.

MS. GUILLARD: Okay.

Q. (BY MS. GUILLARD) Was that your first book that you published towards that first market?

A. There's overlap with my first book, which is also on performance and rodeo and things. Yeah, so there is some overlap.

Q. And your support for your second book and your first book, I'm a little confused because you said it was commercial for the first book and now you're saying it was --

A. No, the first book was also academic. But the sales for my first book and the number of reviews and book adoptions and everything were much greater than the second book.

Q. Do you have plans to submit evidence outside of your testimony to support your -- you said reduction, right, in book sales?

A. I'm not sure I used the word "reduction."

Q. You didn't. I'm sorry. You said "different." You said academia versus commercial. Then you said it was both.

A. I -- outside of my testimony, I am unaware that we are submitting any other evidence.

Q. So your sales -- and I used the word "reduced," so that's

why I want to clarify it before we take a natural break. Your book sales did not reduce?
A. I think between my first book and my second book, the second book had -- did not have as many sales and certainly within the academic world didn't have as many book adoptions or reviews or other things like that.
Q. Do you have numbers? Can you say, like, "My first book sold a million copies. My second book sold --"
A. No. This is academic publishing so, no, not a million copies. I think -- I think -- I believe the numbers would show that the first book sold better, but again, I mean, we're talking about academic publishing, so we're talking in the thousands of books, not in the millions of books.
Q. And the last question for today, did you feel supported by the University of Idaho after my TikTok videos and in students and staff and your natural audience for your book sales and your professional career?
A. Okay. So was that full -- like, different audiences? Did I feel supported at UI and did I feel supported by my wider --
Q. UI, let's start there. Did you feel supported by the University of Idaho after my TikTok videos?
A. I felt supported by my dean, Dean Quinlan. I felt that -- I'm not sure I would have known what to do if I hadn't forwarded that email to him and gotten his quick thinking on what steps to take. So I certainly felt supported there.

Within the wider field, I -- I just didn't engage as much and certainly had a lot of difficulty trying to find ways to engage after your false statements.
Q. Can I just clarify, your dean is your boss? Is that your boss?
A. Yes. He is my first boss in a long line of bosses. The dean oversees the College of Letters, Arts, and Social Sciences, so he's my direct supervisor.
MS. GUILLARD: Your Honor, I think this is a good time to take a natural break.
THE COURT: All right. Thank you, Ms. Guillard.
MS. GUILLARD: Thank you.
THE COURT: Members of the jury, we are going to break for today. We'll resume the cross-examination of Ms. Scofield by Ms. Guillard tomorrow morning at 8:30. Try to be here a little before 8:30 in the jury room.
I'll repeat my admonition to you that I did earlier. Do not discuss the case with anyone, including amongst yourselves, and do not allow anyone to discuss the case with you. Do not read, watch, or listen to anything, any news reports, social media reports, or anything of the like about the case or conduct any research of any kind. If for some reason this does happen overnight, that you're exposed to something, please bring it to my attention first thing in the morning.

With that, I'll thank you and wish you a good night and appreciate your attention today.

The jury may be excused.

(The jury exited the courtroom at 4:52 p.m.)

THE COURT: Ms. Scofield, you may step down and return to plaintiff's table.

Please be seated.

All right. We will resume cross-examination tomorrow, Ms. Guillard. Approximately how much time do you have left? I'm not trying to rush you. I'm just trying to get a sense of --

MS. GUILLARD: I was supposed to be calculating?

THE COURT: No, no. Just how much more cross-examination do you think you have for Ms. Scofield?

MS. GUILLARD: Less than 20, 30 minutes.

THE COURT: Okay. All right. And then, Ms. Olson, you may have some redirect?

MS. OLSON: Probably almost none.

THE COURT: All right. And then you intend to call --

MS. OLSON: Then we intend to call Ms. Guillard --

THE COURT: Okay.

MS. OLSON: -- and then Chris Hanson and then Kim Rytter and then Sean Quinlan and then Rebecca Tallent.

THE COURT: Ms. Guillard, did you get all of that?

MS. GUILLARD: No.

