IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

---

| | |
|---|---|
| REBECCA SCOFIELD, | Case No. 3:22-CV-00521-REP |
| Plaintiff, | Volume II of IV |
| vs. | Boise, Idaho |
| ASHLEY GUILLARD, | February 25, 2026 |
| Defendant. | 8:29 a.m. |

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE RAYMOND E. PATRICCO
CHIEF UNITED STATES MAGISTRATE JUDGE

---

APPEARANCES:

For the Plaintiff: MS. WENDY OLSON
MR. CORY MICHAEL CARONE
Stoel Rives, LLP
101 S. Capitol Boulevard, Suite 1900
Boise, Idaho 83702

For the Defendant: MS. ASHLEY GUILLARD
3262 Westheimer Rd, 942
Houston, Texas 77098

Court Reporter: MS. ANNE BOWLINE, RMR, CRR
Anne_Bowline@id.uscourts.gov

*Proceedings recorded by stenography; transcript produced by computer-aided transcription.*

# I N D E X


| PLAINTIFF'S WITNESSES | PAGE |
|---|---|
| REBECCA SCOFIELD | |
| Cross (Resumed) by Ms. Guillard | 153 |
| Redirect Examination by Ms. Olson | 183 |
| Recross-Examination by Ms. Guillard | 190 |
| ASHLEY GUILLARD | |
| Direct Examination by Ms. Olson | 197 |
| Cross-Examination by Ms. Guillard | 269 |
| Redirect Examination by Ms. Olson | 290 |
| KIM MAX RYTTER | |
| Direct Examination by Mr. Carone | 309 |
| Cross-Examination by Ms. Guillard | 316 |
| Redirect Examination by Mr. Carone | 327 |
| SEAN MICHAEL QUINLAN | |
| Direct Examination by Mr. Carone | 331 |
| Cross-Examination by Ms. Guillard | 345 |
| Redirect Examination by Mr. Carone | 354 |

| PLAINTIFF'S EXHIBITS | | RECEIVED |
|---|---|---|
| 1 | ................................... | 213 |
| 2 | ................................... | 215 |
| 3 | ................................... | 217 |
| 4 | ................................... | 224 |
| 5 | ................................... | 225 |
| 6 | ................................... | 228 |
| 7 | ................................... | 230 |
| 8 | ................................... | 229 |
| 9 | ................................... | 233 |
| 10 | ................................... | 238 |
| 11 | ................................... | 242 |
| 12 | ................................... | 252 |

| | |
|---|---|
| 14A | 256 |
| 14B | 256 |
| 14C | 257 |
| 15B | 259 |
| 17 | 245 |
| 27 | 314 |
| 28 | 260 |
| 34 | 184 |
| 41 | 212 |
| 42 | 226 |
| 43 | 235 |

| DEFENDANT'S EXHIBITS | RECEIVED |
|---|---|
| 508 | 322 |
| 509 | 324 |
| 512 | 284 |
| 516 | 286 |
| 518 | 283 |
| 519 | 167 |

(Proceedings commenced at 8:29 a.m., February 25, 2026.)

(The following took place outside the presence of the jury.)

THE COURT: Please be seated.

THE COURTROOM DEPUTY: The Court will now take up day two of the jury trial for Scofield versus Guillard, Case Number 3:22-CV-521-REP.

THE COURT: All right. Good morning, Counsel. Good morning, Ms. Guillard.

Ms. Olson, do I understand that you have a couple of housekeeping matters to raise first with me?

MS. OLSON: Yes, Your Honor. First, with respect to Exhibit 34 -- that was the one with the redactions -- last night we did provide unredacted copies to Ms. Guillard. The Court has unredacted copies. We provided those already. The two redacted entries were treatment for Professor Scofield's daughter, G.C., who is, obviously, a minor, but also we're not seeking damages related obviously to any treatment for, G.C., so we would propose I can just do it on redirect to offer that again.

THE COURT: All right. And, Ms. Guillard, having now been provided with the unredacted -- I don't know if she's been provided with it before last night or not, but having now been provided with the unredacted version of that document, do you have any remaining objection to its authenticity?

MS. GUILLARD: No, sir.

THE COURT: Okay. Then I'll allow you to ask those questions and enter it into evidence when you wish. What else?

MR. CARONE: Your Honor, we anticipate that Dr. Rebecca Tallent will be called to testify today. I know Your Honor's already addressed her qualifications and certain aspects of her opinions that she's allowed to testify about at this trial. I'm just curious whether your preference is for me to again ask for her to be recognized as an expert on those areas in open court or just along with my questioning.

THE COURT: No, my preference is not for you to ask for me to recognize her as an expert but for you to go ahead and establish her credentials and qualifications as an expert, and then you can ask -- set up your direct testimony and then ask for her expert opinion.

MR. CARONE: Thank you, Your Honor.

THE COURT: All right. And if we need to -- before she takes the stand, if we need to remind her as to exactly what I've allowed her to testify to and not allowed her to testify to, I will provide those, because I made some notes. So we can address that when she's about ready to take the stand.

MR. CARONE: Thank you, Your Honor.

THE COURT: All right. Ms. Guillard, do you have any

preliminary matters that you want to raise with me?

MS. GUILLARD: No, sir. I just need the connection for my laptop.

THE COURT: All right. Ms. Fifer or Ms. Tate, do we have that ready to go for her?

And while you're doing that, Ms. Guillard, I want to just briefly talk to the parties about the informal jury instruction conference today after court. It was my intention to provide to the parties the Court's draft final jury instructions prior to the 3 p.m. informal conference with Mr. Gordon.

Last night we received Ms. Guillard's three proposed jury instructions, and I want -- Ms. Olson, if you can, at 3:00, before we start that informal conference, I'll hear any comments or arguments that you have related to those three jury instructions, because they were late. We didn't have time to digest them beforehand. But I want to hear from you at 3 p.m.

And then what we'll do is Mr. Gordon and I will go back to chambers. We will reconstitute my draft final jury instructions, and then we intend to provide a copy of those to the parties along with the model jury instructions, both Ninth Circuit and Idaho, upon which they are based, the templates, so that the parties can look at my final version, compare them if they wish to the templates.

And then what you'll have the opportunity to do with Mr. Gordon is to wordsmith or propose any possible changes to the version that I've drafted, and then he'll bring them back to me and overnight we'll finalize them. And then tomorrow we'll have the final formal jury instructions conference. That'll be on the record, with the parties having the opportunity to make formal objections to any instructions that are given or not given.

Any questions about that, Ms. Olson?

MS. OLSON: No, Your Honor.

THE COURT: Any questions, Ms. Guillard?

MS. GUILLARD: No, sir.

THE COURT: All right. Then, Ms. Scofield, do you want to resume the witness stand, please.

And then, Mr. Gordon, do you want to go ahead and bring the jury in.

(The jury entered the courtroom at 8:35 a.m.)

THE COURT: Please be seated.

All right. Good morning, members of the jury. I hope you-all had a pleasant and relaxing evening, and I appreciate you being here and ready to go on time.

As I will every morning that we return, I'm going to ask you a few questions just to make sure nothing happened overnight that you need to tell me about. Did any of you see, hear, read, or be exposed to any reporting of this case?

All right. And did anyone try to contact you about this case or did you have contact with anyone about this case?

And then lastly, is there anything at all that you wish to bring to my attention that would bear on your ability to be fair and impartial jurors in this case?

All right. You've answered all those questions in the negative or shook your head, so we're all ready to go.

Ms. Scofield, I'll remind you that you're still under oath.

Ms. Guillard, you can resume your cross-examination.

MS. GUILLARD: Thank you.

CROSS-EXAMINATION (Resumed)

BY MS. GUILLARD:

Q. Good morning.

A. Good morning.

Q. Professor Scofield, yesterday we left off at you stating that your boss was supportive of you from the onset of this incident.

A. Correct.

Q. Can you please remind me of the dean's name?

A. Yes. This would be Dean Sean Quinlan. He's the dean of the College of Letters, Arts, and Social Sciences at the University of Idaho.

Q. And can you recall how supportive he was of you during this time?

A. Yes. So as I stated in my previous testimony, he's who I first forwarded the email to and who I spoke with on November 24, 2022, about appropriate steps that we should take, including reporting it to the police and working with UI security team.

After that we did fairly regular check-ins -- sometimes daily, sometimes every couple of days -- throughout December as we were discussing wrap-up of the semester, any concerns, things that were coming in on that side, and then also options for the following semester as I weighed personal safety on campus.

Q. Thank you.

Around that time you stated that -- and if this is correct, please let me know -- that you also filed -- did you talk to Moscow Police Department when my videos came out?

A. Correct.

Q. What day was that?

A. I called them on November 24.

Q. What did they tell you on November 24?

A. As I stated previously, I simply left a message first on the nonemergency line that there were allegations being made against me and provided the TikTok information. And I said, you know, "If a police officer is available to speak, here's my information."

So a police officer called back a while later, said

he had reviewed all of the videos. Again, it was news to me that there were -- I think he said ten videos at the time or around ten at the time. And we simply talked about that they would -- they were aware of the situation and that they would reach out to me if they had any follow-up questions regarding my involvement or these allegations.
Q. Do you know the name of --
A. I don't remember the name of the police officer I spoke with.
Q. Did they ever get back to you?
A. So they never responded to -- after that initial conversation, the Moscow Police Department never again reached out for questions for me.
Q. Thank you for that.
You stated you received phone calls from family and friends, your parents after the TikTok videos. Were they supportive of you immediately after the TikTok videos?
A. Our close family and friends, as they began seeing it in their feeds and finding out about it, yes, we received a lot of support from our -- from our family, our friends.
Q. Thank you.
Clarify the email you got. That was a student from -- an alumni that warned you of the videos?
A. Yes. So in the initial email, again, I did not recognize the name. It had not been a person I had worked with. There

was maybe a sentence or two that simply said, "I'm an alumna of UI. I think you should watch the video linked below."

Q. And your best friend who's going to testify, Chris --

A. Chris Hanson, yes.

Q. -- Chris Hanson, he also supported you immediately from -- after receiving the videos?

A. Yes, he did.

Q. Okay. Clarify these dates for me, please. On November 24, 2022, you had the support of your job and specifically your boss, the dean? Yes or no.

A. Correct.

Q. On November 24, 2022, same day of the videos, you also had the support of your family and friends; is that correct?

A. At that point the only family and friends who knew was my husband and my sister-in-law.

Q. And -- oh, okay. November 24, 2022, you had the support of your husband and your sister-in-law?

A. Correct.

Q. Others were not aware?

A. Correct. To my knowledge, they were not aware.

Q. Thank you.

On November 24, 2022, your best friend was also supportive of you?

A. Yes, he was.

Q. Clarify: By December 27, 2022, Moscow Police

Department -- and you testified to this yesterday; I just want to go over this again -- that Moscow Police Department made a statement on your behalf stating they did not believe you were involved with the murder of the four students, and you read that yesterday. So is it fair to say by December 27, 2022, Moscow Police Department released to the public that you were not a suspect, showing that they supported you? Yes or no.

A. I would say the word "support" is pretty subjective there. I think they were saying I was not a suspect.

Q. By November 24 -- between November 24, 2022, and December 27, 2022, there was no threat of police investigation from Moscow Police Department? Or would you say that after November -- sorry -- December 27, 2022, there was no threat of being investigated by Moscow Police Department?

MS. OLSON: Your Honor, I'm going to object as to inherently calls for speculation.

THE COURT: She can answer as to her understanding of whether it was -- you perceived that you were going to be investigated going forward.

A. So prior to the 27th -- I mean, I think that I should state that I made very clear I was willing to be investigated at all times before and after this statement was made. I was not concerned at all about an investigation, so I would not say that I was under threat of an investigation --

Q. (BY MS. GUILLARD) Okay.

A. -- either before or after that statement.
Q. Thank you.
So as of November 24, 2022, you were not concerned that you were going to be investigated by Moscow Police Department?
A. Yes. I was not concerned about what the investigation would find because the allegations were false. But I was concerned about the misuse of public resources on investigating someone like me who was wholly unconnected.
THE COURT: Ms. Guillard, in your last question you stated as of November 24, 2022.
MS. GUILLARD: Yes.
THE COURT: All right. I just wanted to make sure that we have the right time frame.
Q. (BY MS. GUILLARD) On the date that you contacted Moscow Police Department, you were not concerned that you would be investigated by them? Yes or no.
A. I offered to be investigated by them.
Q. Yes or no. Were you concerned?
A. Was I concerned? No --
Q. Thank you.
A. -- I was not concerned about an investigation.
Q. By November 24, 2022, you stated you had the support of your boss, the dean. At that time were you concerned that you would be investigated for having a relationship with a

student? Yes or no.
A. No, I was not concerned about --
Q. Thank you.
A. -- an investigation. I was concerned about the suspicion that is inherent to an investigation, as UI policy states.
Q. You stated your boss was supportive of you, helping you throughout this entire ordeal, and that the same day you emailed him a copy of the video and he was not threatening to investigate you; correct?
A. Again --
Q. Yes or no.
THE COURT: Ms. Guillard, you have to let the witness answer.
MS. GUILLARD: Okay.
A. Again, the threat was not the investigation. It was the suspicion that is inherent to an investigation, as per UI policy. I was utterly willing from the get-go to be investigated because these accusations were false. It was not the actual investigations that were concerning; it was the rapid spread of the lies that you were saying online that were concerning, because rumor has as much impact as reality.
Q. (BY MS. GUILLARD) Let me restate the question. Yes or no, were you concerned or worried that you would be investigated for dating a student on November 24, 2022?
MS. OLSON: Objection, Your Honor. This is asked and

answered and at this point argumentative.

MS. GUILLARD: I asked for a yes or no answer, and she's speaking on other things.

THE COURT: I will overrule the objection. You can ask a question that calls for yes or no answer.

But then, Ms. Olson, you'll have plenty of latitude on redirect to ask more questions.

MS. OLSON: And I'd also object on argumentative grounds, Your Honor.

THE COURT: All right. Overruled at this time.

Reask your question, Ms. Guillard.

Q. (BY MS. GUILLARD) On November 24, 2022, you were not concerned that you would be investigated for -- by the University of Idaho for dating a student? Yes or no.

A. No, I was not concerned, because the allegations were false.

Q. On -- by July 2024 did you have the financial support of the Idaho chapter of the American Federation of Teachers?

MS. OLSON: Objection, Your Honor; relevance.

MS. GUILLARD: I'm asking because that's -- I can -- I have follow-up questions on who that is, their teachers union --

THE COURT: Hold on, Ms. Guillard. What's the relevance of whether she had the financial support of the American Federation of Teachers?

MS. GUILLARD: Well, I was just being specific regarding the financial support, but I can state support of her unions, her professional career, her boss, her affiliations.

THE COURT: Ms. Olson, is your objection that the financial support that she may have received from this organization does not go to damages in this case?

MS. OLSON: It is, Your Honor. And if we could -- I'm happy to approach. I think I know what she's going to get into next.

THE COURT: All right. Let's approach, please.

(At sidebar.)

MS. OLSON: Your Honor, a portion of Professor Scofield's legal fees, she raised money through a teachers union and then through a GoFundMe. I don't think how she has paid for her legal fees or hasn't paid for her legal fees in this case are relevant at all.

THE COURT: Because they don't go to damages?

MS. OLSON: Right. We're not asking for attorneys' fees in damages. It's not a component of damages. It's something you have to ask for separately.

MS. GUILLARD: I'm not intending to mention anything about legal fees. I'm not intending to mention anything about legal fees. My purpose is to establish that damage to her professional career did not occur because she was supported by

the union. She was supported by her boss, students, alumni, and stakeholders in the University of Idaho.

THE COURT: And that line of questioning is completely fine, but the question you asked was did she have the financial support. So if you stay away from the financial support and just ask for the moral support or whatever you want to phrase it that's not financially related. Because, as Ms. Olson argued, the financial support for attorneys' fees is not an element of damages, so that's not something that it goes to in this case. So if you want to ask just about support generally, you can do it that way.

MS. GUILLARD: And my next will be the GoFundMe, support from strangers and people in general online.

MS. OLSON: The GoFundMe page, as I understand it, was done by a friend of hers, and it was -- that person then provided the money for legal fees.

THE COURT: Only legal fees?

MS. OLSON: That is my understanding, Your Honor.

MS. GUILLARD: No. It does state that the remaining of the fees, she could use it towards donations of some type.

THE COURT: I'm going to allow that, Ms. Olson, but I will allow you to clarify that on redirect examination, that the money was used or not used exclusively for legal fees. But a public GoFundMe site, I think she's entitled to ask about that. You can clarify it on redirect.

MS. OLSON: Just to be clear, Your Honor, this -- we object. This question is getting well beyond the relevance into damages and it is --

THE COURT: And I don't know enough about the GoFundMe. I completely understand your point about the American Federation of Teachers, but the GoFundMe is a private, public-facing call for money, and I don't know what it was used for. So I'm going to allow that.

(End of sidebar.)

THE COURT: All right. That objection to the previous question will be sustained, and you can proceed as we discussed at sidebar.

MS. GUILLARD: Yes, sir.

Q. (BY MS. GUILLARD) Professor Scofield, by July 2024 or before, did you have the support of Idaho chapter of the American Federation of Teachers?

A. I'm not certain how to quantify support. Certainly -- so the AFT is the teachers union that any UI employee can join, and certainly there was alarm within the union about these types of attacks on faculty. And so I think that there were members of the union who were supportive of my attempt to stand up to this type of behavior.

Q. Thank you.

Did your support begin July 2024, or did they also support you beginning November 24, 2022?

A. I did not speak with my union in November 2022.
Q. Do you know when you perceived to receive their support?
A. I -- I don't remember when that support began. I don't recall there being a moment where union members said, you know, "We support you."
Q. Thank you.
By July 24 -- sorry. By July 2024 did you have the support of Idaho Federation of Teachers?
A. Again, so that's the larger Idaho chapter of our union.
Q. Thank you.
A. And again, I would say there were certainly members within the Idaho chapter that supported my stance.
Q. By July 2024 did you have the support of the National Legal Aid Committee with the American Federation of Teachers?
A. Again, I don't recall a date range of that committee within the national level. I don't remember a date.
Q. Okay. Let me ask this question, because I've never been a part of a union. Can you inform the Court of any -- do they have power to harm your career or enhance it in any kind of way?
A. No. Idaho is a nonbargaining state, so teachers unions are more places to gather to talk about concerns. So I would not say a union in Idaho or even the national-level union would have a significant say in the trajectory of your career. It's in academia much more based in your field of study rather

than a union.
Q. Thank you.
By April 2023 did you have the financial support of the general public and just general support of the general public?
MS. OLSON: Objection, Your Honor, as to the form of the question. It's vague.
THE COURT: That'll be sustained. If you can break that up and rephrase it into two questions, Ms. Guillard.
Q. (BY MS. GUILLARD) By April 2023 did you have the financial support of people online, strangers, general public?
MS. OLSON: Objection, Your Honor. She's again asking about financial support.
THE COURT: That'll be overruled. If you can just ask more specifically.
Q. (BY MS. GUILLARD) Okay. In April 2023 did you have a GoFundMe page?
A. We had a friend who was concerned who established a GoFundMe to help us with legal fees.
Q. Is this friend associated with the University of Idaho?
A. (No response.)
Q. To your knowledge. If you don't know...
A. I don't understand the relevance of my friend's job to her willingness to --
Q. Okay.

A. -- support us.
Q. The person who set up the GoFundMe page, was it one person or a group of people?
A. The person who set up the page itself was one person.
Q. Was that one person a colleague at the University of Idaho?
A. They're not a direct colleague in my department or college. I do not work closely with them at the University of Idaho.
Q. Is it true that the person who set up the GoFundMe page works for or is a stakeholder at the University of Idaho?
A. I'm unclear with the use of the term "stakeholder."
Q. Stakeholder just means a student, a teacher, an investor, someone who is invested in or works with or affiliated with the school, a customer.
A. Yes. This person is employed by a different college at the University of Idaho.
Q. Thank you.
MS. GUILLARD: I would like to present to the plaintiff Exhibit -- Defendant's Exhibit Number 519.
THE COURT: And, Ms. Guillard, did we have a marked set of your exhibits --
MS. GUILLARD: Yes, sir.
THE COURT: All right. Let me just make sure I have them. And have you submitted them electronically, or are you

going to use the ELMO?

MS. GUILLARD: I'm going to use the ELMO because I don't see the option of the screen mirroring. It's not showing me the option.

THE COURT: All right. And have you tried the ELMO before?

MS. GUILLARD: This will be my first time. Well, one time I did.

THE COURT: So before we publish it to the jury, I can now see it on the screen, and there are buttons to focus in and out.

Q. (BY MS. GUILLARD) Professor Scofield, do you recognize Defendant's Exhibit Number 519 as your GoFundMe page?

A. I recognize it as the GoFundMe page that was set up by a friend to help cover legal fees.

MS. GUILLARD: I would like to admit Defendant's Exhibit Number 519 into evidence.

THE COURT: Any objection?

MS. OLSON: Not other than -- we object, but we understand the Court's ruling at the sidebar.

THE COURT: All right. I will admit Defendant's Exhibit Number 519.

(Defendant's Exhibit 519 received.)

MS. GUILLARD: And I'd like to present it to the jury.

THE COURT: And it may be published for the jury.
MS. GUILLARD: Oh, I'm sorry. Published.
Q. (BY MS. GUILLARD) Professor Scofield, do you acknowledge that $22,741 was raised by essentially colleagues, strangers -- people in the general public is what I mean by that -- on your behalf?
MS. OLSON: Objection, Your Honor, as to the form of the question regarding her knowledge about who may have donated to the GoFundMe page.
THE COURT: If she knows who donated.
A. I'm unsure of everyone who donated to that page.
Q. (BY MS. GUILLARD) Did you read the words of support from the people who donated to you?
A. Some of those comments were forwarded to me to try to help me get through this.
Q. And you clarified that this was -- it began in April 2023?
A. (No response.)
Q. Let me ask you, do you know what day the GoFundMe was published?
A. I don't remember what day. It's on the paper. It says July 2024.
Q. It was updated -- sorry -- just to clarify --
A. Oh, I'm sorry.
Q. -- it says July 4, 2023. Do you recall that being the day the GoFundMe began?

A. Again, I don't recall a specific day.
Q. I want to show you a comment from some of the supporters. Two years ago would be 2024, 2025ish. Jamal Lyksett said, "We are all with you." Were you aware of that comment or that support?
A. I genuinely don't know if I was aware of that comment or support specifically at that time.
Q. Two years ago -- and it doesn't give me specific dates, so I'm working with what I have -- Sean Collins said -- do I need to zoom in? -- "From one of your former students, I'm sorry to see you go through this. Good luck." Are you aware that Sean Collins -- you had the support of Sean Collins?
A. I don't remember if I knew that at the time, but it's nice to read that now.
Q. Sydney Freeman also says -- and I'm assuming she means you -- "We have your back, Becca." Are you aware of that comment?
A. Again, this was two years ago. I don't know -- I don't remember being aware of specific comments at the time.
Q. One more. Andrew Goldman donated $25 and said, "From a fellow historian to let you know that we're all supporting you on this." You can answer if you were aware of that or not.
A. I do not recall being aware of it or not two years ago.
Q. Can -- okay. Thank you.
When people donated you $22,000, why didn't you feel

the need to read their comments?

MS. OLSON: Objection, Your Honor --

THE COURT: Sustained.

MS. OLSON: -- relevance and argumentative.

THE COURT: Sustained. It's argumentative.

MS. GUILLARD: Oh, okay.

Q. (BY MS. GUILLARD) On -- this is a different topic. Thank you for your answers on the support questions. On December 21, 2022, you filed a complaint against me; correct?

A. Correct.

Q. In that complaint you acknowledged that I had never been to Idaho. And you were aware of that; correct?

A. Correct.

Q. Do you acknowledge that none of my TikToks were about your kids?

MS. OLSON: Objection, Your Honor, on foundation grounds. I think that there's not been foundation that Professor Scofield watched every single one of the TikToks. So maybe if the question were, "Do you acknowledge that none of the ones that you watched said anything about your kids?"

THE COURT: Ms. Guillard, can you --

MS. GUILLARD: I'll reword it.

Q. (BY MS. GUILLARD) Do you acknowledge that none of the TikTok videos that you watched that I published were about your kids?

A. I acknowledge that none of your TikTok videos that I watched mentioned my kids by name.
Q. Did I mention -- in any videos did I mention your kids generally from your -- from the videos that you watched?
A. From my recollection, I don't believe you mentioned that I had children.
Q. Thank you.
Do you acknowledge that from the videos that you watched, Guillard did not threaten to cause harm to you or your family, to include your kids?
A. I do not acknowledge. The harm implicit in the videos, the harm meant to my life, was in every single video.
Q. I'll rephrase the question. From the videos that you watched, you acknowledged already that you did not see any videos of me even speaking on your kids. So I'll separate the questions. With the videos that you watched, you acknowledge that Guillard did not threaten to physically harm your children?
A. I acknowledge that in none of the videos that I watched did you threaten to physically harm my children. So that has not been our argument throughout this case.
Q. Thank you. That's -- thank you.
Do you acknowledge that Guillard -- in the videos that you watched from my TikToks, that I, Guillard, did not threaten to cause you any physical harm?