THE COURT: Okay. So it's -- she will next call you, then Mr. Hanson, then Ms. Rytter, then Dean Quinlan, then Dr. Tallent.

Correct, Ms. Olson?

MS. OLSON: Yes, that's correct, Your Honor.

THE COURT: So that's the lineup of witnesses tomorrow.

All right. Just a couple of things to take up. Ms. Olson, as I mentioned, I would like to hear from you -- first, before I address that, Ms. Guillard, as I stated, we're going to have that informal jury conference with Mr. Gordon tomorrow at 3 p.m., after the trial day. Mr. Gordon, I believe, has emailed you a link to the Ninth Circuit pattern jury instructions, so you can certainly consult those. And if you wish to submit any jury instructions, please file them on the ECF system by 8 p.m. tonight if you wish to submit any.

And then what we'll do is I intend to give -- to consider what you submit at 8 p.m., and then I will give a draft jury instruction package that I'll put together that I'll intend to give to the jury at the close of evidence. That will consider both what the plaintiff has filed and what you include, and that will be what you can all discuss with Mr. Gordon to let him know if you have any objections or changes that you wish to make to my draft instructions.

And then the next day we'll have the formal jury instruction conference, where I will give you the final jury instructions and give you the opportunity to object on the record, both parties, to any of those instructions.

Any questions about that?

MS. GUILLARD: No, sir.

THE COURT: Any questions, Ms. Olson?

MS. OLSON: No, Your Honor.

THE COURT: Okay. Then that was one of the things on the to-do list. The other thing, Ms. Olson, is I wanted to hear from you. You had objections to Ms. Guillard's amended exhibit list -- second amended exhibit list. And those objections, I believe, were related to prejudice because of inclusion of exhibits for the first time on that second exhibit list. So I'll hear any argument that you have as it relates to those exhibits.

MS. OLSON: Certainly, Your Honor. Just to be clear, we have objections to others, including the ones that are in the stipulated column. We'd stipulated to authenticity but reserved other objections.

But with respect to the ones that we object because they were included for the first time on this exhibit list and that we received for the first time last night at 6:30, that's Exhibit 506, 508, 509, and 510. So they are two public records requests and two denials of producing records in

response to those public records requests.

And my objection is that we did not receive them until last night. We have -- I assume they are what they purport to be. We've not seen them at all in this litigation. Exhibits were due in October. Ms. Guillard didn't produce a single exhibit until over the weekend, and then these are just the latest set.

So we think we're prejudiced on this because it has taken away time that we could be spending preparing for trial. It's taken away time that we would need to meet with our client and with others to prepare for the next day. And, Your Honor, this sort of ongoing trial by fire I think is not the rules here in the District of Idaho, and so for that reason we object.

THE COURT: All right. And, Ms. Guillard, do you want to respond to that?

MS. GUILLARD: Plaintiff also submitted an amended exhibit list, like, a day or so ago and a day or so ago before that. So I've also been spending time reviewing her exhibits and a lot more time on her items than I was able on mine. I'm not getting any sleep. So I understand the use of time, but I also use it. So there's no prejudice regarding time that we're both spending.

THE COURT: All right.

MS. GUILLARD: Additionally, documents are just to

show that initiative, and it doesn't cause unfair prejudice on Scofield in any kind of way.

THE COURT: All right. Ms. Olson, any response to that?

MS. OLSON: Yes, Your Honor. Just so the record is clear, the exhibit list that we filed yesterday morning had exhibits that are 12A, 12B, 12C and then some subexhibits for Exhibits 14, 15, and 16. That is because we intend only to show that small clip from that longer video, all of which were already on our exhibit list and had been provided. In addition, those are -- all exhibits, including almost all of our exhibits, are videos that Ms. Guillard made. So they're documents that are her creation.

THE COURT: All right. Thank you, Ms. Olson.

I've reviewed the exhibits, and they are Exhibits 506, 508, 509, and 510. While Ms. Olson is certainly correct and her objection is well placed, I just don't feel that these are of a type or of a content that would create any undue prejudice to the plaintiff from their late inclusion on an amended exhibit list. They are simply exhibits that show -- tend to show Ms. Guillard's attempts to corroborate her TikToks in some way.