A. I think that would depend on how we interpret threat.
Q. Let me interpret it for you so I can clarify the question. Threat by physical violence, directly and experienced, threat by physical violence directly witnessed by you from me to your family or close relatives, friends, you.
A. Thinking back through all of the ones that I watched, I do not believe you stated a specific intent for physical harm, though there are also alarming indications of hyperfixation and concerning aspects that certainly put myself and my husband on high alert for potential physical threats.
Q. So the answer is, no, you acknowledge that I did not in the videos you watched threaten to physically harm you? Yes or no.
A. Again, I acknowledge that from the videos that I watched, you did not make a statement of intent to physically harm me.
Q. Thank you.
Do you acknowledge that -- and maybe you're not aware of this. Do you acknowledge that you and/or your counsel monitored my social media accounts from the posting of the videos until current date?
A. I have no awareness.
Q. Were you able to view the exhibits prior to this?
A. Yes.
Q. In those exhibits, do you acknowledge that there are exhibits of me on social media from my Instagram, Facebook,

YouTube, and TikTok pages?

MS. OLSON: Objection, Your Honor; relevance --

MS. GUILLARD: I'm trying to get there.

MS. OLSON: -- and foundation as to this witness.

MS. GUILLARD: I'm trying to get there.

THE COURT: Can you rephrase the question, Ms. Guillard.

MS. GUILLARD: My first question was, do you acknowledge that you or your counsel monitored my social media accounts from the posting of the videos until current? And she didn't answer that.

THE COURT: And I'm going to sustain the objection. What's the relevance of what her or her counsel did?

MS. GUILLARD: The relevance is they knew my location wasn't in Idaho.

THE COURT: Why don't you just ask the witness if she knew whether your location was outside of Idaho.

Q. (BY MS. GUILLARD) From November 24, 2022, until current, were you aware that I had never been to Idaho until this trial?

A. Yes. From November 24, 2022, we knew you were not from Idaho and we knew you were not currently in Idaho, but we also know you could easily get to Idaho.

Q. Okay. Would Guillard -- I'm sorry, me. I have to speak to myself in third person. I'm sorry. With me being out of

town and you having the support of your community, professional and personal, with you withdrawing, which was your word yesterday -- yes or no. You withdrew from social media?
A. I think that anyone would acknowledge that it is very hard to not watch what is on social media even if you, yourself, are not promoting yourself or posting. I was still aware of what was happening and what was being said, and I was still very much aware of what was being posted.
Q. Okay. I'm sorry about that. You said you were not posting on social media, but you were active on it but just browsing as a viewer; is that correct?
A. Yes. I will say that, like, I have never had a TikTok account, so this was really browsing with family and friends who would send me things. So I was not actively -- I did not have to actively seek out what was being posted.
Q. And I'm speaking not just what was being posted, your use of social media on Facebook. You said you used Facebook. You said you withdrew from posting on Facebook; is that correct?
A. By and large, yes. I don't remember the posting patterns of all last three years, but I've essentially not posted anything about my kids any longer, yeah, just withdrew from the potential spaces of contact due to the negative interactions I was having.
Q. Thank you.

And lastly, on regards to social media, do you acknowledge that you already acknowledged that you received the support of your professional community? You've acknowledged that you received the support of your personal community. With that being said, your decision to withdraw posting from social media had nothing to do with a lack of support?

A. I would say it would be generous to interpret what I -- the people who were supporting me as the full support of my entire career community. That's a massive statement. And again, the support of a community is also incredibly subjective. My close friends and family who knew me, who knew that -- who know my values, who know who I am certainly supported us.

Q. As well as --

A. My --

Q. Sorry.

A. My withdrawal from social media had everything to do with the allegations that were being made against me and wanting to shut out as much as humanly possible any additional areas of contact.

Q. Yesterday -- clarify your testimony that your boss helped you to privatize your social media accounts.

A. That was -- the UI security team suggested that as sort of standard protocol when faculty are doxxed or when information

is shared about faculty outside of official chains, that they take certain steps to, again, limit where people can reach them, and one of those suggestions was to lock down social media. I had to inquire as to what that meant, and they said how to find the privacy settings on Facebook.
Q. Correct. That was around November 24, 2022?
A. That was on November 24, 2022.
Q. On November 24, 2022, did you privatize your Facebook page?
A. I think I did successfully. I think I followed instructions.
Q. When you privatize your Facebook page, does that mean that only your allowed friends that are already a part of your Facebook page and family or whoever you have added on your social media Facebook page were allowed to communicate with you?
A. I don't think that's what it meant, because I was receiving messages. I think that it meant that only friends could see the posts that I was making. But I don't think it impeded messages, because I was getting messages from people I did not know who were not friended.
Q. To clarify, you could have -- you could private that too.
MS. OLSON: Objection, Your Honor, and move to strike to the extent that the witness -- or Ms. Guillard just testified.

Q. (BY MS. GUILLARD) Okay. Question: You are aware that --

THE COURT: Ms. Guillard, I'm going to sustain the objection, and we'll strike that last statement, that "you could private that too." The jury is instructed to disregard that. You can reask the question and have the witness answer.

MS. GUILLARD: Yes, sir.

Q. (BY MS. GUILLARD) The posts on your social media were only able to be viewed by family and friends and those a part of your Facebook page; correct?

A. As far as I am aware, that was the steps that I had taken on November 24, 2022, was to make it so that only friends and family were able to see my posts, though I also stopped posting. But I think it's retroactive as well. So mostly I was trying to prevent pictures of my kids being widely available. I was just trying to stop that --

Q. Thank you.

On your Facebook posts, with the support of your family and friends, your decision to withdraw posting and your work or anything else you would post on Facebook was solely your decision, and it was not based on any threat of being ridiculed or harmed; is that correct? Because your Facebook page was private.

MS. OLSON: Your Honor, I'm going to object to the form of the question. I think it's compound, and it was -- I'm not clear what the question is.

THE COURT: I'll sustain the objection. It is a compound question, meaning it's got too many parts. So if you'll just break it up, please.
Q. (BY MS. GUILLARD) If you -- your decision not to post on social media was a decision that you were not going to post to your close family and friends and those that you allowed to be on your Facebook page; is that correct?
A. In the initial six weeks before the arrest, I essentially withdrew from life. So, yes, I was not posting anything even to close family or friends.
Q. And that decision was solely your discretion, your decision, and not because posting on your Facebook would cause ridicule from your family and friends?
A. Yes. Sorry. I'm thinking through the moving parts of this. So that initial moment, that initial six weeks, everything ground to a halt, and I did not want -- did not want to engage or boast or anything. You know, I was still communicating with family and friends in other ways. I just wasn't creating content or sharing things widely.
Moving forward, I never felt that I had the ability to have a public-facing set of social media, whether Instagram or Twitter or Facebook, because I couldn't open myself up. It didn't feel safe. So I think there's two stages to that question, the initial stage where just everything stopped and then the ongoing nature of the allegations after the arrest

and how that made it very difficult mentally, emotionally, physically to re-establish any sort of public-facing social media profile.

Q. Thank you.

We already acknowledged that Moscow Police Department made a statement that you were not a suspect December 27, 2022; correct?

A. Correct.

Q. Bryan Kohberger was arrested end of that year, beginning of the next year; correct?

A. December 30, 2022, correct.

Q. You had the support of your family, friends, professional career; correct?

A. Again, you're making a really broad category of humans in "professional career." My immediate supervisor was helping me navigate and look at options. My close family and friends who knew who I was absolutely were getting us through this.

Q. The reason why I ask is because you said you didn't feel safe. Why didn't you feel safe?

A. I will never feel as safe as I did on November 23, 2022.

Q. Why?

A. Because you were calling me a murderer and a sexual abuser still after the arrest and --

MS. GUILLARD: I object. Can I object?

THE COURT: No. Let the witness answer the question.

MS. GUILLARD: Okay.
A. And I was being made very aware that there are still people who are willing to listen to those lies. I will never be able to not have those statements, those false statements, as part of my life. So, yes, I continued to feel scared. The anonymity that we had felt prior in our lives is gone. There was a giant spotlight on me as a human. So, yes, I felt scared.
MS. GUILLARD: My objection was she said that I called her a sexual abuser. That's not true.
A. You accused me of having a sexual relationship or a romantic relationship with a student. The policies we reviewed yesterday, that is considered sexual harassment and abuse under UI policy. So, yes, I would say you accused me of abusing someone who would have been inherently under my purview. That's how sexual harassment works. If you are in a power dynamic, that you have power over someone, like a professor and a student, that is sexual harassment. That's the definition of sexual harassment. So by saying that I did that, you implied that I abused my students.
Q. (BY MS. GUILLARD) Thank you for clarifying that.
You do acknowledge that my statements regarding your alleged -- or that is now considered false relationship with a student was not in any threat to be investigated because your boss -- you had the support of your boss; is that correct?

A. That's not correct at all. It was investigated by the University of Idaho because the allegations were made. Just because my immediate supervisor was supporting me does not mean the allegations did not carry weight.

Q. When was that investigation? And the reason I ask is because I subpoenaed the University of Idaho, and they said they did not investigate you.

MS. OLSON: Your Honor, I'm going to object and move to strike. Ms. Guillard is testifying again.

THE COURT: I'm going to sustain the objection. Ms. Guillard, you have to ask the witness just questions based on her personal knowledge, and she has to have foundation to answer it. And you can't testify to things that she may not have knowledge of. So if you'll rephrase the question, please.

MS. GUILLARD: Yes, sir.

Q. (BY MS. GUILLARD) Based on your knowledge, when did the University of Idaho investigate you?

A. I am not aware of the date range, but I know that the university general counsel looked into the matter and verified that I did not have any contact with any of the students or Bryan Kohberger.

Q. To your knowledge, when the general counsel looked into the allegation, was it in response to the subpoena or was it -- was it in response to the subpoena?

MS. OLSON: Your Honor, I'm going to object. Other than the foundational grounds, she's asking what someone else did. This is going to get into hearsay.

THE COURT: I'm going to sustain the -- sustain that objection, Ms. Guillard. I don't think this witness knows. You can ask her about what is in her knowledge and purview, not what someone else might have did -- done and why.

Q. (BY MS. GUILLARD) Ms. Scofield -- Professor Scofield -- sorry -- in the event that any professor is investigated by their university, are they provided with notice or results of the investigation?

MS. OLSON: Objection, Your Honor. This is now just a hypothetical. Object on the grounds of improper question.

MS. GUILLARD: It's not hypothetical. She said she was investigated.

THE COURT: And you can ask her if she was provided notice.

Q. (BY MS. GUILLARD) During your investigation, did the University of Idaho notice you that you were going to be investigated and the results of that investigation?

A. I was never served with notice of an investigation, but I do know that one happened.

Q. How do you know an investigation happened?

A. I -- I genuinely don't know. I would assume perhaps through this lawsuit. I'm sorry. I don't -- I don't know

when I was informed.
Q. Do you have any evidence outside of this testimony to support that you were investigated by the University of Idaho?
A. I do not have anything physically. I believe we will discuss this later in the trial.
Q. Okay. Can you clarify that the time -- you said first that you were not home during the murder of the four students?
A. Correct.
Q. Please clarify again when you got home.
A. Yeah. So we -- my husband, John, and I left Portland right around 7 a.m., and we -- you know, it's about a six-hour drive, so we would have been getting back to Moscow -- I'm sure we stopped to gas up. I think we had probably arrived somewhere around 1 p.m. or so.
MS. GUILLARD: Thank you. No further questions.
THE COURT: All right. Thank you, Ms. Guillard.
Ms. Olson, redirect?
MS. OLSON: Yes, please, Your Honor. And if we could please have the evidence presentation, please, switched over to Ms. Bibb's computer.

REDIRECT EXAMINATION

BY MS. OLSON:
Q. Professor Scofield, I'm going to start with us going back to Exhibit Number 34.
MS. OLSON: Your Honor, Ms. Guillard was provided

with an unredacted copy and confirmed what is under the redactions. And so, Your Honor, at this time we would offer, based on the foundation yesterday, Exhibit Number 34.

THE COURT: Ms. Guillard, any remaining objection to that?

MS. GUILLARD: No objections.

THE COURT: All right. Plaintiff's Exhibit Number 34 will be admitted and published if you wish.

(Plaintiff's Exhibit 34 received.)

MS. OLSON: Yes, please, Your Honor.

Q. (BY MS. OLSON) And, Professor Scofield, I think when you testified yesterday, you identified Exhibit 34 as also a document that you had received from Gritman Medical Center reflecting charges for services related to the physical and mental health treatment that you received after Ms. Guillard's false accusations; is that correct?

A. That's correct.

Q. And there are two black boxes, one on the screen and one at sort of the top. And have you confirmed what is under those black boxes?

A. Yet. I confirmed that those black boxes are covering the name of my daughter.

Q. And charges for services rendered to her?

A. Exactly. We are not asking for charges related to my children.

Q. You're not asking for damages for services provided to your children; is that correct?
A. Thank you. Yes.
Q. Okay. And then with respect to Exhibit 34, just to orient the jury --
MS. OLSON: Ms. Bibb, if you would zoom in as you had previously before I asked about the black boxes.
Q. (BY MS. OLSON) At the very top there, for example, it says, "Rebecca E. Scofield, Ronald F. Baldwin, M.D." Who is Ronald F. Baldwin, M.D.?
A. That was my primary care provider at the time.
Q. And then on the line below that it says "office or other outpatient visit." What is the date for that one?
A. That's February 24, 2023.
Q. And then if we go and read across the exhibit, there are some amounts and -- excuse me. Read down the exhibit, and at the very bottom there there's a payment from Rebecca Scofield; is that right?
A. Correct.
Q. And it reflects $20. Is that your copay again?
A. That's the standard copay, yes.
Q. Is it the same for the other entries on Exhibit 34? They show the provider, the date of the visit, and an amount that you paid; is that correct?
A. That's correct.

Q. And so if you would turn -- I think it's to the second page. And I did not bring my --

MS. OLSON: Is there a third page, Ms. Bibb?

Q. (BY MS. OLSON) If you go to the very bottom of the second page, it has in there a visit of March 26, 2024; correct?

A. Correct.

Q. And is that, then, the date range for this exhibit, the one we saw at the beginning, which was from February of 2023 to the end there in March of 2024?

A. Yes, that's correct.

Q. And this -- these are different visits from those we looked at yesterday in Exhibit 32; is that correct?

A. Yes. We confirmed that there are no overlapping visits.

Q. Professor Scofield, I next want to turn to what are truly the redirect questions. And I'm going to ask Ms. Bibb to pull up Exhibit 519, the GoFundMe page that Ms. Guillard went over with you. Do you see that?

A. I do.

Q. Now, on this GoFundMe page, you didn't operate it; correct?

A. Correct.

Q. What responsibility did you have for any of the content on the GoFundMe page?

A. Our friend asked if it was okay to do this for us, and we said yes.

Q. Did you input --

THE COURT: Ms. Olson, do you want that published or --

MS. OLSON: Yes, please. Sorry. Thank you, Your Honor. I think it's already in evidence.

THE COURT: It is.

Q. (BY MS. OLSON) And so, Ms. Scofield -- or Professor Scofield, my question is, there's type on this page; correct?

A. Correct.

Q. What responsibility, if any, did you have for the words that were input on the GoFundMe page?

A. My friend wrote them. She put them in. We weren't responsible.

Q. You didn't write them?

A. I did not personally write them.

Q. I take it you were generally in communication with this friend?

A. Yes.

Q. You were generally aware of what she was doing?

A. Yes.

Q. The exhibit that Ms. Guillard put up for you, Exhibit 519, this is an update from July of 2024; correct?

A. Correct.

Q. And in the first paragraph there, would you please read that aloud.

A. "In June the judge granted the motion for partial summary judgment, ruling the defendant has defamed Dr. Scofield and granted the motion to add punitive damages. As requested, damages will be determined by a jury in a damages trial, which we hope will be scheduled soon."
Q. And that was posted in July of 2024; correct?
A. Correct.
Q. And it said by then $22,741 had been raised; correct?
A. Correct.
Q. And was all of that money used to pay your legal fees in this case?
A. Yes.
Q. The legal fees that had been incurred up to that time?
A. Yes.
Q. Since July of 2024, has Ms. Guillard continued to file pleadings in this case?
A. Yes.
Q. Has she continued to contest the decisions rendered by the Court in this case?
A. Yes.
Q. And have your counsel responded to those?
A. Yes.
Q. And has that occurred over the last year and a half since this update?
A. Yes.

Q. And have there been any more legal fees raised through this GoFundMe page?
A. No.
MS. OLSON: You can take that down, Ms. Bibb.
Q. (BY MS. OLSON) Professor Scofield, Ms. Guillard asked you a series of questions about whether you had the support of your spouse. You remember those questions?
A. Yes.
Q. And she asked you if you were concerned about not having the support of people like your spouse and your friends and things like that?
A. Yes.
Q. Were you concerned about the reactions, whether it was termed support or anything else, of people outside of that group of people, outside your friends, your family members, and the dean of your school?
A. Absolutely. Our --
Q. And why were you concerned about that?
A. Our fear from the beginning was because those people didn't know me. They couldn't judge whether what she was saying could possibly be false or true and that someone could believe her and take justice into their own hands or the person who had committed these murders would take interest in our family and target us. It was that this was in front of millions of people who had no standard to judge me by and

therefore associated just my name and face with these lies.
Q. Professor Scofield, in your upbringing and your career, did you strive to gain recognition or popularity from being accused of orchestrating the murders of four University of Idaho students?
A. I did not.
Q. Did you strive in your upbringing or in your career to gain recognition or popularity for being accused of having a sexual relationship with one of your students?
A. I did not.
MS. OLSON: Thank you, Professor Scofield.
THE COURT: Ms. Guillard, I don't typically allow recross, but because we had this issue with Exhibit Number 34 that would have come in yesterday, if you have any questions just as it relates to Plaintiff's Exhibit Number 34, you may ask them. If not, I will excuse Ms. Scofield as a witness.

RECROSS-EXAMINATION

BY MS. GUILLARD:
Q. Professor Scofield, did your treatment begin from Exhibit Number 34's treatment records? Is that correct?
A. Correct.
Q. When did you begin treatment at that facility?
A. So as we went over in testimony yesterday, I began having symptoms in December. They worsened in January. I called in January to set up that February 2023 appointment. So

treatment began in February 2023 and is ongoing.
Q. Before February 2023 -- I just want to clarify -- you had no affiliation with that doctor or clinic or hospital?
A. No. The physicians listed were already my primary care providers. Gritman was already my hospital. I had never been seen for those symptoms previously. This started a whole new treatment for new physical issues.
Q. Please clarify the physical issues.
A. As stated yesterday, these included headaches, nerve compression, hip pain, shoulder pain, yeah.
Q. Beginning February 2023; correct?
A. The pain started in December 2022. I was able to get an appointment in Moscow, Idaho, in February 2023.
Q. After your hysterectomy?
A. Yes, and completely unrelated to the hysterectomy, which I had been cleared previously by my OB-GYN for having --
Q. Thank you.
Professor Scofield, do you have a professional who diagnosed you with headaches -- you said headaches and nerve damage and --
A. Nerve compression.
Q. Nerve compression. Yes?
A. Yes.
Q. And did that professional connect that nerve compression to the TikTok videos?

A. So in my physical therapy, routinely the accusations and the strain, emotional and mental, that came from them was noted throughout my physical therapy.

Q. Your diagnosis -- can you share the name of the doctor who diagnosed you, or it's just general primary care from Gritman?

A. Correct. I'm also confused on the usage of the term "diagnose" in terms of these are symptoms. Having severe and persistent headaches, having nerve compression, those are symptoms. I don't -- I can't say what a diagnosis is, though certainly I have been seen by many doctors about these issues routinely over the last three years.

THE COURT: And, Ms. Guillard, if you'll just confine your questions to Plaintiff's Exhibit Number 34. We've been through much of this yesterday.

MS. GUILLARD: Yes, sir.

THE COURT: Thank you.

Q. (BY MS. GUILLARD) Regarding Exhibit Number 34, those treatment records are -- you don't have a diagnosis from those? It's only symptoms; correct?

MS. OLSON: Your Honor, I object. Exhibit 34 is payment records for visits.

MS. GUILLARD: That she intends to connect to damages for mental health.

THE COURT: And, Ms. Guillard, you've cross-examined on that point yesterday. All I'm allowing you to do today is

to ask any questions that you might have about Plaintiff's Exhibit 34 itself.

Q. (BY MS. GUILLARD) Okay. So that would mean that your payment records or your treatment records in Exhibit Number 34 are all payment receipts?

A. These include all payment receipts.

Q. Those are from nerve damage, headaches, without a diagnosis; correct?

MS. OLSON: Objection, Your Honor; beyond the scope.

MS. GUILLARD: I just want to --

THE COURT: I'll allow that last question.

A. I -- again, I'm -- much of the last three years has been about addressing these issues. I don't want to use the word "diagnosis" because I don't know the technical aspects behind that. However, every time I go in and they ask what's occurring, we go over the same issues and attempt to ameliorate them. So I'm sorry I don't know -- I don't know the answer to the question about diagnosis.

THE COURT: Anything more --

MS. GUILLARD: It wasn't about diagnosis.

THE COURT: Anything more about Exhibit 34, Ms. Guillard?

MS. GUILLARD: Yes. She didn't answer my question. I was not asking about diagnosis. I was limited to only asking if those receipts in Exhibit 34 were all for nerve

compression and headaches.
A. Yes. As -- yes. When I reviewed these, these were for headaches, things associated with headaches, like dizziness, nerve -- leg pain, nerve compression, neuropathy, those sorts of -- these are -- we went through and confirmed that these are appointments to address those ongoing issues, yes.
MS. GUILLARD: That's all. Thank you.
THE COURT: All right. Thank you, Ms. Guillard.
Ms. Olson, may Ms. Scofield step down and be excused as a witness?
MS. OLSON: Yes, please, Your Honor.
THE COURT: Ladies and gentlemen, I think this is also a good time for us to take maybe about a five-minute comfort break, get a drink, use the restroom. So we'll take about a five-minute recess.
The jury will be excused.
(The jury exited the courtroom at 9:52 a.m.)
THE COURT: Ms. Scofield, you may step down.
All right. The Court will be in brief recess. We'll return right at 10:00.
(At 9:53 a.m., a recess was taken until 10:00 a.m.)
(The following took place outside the presence of the jury.)
THE COURT: All right. Please be seated.
Ms. Olson, it's your intention to next call

Ms. Guillard as a witness in your case in chief?

MS. OLSON: Yes, Your Honor.

THE COURT: All right. Then under rule -- Federal Rule of Evidence 611, you'll be permitted to treat her as an adverse witness because she's the adverse party in this case.

Which means, Ms. Guillard, that she will be able to ask you leading questions, as if this was cross-examination. When she's completed her direct examination, then, as we discussed, you'll be able to ask yourself questions and answer those questions. You can ask those questions in any form that you wish to ask them, whether nonleading -- who, what, why, where, or when -- or leading -- "Isn't it true that," and then whatever the question is.

So however you wish to ask those questions, you may, and then wait before answering. Ms. Olson will have the opportunity to object if she wishes. If not, you just go ahead and answer the question. Does that make sense?

MS. GUILLARD: Yes, sir. May I also bring paper and pen? Because I'll have to take notes on what's being asked of me as a witness so that I can cross-examine myself.

THE COURT: Yes, you may.

Any objection to that, Ms. Olson?

MS. OLSON: No, Your Honor, as long as it's clear that whatever paper she has up there doesn't have any notes going in.

THE COURT: It has to be a blank pad, and then you can take whatever notes you wish.

MS. GUILLARD: Yes, sir.

THE COURT: All right. Are we ready for the jury?

MS. OLSON: Yes, Your Honor.

THE COURT: Mr. Gordon.

(The jury entered the courtroom at 10:03 a.m.)

THE COURT: Please be seated.

All right. Members of the jury, we're on to our next witness in the plaintiff's case in chief. Plaintiff intends to call as their next witness the defendant, Ms. Guillard. This is permitted by the rules. Under the rules, because Ms. Guillard is an adverse party, or the party on the opposite side of the plaintiff, plaintiff's counsel is able to examine her as an adverse witness, meaning she can ask her leading questions on direct examination, questions that suggest the answer in the question, "Isn't it true that," and then the question.

Then once Ms. Olson has completed her direct examination, Ms. Guillard will be able to cross-examine herself. It may seem a little unnatural, but it is not unusual at all. It's common in this type of case where there is a pro se party for that party to ask themself a question, pause to allow for any objection, and then answer the question. So that's how we'll go through the examination of

this witness.

Ms. Olson, if you'll call your next witness.

MS. OLSON: Thank you, Your Honor. Plaintiff calls Ashley Guillard.

(The witness was sworn.)

THE COURT: Ms. Guillard, if you'll take the witness stand. You may be seated. Thank you.