I'm not saying that I'm necessarily going to admit them. You'll have other objections, if you wish. And if there's some authenticity objection that you feel you need to

make, Ms. Olson, I'll hear it at the time. But as it relates to the prejudice of their late inclusion on an amended exhibit list, I don't feel like the prejudice is undue, so I'm going to deny the objection on that basis.

All right. Ms. Olson, anything more that we need to take up today before we break for tomorrow?

MS. OLSON: Yes, Your Honor, one thing. I understand that Ms. Guillard is a pro se litigant, but to the extent she's asking questions and arguing with Professor Scofield and in her question suggesting that Professor Scofield testified to something earlier, I think that's inappropriate. It's her testifying about the content of something, and I would ask the Court to instruct her not to do that.

THE COURT: And that's a well taken objection. Ms. Guillard, you certainly have a right to question Ms. Scofield about her prior testimony. But when you characterize that testimony or try to restate the testimony in some way, especially when it is arguing with the witness or being argumentative with the witness, that's not proper. You certainly can ask her a question and say, "As I understood it, you testified to X on direct examination. Is that correct?" and then ask her a question as it relates to X.

But you saying, "You said this before on direct examination," and if that's not accurate, it creates a problem with the foundation for the question. Does that make sense?

MS. GUILLARD: Yes, sir.

THE COURT: All right. So your best -- if you want to ask her something about her prior testimony, ask her first if -- "Did you say X on direct examination? Now I'm going to cross-examine you on what you said," as opposed to saying, "You said X on direct examination," and if that's not accurate, then Ms. Olson has an objection and we're going down that road.

The better way for you to do that is to ask her what she said, if she recalls saying something that you may have taken notes on. "Do you recall saying this?" And if she says she does, then you can ask your next question about the substance of that. Does that procedure make sense to you?

MS. GUILLARD: Yes, sir.

THE COURT: Okay. Because I had to sustain some objections of Ms. Olson because you may have been misstating what it is that Ms. Scofield testified to on direct examination, and that makes the question improper. All right?

MS. GUILLARD: Okay.

THE COURT: Okay. Ms. Olson, does that address your --

MS. OLSON: Yes. Thank you, Your Honor.

THE COURT: Anything else that you want me to take up before we break for the day?

MS. OLSON: No, Your Honor. Thank you.

THE COURT: You're welcome.

Ms. Guillard, anything that you want me to take up before we break for the day?

MS. GUILLARD: No, sir.

THE COURT: Does that time of 8 p.m. tonight give you enough time to look at the link for the jury instructions and to submit them online on the ECF system?

MS. GUILLARD: Yes, sir.

THE COURT: If there's any problem with you submitting them on time on the ECF system, you can go ahead and submit them by email to Mr. Gordon and Ms. Olson. Copy her if there's some problem with that so we at least get them tonight and can digest them. But hopefully you've successfully done a good job of filing things on the ECF system, so I prefer that you file them there. If not, we'll take the email and we'll address that issue tomorrow.

MS. GUILLARD: Yes, sir.

THE COURT: All right. Mr. Gordon, anything more that I need to take up that I've forgotten to ask about?

MR. GORDON: Did you talk about witnesses tomorrow?

THE COURT: The witness lineup?

MR. GORDON: Yes.

THE COURT: Yes, we did. So the witness lineup again, for Mr. Gordon's benefit, is after Ms. Scofield's done, then it's going to be Ms. Guillard, Mr. Hanson, Ms. Rytter,

Dean Quinlan, and then Dr. Tallent. That is going to be our lineup for tomorrow.

Anything else, Mr. Gordon?

MR. GORDON: No, sir.

THE COURT: Okay. All right. Thank you very much, everyone. I appreciate the work that went into today. I think it was a good first day, and I'm glad we're where we're at.

With that, the Court will be in recess.

(Proceedings concluded at 5:05 p.m., February 24, 2026.)

C E R T I F I C A T E

I, ANNE BOWLINE, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing 144 pages constitute a full, true, and correct transcript.

Dated this 20th day of May, 2026.

/s/ Anne Bowline

ANNE BOWLINE
Registered Merit Reporter
Certified Realtime Reporter