Ms. Olson, you may inquire.

Oh, I'm sorry. If you'll ask the witness her name.

THE COURTROOM DEPUTY: Can you please state your full name and spell your last for the record.

THE WITNESS: Yes. My name is Ashley Guillard, spelled G-U-I-L-L-A-R-D.

THE COURT: Now you may inquire.

MS. OLSON: Thank you, Your Honor.

ASHLEY GUILLARD, PLAINTIFF'S WITNESS

DIRECT EXAMINATION

BY MS. OLSON:

Q. Ms. Guillard, you had never met Rebecca Scofield until Monday morning; is that correct?

A. Yes.

Q. You've never met her husband?

A. Yes.

Q. Or her children?

A. Yes.

Q. You have never been to Moscow, Idaho; correct?
A. Correct.
Q. Or to Idaho at all before attending this trial; correct?
A. Correct.
Q. You had been living in Thailand the last five months, since about early October; correct?
A. Traveling, living if that's -- if that's the same, yes.
Q. Well, that's where you had an apartment; correct?
A. Yes.
Q. And you were traveling throughout Thailand; correct?
A. Yes.
Q. You went to beaches?
A. Yes.
Q. You went to an ocean or a sea?
A. I believe a sea.
Q. You went out to dinners?
A. Yes.
Q. You went shopping?
A. Yes.
Q. And that was the culmination of a number of months of travel in Europe and Thailand, the Dominican Republic; is that right?
A. Throughout the years, yes.
Q. And prior to that you were living in Houston, Texas; correct?

A. Louisiana and -- may I --
Q. You were living in Louisiana before you moved to Thailand?
A. Temporarily, yes.
Q. And before that, Houston; correct?
A. Yes.
Q. And Houston is where you were living when you posted the TikToks falsely accusing Professor Scofield of ordering the murders of the four University of Idaho students; correct?
A. Correct.
Q. And Houston is where you were living when you posted the TikToks falsely stating that Professor Scofield had an affair or a relationship with one of her murdered female -- one of the murdered female students; correct?
A. Yes.
Q. And I think you mentioned you had traveled over the years. In 2025 you had eight passport stamps; correct?
A. Yes.
Q. You went to the UK?
A. Yes.
Q. To France?
A. Yes.
Q. To Italy?
A. Yes.
Q. To the Dominican Republic?
A. Yes.

Q. To Japan?
A. Yes.
Q. To Thailand?
A. Yes.
Q. To Vietnam?
A. Yes.
Q. And back to Thailand; correct?
A. Yes.
Q. And you came back to the United States less than a week ago for this trial; right?
A. Yes.
Q. Ms. Guillard, you're familiar with the social media platform TikTok; correct?
A. Yes.
Q. You know how it works; correct?
A. Yes.
Q. TikTok is an application you can download to an electronic device to make short video clips; correct?
A. Yes.
Q. And the device most commonly used is a cell phone; correct?
A. Yes.
Q. TikToks are usually short video clips; correct?
A. Correct.
Q. You can set the app for how long you want the video to be;

correct?
A. Maybe a few seconds to up to ten minutes now.
Q. And that's a -- that's what the user can do with that app; correct?
A. Yes.
Q. You can make that choice?
A. Yes.
Q. It has a timer for hands-free filming?
A. Yes.
Q. You can add music?
A. Yes.
Q. You can add text?
A. Yes.
Q. You can add other photos or videos?
A. Yes.
Q. You can edit?
A. Yes.
Q. You can add sound effects?
A. Yes.
Q. You can add a description?
A. Just generally speaking, correct.
Q. You can add hashtags?
A. Are you asking on my abilities to do these things or just anybody's ability to post on this app?
Q. I said -- well, a person can do that; correct?

A. Correct.
Q. A person can add hashtags; correct?
A. Correct.
Q. And a hashtag is a clickable key word that categorizes content to improve things like discoverability and searchability; correct?
A. It's for subject-based marketing or categorizing.
Q. And so if someone is looking for content on a particular topic, they can use a hashtag to find that topic; correct?
A. Correct.
Q. And if you're posting on TikTok, you can use a hashtag so that people who are interested in that content can find your TikTok; correct?
A. Correct.
Q. And you knew how to do all of these things on TikTok by November of 2022; is that right?
A. Clarify "all." I knew -- may I clarify what I knew how to do?
Q. I'll ask the questions, Ms. Guillard.
So, Ms. Guillard, you knew how to do hands-free filming; correct?
A. Correct.
Q. You knew how to set the timer for how long you wanted the video to be?
A. Correct.

Q. You knew how to add music?
A. Correct.
Q. You knew how to add text at the top?
A. Correct.
Q. You knew how to add in other photos or video; correct?
A. Maybe like a photo to -- yes. I'm not sure how to add another video.
Q. You knew how to edit a TikTok?
A. No.
Q. You knew how to add sound effects?
A. Yes.
Q. You knew how to use hashtags?
A. Yes.
Q. And you could tag people; correct?
A. Correct.
Q. And that's something you knew how to do?
A. Correct.
Q. And you knew how to post a TikTok so could people could see it; right?
A. Yes.
Q. And TikTok pays a certain amount to content posters per 1,000 views; correct?
A. False.
Q. It's your assertion that TikTok doesn't pay for people who post?

A. Correct. They do not pay for people who post.
Q. Ms. Guillard, you've recorded your own YouTube videos?
A. Correct.
Q. You have appeared on other social media hosts' YouTube channels; correct?
A. Correct.
Q. You have an Instagram account?
A. Correct.
Q. You posted on that Instagram account regarding your travels; correct?
A. Yes.
Q. And you posted on that Instagram account regarding purchases and places you've been on your travels; is that correct?
A. Yes.
Q. Ms. Guillard, in 2022 you promoted yourself online as someone who could solve mysterious deaths; correct?
A. Correct.
Q. That is something you told online users through your various social media accounts; correct?
A. Correct.
Q. And one of those unsolved murders that came to your attention was the murders of four University of Idaho undergraduate students on November 13, 2022, in Moscow, Idaho; correct?

A. Define "came to my attention."
Q. You learned about it?
A. Someone asked me to post about it. I didn't know about it at the time.
Q. Well, that wasn't my question, Ms. Guillard. You learned about those murders; correct?
A. No. Are you speaking of initially where it came from?
Q. No, Ms. Guillard. I'm just asking you if you learned about the murders that occurred in Moscow, Idaho, on November 13, 2022.
A. On November 13, 2022, I did not know or learn about the murders.
Q. That wasn't my question.
A. Okay.
Q. So, Ms. Guillard, you would agree that you learned about murders in Moscow, Idaho, of four University of Idaho students and that those murders had occurred on November 13, 2022? You learned those facts; correct?
A. Correct.
Q. You were in Houston at the time?
A. Louisiana.
Q. And then you went back to Houston?
A. Yes.
Q. In the first few days after the murders, you became aware that no suspect had been caught; correct?

A. I didn't learn about the -- I don't know what "a few days" means, but I didn't learn about the murders until around November 24, 2022. And, yes, I learned that no suspect had been caught.
Q. You learned about the murders certainly by November 23, 2022, because that's when you first started posting about them; correct?
A. Sorry. November 23.
Q. And you learned then that no suspect had been identified; is that correct?
A. Correct.
Q. You became aware of a lot of online speculation about who the killer could be; correct?
A. Correct.
Q. And why the murders were committed; correct?
A. No.
Q. In the online speculation about who the murderer was, you didn't learn anything about why the murders may have been committed? There was no speculation about that that you recall?
A. No. Well, it may have been speculation, but I wasn't a part of it.
Q. I'm not asking if you were a part of it. I'm asking if you had learned that there was speculation about the reasons for the murders.

A. No.
Q. And on November 23, 2022, you began posting on TikTok about the murders; correct?
A. Correct.
Q. And by November 24, 2022, you began posting on TikTok that Rebecca Scofield had orchestrated the murders; correct?
A. That sounds correct.
Q. And that she did so because she had been having an affair with one of the female murdered students; correct?
A. Correct.
Q. How many TikToks have you posted stating that Rebecca Scofield ordered or orchestrated the murders?
A. Maybe five or six.
Q. How many TikToks have you posted stating that Rebecca Scofield was having an affair with one of the murdered female students?
A. Maybe four.
Q. You posted additional TikToks making those allegations the next day, November 24; correct? Sorry. That same day, November 24; correct?
A. Correct.
Q. And you posted more on November the 25th; correct?
A. Well, when I said six, I meant total. I don't know about that specific day. I can check, though.
Q. You didn't check before your testimony here today?

A. No.
Q. And your TikTok account has been taken down; correct?
A. Correct.
Q. And you used hashtags so that people searching for online content about the murders would find your TikToks; correct?
A. Correct.
MS. OLSON: Ms. Bibb, if you'll bring up Exhibit Number 40, which has already been admitted into evidence.
Q. (BY MS. OLSON) Ms. Guillard, Exhibit 40, that is one of the TikToks that you posted; correct?
A. Correct.
Q. And you watched it in court yesterday; correct?
A. I believe you. I don't remember, but correct.
Q. And it includes a photo of Professor Scofield; correct?
A. Correct.
Q. And you obtained that photo; correct?
A. Off the University of Idaho website, correct.
Q. Yeah. It was the photo of Professor Scofield, her official photo on the website; correct?
A. Correct.
Q. You were able to track down the University of Idaho website; correct?
A. Correct.
Q. You were able to track down the photos of the faculty members; correct?

A. Correct.
Q. And you were able to find Rebecca Scofield's photo; correct?
A. I wasn't looking for her photo, but it was on there, correct.
Q. You were able to find her photo; correct?
A. "Find" would imply that I was looking for it. I saw her photo on that website, correct.
Q. And you found it there?
A. Correct.
Q. And you included on this a photo of her faculty -- or excuse me -- the content from her faculty biography; correct?
A. Correct.
Q. And you had obtained that from the University of Idaho website; correct?
A. Correct.
Q. You tracked that information down and you put it in your TikTok; correct?
A. Correct.
Q. And that's you in the TikTok; correct?
A. Correct.
MS. OLSON: Ms. Bibb, would you please play Exhibit Number 40.
(Playing video.)
Q. (BY MS. OLSON) And, Ms. Guillard, I'd next direct your

attention to Exhibit 41, which has not yet been admitted, so Ms. Bibb will pull up just the initial screen there. And, Ms. Guillard, from looking at this initial screen of Exhibit 41, do you recognize this as one of the TikToks that you posted?
A. It looks like one of the ones I posted.
Q. Well, Ms. Guillard, you had the opportunity to and you did review Exhibit 41 prior to trial; correct?
A. Correct.
Q. And you were able to tell that it is a TikTok video that includes you and you talking and talking about Professor Scofield; correct?
A. I did not bring my notes to stipulation as to whether this specific exhibit was authentic, but I did email you. So if I emailed you and said it was authentic, then yes.
Q. Ms. Guillard, I don't want you to be guessing up there, so I'm going to ask --
MS. OLSON: I don't know if we want to hand this to Mr. Gordon or --
THE COURT: Yes.
Q. (BY MS. OLSON) Would it help you to look at the email that you sent where you agreed to the authenticity of the exhibits?
A. Yes. Thank you.
THE COURT: And for the record, Ms. Guillard, if you

could just describe the date and the to and from of that email.

THE WITNESS: This email is dated February 24, 2026, 2:03 a.m., from Ashley Guillard, msashleyjt@gmail.com, to Mr. Carone, Ms. Olson, Ms. Bibb. It's titled "Defendant's Response to Plaintiff's Amended Exhibit List."

Q. (BY MS. OLSON) Ms. Guillard, would you please take a look at that and see if it refreshes your recollection as to whether Exhibit 41 is one that you stipulated as to authenticity.

A. Yes.

Q. And it is; correct?

A. Yes.

Q. And so Exhibit 41 is one of the TikToks that you made and you posted; correct?

A. Correct.

Q. Also on November 24, 2022; correct?

A. I don't know, but it looks to be that day based on the couch.

MS. OLSON: Your Honor, at this time I'd offer Exhibit 41.

THE COURT: Any objection, Ms. Guillard?

MS. GUILLARD: No objection.

THE COURT: Plaintiff's Exhibit Number 41 will be admitted and published if you wish.

(Plaintiff's Exhibit 41 received.)

MS. OLSON: Yes. We would request permission to play it for the jury.

THE COURT: You may.

(Playing video.)

Q. (BY MS. OLSON) All right. And, Ms. Guillard, that's the entire TikTok that you posted; correct?

A. Correct.

Q. And it appears to be from that same day because it's you in the same, I think, shirt, and it's the same picture of Professor Scofield that we looked at in Exhibit 40; is that right?

A. Correct.

MS. OLSON: And, Ms. Bibb, if you would please go to the initial screen of Exhibit Number 41.

Q. (BY MS. OLSON) And there are some words that appear on that initial screen; correct?

A. Correct.

Q. What do they say?

A. "Rebecca Scofield ordered the murder of Kaylee and Madison at the University of Idaho students."

Q. You put that type on the initial screen of your TikTok; is that correct?

A. That's correct.

Q. You decided what to say?

A. That's correct.
Q. All right. That was Exhibit Number 41.
Ms. Guillard, I'd like to next direct your attention to Exhibit Number 1. And if you'd look at the screen in front of you, Exhibit 1 is a TikTok that you posted on November 25, 2022; is that right?
A. I believe you.
Q. Well, you have in front of you, again, the document that we looked at earlier to refresh your recollection; is that right?
A. I -- I don't object to authenticity. I just cannot confirm that it was November 26 because I don't know.
Q. You don't remember the dates you posted these on; is that right?
A. Yes. And I didn't put the dates on my notes in your email.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 1.
THE COURT: Any objection, Ms. Guillard?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 1 will be admitted and published for the jury if you wish.
(Plaintiff's Exhibit 1 received.)
MS. OLSON: Yes, please, Your Honor.
And, Ms. Bibb, will you please play Exhibit Number 1.

(Playing video.)
Q. (BY MS. OLSON) And, Ms. Guillard, that's your voice in the TikTok; correct?
A. Correct.
Q. And this policy that we see there, the B policy, that's the same policy that we looked at yesterday in Exhibit 25; is that right?
A. Correct.
Q. And you chose to put this policy in with your TikTok; correct?
A. Correct.
Q. And you found it online; is that right?
A. Correct.
Q. And you say that she was worried about losing respect; correct?
A. Correct.
Q. And you would agree that that would be a natural outcome if someone was accused of having an affair with a female student; correct?
A. Pertaining to this -- no, that was not my intent regarding this video. I was saying she would lose respect for actually having -- being caught having a relationship with a student at that time, is what I believe. It wasn't about speculation or false statements at the time.
Q. Well, you knew at the time that as a consequence of the

allegation you were making, that Professor Scofield risked being punished according to that policy; correct?
A. False.
Q. Ms. Guillard, I'm next going to direct your attention to Exhibit Number 2. Ms. Guillard, you recall watching Exhibit Number 2 prior to trial?
A. Correct.
Q. This is a TikTok you posted on November 26, 2022?
A. Correct.
Q. It includes your voice?
A. Correct.
Q. It's about ten seconds long?
A. I believe so.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 2.
THE COURT: Any objection, Ms. Guillard?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit 2 will be admitted and published to the jury.
(Plaintiff's Exhibit 2 received.)
MS. OLSON: Thank you, Your Honor.
(Playing video.)
Q. (BY MS. OLSON) Ms. Guillard, this one also has type on the -- on the initial screen; is that correct?
A. Correct.

Q. What does it say?
A. "The two people who partnered to kill the four University of Idaho students, Rebecca Scofield and Jack DuCoeur."
Q. And in this you -- well, first, you chose what words to put on this screen of Exhibit 2; is that right?
A. Correct.
Q. You referred to a young man named Jack DuCoeur?
A. Correct.
Q. You never met Jack DuCoeur; correct?
A. Correct.
Q. And you later learned from a subpoena you sent to the University of Idaho that Professor Scofield never had any communications with Mr. DuCoeur; correct?
A. The subpoena stated there was no proof of an investigation that she had communication with Jack DuCoeur. I'm not sure it's the same thing as what you just said.
Q. Well, you've obtained no evidence whatsoever that Professor Scofield ever had any communication with a person named Jack DuCoeur; correct?
A. Correct.
Q. And you certainly didn't have any evidence or any facts at the time that you made that statement; correct?
A. Correct.
Q. All right. If we could next look at Exhibit Number 3. Ms. Guillard, do you recognize Exhibit Number 3?

A. Correct.
Q. And that is also a TikTok that you made and posted about Professor Scofield and the murders at the University of Idaho; correct?
A. Correct.
Q. You watched this prior to trial; correct?
A. Correct.
Q. It's a TikTok you posted on November 28, 2022?
A. Again, I'm not sure of the dates, but possibly that's correct.
Q. It includes your voice?
A. Correct.
Q. That's you in the video?
A. Correct.
Q. It's 59 seconds long?
A. Possibly correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 3.
THE COURT: Any objection, Ms. Guillard?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 3 will be admitted and published for the jury.
(Plaintiff's Exhibit 3 received.)
(Playing video.)
Q. (BY MS. OLSON) And, Ms. Guillard, with respect to Exhibit

Number 3, that also has some type on the front; is that right?
A. Correct.
Q. And that's type that you chose to put in the TikTok; correct?
A. Correct.
Q. And would you please read that type.
A. "I don't care what y'all say, Jack DuCoeur and Rebecca Scofield killed Kaylee, Madison, Ethan, and Xana."
Q. Please keep reading.
A. Sorry. I'm not -- sorry. Give me a moment. "Rebecca was the one" -- I'm sorry -- "to initiate the plan" -- sorry. Just one moment.
THE COURT: Take your time.
A. "And hired Jack DuCoeur."
Q. (BY MS. OLSON) And when you made -- do you need to take a break, Ms. Guillard?
A. Just one moment, please. Thank you.
Q. And, Ms. Guillard, when you made this TikTok that we see in Exhibit Number 3, you had still never met Jack DuCoeur; correct?
A. Correct.
Q. And you didn't have any facts that showed any connection between Mr. DuCoeur and Professor Scofield; correct?
A. Correct.
Q. I would next direct your attention to Exhibit Number 4.

And, Ms. Guillard, looking at the screen at Exhibit Number 4, do you recognize the person depicted on the screen of Exhibit Number 4?
A. Yes.
Q. Is that you?
A. Yes.
Q. And there's also some type that is on that first screen; is that correct?
A. Correct.
Q. And is that type that you included on a TikTok that has you in it?
A. Correct.
Q. And this TikTok in Exhibit Number 4, it also addresses your statements that Rebecca Scofield and Kaylee Goncalves, one of the students, were involved; correct?
A. I'm not sure.
Q. You've watched Exhibit Number 4 prior to trial; correct?
A. Yes.
Q. And you've watched that all the way through?
A. Correct.
Q. It's about 2 minutes and 35 seconds long; correct?
A. That could be correct.
Q. Yeah. And all of that 2 minutes and 35 seconds is you talking; correct?
A. Correct.

Q. And all of that is you talking about the relationship between Professor Scofield and a student; correct?
A. It appears to be.
Q. Well, you watched it prior to trial; right?
A. Correct.
Q. And is that your recollection of it?
A. My recollection of it -- I viewed 50 documents and exhibits. Sorry. I have no -- other than my notes, which states that it appears to be edited and manipulated. That's all I have.
Q. Well, you're not disputing when you watched Exhibit Number 4 that it was you in the video; correct?
A. Correct.
Q. And you're the only one talking in the video; correct?
A. Correct.
Q. And it reflects statements that you made; correct?
A. No. It reflects words that I said, but it appears to be edited to omit some things and put things -- make a sentence that wasn't stated. For example, it's edited. It appears to be edited, manipulated.
Q. Are -- the statements that are made in there, are those statements that you made about Professor Scofield and one of the students?
A. I believe the statements are like a statement from one moment and then maybe I'm talking about another sentence and a

couple words out of that sentence. It doesn't appear to be a coherent video that I made.
Q. And the portions that are in it, they show what you actually said; correct?
A. No. It states a manipulated version of words that I said in one video. It's not -- it's manipulated and edited.
Q. And you're saying that based on your recollection; is that right?
A. Yes.
Q. And you don't have copies of your TikToks; correct?
A. Yes, I do.
Q. You do have copies of your TikToks?
A. I believe I have copies of them.
Q. Did you compare Exhibit Number 4 with the same TikTok that you made?
A. I did not.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 4.
THE COURT: Any objection, Ms. Guillard?
MS. GUILLARD: I do object to authenticity on the grounds that it's edited and manipulated, but I can look at it.
THE COURT: Do we need to have a break for you to do that before -- outside the presence of the jury?
MS. GUILLARD: I can check my phone files to see if I

have a comparison video, but it does appear to be an edited video. And, yes, I don't mind taking a break to check.

THE COURT: All right. Members of the jury, we'll take a brief recess so that we can resolve any authenticity issue on this particular exhibit. We'll be in brief recess for the jury.

(The jury exited the courtroom at 10:36 a.m.)

THE COURT: Please be seated.

THE WITNESS: May I go get my phone?

THE COURT: Yes. You may step down and go to defendant's table.

So, Ms. Olson, is Ms. Guillard -- you can go to defense table.

THE WITNESS: In front of there?

THE COURT: Yes, please.

As she's heading back to defense table, do I understand that this particular TikTok, Plaintiff's Exhibit Number 4, dated November 28, 2022, is an excerpted version of a longer TikTok?

MS. OLSON: Not to my understanding, Your Honor. This is the version that was downloaded. We used a service, Page Vault, to download from the Internet. And just so the Court -- you know, in full candor, if she can't authenticate it, Mr. Hanson, who also downloaded videos from the Internet, can also authenticate it.

THE COURT: All right. And do we want to play that for you, Ms. Guillard, right now so that you can authenticate that --

MS. GUILLARD: Yes, please.

THE COURT: -- it is actually you and you said those words at some point, even if this is an edited version? If you have another version of it, you are free to play that version. But this is a version that Ms. Olson has stated was taken off the Internet both by a company they hired and by another witness in this case and that is the version that they pulled off the Internet. Unless you're disputing in some way that this is not you or you did not say these words, I'm inclined to say that it's an authentic video of you that can be admitted at this trial.

Ms. Bibb, if you'll play that for Ms. Guillard.

(Playing video.)

MS. GUILLARD: No objection.

THE COURT: All right. Thank you, Ms. Guillard. If you'll resume in the witness box.

Mr. Gordon, please bring the jury back in.

(The jury entered the courtroom at 10:42 a.m.)

THE COURT: All right. Please be seated.

Ms. Olson, you can resume your examination.

MS. OLSON: Thank you, Your Honor.

Q. (BY MS. OLSON) Ms. Guillard, you now do not object to

Exhibit Number 4; is that correct?
A. Correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 4 and ask to publish it for the jury.
THE COURT: Plaintiff's Exhibit Number 4 will be admitted and published to the jury.
(Plaintiff's Exhibit 4 received.)
Q. (BY MS. OLSON) And, Ms. Guillard, before Ms. Bibb starts the video, there's words on the screen; correct?
A. Correct.
Q. And those words on the screen are your words; correct?
A. Correct.
Q. What do they say?
A. "A look into Rebecca Scofield and Kaylee Goncalves's connection."
MS. OLSON: Would you please play Exhibit Number 4, please, Ms. Bibb.
(Playing video.)
Q. (BY MS. OLSON) We would next pull up Exhibit Number 5. And, Ms. Guillard, you had an opportunity to watch Exhibit Number 5 prior to trial; is that right?
A. Correct.
Q. Do you recognize Exhibit Number 5 as a TikTok that you made and posted on December 1, 2022?
A. That sounds accurate, yes.

Q. It is definitely one you made and posted; correct?
A. Correct.
Q. And you would agree that around December 1, 2022, is the correct date; right?
A. Correct.
Q. It includes your voice?
A. Correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 5.
THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 5 will be admitted and published for the jury.
(Plaintiff's Exhibit 5 received.)
MS. OLSON: Thank you.
Q. (BY MS. OLSON) Before we play it, would you please read aloud the words on the screen.
A. "Rebecca Scofield isn't remorseful for ordering the murder of the four University of Idaho students."
Q. And those are words that you chose to put on the screen; correct?
A. Correct.
MS. OLSON: Ms. Bibb, will you please now play Exhibit Number 5.
(Playing video.)

Q. (BY MS. OLSON) And, Ms. Guillard, at the time that you made and posted Exhibit Number 5, you had never met Professor Scofield; correct?
A. Correct.
Q. Never spoken with her; correct?
A. Correct.
Q. Next I'm going to direct your attention to Exhibit 42. And, Ms. Guillard, do you recognize the first screen of Exhibit 42?
A. Correct, yes.
Q. You watched this prior to trial?
A. Yes.
Q. This is a TikTok that you posted on or around December 1, 2022?
A. Correct.
Q. It includes you and your voice; correct?
A. Correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 42.
THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: All right. Plaintiff's Exhibit Number 42 will be admitted and published if you wish.
(Plaintiff's Exhibit 42 received.)
MS. OLSON: Yes, please.

And, Ms. Bibb, would you bring that up. Just pause for a minute there.

Q. (BY MS. OLSON) Ms. Guillard, in the upper left corner, there's a little circle, and it says, "Reply to ashleytaylorlies's comment," and there's a comment there; correct?

A. Correct.

Q. And people were responding and making comments on your various posts; is that right?

A. Correct.

Q. You knew that your content was reaching many people; correct?

A. Correct.

Q. And you also chose the type that is on the first screen of Exhibit Number 42; correct?

A. The top left corner?

Q. No, the -- below that, in the little box, the rectangle.

A. Below that, yes.

Q. You decided what to put in that TikTok?

A. Yes.

Q. And what does that say?

A. "Rebecca Scofield will spend her life in prison."

MS. OLSON: Would you please play Exhibit Number 42.

(Playing video.)

Q. (BY MS. OLSON) Ms. Guillard, I'd next direct your

attention to Exhibit Number 6. Ms. Guillard, did you watch Exhibit Number 6 prior to trial?
A. Yes.
Q. And Exhibit Number 6 is a TikTok that you posted on or about December 2, 2022; correct?
A. Correct.
Q. It has your picture?
A. Correct.
Q. Your voice?
A. Correct.
Q. And type that you chose to put on the screen; correct?
A. Correct.

MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 6.

THE COURT: Any objection?

MS. GUILLARD: No objection.

THE COURT: Plaintiff's Exhibit Number 6 will be admitted and published if you wish.

(Plaintiff's Exhibit 6 received.)

MS. OLSON: Yes, please, Your Honor.

Q. (BY MS. OLSON) And before Ms. Bibb presses "play," would you please read aloud the text that you chose for the screen.
A. "Rebecca Scofield is going to prison for the murder of the four University of Idaho students whether you like it or not."

MS. OLSON: Please play Exhibit Number 6.

(Playing video.)
Q. (BY MS. OLSON) We'll next look at Exhibit Number 8. And, Ms. Guillard, have you watched Exhibit Number 8 prior to trial?
A. Yes.
Q. And this is a TikTok that you made and posted on or about December 5, 2022?
A. Yes.
Q. It includes your voice?
A. Yes.
Q. Your picture?
A. Yes.
Q. And words that you selected to put on the front screen of the TikTok; correct?
A. Correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 8.
THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 8 will be admitted and published for the jury.
(Plaintiff's Exhibit 8 received.)
MS. OLSON: Thank you, Your Honor.
Q. (BY MS. OLSON) And, Ms. Guillard, that front screen, what words did you choose to put on there?

A. "Rebecca Scofield and Kaylee's relationship."

MS. OLSON: Please play Exhibit Number 8.

(Playing video.)

Q. (BY MS. OLSON) We'll next look at Exhibit Number 7. And, Ms. Guillard, looking at the front screen of Exhibit Number 7, do you recognize this as a TikTok that you watched prior to trial?

A. Yes.

Q. And this is another TikTok you made and posted on or around December 5, 2022; correct?

A. Correct.

Q. And it's actually part two to the video that we just watched in Exhibit Number 8; is that right?

A. Correct.

MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 7.

THE COURT: Any objection?

MS. GUILLARD: No objection.

THE COURT: Plaintiff's Exhibit Number 7 will be admitted and published for the jury.

(Plaintiff's Exhibit 7 received.)

Q. (BY MS. OLSON) And on the front page -- or the front screen of Exhibit Number 7, what text or type did you put in there?

A. "Rebecca Scofield's relationship with Kaylee, part two."

MS. OLSON: And would you please play, Ms. Bibb, the TikTok in Exhibit 7.

(Playing video.)

Q. (BY MS. OLSON) And, Ms. Guillard, these videos that we just looked at in Exhibit 7 and Exhibit 8, where there was a two-part video posted the same day, that was common for you; correct? You would post a number of videos about the case on the same day; correct?

A. Correct.

Q. And you would post a number of videos in a row that dealt with your allegations that Professor Scofield orchestrated their murder; correct?

A. Correct.

Q. And you would post a number of videos in a row with your allegations that Professor Scofield was having a relationship with that one murdered student; correct?

A. Correct.

Q. And in fact, you had posted 15 TikToks on November 24, 2022; correct?

A. I did not count the amount of videos that I posted.

Q. Does that sound about right?

A. It could be.

Q. And you had posted seven on November 25, 2022; correct?

A. On November 25 I posted just seven videos?

Q. Seven TikToks about this case; correct?

A. It's possible.
Q. And on November the 26th, 2022, you posted five TikToks about the University of Idaho murders and Professor Scofield's role in them; correct?
A. Possible.
Q. Yeah. And on November 28 you posted ten TikToks about the University of Idaho members -- murders and Professor Scofield's role in them; correct?
A. On November 28 I posted about the murders? That's two separate questions. I've posted videos about the murders, correct. I don't know how many of those videos were about Rebecca Scofield.
Q. Ms. Guillard, the videos we've looked at so far in these exhibits were all posted on or before December 10, 2022; correct?
A. Correct.
Q. And they were all posted by you; correct?
A. Correct.
Q. I'm next going to have you take a look at Exhibit Number 9. And, Professor Scofield [sic], Exhibit Number 9 is a TikTok that you watched prior to trial; correct?
A. Correct.
Q. And it's one you posted on December 13, 2022?
A. Correct.
Q. It includes your voice?

A. Correct.
Q. And your picture; correct?
A. Correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 9.
THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 9 will be admitted and published for the jury.
(Plaintiff's Exhibit 9 received.)
Q. (BY MS. OLSON) And on the front screen there you selected some type to put in there; correct?
A. Correct.
Q. And what did you choose to say?
A. "Rebecca Scofield's attorney, Wendy J. Olson, sent me a demand letter to remove TikToks with false statements. I made no false statements KMA," which means --
Q. What does it mean, Ms. Guillard?
A. It means kiss my ass.
MS. OLSON: Would you please play Exhibit Number 9.
(Playing video.)
Q. (BY MS. OLSON) And, Ms. Guillard, that demand letter that you received is the same document that we looked at yesterday in Exhibit Number 20; correct?
A. Correct.

Q. And that demand letter enclosed a copy of the earlier demand letter, the one that we looked at in Exhibit Number 19; correct?
A. Correct.
Q. And in that demand letter -- both demand letters -- it simply asked that you take down the videos; correct?
A. That was one of the things asked.
Q. And then it asked you to not post any more making the false statements; correct?
A. That was another thing that was asked.
Q. And then it asked to -- you to apologize; correct?
A. Correct.
Q. And you didn't take down the videos; correct?
A. Correct.
Q. And you kept making the videos; correct?
A. Correct.
Q. And you've never apologized to Professor Scofield; correct?
A. Correct.
Q. And you certainly didn't in response to that cease and desist letter in December of 2023 -- 2022; correct?
A. False. That was my response.
Q. Your response was --
A. The video.
Q. The video that ends with KMA?

A. Yes.
Q. If we could next look at Exhibit Number 43. And, Professor Scofield, do you recall watching Exhibit Number 43 prior to trial? I'm sorry. Ms. Guillard, did you watch Exhibit Number 43 prior to trial?
A. Yes.
Q. And it's another video that you made and posted on TikTok; correct?
A. Correct.
Q. And you made this one on or about December 13, 2022; correct?
A. That's possible.
Q. About the same time as the one we just looked at in Exhibit Number 9?
A. It looks like new clothes, so maybe a couple days later. They were around the same time.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 43.
THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 43 will be admitted and published for the jury.
(Plaintiff's Exhibit 43 received.)
Q. (BY MS. OLSON) And the screen that -- or the type that is on the screen on the first page of Exhibit Number 43, what

does that say?
A. It says, "Found a good place for the demand letter Rebecca Scofield's attorney sent me," upside-down smiley face.
Q. And you chose the words to put there; correct?
A. Correct.
MS. OLSON: Ms. Bibb, if you'd please play Exhibit 43.
(Playing video.)
Q. (BY MS. OLSON) And, Ms. Guillard, after receiving that demand letter and after you made the TikTok that's in Exhibit 9 and after you made the TikTok that's in Exhibit 43, you continued to post on TikTok making the false statements that Professor Scofield orchestrated the murders; correct?
A. That's possible.
Q. And you continued to post on TikTok making the false statements that Professor Scofield had had an affair with one of the murdered students; correct?
A. That's possible.
MS. OLSON: Your Honor, I don't know what time the Court plans to take the morning break. I know we've had a couple of times we've stepped out, but I'm fine with any time. I'm just alerting the Court that that would be --
THE COURT: If you have about another 15 minutes. Or if this is a better breaking time, we can break now.
MS. OLSON: No, Your Honor. I can keep going. I

just know we've been going for a while.
Q. (BY MS. OLSON) Ms. Guillard, I'm next going to have you look at Exhibit Number 10, and I'll direct your attention to the second page of Exhibit Number 10. And on Exhibit Number 10, Ms. Guillard, does that show the first screen of the TikTok that we looked at that's in Exhibit Number 6?
A. It appears to be.
Q. And you were aware when you were posting on TikTok that people could mark if they had liked your TikToks; correct?
A. Correct.
Q. And you could see if people had shared your TikToks; correct?
A. Correct.
Q. And it would also show the hashtags that had been selected for that content; correct?
A. Correct.
Q. And Exhibit Number 10 shows all of those things for the video -- the TikTok video we looked at in Exhibit Number 6; correct?
A. Correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 10.
THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 10 will be

admitted and published for the jury.

(Plaintiff's Exhibit 10 received.)

MS. OLSON: And, Ms. Bibb, I'm going to ask you to zoom in on just the part above the thumbnails below.

Q. (BY MS. OLSON) And, Ms. Guillard, over to the right, where there's a heart and it has 11.9K under it, what does that mean?
A. It means that 11.9K people or accounts on TikTok pressed the heart button on that video.
Q. Meaning they liked it; correct?
A. It just means they pressed the heart button.
Q. Have you ever pressed the heart button on somebody else's TikTok?
A. Yes.
Q. And what was your purpose when you would press the heart button on somebody else's TikTok?
A. Support or like or -- yeah, either one.
Q. And then below that, with sort of the thought bubble with three dots and 277, that's comments; correct?
A. Correct.
Q. And then below that, the 128 with an arrow, that's shares; is that correct?
A. Correct.
Q. So that means 128 people passed on your TikTok video that was Exhibit Number 6 to somebody else; correct?

A. False. It could mean that they shared it and commentary, for example, to go against it or go with it. It could mean that they just pressed the copy link button and saved it somewhere else. It doesn't mean that they actually published it. It just means that they clicked the link, copied it, or they could have shared it.
Q. Any of those things. You just don't know; correct?
A. I don't know.
Q. But at least 129 people did one of those things; right?
A. 128, yes.
Q. Fair enough. 128. I should put my glasses back on.
And, Ms. Guillard, that was common with your TikToks? They would get heart buttons pushed; correct?
A. Correct.
Q. Sometimes in the thousands of people; right?
A. Some of them, correct.
Q. And they would get the arrow thing where it would be shared or reposted or just put some other place that you described earlier; correct?
A. Correct.
Q. And then below there are a number of hashtags; correct?
A. Correct.
Q. And are those hashtags that you selected to go with your TikTok video?
A. Correct.

Q. So you selected hashtags about "solving mysterious deaths"; correct?
A. Correct.
Q. That was how you billed yourself; right?
A. Correct.
Q. And you also selected a hashtag for "University of Idaho murder"; correct?
A. Correct.
Q. And that meant people who were looking for content on the University of Idaho murder, they might then land on your TikToks; right?
A. Correct.
Q. And then it says just "University of Idaho"; correct?
A. Correct.
Q. And then it says hashtag "Rebecca Scofield"; correct?
A. Correct.
Q. So you wanted to make sure if people were looking for content on Rebecca Scofield, they would be able to see or could choose to see your TikToks; correct?
A. That's possible.
Q. And then you also hashtagged the other people that you've mentioned, the University of Idaho students and the young man that you said Professor Scofield hired; correct?
A. And these hashtags are topics. It's just topics that goes with the video. Correct.

Q. And those are the ones that you picked; correct?
A. Correct.
Q. I'm next going to direct your attention to Exhibit Number 11. And, Ms. Guillard, you had an opportunity to watch Exhibit Number 11 prior to trial; correct?
A. Correct.
Q. And this is a TikTok that you posted on December 26, 2022; correct?
A. It appears to be an ABC News TikTok or -- or reposted online.
Q. So you reposted something on your TikTok; correct?
A. Correct.
Q. And you made the choice to repost that content; correct?
A. Correct.
Q. And you typed the information that's on the first screen of Exhibit Number 11; correct?
A. Correct.
Q. You posted this to your account; correct?
A. My second account.
Q. You had to post it to a backup account; right?
A. Correct.
Q. And that's because your first TikTok account by December 26, 2022, had been taken down and you couldn't use it; right?
A. Correct.

Q. And you posted --
A. It was banned for weeks at a time.
Q. And you wanted to post on this backup account in part so that your followers would know where to find you and that you were okay; correct?
A. Correct.
MS. OLSON: Your Honor, at this time I will offer Exhibit Number 11.
THE COURT: Any objection?
MS. GUILLARD: No objection on authenticity, but it's not my video. It's an ABC News video.
THE COURT: Ms. Guillard, you'll be able to point that out on cross-examination if you wish.
MS. GUILLARD: No objection.
THE COURT: All right. Thank you. Plaintiff's Exhibit Number 11 will be admitted and published for the jury.
(Plaintiff's Exhibit 11 received.)
MS. OLSON: Thank you.
Q. (BY MS. OLSON) And on the type that you put over this, what you've called an ABC video, you chose what to put there; correct?
A. Correct.
Q. And what did you choose to say?
A. "Hey," hand wave, "I can't post comments or videos on my main page right now. I'm okay."

MS. OLSON: And, Ms. Bibb, would you please play Exhibit Number 11.

(Playing video.)

Q. (BY MS. OLSON) Then, Ms. Guillard, it was your choice to post that TikTok; correct?

A. Correct.

Q. And that was obviously after this lawsuit had been filed; correct?

A. Correct.

Q. And even after the lawsuit was filed, you continued to post content alleging that Professor Scofield had orchestrated the murders; correct?

A. I would have to verify that.

Q. And you continued to post content that Professor Scofield orchestrated the murders because she was having an affair with one of the murdered students; correct?

A. Again, I would have to verify that. I know that videos -- the amount of videos went down, and it eventually was, like, one or two, but it stopped. But I'm -- there may be a few videos, yes.

Q. And you continued to post content or to make statements that Professor Scofield was responsible for the murders and that Professor Scofield had an affair with one of the murdered students throughout this litigation; correct?

A. In legal documents mostly, yes.

Q. And other places; correct?
A. Most of it was regarding the lawsuit and legal documents.
Q. And you would assert in those legal documents that, as a fact, Professor Scofield had orchestrated the murders; correct?
A. False. I would assert that I believed that she orchestrated the murders and had a relationship with one of the students.
Q. I'll now have you look at Exhibit Number 17. And, Ms. Guillard, is Exhibit Number 17 a video that you watched prior to trial?
A. Correct.
Q. And this is a TikTok that you posted on August 28, 2025; correct?
A. Correct.
Q. And this one doesn't actually feature you. There's just some music and text and a repeated phrase; right?
A. Correct.
Q. And you would agree that August 28, 2025, that was after Bryan Kohberger had been charged; correct?
A. Correct.
Q. After he had pleaded guilty; correct?
A. Correct.
Q. After he had, in a courtroom in this same city, admitted that he killed each of the students; correct?

A. Correct.
Q. And after he had been sentenced for those crimes; correct?
A. Correct.

MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 17.

THE COURT: Any objection?

MS. GUILLARD: No objection.

THE COURT: Plaintiff's Exhibit Number 17 will be admitted and published for the jury.

(Plaintiff's Exhibit 17 received.)

MS. OLSON: I think everyone has to look quick, Your Honor. There seems to be an issue with the system. Maybe now would be a good time to take a break.

THE COURT: I think that's a good suggestion.

Ladies and gentlemen of the jury, we will take our midmorning break. It'll be approximately 20 minutes, so if you want to get an early lunch or snack or drink, and then we'll resume back here at approximately 11:35. We'll be in recess.

(The jury exited the courtroom at 11:15 a.m.)

THE COURT: Please be seated.

Ms. Guillard, you may step down.

We'll try to, on our end, get that working. Ms. Bibb, if you'll stick around to help us do that.

We'll take our midmorning recess now. The Court will

be in brief recess.

(At 11:16 a.m., a recess was taken until 11:36 a.m.)

THE COURT: Please be seated.

Ms. Fifer, Ms. Tate, did we get the video back up and running?

THE COURTROOM DEPUTY: I think so.

THE COURT: We'll have the jury come back in.

(The jury entered the courtroom at 11:38 a.m.)

THE COURT: Please be seated.

Ms. Guillard, if you'll please retake the witness stand. You may be seated. I'll remind you that you're still under oath.

Ms. Olson, we left off trying to publish Plaintiff's Exhibit Number 17.

MS. OLSON: That's correct. I think we have that fixed, and so I think I'd just ask to publish it now.

THE COURT: All right. You may, and you may inquire.

MS. OLSON: Thank you, Your Honor.

Q. (BY MS. OLSON) Ms. Guillard, on the first part of Exhibit Number 17, that's type that you put on there and copied into this TikTok from some other source; is that right?

A. Maybe I typed it.

Q. Or do you know where you got the content that you put on the beginning of the screen of Exhibit Number 17, which is your TikTok posted on August 28, 2025?

A. Yes. Idaho State Police reports, supplement number seven.
Q. And so you excerpted material from that and decided to post it on August 28, 2025; correct?
A. Correct.
Q. After Mr. Kohberger had been sentenced for the murders; correct?
A. That -- yes, because they didn't post those documents until well after.
MS. OLSON: Ms. Bibb, if you'd please play Exhibit Number 17.
(Playing video.)
Q. (BY MS. OLSON) And, Ms. Guillard, in that TikTok, the center photo, that's also a photo that you selected, the one that we saw between -- there was the screen from the report and then there was a photo. Do you recall that?
A. Yes.
Q. And then there's what we see on the screen now, which appears to be a redacted report. Do you see now on the screen a photo?
A. Yes.
Q. And that's a photo of Professor Scofield; correct?
A. Correct.
Q. And her husband; correct?
A. Correct.
Q. And that's in front of them buying -- or with a white

Subaru at a Subaru dealership; correct?
A. Correct.
Q. So in August of 2025 you were still posting content linking Professor Scofield to the murders; correct?
A. False.
Q. And you were still posting content linking Professor Scofield to one of the murdered students; correct?
A. I posted content on that day.
Q. About Professor Scofield; correct?
A. Correct.
Q. And it was content linking her to the murders; correct?
A. Correct.
Q. Linking her to the murders that you had repeatedly accused her of orchestrating; correct?
A. False. Sorry. I misspoke. False. I believe the content was about the ISP report. And if you could go back, I could read it.
Q. That actually wasn't my question, Ms. Guillard.
A. Okay.
Q. So this TikTok that we see in Exhibit Number 17, where we see -- the part of it that's on the screen now is a picture of Professor Scofield and her husband; correct?
A. Correct.
Q. And so on August 28, 2025, you were still posting content of Professor Scofield in connection with the murders; correct?

A. I posted content on that day, correct.
Q. And it was the same murders that you had earlier repeatedly accused Rebecca Scofield of orchestrating; correct?
A. Correct.
Q. Ms. Guillard, do you know what year that photograph was taken?
A. I know -- I do not know what year that photograph was taken.
Q. 2019?
A. I may have known when I posted it, but right now I don't remember. It's possible that it was 2019.
Q. So some three years before the murders occurred; correct?
A. Possible.
MS. OLSON: You can take that down, Ms. Bibb.
Q. (BY MS. OLSON) Ms. Guillard, you were aware that the Moscow Police Department issued a press release on December 27, 2022, after this lawsuit was filed, where they said the professor who was suing the TikTok artist is not -- they don't believe that she's involved in the murders. Do you recall seeing that?
A. Yes.
Q. And that was what we looked at yesterday in Exhibit 21; is that right?
A. Yes.
Q. And you learned that Bryan Kohberger was arrested or taken

into custody at the end of December of 2022 or early January of 2023; correct?
A. Correct.
Q. That's the time frame you recall?
A. Correct.
Q. And you made statements after that accusing Professor Scofield of orchestrating the murders; correct?
A. Correct.
Q. And of doing so because she was having a relationship with one of the female students; correct?
A. Correct.
Q. I'm going to direct your attention to Exhibit Number 12. Some of the statements you made after Bryan Kohberger was arrested were made in a YouTube video that you posted on February 9, 2023, titled Full Synopsis of the Plot to Kill the Four University of Idaho Students; correct?
A. Correct.
Q. And Exhibit 12 is that Full Synopsis of the Plot to Kill the Four University of Idaho Students; correct?
A. It can be. It appears to be.
Q. Well, you had an opportunity to watch it prior to trial; correct?
A. The 12 I have is 12A, B, C. It's cut into three different videos. Is that what I'm looking at?
Q. No, Ms. Scofield -- Ms. Guillard. So prior to trial you

received Exhibit Number 12; correct?
A. Correct.
Q. And you had the opportunity to watch Exhibit Number 12; correct? The full video; correct?
A. Correct.
Q. And you are familiar with the full video; correct?
A. Correct. But I'm just confused because you have a 12A, B, and C.
Q. I'm not asking anything about those -- the email that you and I exchanged. I'm just asking you if you had an opportunity to view the full Exhibit Number 12, which is your Full Synopsis of the Plot to Kill the Four University of Idaho Students.
A. My exhibit, Defendant's -- my exhibit?
Q. No, our Exhibit Number 12.
A. And I'm asking you to clarify if 12 means A, B, and C, because I'm understanding that you have three 12s.
Q. I'm not asking you anything about anything that says 12A, 12B, or 12C. I'm not suggesting anything about that. I'm just asking you if you have been able to watch the full video that -- your Full Synopsis of the Plot to Kill the Four University of Idaho Students.
A. Correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 12.

THE COURT: Any objection?

MS. GUILLARD: No objection.

THE COURT: All right. Plaintiff's Exhibit Number 12 will be admitted.

(Plaintiff's Exhibit 12 received.)

MS. OLSON: And I would ask that initially we put up the first page of Exhibit Number 12, but I only intend to play portions of it, Your Honor.

Q. (BY MS. OLSON) Ms. Guillard, in this YouTube video we see in Exhibit Number 12, dated February 9, 2023, you continued saying that Rebecca Scofield had a relationship with one of the female students; correct?

A. Correct.

MS. OLSON: Ms. Bibb, will you please play from approximately 2:43 to 4:45 in terms of the timestamp on it. I know it's a little hard to get there, so just a little more. 2:46.

(Playing video.)

MS. OLSON: And I think we actually stopped at 4:47, and I think it started at 2:46.

Q. (BY MS. OLSON) Ms. Guillard, in the video from February 9, 2023, the YouTube video that's Exhibit Number 12, you also continued saying that Rebecca Scofield came up with the plan to have the students killed; correct?

A. Correct.

MS. OLSON: Ms. Bibb, if you would next play from approximately 7:34 to 9:33. And if you can get it back to 7:25, that's fine.

(Playing video.)

MS. OLSON: If you would stop it there. We started at 7:25 and ended at 9:33.

Q. (BY MS. OLSON) And, Ms. Guillard, in your YouTube video that is Exhibit Number 12, the one you made on February 9, 2023, one of the changes you made about what you were posting is that you started including Bryan Kohberger in your posts; correct?

A. False.

Q. You started including Bryan Kohberger as having somehow been involved in the plan that Rebecca Scofield was putting together?

A. It wasn't a change. His name was mentioned, but I had already mentioned another culprit November 23, 2022.

Q. That --

A. The change was saying his name specifically.

MS. OLSON: If you'd now play from approximately -- Ms. Bibb, from 24:43 to 29:14.

(Playing video.)

MS. OLSON: We went from 24:43 to 29:14. You can take Exhibit Number 12 down now, Ms. Bibb.

Q. (BY MS. OLSON) Ms. Guillard, you learned that Bryan

Kohberger was charged by way of indictment on May 16, 2023; correct?
A. False.
Q. You didn't learn about him being charged with the murders?
A. Not arrested but being charged?
Q. Correct.
A. I don't know what day.
Q. You learned that he was being charged; correct?
A. Correct.
Q. And after he was charged that formal way, you knew that he alone was charged; correct?
A. Correct.
Q. And you learned that no other person was ever charged along with Bryan Kohberger; correct?
A. Correct.
Q. And you made statements after May 16, 2023, accusing Professor Scofield of orchestrating the murders; correct?
A. I would have to see that. It's possible.
Q. You appeared on a YouTube program called The Nerd Report on June 9, 2023?
A. Yes.
Q. You did an interview with the hosts?
A. Yes.
Q. You were sitting in a Maserati vehicle; correct?
A. Correct.

Q. I'm next going to direct your attention to Exhibit Number 14. Ms. Guillard, did you watch Exhibit Number 14 prior to trial?
A. A little bit of it.
Q. You watched certain excerpts of it?
A. A little bit.
Q. And you recognized it as the -- your appearance on the YouTube program called The Nerd Report on June 9, 2023; correct?
A. Correct.
MS. OLSON: Your Honor, we're not going to offer all of Exhibit 14. I'm going to offer Exhibit 14A.
Q. (BY MS. OLSON) Do you recall looking at Exhibit 14A, Ms. Guillard?
A. I looked at 14A.
Q. And that is a true and accurate excerpt of your appearance on The Nerd Report on June 9, 2023?
A. Well, it's edited, but yes.
Q. It's just an excerpt; right?
A. Yes.
Q. And it's just a part of a larger video; correct?
A. Correct.
Q. But it's a true and accurate excerpt of that larger video; correct?
A. True and accurate in the sense that it's me saying those

words?
Q. Yes.
A. Correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 14A.
THE COURT: Any objection, Ms. Guillard?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit 14A will be admitted and published to the jury.
(Plaintiff's Exhibit 14A received.)
(Playing video.)
Q. (BY MS. OLSON) And, Ms. Guillard, did you also watch Exhibit 14B prior to trial, another excerpt from your June 9, 2023, appearance on The Nerd Report?
A. Yes.
Q. And is 14B a true and accurate excerpt of another portion of your appearance on The Nerd Report?
A. Yes.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 14B.
THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit 14B will be admitted and published.
(Plaintiff's Exhibit 14B received.)

(Playing video.)
Q. (BY MS. OLSON) Ms. Guillard, did you also watch Exhibit 14C prior to trial?
A. Yes.
Q. And that's also an excerpt from your appearance on The Nerd Report on June 9, 2023?
A. Yes.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 14C.
THE COURT: Any objection?
MS. GUILLARD: No objection, Your Honor.
THE COURT: Plaintiff's 14C will be admitted and published.
(Plaintiff's Exhibit 14C received.)
(Playing video.)
Q. (BY MS. OLSON) Ms. Guillard, you also made a YouTube video and posted it to your YouTube channel on October 14, 2023, where you referred to Professor Scofield as a murderer; correct?
A. October --
Q. 14th of 2023.
A. It's possible.
Q. And you had over 1,000 subscribers to your YouTube channel; correct?
A. Yes.

Q. Do you recall watching Exhibit 15B prior to trial?
A. Yes.
Q. And is that an excerpt from an October 14, 2023, YouTube video that you made?
A. Is it possible for me to see it before I answer that question?
Q. Sure.
MS. OLSON: Ms. Bibb, if you would please pull up the first part of Exhibit 15B.
A. Yes.
Q. (BY MS. OLSON) And that's a post that you made on your YouTube channel on October 14, 2023; correct?
A. Correct.
Q. And that post on the YouTube channel, that's one where you refer to Professor Scofield as a murderer; correct?
A. I would have -- I don't remember. I would have to see the video again.
Q. Do you recall watching Exhibit 15B?
A. I watched it as well as all of the other videos. I don't recall whether I referred to her as a murderer.
Q. Exhibit 15B is an excerpt of a YouTube video that you posted; correct?
A. Correct.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 15B.

THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit 15B will be admitted and published for the jury.
(Plaintiff's Exhibit 15B received.)
(Playing video.)
Q. (BY MS. OLSON) So, Ms. Guillard, would you agree that in that excerpt from your October 14, 2023, YouTube video, that you referred to Professor Scofield as a murderer?
A. Yes.
MS. OLSON: You can take that down, please, Ms. Bibb.
Q. (BY MS. OLSON) Ms. Guillard, by December 21, 2023, you knew that the University of Idaho had no evidence or information that Professor Scofield had ever communicated with any of the students who were murdered; correct?
A. False.
Q. You reached out to the University of Idaho; correct?
A. Yes.
Q. You sent them a subpoena; correct?
A. Correct.
Q. And you received a response to that subpoena; correct?
A. Correct.
Q. And it came from Kim Rytter; correct?
A. Correct.
Q. He's the general counsel for the University of Idaho?

A. Correct, from my understanding.
Q. And if I could direct your attention to Exhibit 28. Ms. Guillard, do you recognize Exhibit 28 as the response that you received from the University of Idaho regarding -- in response to your inquiry about Professor Scofield's contact with the students?
A. Yes.
Q. And you agree that this is a true and accurate copy of that?
A. I believe so.
Q. Do you recall receiving it?
A. Yes.
MS. OLSON: All right. Your Honor, at this time I'd offer Exhibit 28.
THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's 28 will be admitted and published for the jury.
(Plaintiff's Exhibit 28 received.)
Q. (BY MS. OLSON) And, Ms. Guillard, this letter's dated December 21, 2023; correct?
A. Correct.
Q. It's addressed to you by email; correct?
A. Correct.
Q. And it starts out, "Dear Ms. Guillard, this correspondence

is in response to the subpoena to produce documents, information, or objects, or to permit inspection of premises in a civil action issued by you in the above-referenced matter and served the University of Idaho." Did I read that correctly?
A. Yes.
Q. And then it says, "The University of Idaho conducted a search of records within its custody and control to respond to the production requests in your subpoena"; correct?
A. Correct.
Q. "The response to each production request is as follows." Did I read that correctly?
A. Yes.
Q. And then it numerically goes through all of the things that you asked for; correct?
A. Correct.
Q. And this is signed by Mr. Rytter on page 2; correct?
A. Correct.
Q. All right. And if you need to look -- I know it's a multipage document. I think there's still a binder in front of you, at tab 28. And one of the things that you asked for was communication, including deleted communications, between Professor Scofield and the University of Idaho student whom you had accused her of having an affair with; correct?
A. Correct.

Q. And what was the response of the University of Idaho?
A. Are we on number 1? I'm sorry.
Q. We're on number 2.
A. Okay. Number 2, the response is, "The University of Idaho did not locate and is not aware of any communication, including deleted communication, to and from Rebecca Scofield and the University of Idaho student Kaylee Goncalves."
Q. And you had asked that same question about each of the other three murdered students; correct?
A. Correct.
Q. And the University of Idaho responded to each of those; correct?
A. Correct.
Q. And the University of Idaho indicated that it had no such communications; correct?
A. That they were not aware of and did not locate.
Q. They didn't have anything to provide to you in response to your subpoena; correct?
A. They did not provide me -- they provided me with this response, yes.
Q. And nothing else, just this response; correct?
A. Correct.
Q. And you have no reason to think they didn't look for the documents; right?
A. I did email them a follow-up email asking, "Hey, you said

you were not aware of it and did not locate. Did you actually look for these documents?" And they did not respond to me.
Q. Well, the general counsel responded to you with this letter; correct?
A. And when I responded, he didn't respond.
Q. Did you send him a second subpoena?
A. I did not send a second subpoena.
Q. You also asked if there were any transactions between Professor Scofield and the students; correct?
A. Yes.
Q. And the information you got back, as reflected in Exhibit 28, is there were no such transactions; correct?
A. Which number is that on here?
Q. So I'm trying to summarize it a little bit, but let's look at number 3.
A. I can't -- okay. Number 3.
Q. You asked for communications and transactions between -- to and from Rebecca Scofield and one of the other University of Idaho students; correct?
A. Correct.
Q. And they again indicated, "We don't have anything"; right?
A. I would like to see that before I say --
Q. Sure. It's number 3.
A. Okay. Yes. It said they did not locate and is not aware of any communication or transactions.

Q. And they had actually said above that they had conducted a search of their records; correct?
A. (No response.)
Q. If you look in the very first paragraph, don't they tell you, "We conducted a search of records within our custody and control to respond to the production request in your subpoena"? Correct?
A. Correct.
Q. And they didn't find anything responsive to any of the requests that you made; correct?
A. Correct.
Q. And you made ten requests; correct?
A. I believe so.
Q. Well, if we go to page 2, there's ten numbers; right?
A. Yes.
Q. And you also asked about communications with Bryan Kohberger; correct?
A. Correct.
Q. And you asked about communications with the young man who you had identified in your early TikToks in late November of 2022; correct?
A. Correct.
Q. And you also asked if Professor Scofield had attempted to delete, remove, hide, or otherwise restrict access to information regarding her connection with any of the students

or Mr. Kohberger; correct?
A. Correct.
Q. And that's the very last bullet, number 10; correct?
A. Correct.
Q. And what was the University of Idaho's response?
A. "The University of Idaho did not locate and is not aware of any communications indicating or suggesting that counter-defendant Rebecca Scofield has or has attempted to delete, remove, hide, or otherwise restrict access to information regarding her connection to any of the aforementioned students."
Q. And then it includes the names of the four murdered students, Mr. Kohberger, and the young man you repeatedly said in your TikTok videos had actually carried out the murders; is that right?
A. Correct.
Q. And you had all of that information by December 21, 2023; is that right?
A. Correct.
Q. And you continued making statements after that accusing Professor Scofield of murder even though you knew Bryan Kohberger was the only one ever charged?
A. Correct.
Q. And part of your online work then was to comment on and reject the other online personalities who disagreed with you;

correct?
A. Part of my work or -- no.
Q. Part of your online commentary was to comment on and reject the other online personalities who disagreed with you?
A. I took up for myself, yes.
Q. And on May 1, 2025, you posted a video and reposted and responded to somebody who called himself MadCaster; is that right?
A. Correct.
Q. And that was in -- again, May 1, 2025. Does that sound right?
A. It sounds right.
Q. And one of the things you said was, "He don't know the professor from a can of paint." Do you remember that?
A. Yes.
Q. All right. You also didn't know Professor Scofield from a can of paint; correct?
A. I'm claircognizant, so that would be the difference. He's not.
Q. That wasn't my question. You also don't know Professor Scofield from a can of paint; correct?
A. False.
Q. You've never met her until this trial?
A. Correct.
Q. And you had obtained information from the University of

Idaho, and they told you there was no connection between Professor Scofield and any of the students; correct?
A. Correct.
Q. And all that you knew about her was what you had looked up online; correct?
A. And -- that's not the only thing.
Q. And all you knew about her -- all the facts you knew about her was that you had looked her up online; correct?
A. The facts were from this legal case, yes.
Q. Ms. Guillard, you posted on your Instagram story on July 12, 2025, that you were in Italy or Greece; is that right?
A. July 2025 -- July when?
Q. 12th of 2025.
A. I may have posted it that day, but, no, I was not -- where?
Q. Italy or Greece.
A. I wasn't in Greece. I was in Italy in June.
Q. And you made purchases there? You went shopping?
A. Until July 3, yes, I was in Italy.
Q. You purchased perfume?
A. Yes.
Q. Handbags?
A. A purse, yes.
Q. Candy?

A. Yes.
Q. And you posted all of that on your Instagram story for people to see; correct?
A. Correct.
Q. Ms. Guillard, you have never apologized to Professor Scofield for calling her a murderer; correct?
A. Correct.
Q. You've never apologized to Professor Scofield for saying Professor Scofield orchestrated the murder of four students; correct?
A. Correct.
Q. You have never apologized to Professor Scofield for saying Professor Scofield had an affair with one of the students; correct?
A. Correct.
Q. You never took down any of your posts or videos saying that Professor Scofield was a murderer; correct?
A. TikTok took them down.
Q. Right. You never took them down; correct?
A. Correct.
Q. And you never took down any of your posts saying that Professor Scofield had orchestrated the murders; correct?
A. Correct.
Q. Or that Professor Scofield had an affair with one of the students; correct?

A. Correct.
Q. Only TikTok did that; correct?
A. TikTok did it, correct.
MS. OLSON: Thank you, Ms. Guillard.
THE COURT: All right, Ms. Guillard. You have the opportunity to cross-examine yourself, as we discussed before. You'll ask a question if you wish and then answer the question after a bit of a pause to allow any objections that might come. You can ask these questions, but just realize that if you intend to also testify in your case in chief, be a witness, that I probably won't allow cumulative testimony. But Ill give you some latitude there. So you can proceed with your cross-examination.
MS. GUILLARD: Thank you.

CROSS-EXAMINATION

BY MS. GUILLARD:
Q. I will ask myself, Ashley Guillard, a question regarding the posted number of videos. I have to speak to myself in the third person.
Ashley Guillard, you posted a number of videos regarding the murder of the students and Rebecca Scofield's involvement. Why did you post those videos?
No objections?
A. I posted, for example, on November 24 -- or November 2024 -- I should note there was 15 videos November 24 or seven

videos November 7 because the videos are limited to TikTok at that time were like 60 seconds or less. So when I would do a tarot reading and get a message, if the message did not fit within 60 seconds, it would require another video.

So seven videos may be a total of less than -- it could be seven or less minutes regarding whatever topic I was speaking on. So the number of videos does not necessarily mean a massive volume because the videos were limited to 60 seconds or less. And as you've seen from the evidence, some of them were even 15 seconds.

THE COURT: Ms. Guillard, you can just say "question" and "answer." That'll break it up for the record as well.

MS. GUILLARD: Okay.

THE COURT: Thank you.

Q. (BY MS. GUILLARD) Question: Why were those videos posted?

A. Answer: I posted those videos because I first was requested by a TikTok user to use tarot readings.

MS. OLSON: I'm going to object to the extent it's being offered for the truth of the matter asserted. If it's only being offered for what she did in response, I think that's fine, but just so it's clear that anything someone said out of court is not offered for the truth.

THE COURT: And that objection will be overruled. As I understand it, you're asking about whether a TikTok user's

statement or requesting what she did is hearsay?

MS. OLSON: Your Honor, I'm only objecting if it's being offered for the truth of the matter asserted.

THE COURT: All right. As I understand it, Ms. Guillard is going to testify about why she posted videos, and it was in response to something a TikTok user requested. The jury's not to consider that for the truth of what the TikTok user said but just to show the reaction of Ms. Guillard in response to that.

You may continue, Ms. Guillard.

MS. GUILLARD: Thank you.

A. At the time I was posting videos regarding the suspicious death of Shanquella Robinson, who --

MS. OLSON: Objection, Your Honor; relevance. And I think this gets into the character evidence that we discussed.

THE COURT: Overruled.

A. At the time I was posting content regarding the murder of Shanquella Robinson, and during those videos a TikTok user said, "I'm waiting on you to do a reading on the murder of the four University of Idaho students." I believe that to be around November 22, 2022. I responded that I would do it.

So on November 23, 2022, I stopped reporting on the death of Shanquella Robinson and began doing readings and posting on my TikTok on the murder of the four University of Idaho students. The way that I would --

Q. (BY MS. GUILLARD) Okay. Question: Where did you get the information that you posted regarding the murder of the students and Rebecca Scofield?

A. Answer: I conducted tarot and oracle card readings on basically the hypothesis on who, what, when, where, and why the students were murdered. I used, again, two, like, oracle cards and tarot cards as well as public information on the case. For example, I learned of the victim's name Kaylee Goncalves. So I would do a question to myself in my notes, who killed Kaylee Goncalves? Why was Kaylee Goncalves killed? And I did that for each name of the students.

As I was conducting tarot readings and oracle card readings, the word "history" continued to come out in those readings. And as a spiritualist, when you see something repeated, sometimes it's a message. So when I saw the word "history," I dug more into it. I asked my tarot and oracle card, why am I seeing "history"? And it alluded to a teacher, the tarot and oracle card reading. Tarot and --

Q. Question: What are tarot and oracle cards?

A. Tarot cards are card decks created by people in the spiritual community that delivers messages. To get a message from it, you shuffle it or pick a card. People do it different ways. But you shuffle it, and a card pops out as you're shuffling. And you would take that card -- I take that card -- sorry, not you. I take that card and decipher a

message from that card. The same is for oracle cards.
Q. Question: What message did you receive from the tarot and oracle cards?
A. Again, the messages I was receiving was that a teacher ordered the murder of the students, and she hired two people, ultimately only going with one, to execute the crimes. After the word "history" came out several times and a teacher, I went to the University of Idaho website, because that's where the students attended. I looked at the history department. When I got to the history department, it was maybe ten people listed as faculty on the history department's page.

I then took my tarot and oracle card readings in my notebook, and I wrote down each of their names. And for each one, again I conducted a tarot and oracle card reading with the question, what was -- whatever person that name was -- I don't remember all of their names -- what was this faculty member's role in the murder of the four University of Idaho students?

The reading for the remaining faculty members that I did that day came out that -- various messages, like they were afraid, they were waiting for other people to learn of what happened, general messages of noninvolvement.

When I did the reading on Rebecca Scofield, the reading stated that she was involved with the crimes. She ordered the crimes, and she was involved with the students. I

was in shock to receive that message, so I did several more tarot readings to confirm the message regarding Rebecca Scofield's role in the murder of the students. And it continuously gave me the same message, that she was dating a student. And then who, what, when, where, and why, again I asked about Rebecca Scofield. It alluded to anxiety. It alluded to not wanting to be caught. It alluded to her involvement with the crimes.

At that time I believed --

MS. OLSON: Your Honor, I think we've gotten into a little bit of a narrative. I would ask that we proceed in question and answer.

MS. GUILLARD: Okay.

THE COURT: That'll be sustained. Just ask another question. Thank you.

Q. (BY MS. GUILLARD) Question: After receiving the message of the tarot and oracle readings concerning Rebecca Scofield's involvement with the murders, why did you post those reading and -- tarot and oracle readings on TikTok?

A. Answer: That goes back to the initial post of the TikTok user who asked me what -- can you do a reading on the students. Two, also I thought it was important information that I believe someone was involved with the crimes and that the public should know.

Q. Question: Why did you post multiple videos?

A. Answer: Again, multiple videos are posted, one, because of the limited 60 seconds or less videos that I had to post on TikTok; and, two, I really wanted the message to get out that Rebecca Scofield ordered the murder of the students, because there were no arrests at the time and I believe it to be true.
Q. Question: After there was an arrest, why didn't I apologize to Rebecca Scofield?
A. After Bryan Kohberger was arrested, I did another tarot and oracle card reading on his involvement. I wanted to see if the reading came out contradictory to the ones that I had already done regarding the murders. Instead, it added to the story. On November 24, 2022, my reading stated that she had two options. And after Kohberger's arrest, my reading stated he was one of those options, and my reading said he did not do it.
I continued to post because I did not believe the narrative that was being pushed by law enforcement and the media regarding the actual person who ordered and murdered the University of Idaho students, again, so I posted to get help. Maybe they would listen. Maybe somebody in law enforcement or somebody with power or somebody with knowledge of the case would look into it.
Q. Question: Were you contacted by law enforcement or anyone regarding your statements of Rebecca Scofield's involvement?
A. Answer: I also submitted a tip to the FBI tip line

several times --

MS. OLSON: Your Honor, I'm going to object as to nonresponsive. Her question was were you contacted, not whether she made contact.

A. Answer --

THE COURT: I'm going to overrule the objection.

A. I submitted a tip to the FBI tip line regarding what I believed happened to the students and the real culprits. I did not receive a response from law enforcement.

Q. (BY MS. GUILLARD) Question: Again, why didn't I apologize to Rebecca Scofield?

A. Answer: The public information on the case was being limited. There was a gag order in place on preventing information from being presented to the public regarding the details of the case. I submitted inquiries to the FBI. They were not responding.

My readings, which I believed 100 percent, were not contradictory to the information that was coming public to the case. For example, my reading on who, what, when, where, and why the students were murdered stated that the students were separated into three rooms. The roommates were in a room, Kaylee and Maddie, were in a room, and Xana and Ethan were in a room.

When the public information came -- when the information came out from a press release from law

enforcement, some of my readings were confirmed, in my opinion, to be true.

MS. OLSON: Your Honor, I'm going to object on the grounds that that inherently includes hearsay.

THE COURT: I'm going to overrule the objection. She's not offering that to prove the truth of that statement but rather to explain her state of mind.

You may continue.

MS. OLSON: Your Honor, may we approach?

THE COURT: You may.

(At sidebar.)

MS. OLSON: Your Honor, there's inherently -- when she says it confirmed, it was consistent with my reading, that inherently is relying on the fact of her assertion that what was said in whatever document she's referring to -- and we don't know what it is -- that there were statements in that that were the same as her reading.

THE COURT: You can cross-examine -- you can cross-examine her about that on redirect. She's explaining what was in the public record that to her, in her belief, confirmed her tarot and oracle card readings. And this is a punitive damages case that goes to her bad faith, and she's got a right to explain what was in her head at the time, and what was in her head at the time was in part coming from public information that was being released to her. So that'll

be my ruling. You'll be able to go into it on cross-examination.

MS. OLSON: So she doesn't have to actually introduce the things that were -- or the information that she relied on? She can just say, "This is what that document says and it confirmed my reading"?

THE COURT: Well, she --

MS. GUILLARD: I --

THE COURT: Wait.

She's explaining what was in her head at the time, just like your client explained what was in her head at the time in terms of how she was feeling and her damages and things of that nature. She was explaining what it is that was in her head at the time, and that's just as much evidence from the witness stand as if there's a document. Again, you can ask her on cross-examination what she relied on. Do you have that here in court? Have you produced it in trial? All those things.

MS. OLSON: Understood, Your Honor. But I don't want to disrupt the proceedings repeatedly, but I would like to have a standing objection anytime she refers to a document and quotes from it or refers to it and then says that confirmed -- or, "It confirmed my reading," because I think that is inherently hearsay.

THE COURT: I don't think she's offering it to prove

the truth of what is in that document but solely as it went to her state of mind at the time.

MS. OLSON: I think she is offering it, Your Honor, because what she's saying is, "There was a document that said X, and that was consistent with what was in my reading."

THE COURT: And --

MS. OLSON: So the fact that the document said X she is offering for the truth of the matter asserted.

THE COURT: And if you wish me to at the end -- and I'm already giving a limiting instruction that says, you know, the reason this is relevant is to her state of mind, not for the truth of what that document says --

MS. OLSON: I would appreciate that, Your Honor.

THE COURT: I can do that at the end.

MS. OLSON: That's fine.

THE COURT: Remind me to do that at the end, and I'll give that limiting instruction.

MS. GUILLARD: I can bring my laptop over and introduce exhibits, but I was listening to you guys and you wanted -- you didn't want my testimony to be redundant.

THE COURT: Yes. And it's up to you how you want to handle your testimony, but all Ms. Olson is saying is that whatever documents or statements -- say, in this instance a statement by the FBI or a statement by the Moscow Police Department that you relied on and said this corroborated my

spiritual readings, I would just instruct the jury to say that whatever information you got from public records, from FBI, from Moscow Police Department, you are not offering that today to prove the truth of what the FBI said, to prove the truth of what the Moscow Police Department said, but just as you saw that or read that in realtime, that that, to you, affected your state of mind insofar as it made you believe that your readings were accurate.

MS. GUILLARD: Yes, sir.

THE COURT: All right.

MS. GUILLARD: May I grab my laptop just in case?

THE COURT: You may.

(End of sidebar.)

THE COURT: And, ladies and gentlemen of the jury, to be -- you may be seated, Ms. Guillard.

The objection that Ms. Olson had is that Ms. Guillard is now testifying about facts in the public record, whether it be a statement by the FBI or a statement by Moscow Police Department, that for her, in her mind, confirmed some of her tarot and oracle card readings.

I'm going to instruct you that what she says from the witness stand here about out-of-court statements by the FBI, Moscow Police, anyone, are not being offered to prove the truth of those statements but simply as they affected her state of mind back at the time she was doing her tarot and

oracle card readings. So the objection will be overruled.

With that limiting instruction, you may continue, Ms. Guillard.

MS. GUILLARD: I'll ask an additional question.

Q. (BY MS. GUILLARD) What is a documented example of information that you received from oracle card and tarot card readings in the case that made you believe it matched with the information coming out on the public record?

A. Answer: On December 10, 2022, I submitted a tip to the tip line at ci.moscow.id.us of what I believed the killer and the motive of the four University of Idaho students.

I'm sorry. I need to get this technology.

THE COURT: Ms. Guillard, do you need some time to get your computer up and running?

MS. GUILLARD: I'm here now.

THE COURT: Okay.

MS. GUILLARD: Oh, well, I thought I had it. It's blank again now.

THE COURT: Why don't we take just a five-minute comfort break right now. It's a good time for us to break while you get those things organized. So we'll take a brief recess for a comfort break.

(At 12:45 p.m., a recess was taken until 12:51 p.m.)

THE COURT: Please be seated.

All right. Ms. Guillard, are you ready for the jury?

MS. GUILLARD: Yes, sir.

THE COURT: Ms. Olson?

MS. OLSON: Yes, Your Honor.

THE COURT: Mr. Gordon.

(The jury entered the courtroom at 12:52 p.m.)

THE COURT: Please be seated.

Ms. Guillard, are you ready to continue your cross-examination?

MS. GUILLARD: Yes, sir.

THE COURT: All right. You may.

Q. (BY MS. GUILLARD) A reminder of the question: Why didn't I apologize to Rebecca Scofield?

A. At the time -- answer: At the time the public information on the case was limited, but sometimes when information was put out, it confirmed my tarot readings. And other times when information was put out, it confirmed that the message, in my opinion, I got in my tarot reading was accurate when the public information put out in the case was not.

For example, I'll introduce Exhibit -- Defendant's Exhibit Number 518.

THE COURT: Hold on, Ms. Guillard. You said 518?

MS. GUILLARD: Yes, sir.

THE COURT: Ms. Olson, any objection to the admission of Defendant's Exhibit 518?

MS. OLSON: Other than discussed at sidebar, Your

Honor, none.

THE COURT: All right. You're offering that into evidence, Ms. Guillard?

MS. GUILLARD: Yes, sir.

THE COURT: Defendant's Exhibit 518 will be admitted.

(Defendant's Exhibit 518 received.)

THE COURT: Do you wish to have it published for the jury?

MS. GUILLARD: Please publish Defendant's Exhibit Number 518 to the jury.

THE COURT: All right. It will be. It's up there.

A. This exhibit is a press release from the website of Moscow Homicide Update, labeled "Moscow homicide update, clarification," dated November 30, 2022, at 7:15 p.m. It states, "The Moscow Police Department is providing the following information to update the public on the known facts surrounding the murders that occurred on November 13 in Moscow, Idaho."

They updated the public on several things, but I'm going to limit it to save some time on the purpose of this testimony. The update stated that the roommates and the victims were asleep the night of the murders and that the roommates did not hear anything. For this document, there's a lot of other information that was released, but I want to focus on that.

My tarot reading stated that the surviving roommates were not sleeping the night of the murders.

THE COURT: Ms. Guillard.

MS. GUILLARD: Oh, I'm sorry. So sorry.

A. -- and that they heard everything. The tarot reading video was not produced as evidence, but I do have my initial email to the FBI tip line that states that information, which is Defendant's Exhibit Number 512.

MS. GUILLARD: Please present --

THE COURT: You're seeking to admit Defendant's Exhibit 512?

MS. GUILLARD: I seek to admit Defendant's Exhibit Number 512.

MS. OLSON: No objection.

THE COURT: All right. Defendant's Exhibit 512 will be admitted. You may now publish it for the jury.

(Defendant's Exhibit 512 received.)

A. This Exhibit Number 512 is my email from December 10, 2022, to the FBI tip line of my attempt to give them the information that I believe led to the murder of the four students. For the sake of this testimony, which is focused on my reason for not apologizing to Scofield, I want to focus on the roommates, the comment regarding the roommates.

In my statement or tip to the FBI and Moscow PD, I said that the roommates -- the surviving roommates heard

everything. They came to investigate while Xana was alone with Ethan -- quote, unquote, he was dead -- and confirmed their suspicions. Their car was stuck in the mud, so they felt they couldn't get away to go get help. They told Xana they'd get her help, and then they left her. Instead, they hid until it was all over. This was sent to them again December 10, 2022.

MS. GUILLARD: Sorry. Thank you. Now I would like to introduce Defendant's Exhibit Number 516.

THE COURT: Any objection, Ms. Olson?

MS. OLSON: Yes, Your Honor, on authenticity grounds. I'm not sure, quite frankly, what this is.

THE COURT: Ms. Guillard, if you could ask yourself some questions in Q and A format and identify what this document is and where it came from.

Q. (BY MS. GUILLARD) Question: What is Defendant's Exhibit Number 516?

A. Answer: It is a statement of Brett Payne, who states that it was taken from a public record that states he is --

THE COURT: Don't say what it says yet. What is the public record?

MS. GUILLARD: Moscow Police Department records regarding the murder of the four University of Idaho students published on their website.

THE COURT: All right. Any objection, Ms. Olson?

MS. OLSON: Your Honor, may I ask some questions in aid of objection?

THE COURT: You may.

MS. OLSON: Ms. Guillard, when did you get the document that you've marked as Defendant's Exhibit 516?

MS. GUILLARD: The document is dated December 29, 2022.

MS. OLSON: So my question is, when did you get it?

MS. GUILLARD: Around that time. I can't tell you what specific day.

MS. OLSON: It appears to be a search affidavit of some sort; is that right?

MS. GUILLARD: It was a part of the probable cause affidavit, so it had to be after Mr. Kohberger was arrested. And it was published December 29, 2022, or filed, as the stamp says, from the District of Latah County. So it had to be after that.

MS. OLSON: And, Your Honor, subject to the Court's earlier limiting instruction, I'm not going to object to this exhibit.

THE COURT: All right. Defendant's Exhibit 516 will be admitted.

(Defendant's Exhibit 516 received.)

THE COURT: Again, ladies and gentlemen, the -- this appears to be part of the complaint affidavit for the arrest

of Mr. Kohberger, I think. There's a lot of factual statements in it. Ms. Guillard is offering this as it goes to her state of mind at the time she was making some of these TikTok videos and publishing them and performing her tarot card and oracle card readings. The facts that are in this exhibit are not being offered for the truth, and you're not to consider them for the truth of what is being stated, only as it went to Ms. Guillard's state of mind at the time and how they affected her state of mind.

So with that, again, Defendant's Exhibit 516 will be admitted.

MS. GUILLARD: May I publish it to the jury?

THE COURT: You may.

A. So to bring it back, this Defendant's Exhibit Number 518 stated, from Moscow Homicide Update, that --

THE COURT: Did you mean -- is it 518?

MS. GUILLARD: Yes.

THE COURT: Sorry.

A. If I go back here, it stated the roommates were sleeping and the two did not wake up until that morning, alluding that they didn't hear anything.

My email to the tip line from Exhibit Number 512 stated that the roommates heard everything. And this is dated December 10, 2022, but the tarot readings were done November 23, 2022, and up until this date of this email. They came to

investigate, found Xana was alone and everything I stated earlier, and they hid until it was all over.

Now, Exhibit Number 516, which is the statement from law enforcement released after the arrest of Bryan Kohberger on December 29, 2022, after that page 4 confirms on -- well, page 4 states and it confirmed in my mind that despite receiving information that the roommates were sleeping, that my tarot readings were correct. They were awake. They did hear a male say something to the effect of, "It's okay. I'm going to help you." They did see Xana that evening crying in her room. And there's more, but I'm going to stop there for that exhibit.

The purpose of showing you guys those three exhibits -- okay. Sorry.

MS. OLSON: Your Honor, objection; argument.

Q. (BY MS. GUILLARD) Question --

THE COURT: You can't make argument at this time, but ask yourself a question that is relevant and answer that question.

Q. (BY MS. GUILLARD) Question: What does those three exhibits have to do with not apologizing to Rebecca Scofield?

A. Answer: As I was receiving information for the case, first that contradicted what was in my tarot reading, and then, for example, Exhibit 518 stated the roommates were asleep. My tarot reading said they were up and figuring out

what was involved and they heard everything and they hid. But then when the probable cause affidavit came out in Exhibit 516, it confirmed that despite what law enforcement had put out, what I read in my tarot and oracle card readings were accurate.

And that's when I saw that there was an objective basis to clarify things that I was seeing in my tarot reading. So I was less inclined to simply believe I was wrong in my tarot readings just because Bryan Kohberger was arrested.

Q. Question: Why did I keep posting?

A. Answer: Again, I had a strong belief in my tarot readings, and at the time there wasn't information being released in the case. And in 2025, when the gag order was released and still documents were becoming available, that again in my opinion confirmed some of the information that I put out in my tarot readings.

I'm not saying that I can't be wrong. What I'm saying is because the information was hid from or under seal and not released to the public from November -- or from his arrest in December 2022 up until current, where a lot of documents are under seal, and 2025, when more was being released, I had no way of knowing or receiving objective information that made me believe that what I was seeing was false. So because information was being hidden from the public or sealed from the public, I relied on my intuition and

my faith that -- and examples like this that I was correct even though the public information put out was wrong that what I was seeing was true.

Additionally, it was very hard -- it was very hard for me to simply apologize and move on because after doing so many tarot and oracle card readings on the students, it touched me. So I felt emotionally invested in solving or helping to solve the murder of the four students and also wanting justice for them. And at the time I believed that Rebecca Scofield was a murderer, so it was not in my heart to apologize to someone who I believe was a murderer.

MS. GUILLARD: That would be all.

THE COURT: All right. No further questions?

MS. GUILLARD: No further questions.

THE COURT: All right. Ms. Olson, redirect examination?

MS. OLSON: Yes, please, Your Honor.

REDIRECT EXAMINATION

BY MS. OLSON:

Q. Ms. Guillard, murder is a serious crime; correct?

A. Yes.

Q. You knew that on November 23, 2022, when you started posting about the University of Idaho murders; correct?

A. Yes.

Q. You knew that on November 24, 2022, when you posted the

TikToks we've looked at in Exhibits 40 and 41; correct?
A. Sorry. Yes.
Q. And you knew that a conviction for a murder carried very, very serious penalties; correct?
A. Yes.
Q. Including life in prison potentially?
A. Yes.
Q. And you knew that murder of four individuals would be treated more seriously than murder of a single individual; correct?
A. Yes.
Q. And on November 24, 2022, when you started posting about Professor Scofield, you had not a single fact that indicated she was in any way involved in the murders; correct?
A. Psychics don't go off facts. Psychics go off intuition.
Q. Well, you know what facts are, Ms. Guillard?
A. I know what a fact is.
Q. So a fact might be that Professor Scofield was not in Moscow, Idaho, November 12th and 13th of 2022; correct?
A. False. Rebecca Scofield stated she got there November 13 at 1 p.m.
Q. That would be a fact; correct?
A. Correct.
Q. And so you know what a fact is; correct?
A. Correct.

Q. And you know that only -- that murders can only be charged and prosecuted based on facts; correct?
A. Correct.
Q. And you didn't have a single fact that in any way connected Professor Scofield to their murders; correct?
A. Again, I was using intuition, not facts.
Q. That wasn't an answer to my question. My question was, you didn't have a single fact that connected Professor Scofield to their murders; correct?
A. Correct.
Q. And you didn't have a single fact that connected Professor Scofield to the one murdered student you alleged that she had an affair with; correct?
A. Correct.
Q. And you know how to look up information; correct?
A. Correct.
Q. Like, you went to the University of Idaho website; correct?
A. Correct.
Q. And you could figure out what Professor Scofield's job was; correct?
A. Correct.
Q. That was a fact; correct?
A. Correct.
Q. And you looked up information about the young man that you

allege that she hired; correct?
A. Correct.
Q. And at the time you looked up information and you found online or in media that he had previously had a relationship with the young woman that you then accused Professor Scofield of having a relationship with; correct?
A. That was long. Sorry.
Q. You learned that that young man you accused -- correct? -- that he had previously been involved with or was the ex-boyfriend of the same young woman you accused Professor Scofield of having an affair with? Correct?
A. After my tarot readings, or are you asking before my tarot readings?
Q. I'm asking if you looked that up and found that as a fact.
A. Alleged fact, yes.
Q. So that was information you found somewhere online or information about their prior relationship; correct?
A. Correct.
Q. Once you had this tarot card reading, what steps or due diligence did you perform to determine whether or not Professor Scofield was even in Moscow, Idaho, when the students were killed?
A. My tarot reading and oracle card reading stated she ordered the murders, so I felt no need to look up her location the night of the murders because cell phones exist.

Q. So you didn't do any due diligence to see whether or not she was in Moscow, Idaho, when the murders occurred; correct?
A. Correct.
Q. And you didn't do any due diligence to see if she even knew the young man that she hired; correct?
A. Are you speaking on November 24, or are you speaking after?
Q. On November 24, before you posted anything that connected her to that young man, what due diligence did you do -- before or after your tarot card readings, what due diligence did you do to see if Professor Scofield had any relationship with that young man?
A. All I did was a tarot and oracle card reading.
Q. So you didn't look to see if there were any facts to confirm that tarot card reading?
A. No. I mean, I looked -- other than looking up the University of Idaho website, no.
Q. And when you looked on the University of Idaho website, you picked out Rebecca Scofield; correct?
A. False. I told you I looked up and did a reading on each and every person that was on that web page, and the rest of them, my tarot reading revealed or stated the message was they were not involved, and my tarot reading on Rebecca Scofield stated that she was involved.
Q. And after that you did no due diligence to find any facts

to see if your tarot card reading in fact had facts to back it up so that if you were going to accuse somebody of a crime, that was evidence that could be used in the process; correct?
A. That was the point of my tip to the FBI, because I believe they are the factfinders in criminal cases, or in this case the Moscow Police Department, not the public.
Q. Well, you posted your TikToks, I think a significant number, 15, on November 24; correct?
A. Correct.
Q. And then multiple the next day, on November 25; correct?
A. About -- generally about the murders.
Q. And about Professor Scofield. You alleged that she had orchestrated them; correct?
A. And some of them were about Rebecca Scofield.
Q. And some of them were about Rebecca Scofield having had a relationship with one of the students; correct?
A. Correct.
Q. And there were as many as ten on November 28, 2022; correct?
A. Regarding the murder of the four students generally and Rebecca Scofield?
Q. You posted ten videos on November 28, 2022, about the videos and Professor Scofield's involvement in them; correct?
A. All of the videos were not about Rebecca Scofield, but, yes, some of the videos were.

Q. And the only person you ever named in any of your TikToks that you alleged orchestrated the murders was Rebecca Scofield; correct?
A. Correct.
Q. And in all of the videos that you did, the only person that you ever said actually murdered the students was the young man who is in those videos; right?
A. Correct.
Q. And you never posted a video saying that Bryan Kohberger actually committed the murders; correct?
A. I never said that.
Q. Ms. Guillard, you've talked about your FBI tip line. Let's take a look at that. I think it's Exhibit 512.
MS. OLSON: And, Your Honor, I think that's in evidence, so if it may be published.
THE COURT: It may.
Q. (BY MS. OLSON) Ms. Guillard, if we go to the very upper right-hand corner, this is an email that you sent; correct?
A. Correct.
Q. And it's dated Saturday, December 10, 2022, at 3:54 a.m.; is that right?
A. Correct.
Q. And that was more than two weeks after you first started posting TikToks stating that Rebecca Scofield had orchestrated the murders; correct?

A. Correct.
Q. And that was more than two weeks after you had posted on TikTok that Professor Scofield was having a relationship with a female student; correct?
A. Correct.
Q. And between November 24 and December 10, 2022, what facts had you gathered to show that Professor Scofield was in any way involved in the murders?
A. Again, as a -- they call it psychic. I say claircognizant. We work with intuition, not facts.
Q. But when you were on TikTok, you were stating as a matter of fact that Professor Scofield was the murderer; correct?
A. False. In my TikToks I'm holding up tarot and oracle cards, which would imply it is a tarot and oracle card reading, which is not a fact.
MS. OLSON: If we could please look at Exhibit Number 40.
Q. (BY MS. OLSON) Ms. Guillard, you remember Exhibit Number 40?
A. Yes.
MS. OLSON: Could we please play Exhibit Number 40.
(Playing video.)
Q. (BY MS. OLSON) All right. Ms. Guillard, there's no reference to a tarot card in Exhibit 40; correct?
A. False. My channel was a reference to tarot and oracle

card readings because that is what my channel on TikTok was used for.
Q. That wasn't my question, Ms. Guillard.
A. So, no, that's false because I posted that in a forum that I posted tarot and oracle card readings.
Q. Ms. Guillard, Exhibit Number 40, you chose what to say in that video; correct?
A. Correct.
Q. And not once in that video do you refer to a tarot card reading or an oracle card reading; is that right?
A. Correct.
Q. Let's go back to Exhibit 512. Exhibit 512 is your FBI tip line sent more than two weeks after you first started posting your TikToks; correct?
A. Correct.
Q. And in this tip line, is there a place where you say -- where you tell whoever you're sending this to, "Hey, I got this through an oracle card reading or a tarot card reading"?
A. No.
Q. You just provide what you set out here as facts; correct?
A. As a tip.
Q. Right. Well, you assert in the very first line, "Co-Conspirators: Rebecca Scofield ordered the execution of," and then you list two students; correct?
A. Correct.

Q. At that time did you ever have any facts that the young man you identified had ever been at the house on King Road on November 12th or 13th or 2022?
A. By "fact," do you mean did I have any documents or --
Q. I understand you said you had your tarot or oracle card readings; correct?
A. Correct.
Q. And you said that you know that tarot and oracle card readings are not facts that can be used to prosecute someone; correct?
A. Correct.
Q. So my question is, do you have any facts that that young man had been at the house on November 12 or 13, setting aside your tarot card readings, any facts?
A. The online information that he was her ex-boyfriend would imply that he was at their house, but I had not seen him personally in that house.
Q. And you hadn't seen any fact, any report, anything, including in that November 30 press release that we looked at in Exhibit 518, that would suggest that that young man had ever been at the house; correct?
A. False.
Q. And you don't present -- in Exhibit 512 you don't present any of this on the tip line as having been from a tarot card reading; correct?

A. It's not required. We don't have to tell them where we get our tips from.
Q. Well, you didn't tell them that; right?
A. Correct.
Q. You asserted certain things and provided that as your tip that you wanted them to follow up on?
A. Investigate. I wanted them to investigate them at least.
Q. And at the time I take it you didn't know that Professor Scofield had called the police department on November 24, 2022; correct?
A. Correct.
Q. And you didn't know that she had periodically after that called the police department to update the police department; correct?
A. I have no knowledge of that.
Q. And you didn't make any effort to find out any of those facts; correct?
A. The facts is the job of law enforcement, not a psychic.
Q. With respect to Exhibit 518, that press release that we looked at, Exhibit 518 doesn't have a single fact in it that refers to Professor Scofield or a history professor or anyone having ordered the murders; correct?
A. I don't believe so.
Q. And Exhibit 516, that probable cause statement that you say you got on December 29, 2022, the probable cause statement

that you got through public records, that doesn't say a single thing or have a single fact in it that in any way suggests that Professor Scofield was involved in the murders; correct?
A. Correct.
Q. And it doesn't have any information in it to suggest that anyone other than Bryan Kohberger was involved in the murders; correct?
A. False.
Q. Bryan Kohberger's the only person that it identifies as having been involved in the murders; correct?
A. Correct. But this says -- described as a figure a five-ten or taller male, could be anybody five-ten or taller, that's a male, and not very muscular.
Q. With bushy eyebrows?
A. With bushy eyebrows.
Q. And have you seen pictures of Bryan Kohberger?
A. After the arrest, yes.
Q. And he has -- he was tall and thin; correct?
A. I don't have an opinion on that.
Q. He had a lean build; correct?
A. I don't have an opinion on that.
Q. And he had bushy eyebrows; correct?
A. I don't have an opinion on that.
Q. And he had dark hair; correct?
A. I don't have an opinion on his looks.

Q. And the young man you accused of the murder, he had blond hair?
A. I believe so. I'm not sure.
Q. And, Ms. Guillard, you would agree, though, that there's nothing in Exhibit 516 that in any way suggests that there was any information that law enforcement ever had implicating Professor Scofield in any way; correct?
A. I don't have -- I don't have -- you said -- can you repeat that? I'm sorry.
Q. Sure. Exhibit 516 doesn't have any information in it whatsoever that in any way suggests that Professor Scofield was involved in the murders; correct?
A. Correct.
Q. Or that a history professor was involved in their murders; correct?
A. Correct.
Q. Or that anyone had orchestrated the murders; correct?
A. Maybe.
Q. And you have not ever seen a single fact that in any way suggests that Professor Scofield was involved in the murders; correct?
A. I requested facts in evidence, and I was denied.
Q. That wasn't my question, Ms. Guillard. You have not received any facts; correct?
A. At that time it was on a gag order. And again, I did not

receive it. I requested it, and I was declined.
Q. Well, you're aware that there's no longer a gag order in the case; correct?
A. There is still documents under seal, so sorry if I'm saying gag when I mean sealed.
Q. And you've looked at records that have been unsealed; correct?
A. Correct.
Q. And you haven't seen a single fact that would in any way suggest that Professor Scofield was involved in the murders; correct?
A. Again, I requested it, but I was not -- they denied me access to those documents, so, no, I do not have it.
Q. And you didn't start requesting any of those documents until this lawsuit had been filed; correct?
A. The lawsuit was filed 29 days after I posted my videos, so not a lot of time. And the lawsuit was filed before anyone was arrested. There was nothing to request.
Q. So you didn't request or start looking for any such information before the lawsuit was filed; correct?
A. I submitted the tip to the FBI tip line December 10. That's -- at that time you could submit tips, but there was no documents to request.
Q. You didn't -- my question was, you didn't get any information prior to the time the lawsuit was filed indicating

Professor Scofield was involved; correct?
A. There was no information.
Q. And in fact, in the three years and three months since you started posting TikToks accusing Professor Scofield of the murders, you haven't seen a single document that in any way provides a fact that would support that Professor Scofield was involved in the murder; correct?
A. False. I requested documents that I intend to introduce into evidence during my testimony in the future or tomorrow, whenever, that I did see some things that I had questions about and I requested those factual-based documents.
Q. That wasn't my question. You haven't seen a single document that in any way provides any fact or suggests that Professor Scofield was in any way involved in the murders; correct?
A. That's false.
Q. What document have you seen that suggests that Professor Scofield was involved in the murders?
A. There was documents that was under seal that I requested, specific exhibits or specific documents that was held by the police department for me to receive. I did not introduce that into evidence at this time because I was only speaking on my state of mind in the beginning. But I do plan to introduce those documents that state specific evidence or potential evidence that could prove what I was saying about Scofield or

that could prove me wrong.
Q. So your testimony, what you're telling this jury here this afternoon, is that when you testify in your own case, you will introduce a document that provides evidence or facts that Professor Scofield was involved in the murder?
A. I will -- you asked me have I seen a document that could suggest Rebecca Scofield was involved. There were documents that were released or under seal regarding the Kohberger case. I requested those documents. They could be documents that connect Rebecca Scofield to the crimes. However, I was denied access to those documents, so, no, I do not have that as evidence.
Q. So you will not -- and you have not actually seen a single document or single fact that suggests that Professor Scofield was involved in the murders; correct?
A. Correct.
Q. And you haven't seen a single fact for the three years and three months since you first started posting TikToks about her; correct?
A. The documents are under seal so --
Q. That wasn't my question, Ms. Guillard.
A. It wasn't like I didn't receive any documents. The documents are under seal, so none -- the general public did not have access to the evidence in the case of the murder of four University of Idaho students against Bryan Kohberger.

Q. My question, Ms. Guillard, is, in the three years and three months since you first started posting on TikTok that Professor Scofield orchestrated the murders of four students at the University of Idaho, you have not seen and do not have a single document or other piece of evidence that in any way connects Professor Scofield to the murders?
A. In three years and three months, those documents have been under seal.
Q. You don't have a document that connects Professor Scofield; correct?
A. Because they're under seal, and I was denied access.
Q. So your answer is, yes --
A. No.
Q. -- you don't have such a document?
A. It's impossible. It's under seal.
Q. So it's your position that there are documents still under seal that would tell the world that Professor Scofield orchestrated the murders?
A. It could be possible, is what I'm saying. It could prove that I'm wrong. It could also prove that I was right.
Q. And at this point you don't have a single document and you're not going to introduce a single piece of evidence that shows that you were right; correct?
A. No, because this is on damages only. We're not here to prove my statements regarding Rebecca Scofield's role in the

murders of the students or the affair was true. We're only here for damages.

MS. OLSON: All right. Thank you, Ms. Guillard.

THE WITNESS: You're welcome.

THE COURT: All right, Ms. Guillard. You may step down.

Members of the jury, I think this is a good time for us to take our last late-afternoon break. That'll be another 20-minute break, and then we'll finish up the day by 3 p.m. So if we can come back about 1:55 or so, we'll do that, give you about 20 minutes to relax and take care of some affairs before we finish up the court day.

The jury will be excused.

(The jury exited the courtroom at 1:34 p.m.)

THE COURT: Please be seated.

All right. Ms. Olson, who will be your next witness?

MR. CARONE: Your Honor, we're going to adjust our order just a little bit to accommodate travel schedules. I know originally we said Mr. Hanson would be next, but it'll actually be Mr. Rytter.

THE COURT: Okay. And how long do you expect that witness to take?

MR. CARONE: I think he'll be relatively short, Your Honor, maybe 15 to 30 minutes at most.

THE COURT: Okay. And then presuming we get done

with him, who will be your next witness after that?

MR. CARONE: Sean Quinlan.

THE COURT: All right. Mr. Carone, Ms. Olson, anything that you need to bring up at this point?

MR. CARONE: No, Your Honor.

THE COURT: Ms. Guillard?

MS. GUILLARD: No, sir.

THE COURT: Then we'll take a 20-minute recess and be back at 1:55.

(At 1:35 p.m., a recess was taken until 1:55 p.m.)

THE COURT: Please be seated.

Mr. Carone, are we ready for the jury?

MR. CARONE: Yes, Your Honor.

THE COURT: Mr. Gordon.

(The jury entered the courtroom at 1:56 p.m..)

THE COURT: Please be seated.

Mr. Carone, please call your next witness.

MR. CARONE: Your Honor, plaintiffs call Kim Rytter.

(The witness was sworn.)

THE COURTROOM DEPUTY: And can you please state your full name for the record and spell your last.

THE WITNESS: Yeah. Kim Max Rytter, R-Y-T-T-E-R.

THE COURT: Mr. Carone, you may inquire.

KIM MAX RYTTER, PLAINTIFF'S WITNESS

DIRECT EXAMINATION

BY MR. CARONE:

Q. Good afternoon, Mr. Rytter. Sir, how are you employed?

A. I'm general counsel at the University of Idaho.

Q. How long have you worked at the University of Idaho?

A. Next month will be nine years.

Q. And have you always worked in the general counsel's office?

A. Yes.

Q. Does your responsibilities at the University of Idaho include responding to subpoenas?

A. Yes.

Q. When the University of Idaho receives a subpoena, does it go through an investigation to find responsive emails and documents to respond to that subpoena?

A. I wouldn't call it an investigation. But, yes, we -- when we get the subpoena or public records request, we do an inquiry within the institution, what the records are, where we would find them, do we have them, that kind of thing.

Q. Is it a thorough process?

A. Yes.

Q. Is the intent to make sure that the University of Idaho's response is accurate?

A. Yes.

Q. Do you know whether the -- excuse me. Do you know whether Ms. Guillard served a subpoena on the University of Idaho in relation to this lawsuit?
A. Yes, she did.
Q. Were you responsible for coordinating the response to that subpoena?
A. Yes.
MR. CARONE: Your Honor, it's already been admitted, but I'd pull up Exhibit 28, please.
THE COURT: Please publish 28. It may be published.
Q. (BY MR. CARONE) Mr. Rytter, do you recognize Exhibit 28?
A. Give me a minute. Yes, it looks like my response. There's a second page, but I don't see -- there we go. Yes.
Q. Who drafted Exhibit Number 28?
A. I did.
Q. Who signed Exhibit Number 28?
A. I did.
Q. And in Exhibit Number 28 do you see that there are numbers and bullet points?
A. Yes.
Q. What are the numbers?
A. The numbers are the requests or the demands in the subpoena.
Q. What are the bullet points?
A. Those are my responses.

Q. So when Ms. Guillard subpoenaed the University of Idaho, you had to go through the various emails and documents and records in the University of Idaho to provide those bulleted responses?
A. Yes.
Q. Do questions number 2, 3, and 4 ask for all communications between Professor Scofield and three of the four University of Idaho students who were murdered in November of 2022?
A. Yes.
Q. Did the University of Idaho go through Professor Scofield's email account and other records to provide the responses to these questions?
A. Yes.
Q. Did the University of Idaho find any responsive communications?
A. No.
Q. Did question number 5 ask for all communications between Professor Scofield and Jack DuCoeur?
A. Yes.
Q. If you know, who is Jack DuCoeur?
A. He's a student. I haven't thought about that name in a while. He was identified by -- I believe in the media as someone of interest.
Q. Did the University of Idaho need to go through Professor Scofield's email accounts and other documents to provide a

response to question number 5?
A. Yes.
Q. Did the University of Idaho find any responsive communications?
A. No.
Q. Did question number 7 ask for all communications between Professor Scofield and Bryan Kohberger?
A. Yes.
Q. Did the University of Idaho need to go through Professor Scofield's email accounts and other records to respond to question number 7?
A. Yes.
Q. Did the University of Idaho find any responsive communications?
A. No.
Q. Did questions 8 and 10 ask for any communications or documents suggesting that Professor Scofield had deleted or hidden evidence of her interactions with the four victims who were murdered in November of 2022, Jack DuCoeur, and Bryan Kohberger?
A. Yes.
Q. Similar to before, did the University of Idaho need to go through Professor Scofield's emails, records, things of that nature, to see what the response was to these questions?
A. Yes.

Q. Did the University of Idaho find any responsive communications?
A. No.
Q. What is the date of Exhibit Number 28?
A. December 21, 2023.
Q. Did you send Exhibit 28 to Ms. Guillard on that date?
A. Yes.
Q. Did you -- did the University of Idaho receive a subpoena from Professor Scofield in relation to this lawsuit?
A. Yes.
Q. Were you -- were you responsible for responding to that subpoena?
A. Yes I was.
MR. CARONE: This one has not yet been admitted, Your Honor, but I'd ask Ms. Bibb to pull up for Mr. Rytter Exhibit Number 27.
Q. (BY MR. CARONE) Mr. Rytter, do you recognize Exhibit Number 27?
A. Yes. It appears to be the subpoena we received.
MR. CARONE: Ms. Bibb, can you scroll through each of the pages for Mr. Rytter.
Q. (BY MR. CARONE) Does Exhibit Number 27 also include the University of Idaho's response to the subpoena?
A. Yes, it does.
Q. Who drafted the University of Idaho's response?

A. I did.
Q. Who signed the University of Idaho's response?
A. I did.
Q. Is Exhibit Number 27 a true and accurate copy of the subpoena that U of I received and the response provided to it?
A. Yes.
Q. And did you write the information that's on University of Idaho's response at or near the time you received it?
A. Yes.
Q. Was this subpoena kept in the course of regularly conducted business at the University of Idaho?
A. Yes.
Q. And is it the regular practice of the University of Idaho to document subpoena responses in this way?
A. Yes.
MR. CARONE: Your Honor, at this time I'd offer Exhibit Number 27 into evidence.
THE COURT: Any objection, Ms. Guillard?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's 27 will be admitted and published to the jury.
(Plaintiff's Exhibit 27 received.)
Q. (BY MR. CARONE) Similar to what we saw in Exhibit Number 28, Mr. Rytter, do you see that there are numbers and then bullet points in Exhibit Number 27?

A. Yes.
Q. What are the numbers?
A. Those are the requests or demands in the subpoena.
Q. And what are the bullet points?
A. My responses to those.
Q. And can you please read the first question out loud.
A. "Please produce all documents and communications indicating that Professor Rebecca Scofield ever taught a class at the University of Idaho that was taken by students Ethan Chapin, Kaylee Goncalves, Xana Kernodle, Madison Mogen, or Jack DuCoeur.
Q. What was the University of Idaho's response to that question?
A. "The University of Idaho has no record of Ethan Chapin, Kaylee Goncalves, Xana Kernodle, Madison Mogen, or Jack DuCoeur having taken any classes at the University of Idaho which were taught by Professor Rebecca Scofield."
Q. And then do you see questions number 2 and 3 ask about a formal -- any formal investigations?
A. Yes.
Q. Okay. Do you understand a formal investigation to be something different than the process that the University of Idaho goes through to respond to a subpoena?
A. Yes.
Q. In a formal investigation, would there need to be notice

provided to the accused and a process that's followed?
A. Well, there would be due process at the end of a formal investigation, but, yes, we would have -- a formal investigation, in my mind, is interviews, those kinds of things.
Q. The University of Idaho still did go through a thorough process to review Professor Scofield's emails and documents and any other records in the University of Idaho to provide full and complete responses to the subpoena in Exhibit Number 27?
A. Yes.
Q. Similar to what it did in the subpoena -- or the subpoena response we saw in Exhibit Number 28?
A. Yes.
MR. CARONE: I don't think I have any further questions, Your Honor, at this time.
THE COURT: All right. Thank you, Mr. Carone.
Any cross-examination?
MS. GUILLARD: Yes, sir.

CROSS-EXAMINATION

BY MS. GUILLARD:
Q. Good afternoon, Mr. Rytter.
A. Good afternoon.
Q. Do you recall receiving an email from me, Ashley Guillard, after you responded to my subpoena request?

A. Not offhand. That was a long time ago.
Q. And I'll say some of the emails to see if you can remember. In the email sent December 21, 2023, after I received the subpoena, I asked, "Please clarify whether the University of Idaho conducted an investigation on Rebecca Scofield's alleged connection to the four students who were murdered."
MR. CARONE: Objection, Your Honor, to the extent that she's reading a document into the record.
THE COURT: Objection is sustained. Ms. Guillard, if you want to show him, if you have it, the exhibit, and ask him if he recalls seeing it at the time.
MS. GUILLARD: Okay.
MR. CARONE: Your Honor, it's unclear, -- given the fact that Ms. Guillard's using her laptop as opposed to the paper exhibits, I have questions whether this was a marked trial exhibit.
THE COURT: If you'll return to the podium. Go ahead. Is this one of your marked exhibits?
MS. GUILLARD: No, sir.
THE COURT: Okay. Can you --
MS. GUILLARD: I'll rephrase the question.
THE COURT: That's okay. Can you please show Mr. Carone what it is you want to show the witness to perhaps refresh his recollection.

(Discussion off the record.)

MR. CARONE: Your Honor, I mean, I can see it on her computer. I feel that I should have a copy of this document if she's going to be asking him questions about it as well as to address on redirect if necessary.

THE COURT: Well, first we're going to ask -- Mr. Gordon, if you'll take that laptop, please, and show the witness, we'll see if that refreshes his recollection first.

And, Mr. Rytter, for the record, does that appear to be a December 21, 2023, email from Ms. Guillard to you?

THE WITNESS: Yes.

THE COURT: Okay. Does that refresh your recollection as to having received such an email?

THE WITNESS: I mean, it's two years ago. I don't specifically remember it, but at the same time I could have received it. I get a lot of communications.

THE COURT: Mr. Gordon, if you'll bring that back.

Q. (BY MS. GUILLARD) Mr. Rytter --

THE COURT: Wait, wait.

MS. GUILLARD: Oh, I'm sorry.

THE COURT: So, Ms. Guillard, that does not refresh his recollection.

MS. GUILLARD: Yes, sir.

THE COURT: You won't be able to read from the documents. You'll have to ask him another question.

MS. GUILLARD: Yes, sir.

THE COURT: All right.

Q. (BY MS. GUILLARD) Mr. Rytter, can you clarify what an inquiry is versus an investigation?

A. So when we're -- when we receive a subpoena, we look to see what's being requested, determine where within the institution that information would lie. For example, if the request is, as we were talking about earlier, related to courses and that sort of thing and whether or not somebody took those, that would reside with the registrar's office. So we do an inquiry looking to see where that responsive information would be located and have those individuals try to locate it. They then provide it to our office, and it's produced.

The concept of an investigation is more -- like, for example, in higher education you have Title IX investigations, that sort of thing. You have an allegation, you have people that look into it, and then there's usually some sort of action at the end which results in somebody getting their due process. So an investigation is a much more formal process that's initiated by a complaint of some kind.

Q. Thank you.

Can you clarify "did not locate communication between Professor Scofield and the students." In a subpoena you stated "did not locate." Does that mean -- because you

explained what an inquiry is -- that a department handles all of the emails and communication that the professors receive? Can you clarify for me what "did not locate" means?
A. I believe in this situation we did a review of all the communications that were in Professor Scofield's email account in looking for any communication between herself and any of those individuals that you listed in the subpoena. So no -- nothing came back, so that's a did not locate.
Q. Did not locate also means -- question: Does did not locate also mean that you have access to old emails and deleted emails and did not locate them?
A. We have a pool that we look in, which is going to be the emails. IT, the information technology office, will do a look at whatever is in there. So it's -- I'm not sure how -- what exactly you're asking. We're looking for something in a pool of information. It was not identified. Nothing came back.
Q. I can clarify. Does that pool of information include deleted emails and communications?
A. It's possible. But in this situation I don't know the answer to that.
Q. The answer is you don't know?
A. Well, the answer is unlikely.
Q. It's unlikely that deleted emails were part of that inquiry?
A. I'm starting to get confused by your questions.

Q. My question is pertaining to the subpoena, and the response I received is that the University of Idaho did not locate any communication emails between Professor Scofield and the four students. My question is, in that inquiry, which you stated you guys looked into a pool of information, did that pool of information include deleted emails?
A. I think by definition if something's been deleted or -- you're asking if it's been removed? Then if it's removed, then it would not be included.
Q. Thank you.
My next question is, during investigations you stated there was due process at the end of a formal investigation; correct?
A. If there's some sort of action to be taken, then, yes, due process is provided.
Q. If a professor, as in Professor Scofield, was formally investigated for any of the allegations that I made against her, would she be aware of that formal investigation?
A. Yes.
Q. How would she be made aware?
A. She would be -- questions would be asked. If a complaint is received and we do an investigation into it, she would receive questions. She would be made aware that the inquiry is happening or -- while the investigation is happening. Sorry. We're using the same term two different ways.

Q. And after that investigation, what does due process look like after a formal investigation if you find nothing?
A. If you find nothing, then the individual -- there's no action to be taken, so there's no due process necessary.
Q. Well, if nothing is found after a formal investigation, will the person being investigated know that there was an investigation but nothing was found?
A. Generally, yes. Otherwise, you're just leaving them hanging.
Q. Yes. Thank you.
Are you aware of a request for public records that I emailed to -- or I submitted to the University of Idaho general counsel? And I can show you --
MS. GUILLARD: I can introduce Defendant's Exhibit Number 508 to the witness.
THE COURT: Mr. Carone, any objection to the admission of Defendant's 508?
MR. CARONE: No objection, Your Honor.
THE COURT: All right. Defendant's Exhibit 508 will be admitted.
(Defendant's Exhibit 508 received.)
THE COURT: Do you wish to have it published for the jury?
MS. GUILLARD: Please publish it for the jury.
THE COURT: All right.

Q. (BY MS. GUILLARD) Mr. Rytter, do you recognize this as an email response to a public records request to the University of Idaho? I can move it up. Just let me know.
A. I remember your request. That is not usually -- no. There we go.
Q. Did I move too fast? I'm sorry.
A. What I'm looking at -- as I understand it, I went through the portal that we have for submitting a public records request. That is the information that's sort of structured a certain way. It's an email string. The one that was above was letting you know you would get a response at a later date.
Q. Thank you.
Do you recognize that the request was me requesting information regarding the advisors for the four University of Idaho students and corresponding dates?
A. I recognize that's what it says, yes.
Q. And records detailing funds received by one of the victims?
A. Yes, number 2.
Q. Thank you.
MS. GUILLARD: I would like to introduce Defendant's Exhibit Number 509.
THE COURT: And that is the response?
MS. GUILLARD: Yes, sir.
THE COURT: Any objection, Mr. Carone?

MR. CARONE: No objection, Your Honor.

THE COURT: All right. Defendant's 509 will be admitted and published for the jury.

(Defendant's Exhibit 509 received.)

Q. (BY MS. GUILLARD) Mr. Rytter --
A. Is this a different one? Sorry if I'm getting ahead of you.
Q. A different request?
A. Yeah. I didn't --
Q. It had to be.
A. Can you move it up just a little bit, please.
Q. This way?
A. Yeah. Okay.
Q. This is the response email that I received.
A. All right.
Q. Do you recognize this response to the FOIA request that I sent to the University of Idaho?
A. Yes. It's a request under the Idaho Public Records Act and the response.
Q. Can you clarify the response for the record. Or if you want to shorten it, I can do that as well.
A. What --
Q. Can you clarify that I was denied access to the records that I requested?
A. Yes. Under the -- so some of the information you were

asking for was -- is regulated to be released under the Public Records Act due to the Gramm-Leach-Bliley Act. The other is that there was ongoing litigation, and the Public Records Act does not allow for that as a process when you have access to discovery. And so it was denied for those reasons that are under the Public Records Act as exceptions to access to those documents.
Q. Can you clarify that the one denied for on the basis of the extensions was the request for advisers for the four students?
A. Essentially -- so can we go back to the two questions or the two requests?
Q. Go back to this one?
A. Well, this -- that one.
Q. Regarding question number 1 --
THE COURT: Just for the record, we're still looking at Defendant's Exhibit 509 now, the first page?
MS. GUILLARD: Yes, sir.
THE COURT: All right.
A. So the Public Records Act has a limitation on when -- when there's litigation, and so that applies to both requests. The information relating to funds, there's an additional one which is the Gramm-Leach-Bliley. So both -- both are subject to the prohibition under the Public Records Act for essentially ongoing litigation.

Q. (BY MS. GUILLARD) Do you recognize -- or can you clarify that Rebecca Scofield's name was not mentioned in my request for public records from the University of Idaho?
A. Okay. Yes.
Q. So this FOIA request was -- can you clarify that it's a general request that is outside of litigation?
A. I can't. I don't know what -- I don't know what the purpose of why you were submitting the request. We knew that you had ongoing litigation that related to this, and so part of the process is to give you a denial, and then you have the ability to object under the Public Records Act. You did not do that.
Q. And my next question is, do you typically ask people who submit FOIA requests why they're submitting requests?
A. No. We're not allowed under the Public Records Act to really ask much in the way of questions. It's not set up that way. If you're making a request, it's just essentially a demand for records you're entitled to. In this situation, as we understood it, you were not entitled to the records.
Q. And to clarify, are you stating that I was not -- I was denied the requested records, in your opinion, because I was not entitled to it because of this litigation? Is that correct?
A. Under the Public Records Act, if you're requesting information related to litigation, then it's -- then, yes,

you're not allowed -- you're not -- the obligation under the Public Records Act does not trigger.

Q. Last question. Are you aware of any investigation -- thank you for this. Are you aware of any formal investigation into the statements that I made regarding Rebecca Scofield? Did that in turn result in Rebecca Scofield being formally investigated by the University of Idaho?

A. No.

MS. GUILLARD: Thank you, sir.

THE COURT: Any redirect, Mr. Carone?

MR. CARONE: Yes, briefly, Your Honor.

THE COURT: All right.

REDIRECT EXAMINATION

BY MR. CARONE:

Q. Mr. Rytter, you were asked some questions about the distinction in your mind between an investigation and an inquiry. Do you remember that?

A. Yes.

Q. Is that distinction something you know as an attorney in the general counsel's office in the University of Idaho?

A. Yes.

Q. Are professors generally responsible for responding to subpoenas directed to the University of Idaho?

A. I would say they're -- I can't think of an instance where we would have them respond.

Q. So would a professor have a reason to understand the distinctions that you, as a lawyer, make between inquiries and investigations as it relates to subpoena responses?
A. No.
MR. CARONE: Let's pull up Exhibit 28 again, please.
Your Honor, may I publish Exhibit 28? It's already been admitted.
THE COURT: You may.
Q. (BY MR. CARONE) Mr. Rytter, I'd like to direct your attention to question number 8, which is on the second page of Exhibit 28. Please read question number 8 aloud.
A. All right. "Please produce any communications indicating or suggesting that Rebecca Scofield has or has attempted to delete, remove, hide, or otherwise restrict access to communications and/or transactions involving any of the aforementioned students -- Xana Kernodle, Kaylee Goncalves, Ethan Chapin, Madison Mogen, Jack DuCoeur -- and Bryan Kohberger."
Q. Did the University of Idaho review all of its documents, communications, and records to respond to -- available to it at this time to respond to question number 8?
A. I wouldn't say we reviewed every -- everything that made sense to review in this. We didn't, for example, go through the library and look at every book that's been -- we have a lot of documents.

Q. Fair enough. So anything that would potentially be responsive to question number 8 University of Idaho would have reviewed?
A. Yes.
Q. Did University of Idaho find any documents or evidence suggesting that anything had been hidden or removed or deleted?
A. No.
Q. I'll direct your attention to question number 10. Can you please read question number 10 aloud.
A. "Please produce any communications indicating or suggesting that counter-defendant Rebecca Scofield has or has attempted to delete, remove, hide, or otherwise restrict access to information regarding her connection to any of the aforementioned students -- Xana Kernodle, Kaylee Goncalves, Ethan Chapin, Madison Mogen, Jack DuCoeur -- and Bryan Kohberger."
Q. Similar to with question number 8, did the University of Idaho review any of its potentially relevant documents and records to respond to question number 10?
A. Yes.
Q. Did the University of Idaho find any such evidence of deletion or removal?
A. No.
Q. And finally, Exhibit Number 509.

MR. CARONE: This was also previously admitted, Your Honor.
Q. (BY MR. CARONE) Do you remember Ms. Guillard asking you questions about Exhibit 509?
A. Yes.
Q. What's the date of Exhibit 509?
A. Oh, October 21, 2025.
Q. Is that after this lawsuit was filed?
A. Yes.
Q. Was that --
A. I believe so, yeah.
Q. Was that after Ms. Guillard had already subpoenaed the University of Idaho?
A. Yes.
Q. Why did the University of Idaho not respond to this public records request?
A. Primarily because there's litigation ongoing. The Public Records Act is not set up to be a substitute for discovery.
Q. Did the University of Idaho fully respond to Ms. Guillard's subpoena, which was a proper discovery tool in this case?
A. Say that again.
Q. So Exhibit Number 28 earlier, that was the University of Idaho's response to Ms. Guillard's subpoena.
A. Oh, right. Okay.

Q. Is the subpoena what you're referring to as a discovery tool?
A. Correct.
Q. When you're saying -- and did the University of Idaho respond to Ms. Guillard's subpoena?
A. Yes.
MR. CARONE: No further questions, Your Honor.
THE COURT: All right. May the witness be excused, Mr. Carone?
MR. CARONE: Yes, Your Honor.
THE COURT: Thank you, Mr. Rytter. You may be excused.
Mr. Carone, if you'll call your next witness.
MR. CARONE: I'd like to call Sean Quinlan, Your Honor.
(The witness was sworn.)
THE COURTROOM DEPUTY: And can you please state your full name and spell your last for the record.
THE WITNESS: My name is Sean Michael Quinlan. Last name is Q-U-I-N-L-A-N.
THE COURT: You may inquire.
MR. CARONE: Thank you, Your Honor.

SEAN MICHAEL QUINLAN, PLAINTIFF'S WITNESS

DIRECT EXAMINATION

BY MR. CARONE:

Q. Good afternoon, Mr. Quinlan.
A. Good afternoon.
Q. Do you have an undergraduate degree?
A. Yes, I do.
Q. Where from?
A. Arizona State University.
Q. Do you have any graduate degrees?
A. Yes. I have a master's degree and a doctorate from Indiana University Bloomington.
Q. What years, if you remember, did you obtain those degrees?
A. Arizona State I believe was 1992, and my doctorate was 2000.
Q. Have you worked in academia since receiving your Ph.D.?
A. Yes, I have.
Q. Where do you currently work?
A. I work at the University of Idaho.
Q. How long have you worked at the University of Idaho?
A. Almost 25 years now.
Q. What's your current title at the University of Idaho?
A. I'm an academic dean. I'm dean of the College of Letters, Arts, and Social Sciences.
Q. As the dean of the College of Letters, Arts, and Social Sciences, do you oversee the history department?
A. I do. The history department is one of my departments, yes.

Q. How long have you been in that position as dean?
A. Going on nine years now.
Q. Do you know Professor Scofield?
A. Yes, I do.
Q. How do you know Professor Scofield?
A. I've known her for almost a decade now. I was chair of the history department when the University of Idaho originally hired her.
Q. In your experience as an academic and as a dean at the University of Idaho, are academics evaluated based on their research and teaching?
A. Yes, sir, they are.
Q. How important is reputation to an academic's ability to succeed as a researcher and a teacher?
A. I would say it's extremely important.
Q. Why?
A. It's a variety of factors that go into that. I believe it's -- it is where one received their training originally. It's the -- it's the rank of the institution that one works at. It's the record of publications that they've accumulated over time, honors, distinctions. Much in -- I would say in academia it is done through committee work in which faculty or administrators, grant panelists if they work for the federal government or state agencies are assessing people's work, looking at their dossiers, looking at their curriculum vitae,

looking at their scholarly productivity, one's reputation, you know, reviews that come in on people's work.

So one's status, I think, in terms of how people in the field look at one's career is extremely important for the present and also for future opportunities as well.

Q. Does an academic's reputation affect which universities will hire them?

A. Yes.

Q. Does an academic's reputation affect which publishers will work with them?

A. Absolutely, yes.

Q. Prior to November 2022, how would you describe Professor Scofield as a teacher?

A. She's -- she's an excellent teacher. And, you know, I think that when University of Idaho originally hired her, you know, one of the things we saw great potential in her as a researcher. We saw great potential to her as a teacher as well and her work, her ability to interact with students, the rapport that she developed with them, the fact how she could get them to think, to engage in the subject matter. As someone who practices history myself, it's deeply -- it's really impressive. And, you know, I think her work and her ability to inspire students about history and to get them to think about the past in, you know, new and creative ways is deeply moving to me.

Q. You touched on this a little bit, but prior to November 2022, how would you describe Professor Scofield as a researcher?
A. She's top-notch in her field. She -- you know, she came into the University of Idaho with great credentials, a great background. We had great hopes, particularly as a chair and as a department, that she would excel in her academic performance. When she came, you know, she didn't disappoint at all.
She published. She got a book out, which is kind of the gold standard in our field, is the key part in someone being able to come up for tenure and promotion. She received a very prestigious Whiting Foundation fellowship for outreach, you know, as -- it was doing all the things, I would say, as someone that could work at any top-notch institution in the country.
Q. Prior to November 2022, how would you describe Professor Scofield as a person?
A. She was -- she's a great colleague. She's a great colleague, you know, engaged in everything she's doing, engaged with teaching, with research, with service in the unit, you know, someone I would call a good citizen in the department, you know, someone who volunteers and, you know, does all the grunt work that people don't want to do in terms of sitting on committees, sacrificing time, going to outreach

events, weekend stuff.

You know, she had a great sense of humor, thought long and hard about not just the history program but our academic college, our university. You know, I would say as a colleague it's just, you know, absolutely stellar and the type of person you hope to hire at an institution.

Q. Prior to November 2022, are you aware of anything about Professor Scofield's reputation that would have negatively impacted her ability to succeed as a historian?

A. No, not -- none whatsoever.

Q. Dean Quinlan, were you living in Moscow, Idaho, in November 2022, when Bryan Kohberger murdered four students?

A. Yes, I was living there.

Q. How would you describe the atmosphere in November of 2022?

A. I would -- I would say first and foremost it was a community that was absolutely grief stricken and in shock and that, you know, these -- that something that terrible had happened, the sense of loss over four young people's lives. It -- it hit the community, hit the university. The outpouring of grief was unbelievable. And so there was that immediate, I think, sense of grief and loss.

You know, there were makeshift shrines that were developing all over the town, at the entrance to the university, at the restaurant where at least one of the victims had worked. There was just this outpouring of grief.

There was deep concern and panic in the community and the fear that there could be a murderer amongst us, that that killer might strike again. There was -- yeah, there was a huge sense of insecurity that went along with it. People were afraid to go outdoors. People were afraid to go to class.

There was that -- there was a real sense, I think, of invasion that happened as well with the media, journalists who came -- who came into the community. And that kind of made the sense of grief and paranoia even worse. And, you know, I think there was something -- you'd stop people on the street. That's what they would talk about. I think the concern was -- it was -- it was very intense. That's the only way I can describe it.

Q. Thank you, Dean Quinlan.

You mentioned this sense of fear and panic in the community. Did you observe anything about how people responded to the doxxing of suspects online kind of in this immediate aftermath?

A. Yes. And I think there was real concern. You know, there were -- my memory of it is that there were a number of people who kind of emerged of interest in social media or in the news and an enormous amount of kind of speculation evolved around that. You know, and from what I understood is a lot of insecurity for those people who were targeted, concerns about their personal safety, their privacy, their ability to kind of

continue on afterwards. And I think that, you know, members of the community and people I was speaking to, they were dismayed and shocked by that.
Q. Do you remember Thanksgiving Day in November 2022?
A. Yes, I do.
Q. Were you Professor Scofield's dean at that time?
A. I was.
Q. On that day did you learn that Ms. Guillard was posting about Professor Scofield?
A. Yes, I did.
Q. Were you concerned at that time about Professor Scofield's safety?
A. Yes, I was.
Q. Why?
A. Given -- given all the media and paranoia around the murders, I was very concerned about her safety and her privacy, you know, whether she could be a target of some kind of vigilanteism and worst-case scenarios or having her house overrun with media. Yeah, so I was very concerned about her well-being.
Q. Did you call campus security or the police because of your concerns?
A. Yes, I did.
Q. Why?
A. I was first of all trying to alert somebody and to let

security know that there could be issues. And I wanted to make sure -- you know, Professor Scofield works in our college. You know, a sense of responsibility as a colleague, as a member of our community is to make sure we're doing everything to keep her, you know, safe and sound.

Q. Did you talk to the VP of information technology at the University of Idaho that day?

A. Either on that day or the following days.

Q. And why did you speak to that person?

A. Well, I was -- since it involved social media, since it involved -- you know, Rebecca had a web page. There's information about how to get ahold of her, her office location. I was also looking for information, if there were any, to -- if someone was being the target of kind of salacious defamatory attacks, is there anything that we could do in terms of technology to respond, to shut things down, is there -- could we help in any way.

Q. Did you ask to have Professor Scofield's web page taken off the University of Idaho's website?

A. Yes.

Q. Why?

A. It is that -- so that her personal information, how people could find her on campus, her classroom, where she taught, you know, where her office space is, that that would become private information so if we did have people who were looking

to find her, that they would have a tougher time doing so.
Q. Did you consider whether to have Professor Scofield teach remotely to help her stay safe?
A. Yes.
Q. Did you also call the director of communications for the University of Idaho?
A. Yes, I did.
Q. And why did you call the director of communications?
A. To -- to inform -- her name's Jodi Walker. To inform Jodi Walker that this was going on. Also to get information as to how the university could respond to one of our colleagues who was being targeted on social media, how we could potentially help, awareness as well. That if it became a media issue, that they would know that one of our employees was being targeted in such a way. And also in my, you know, limited understanding of social media or how to respond to it, was trying to get as much information to help a colleague as possible.
Q. Is it fair to say that you called a lot of people at the University of Idaho in response to Ms. Guillard's posts?
A. Yes.
Q. This was a situation you were taking seriously?
A. The situation was taken very seriously, yes.
Q. Immediately following Thanksgiving of 2022, how often were you checking in with Professor Scofield?

A. In the weeks up through the Christmas break, I would say we were regularly checking in, whether it was every day or every other day. But we were connecting very frequently, find out how she was doing, if there was -- if there was news, you know, just to check in on her general state and also to inform her of any developments I was hearing on the side of the university as well.

Q. In the November-December 2022 time frame, did you personally observe Ms. Guillard's posts causing stress for Professor Scofield?

A. I saw a handful of them.

Q. I'm sorry. Did you see it causing stress for Professor Scofield?

A. I'm sorry. Yes, yes, I absolutely saw.

Q. What did you observe?

A. You know, what I would probably describe as physical manifestations of stress, anxiety. Our conversations were always about the worry, about personal safety. It was the worry about, you know, logistics at work, the impact about professional reputation. I mean, at some point, you know, there is -- this was in *The Guardian*. I mean, it was an international news. You know, you could see it in terms of exhaustion. You know, I was very concerned about how she was holding up under what seemed to me extremely trying circumstances.

Q. Did you observe that stress making it more difficult for Professor Scofield to continue to perform as a professor as she had prior to November 2022?

A. It seemed to me that everything she was doing was taking enormous effort and was -- everything had to be kind of above and beyond what I would consider to be any kind of reasonable expectation of duty.

Q. In the three years since then, have you continued to observe Professor Scofield needing to strain or work harder to perform how she did prior to November of 2022?

A. Yes. That same, I think, kind of sense of exhaustion, anxiety, worry I think had been apparent in our conversations, in her comportment and her demeanor. There's very few -- she's a department chair. You know, we have regular work meetings together, check-ins, you know, visits in departments talking about all the range of, you know, academic business that we have in our units. And, you know, this habitually came up in all of our discussions. You know, I would, you know, ask -- try not to be invasive, but, "How are you doing? Are there things we could be doing? Is there anything I could be doing to help?" So, you know, this is something that I think she has carried with her heavily over the past three years.

Q. As an academic and a dean, do you have experience with how professors are hired by universities?

A. Yes.
Q. As an academic and a dean, do you have experience with how professors are promoted into leadership positions at universities?
A. Yes, I do.
Q. Do you have any concerns about the long-terms effects of Ms. Guillard's posts on Professor Scofield's career?
A. In my professional estimation, yes.
Q. What are your concerns?
A. It is -- if I may preface by saying I think Professor Scofield is an extremely talented teacher and historian, and I think she is -- based upon her skills, you know, she -- she has enormous career opportunities ahead of her. I mean, I would hate to have her leave the University of Idaho, but she has an enormous amount of potential in terms of her skills or her abilities and, you know, as someone who under most circumstances could probably, you know, very easily write the next stages of their career and make all sorts of choices.
And having said that is that I know being a professor or being in leadership roles in universities are very public roles. There's a lot of vetting that goes on behind that. Institutions are -- I think are very concerned with their image, with the background of the people that they hire. These are things that get looked into. They get scrutinized really carefully.

And so if someone were, you know, trying to, you know, have, like, you know, another opportunity at an institution for promotion, for greater salary or career opportunities, someone that, you know, in which there's material on the Internet or background information is that -- that material could circulate and really impact the decision-making of a hiring committee as well.

For someone in a leadership role as well, it is that people, you know, habitually look into their Google past or they look them up. And there will -- like, people will ask questions about their past. And it could very well be is that, you know, that institution is like, "That's too much liability for me, or I'm concerned about hiring. We don't need that type of publicity. We don't need our marketing or communications team worrying about this."

So, yeah, it could -- it could very well be that is the long-term impacts of this in terms of someone's career potential, their earnings. It is -- you know, it's going to be part of their reality moving forward. And if anyone is kind of going into -- has that background, that's going to be something constant. They're going to have to have a script for that at all times. They're going to have to answer questions and be prepared to explain it in ways that, you know, could be extremely professionally degrading and humiliating.

MR. CARONE: Thank you, Dean Quinlan.
No further questions, Your Honor.
THE COURT: All right. Any cross-examination?
MS. GUILLARD: I have several questions.
THE COURT: You have what?
MS. GUILLARD: I have several questions. Just begin anyway?
THE COURT: Yes. How long do you think you'll have?
MS. GUILLARD: 20 minutes.
THE COURT: All right. We'll get started. I don't know that we'll finish.

CROSS-EXAMINATION

BY MS. GUILLARD:
Q. Good afternoon, Mr. Quinlan.
A. Good afternoon.
Q. You stated you have been Professor Scofield's boss, but you stated you've known her for a decade. How long have you been her boss?
A. I was department chair when she hired for six years and then have supervised her in the capacity of chair in the, I think, four or five years since she's become a department chair.
Q. 11 years?
A. A total of about ten years I've been working with her.
Q. Regarding Professor Scofield's performance during that

time, you stated she was excellent, top-notch in her field; correct?
A. Yes.
Q. And today, as of today and after November 23, 2022, she's still top-notch and excellent in her field?
A. She is -- she is a top-notch, excellent academic.
Q. As a result of the accusations that I made against her and posted TikTok videos, as her boss did you ever feel the need to demote her, investigate her, or punish her in any kind of way?
A. No.
Q. When you said that this could impact her future professional career, you were speculatively speaking on what another institution could do. At the University of Idaho, does Professor Scofield have a promising future?
A. I -- I think she has great potential ahead of her. How -- how the social media background may impact opportunities for leadership roles down the road, I -- it would be difficult for me to say.
Q. When I -- on November 23rd and 24th, 2022, when you became aware of the accusations I made against Professor Scofield, was it your intent to use that information to negatively impact her career as her boss?
A. I'm sorry. Could you repeat the question.
Q. I'm sorry.

A. No, no. I apologize.
Q. At the time of the videos, did you feel the need to punish Rebecca Scofield or limit her opportunities at that time?
A. No.
Q. Why would in the future -- because you said -- you just made a statement stating that the University of Idaho or any leadership position she could be scrutinized for because of the videos. If at the time of the videos she was not scrutinized or limited in any kind of way, what would change in ten years per se or in five or another three that would change that to make her then in the future be scrutinized?
A. I think that would be really -- I think that the impact would be in very subtle ways actually. Is that in -- where people might be in a public role and you have search committees and you have colleagues who are together and who may be looking at individuals that have, for lack of a better word, external-facing roles and that they become the public face of the institution, that they may have second thoughts or concerns that the individuals that they're -- someone in that position is that questions may be about their social media background or what they find in the Internet more so than the business at hand at the university.
You know, for instance, if someone's in the role of a dean in which one of their big -- you know, one of their big roles is actually development and cultivating relationships

with alums and stakeholders, oftentimes for the purpose of trying to raise money for our students, and that if these conversations are consumed with someone's social media past or they have to answer questions about what they -- what really happened or going back into the past could potentially become a big distraction in those conversations and those -- and could really potentially negatively impact someone's -- you know, "We don't want to touch this right now. We'll go with someone safe here, or we won't -- we won't explore this further." So I think that is kind of on the level of where the concern was.

Q. And, Mr. Quinlan, this example you just gave is based on a real person or just speculation? Are you speculating?

A. Not to bring in too much of my own personal information actually, but in -- in my history as a professor and as a dean, twice in a very small level I was subject to kind of social media attacks. And they were because I had -- they were because of things that I was involved with in terms of the history profession, my writing at the time.

And some of that, for instance, happened 21 years ago, and I will still get emails about that and I will still get questions about it and sometimes in very unexpected ways. And so, you know, even though it may be 20 years ago, that material has a life on the Internet, and it comes back and is an object of discussion. And people ask, "Well, what happened

there or what -- you know, can I go back and look more about that? I'm interested." And it becomes a professional distraction.
Q. This alleged event you're speaking of that you experienced on social media was, you said, 20 years ago; correct?
A. Yes.
Q. How long have you been dean, again? Can you restate how long --
A. Almost nine years.
Q. So nine years ago you were promoted to dean at the University of Idaho despite the online speculation from 21 years ago; is that correct?
A. Yes.
Q. Over the past three years of this litigation, has Professor Scofield been promoted or received a salary increase?
A. I'm thinking of the timeline. Is -- yes.
Q. Has she been promoted or received a salary increase several times, let's say annually?
A. I apologize for saying this. I can't remember what years that might have been.
Q. But it's been multiple years?
A. Two years if -- there was one. It was one occasion, I believe.
Q. Did my online videos prevent Professor Scofield from any

promotions, salary increases, opportunities at the university?
A. Not under my watch, no.
THE COURT: And, Ms. Guillard, we're at 3:01. If you have, say, another ten minutes, you can finish up today.
MS. GUILLARD: Yes, sir.
THE COURT: Is that okay?
MS. GUILLARD: Yes, sir.
THE COURT: Rather than bring Dean Quinlan back again, we'll finish up, if the jury will accommodate us.
Q. (BY MS. GUILLARD) After November 13, 2022, did you work closely with Professor Scofield between November 13 and November 22, 2022?
A. Yes. We were in frequent communication, yes.
Q. How would you describe her demeanor and behavior or response around that time?
A. To the TikTok videos or --
Q. That was -- so November 13, that's unfortunately when the students were murdered, and I'm asking between November 13 and November 22, before the TikTok videos.
A. Before. I apologize for the -- my interactions with her would have been routine daily check-ins, as I would do with all of the department chairs in my unit.
Q. You stated earlier that after the murders, the staff and the environment at the University of Idaho was, you know, panic in the community, fear, insecure; is that correct?

A. Yes.
Q. Was Rebecca Scofield in that community and also panicked, fear, and worried about her safety?
A. She expressed many of the same concerns about personal safety. I would say that -- and concern over our students and her fellow students that were exhibited by many other faculty members that I was working with at the university.
Q. After the TikTok videos, did you see an increase in distress?
A. Yes.
Q. Different from that after the murders?
A. Absolutely.
Q. If you had to compare her demeanor after the murders versus her demeanor after the TikTok videos, would you say she was more distraught about the TikTok videos than she was about the murders?
A. I would say that in addition to the shock and grief of the murder of the students is then -- was added an element of concern over personal safety and vulnerability due to social media exposure.
Q. After the murders, were there any other professors in your department or generally at the University of Idaho that were moved to online classes versus on-site classes?
A. There were several -- several faculty members who also -- who for very different reasons taught online. And there were

opportunities that faculty gave to their students as well to give them more flexibility in terms of whether going to class or learning remotely in order to accommodate the sorrow in the community and also the sense of vulnerability.
Q. After the murders -- or on November 13 or before, did Professor Scofield teach a class on-site at the University of Idaho?
A. I'm sorry. Could you repeat the dates for me again, please.
Q. Before or on -- between November 13 and November 22, 2022, before the TikTok videos, did Professor Scofield have a class on-site at the University of Idaho?
A. My recollection is that she was teaching an in-person class.
Q. And that in-person class after the murders, was Professor Scofield offered the opportunity to move her classes online?
A. Yes.
Q. You stated you did everything to keep her safe and sound after the TikTok videos. Would you say you also did everything to keep her safe and sound after the murders?
A. Yes, in terms of level of care that we were exhibiting to -- or trying to give to all of our colleagues and students.
Q. You described Professor Scofield being grief -- you know, anxiety and things of that sort after the TikTok videos. Are you describing those symptoms as a -- are you a psychiatrist?

A. No, just out of being a concerned colleague.
Q. Do you know the diagnostic criteria of anxiety?
A. Not as -- not as a psychiatric professional, no.
Q. So you were just guessing or estimating based on layman's knowledge?
A. Based upon what I've seen, individuals under extreme stress at a particular moment and, you know, on level of, you know, just trying to care for another person.
Q. And last question. You said that my TikTok videos against Professor Scofield, you said the situation was taken seriously. I want to clarify. By "seriously" did you mean that you were keeping her safe and told her what to do to protect herself online? Is that what you mean by taking it seriously, or do you mean taking seriously meaning investigate it?
A. It meant that we -- we were very concerned that the videos may create untoward attention towards her from either media or random vigilantes. And that we wanted to make sure that one of our colleagues, you know, had as much protection, personal protection, as possible from random danger that could be generated.
Q. Sorry, one more question.
A. Sure thing.
Q. Thank you for reminding me about the vigilantes and being overrun by media. It's been three, four nearly years since

the posting of those TikTok videos. Are you aware of any vigilantes that has went after Professor Scofield?
A. No, I'm not, fortunately.
Q. Are you aware of her home being overrun by media?
A. Not that I'm aware of, no.
MS. GUILLARD: Thank you, sir.
THE WITNESS: Yeah.
MS. GUILLARD: No more questions.
THE COURT: Thank you, Ms. Guillard.
Mr. Carone, any redirect?
MR. CARONE: Very briefly, Your Honor.
THE COURT: All right.

REDIRECT EXAMINATION

BY MR. CARONE:
Q. Dean Quinlan, you were just asked whether you're aware of any vigilantes who have reached out to Professor Scofield. Do you remember that?
A. Yes.
Q. Are you aware of any TikTok artists who have continued to post about Professor Scofield and accusing her of being a murderer and having a relationship with a student?
A. I'm aware of that, yes.
MR. CARONE: No further questions, Your Honor.
THE COURT: May the witness be excused?
MR. CARONE: Yes, Your Honor.

THE COURT: Thank you, Dean Quinlan.

THE WITNESS: Thank you, Your Honor.

THE COURT: You may be excused.

Thank you, jurors, for your extra patience today. I failed you by ten minutes, but maybe we'll make it up tomorrow.

I repeat those -- that same admonition to everybody that I gave last night as well not to see, hear, or read any reporting of this case. Do not have any contact or communications about this case with anybody. And if for some reason you do get exposed or someone tries to contact you about the case, please report it to me first thing in the morning.

With that, have a good night, and we'll see you-all tomorrow at 8:30.

The jury will be excused.

(The jury exited the courtroom at 3:11 p.m.)

THE COURT: Please be seated.

All right. Ms. Olson, as I mentioned, I wanted to briefly get -- give you the opportunity to address Ms. Guillard's three jury instructions that she filed last night and get your position on those before you have the informal conference with Mr. Gordon to wordsmith the instructions that I put together, and so let me hear from you if you wish.

MS. OLSON: Could we have just a moment, Your Honor?

THE COURT: Yes. I know we're moving along. I have a 3:30, is the only reason I have to get moving.

MR. CARONE: Sorry, Your Honor. We just got these late last night, so we haven't had a lot of time to meaningfully process them.

But just to address them in order, so the mitigation instruction, Ms. Guillard identifies the pattern jury instruction. Candidly, I've not had an opportunity to confirm that this exactly mirrors the pattern jury instruction. If it does, we have no objection to using the pattern jury instruction for the damages.

The punitive damages, the second instruction, we would object to this on several bases, the first being that there is an Idaho pattern civil jury instruction on punitive damages, which would have been what we included in our submission. And the rule's pretty clear that when there's a pattern instruction, generally you're supposed to have some deference to that.

I also think Ms. Guillard is kind of mixing up the pretrial standard for punitive damages versus at trial and that there's a process that the Court has to go through to consider evidence when granting relief to seek punitive damages at trial. I don't think that process would be applicable to what's then actually given to the jury at that

point. There's a separate part of the statute that addresses when the jury may award punitive damages, and I think that anything that goes to the pretrial leave to seek punitive damages would not be relevant or appropriate here.

And finally on the mental health damages, again, I haven't had time to verify this, but looking -- she's not citing a pattern jury instruction. She, I think, is just cherry-picking an Idaho Code section on something that is totally different from what we're here for in this trial, and also that there are other multiple ways to show mental health damages or noneconomic damages. And so we'd object to this mental health damages instruction as inappropriate.

THE COURT: All right. Ms. Guillard, do you have any response to that?

MS. GUILLARD: My -- my only response is in regards to the mental health damages. Mr. Carone said it has nothing to do with this, but PTSD has been mentioned several times during this litigation, so I wanted some type of instruction for the jury as it pertains to how to calculate damages for that.

Additionally --

THE COURT: Before you move on, are you still arguing that particular instruction?

MS. GUILLARD: Yes.

THE COURT: Okay. Go ahead.

MS. GUILLARD: That's pretty much what I --

THE COURT: All right. So that Idaho Code section, that is the standard for workers' compensation to grant workers' compensation for PTSD. It's not a jury instruction that I believe is applicable in a case like this, so I don't think it would be something that I would instruct the jury. You're certainly able to argue that point, but absent a pattern jury instruction in Idaho law that's applicable, that is just a code section that deals with, if somebody has PTSD, whether they can get workers' compensation and the standard for them doing so.

So I don't know, Mr. Carone, if you have anything else to add on that point.

MR. CARONE: Not on that third instruction, Your Honor.

THE COURT: Did you have something to add on another instruction?

MR. CARONE: Just briefly on the second instruction, again, the punitive damages one. I just realized that she had cited to -- it looks like she's citing to the Ninth Circuit pattern jury instruction at least in part.

In this situation, because we're in diversity jurisdiction, the Idaho Code is a substantive law, so the federal court is applying Idaho law, which is why the Idaho pattern jury instruction on the punitive damages statute would

be the more appropriate instruction to give in this case.

THE COURT: So, Ms. Guillard --

MS. GUILLARD: No objection to that.

THE COURT: And we will have a standard Idaho punitive damages instruction under the Idaho model jury instructions. And then do I understand that, Mr. Carone, if the instruction as to mitigation is accurate, that you don't have an objection to that?

MR. CARONE: That is correct, Your Honor.

THE COURT: All right. Okay. Mr. Gordon, did you get all that?

MR. GORDON: Yes.

THE COURT: So then Ms. Guillard doesn't object to the Idaho pattern punitive damages instruction. Mr. Carone does not object to the mitigation instruction. And absent a pattern jury instruction as to mental health damages, the one that Ms. Guillard has submitted we will not include because it is the legal standard for a workers' compensation claim, and that really doesn't apply in this case.

All right. So what we've done, Counsel and Ms. Guillard, is we've put together a draft court's -- a court's draft final jury instruction, and Mr. Gordon is going to meet with you-all in the courtroom now, provide you with our draft.

Are you ready to do that, Mr. Gordon?

MR. GORDON: I'm going to need to make some changes.

THE COURT: So maybe in about 10 or 15 minutes.

MR. GORDON: Yeah. I'll need to print them off, and also the models too.

THE COURT: And Mr. Gordon is also going to print out the relevant model jury instruction templates for the Ninth Circuit ones and the Idaho ones so that counsel and Ms. Guillard can see how it is that we modified them. And then if there's any wordsmithing that the parties want to do based on our modification, you can certainly have that input. But Mr. Gordon will take that down, and then we'll address that later tonight and have a final set for you tomorrow. And like I said, then we'll have the formal jury instruction conference with me, where you can object to what my final instructions say.

Any questions about that, Ms. Guillard?

MS. GUILLARD: No, sir.

THE COURT: Any questions, Mr. Carone?

MR. CARONE: No. Thank you, Your Honor.

THE COURT: All right. Anything else, Ms. Olson, Mr. Carone, that you want to bring to my attention today?

MS. OLSON: Witness order for tomorrow, we had to make a few shifts because we've gone a little slower than I anticipated. I think we anticipate that we will call Rebecca Tallent, Rebecca Bohn, Chris Hanson, John Carlsen, Margie

Scofield.

THE COURT: And is that all of your remaining witnesses?

MS. OLSON: It is, Your Honor.

THE COURT: All right. And do you anticipate that we'll get through them all tomorrow?

MS. OLSON: We hope so, Your Honor.

THE COURT: Okay. So, Ms. Guillard, you ought to be prepared sometime later in the day for your case in chief as well. We won't take any break in between the plaintiff's finishing their witnesses, if they do, and resting their case. We'll go directly into yours unless there's any legal motions that are made. But we'll just jump right into your case in chief, and so please be ready for that.

Again, the questions that you want to ask yourself and testify to in your case in chief, I want to make sure that they're not cumulative of what you testified to today on cross-examination, so try to pay some attention to that. I'll give you some latitude, but I don't want a repeat of the same questions that the jury's already heard.

Any questions about that?

MS. GUILLARD: No, sir.

THE COURT: Okay. Anything that you want to bring to my attention housekeepingwise or otherwise?

MS. GUILLARD: No, sir.

THE COURT: Okay. All right. With that, the Court will be in recess.

(Proceedings concluded at 3:21 p.m., February 25, 2026.)

C E R T I F I C A T E

I, ANNE BOWLINE, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing 217 pages constitute a full, true, and correct transcript.

Dated this 20th day of May, 2026.

/s/ Anne Bowline

ANNE BOWLINE
Registered Merit Reporter
Certified Realtime Reporter