IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

---

REBECCA SCOFIELD,

Plaintiff,

vs.

ASHLEY GUILLARD,

Defendant.

Case No. 3:22-CV-00521-REP

Volume III of IV

Boise, Idaho

February 26, 2026
8:29 a.m.

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE RAYMOND E. PATRICCO
CHIEF UNITED STATES MAGISTRATE JUDGE

---

APPEARANCES:

For the Plaintiff: MS. WENDY OLSON
MR. CORY MICHAEL CARONE
Stoel Rives, LLP
101 S. Capitol Boulevard, Suite 1900
Boise, Idaho 83702

For the Defendant: MS. ASHLEY GUILLARD
3262 Westheimer Rd, 942
Houston, Texas 77098

Court Reporter: MS. ANNE BOWLINE, RMR, CRR
Anne_Bowline@id.uscourts.gov

*Proceedings recorded by stenography; transcript produced by computer-aided transcription.*

# I N D E X


| JURY INSTRUCTIONS | PAGE |
|---|---|
| jury instruction conference | 585 |

| PLAINTIFF'S WITNESSES | PAGE |
|---|---|
| REBECCA J. TALLENT | |
| Direct Examination by Mr. Carone | 367 |
| Cross-Examination by Ms. Guillard | 375 |
| REBECCA BOHN | |
| Direct Examination by Ms. Olson | 390 |
| Cross-Examination by Ms. Guillard | 408 |
| Redirect Examination by Ms. Olson | 466 |
| CHRISTOPHER HANSON | |
| Direct Examination by Mr. Carone | 470 |
| Cross-Examination by Ms. Guillard | 487 |
| Redirect Examination by Mr. Carone | 504 |
| JOHN JOSEPH THOMAS CARLSEN | |
| Direct Examination by Mr. Carone | 510 |
| Cross-Examination by Ms. Guillard | 526 |
| MARGIE ELENA SCOFIELD | |
| Direct Examination by Ms. Olson | 559 |
| Cross-Examination by Ms. Guillard | 576 |
| Redirect Examination by Ms. Olson | 583 |

| PLAINTIFF'S EXHIBITS | | RECEIVED |
|---|---|---|
| 13 | .................................... | 483 |
| 37 | .................................... | 520 |

| DEFENDANT'S EXHIBITS | | RECEIVED |
|---|---|---|
| 501 | .................................... | 420 |

| MOTIONS | PAGE |
|---|---|
| motion to excuse Juror Number 5 | |
| Ms. Guillard | 552 |
| Ms. Olson | 552 |
| the Court | 553 |

(Proceedings commenced at 8:29 a.m., February 26, 2026.)

THE COURT: Please be seated.

THE COURTROOM DEPUTY: The Court will now take up day three of the jury trial for Scofield versus Guillard, Case Number 3:22-CV-521-REP.

THE COURT: All right. Good morning, Counsel. Good morning, Ms. Guillard.

MS. GUILLARD: Good morning.

THE COURT: Ms. Olson, Mr. Carone, are we ready to proceed?

MR. CARONE: Yes, Your Honor.

THE COURT: Ms. Guillard, ready to proceed?

MS. GUILLARD: Yes, sir.

THE COURT: All right. Mr. Gordon, can we bring in the jury, please.

(The jury entered the courtroom at 8:30 a.m.)

THE COURT: Please be seated.

All right, members of the jury. Good morning. I hope you-all had a good evening. And it seems like we got a little bit of a break in the weather with this rain and a nice sunny morning, so I hope you've had a pleasant morning.

I'll ask the same questions that I've asked the past couple of days. Have any of you seen, heard, or read anything related to the reporting of this case?

All right. Has anyone had any contact with you or

attempted to have any contact with you about the case?

All right. And then overnight, is there anything you wish to bring to my attention that would bear on your ability to be fair and impartial jurors?

All right. Having had no positive responses, I'll ask Mr. Carone to call the plaintiff's next witness.

MR. CARONE: Your Honor, the plaintiff calls Dr. Rebecca Tallent.

(The witness was sworn.)

THE COURTROOM DEPUTY: Please state your full name and spell your last for the record.

THE WITNESS: My name is Rebecca J. Tallent, T-A-L-L-E-N-T.

THE COURT: Mr. Carone, you may inquire.

MR. CARONE: Thank you, Your Honor.

REBECCA J. TALLENT, PLAINTIFF'S WITNESS

DIRECT EXAMINATION

BY MR. CARONE:

Q. Good morning, Dr. Tallent.

A. Good morning.

Q. Do you have an undergraduate degree?

A. Yes, I do.

Q. Where did you obtain your degree?

A. It is now the University of Central Oklahoma. At the time it was Central State University.

Q. When did you obtain your degree?
A. In 1975.
Q. Did you -- what was your major?
A. It was journalism, with minors in education and English.
Q. Did you later obtain a master's degree?
A. Yes, I did.
Q. At the same university?
A. University of Central Oklahoma.
Q. When did you obtain your master's degree?
A. 1977.
Q. Did you have a major specialization with your master's degree?
A. It was a master of education with an emphasis in journalism.
Q. Did you later obtain a doctorate degree?
A. Yes, I did.
Q. Where did you obtain that doctorate degree?
A. Oklahoma State University.
Q. When did you obtain that degree?
A. 1995.
Q. What was the title of your dissertation?
A. The title of my dissertation was -- and please forgive me; it was 1995, and I may not get it exactly correct -- *Seeking a Place in the Journalistic Sun: A Delphi Study of Future Journalism Ethical Issues*.

Q. Have you ever worked in public relations?
A. Yes, I have.
Q. How many years did you work in public relations?
A. I believe total it was about 27.
Q. Where did you work during those years?
A. Mostly for Oklahoma State University, but it included the Oklahoma Department of Transportation, the university hospital system, the University of Oklahoma Health Sciences Center, and then also some not-for-profits, such as Epworth Villa in Oklahoma City. Another agency I worked for was the Oklahoma Energy Resources Board.
Q. What types of public relations work did you perform?
A. Mostly it was making sure that we got our messages out however -- whatever means we needed to do that. Early on it was primarily through pitches to news media or writing press releases. Later on it became much more involved with social media in learning how to connect with people using Facebook, at the time Twitter, and other social media platforms.
Q. Do you have any teaching experience related to public relations or mass media?
A. Yes, I do.
Q. How do you define public relations?
A. Public relations is communicating with the public to gain -- so people can gain information that they need, and we use a variety of platforms to do that.

Q. What is mass media?
A. Mass media is basically an umbrella term for all things related to journalism. Journalism is a subset. So is public relations, advertising, also social media. And in the last 15 years gaming has come under that as well.
Q. Where did you most recently teach?
A. Most recently the University of Idaho.
Q. How long did you teach at the University of Idaho?
A. From 2006 until my retirement in 2019. I was head of the public relations unit.
Q. What classes did you teach on public relations or mass media?
A. I taught the introductory course, Intro to Mass Media. Prior to renaming it in 2015, it was Introduction to Public Relations. I also taught case studies. I taught research. I taught the capstone class, which was basically the students taking all the information that they had learned in their four years or more at the university and applying them to helping a client deliver messages to their target demographics.
Q. Did you develop any of those courses?
A. I developed every one of those courses.
Q. Have you presented as an academic on public relations or mass media?
A. I've made multiple presentations for multiple groups, including the Society of Professional Journalists, the

Indigenous Journalists Association, and others.
Q. Have you received any awards related to your work in public relations or mass media?
A. I have, several awards. The one I'm most proud of is that in 2019, I was awarded the Wells Memorial Key by the Society of Professional Journalists. It's the highest award the society gives, and it's for basically -- it is for dedicated service to journalism.
Q. Based on your experience in public relations and academia, how important is an academic's personal reputation or brand?
A. It is absolutely imperative. If you do not have a good reputation, a good brand -- which is very hard to earn -- then you are basically lost, whether it be for students to take your class or for people to work with you in collaborative effort on a project or research or any number of things that academics are required to do.
Q. Can false statements negatively affect a person's reputation?
A. I'm sorry. I didn't understand part of that.
Q. I'm sorry. I said, can false statements affect a person's reputation?
A. False statements can definitely affect your reputation because one of the things that people will do -- and it's just a fact of our modern life -- is that they will tend to go to social media and either gather or spread rumors. And that

ends up hurting the individual involved because -- especially if the information is not true. Then -- and provably not true. Then that person has -- if you are a faculty member, what this will do to you, it's not just, oh, the students are mad at you or the students don't trust you. You lose the trust of your administration. You lose the trust of your department, your colleagues. You can end up losing your job.

You could end up losing any grants that you might have funding from another source. You might lose your ability to work with other researchers. Your research could be in danger. Once you finish your research, if you go to publish that research, then people -- every piece of research is peer reviewed by three other researchers, and if one of those other researchers says, "Oh, that person has an image problem, I'm not going to approve this," and so therefore the research does not get published. So there's a number of long-term things that can happen from one false statement.

Q. Are false statements made online more damaging to reputation compared to false statements made in traditional media?

A. I believe that they are. And the reason is -- is because people don't tend to stop, think, and look at what is the information that's being given, how can I check to see whether or not that information is true. And they don't stop to say, "Oh, let me do a quick check of Snopes or PolitiFact or any of

the other numerous websites that are out there for checking facts. And so, therefore, you know, these things can snowball faster and faster and make it much more difficult for the person to clear their name.
Q. How can false statements online negatively affect an academic's reputation?
A. False statements online can make people leery of the individual involved. They may say, "I don't want to work with that person. I don't want to -- if I'm peer reviewing that person's work, I don't want to allow that person's research to go forward." And it is -- I know you've all heard the phrase, you know, publish or perish when it comes to academia, but it's true. I mean, if you don't get your work published, your research published, you lose your job, end of -- full stop, end of statement.
And so these things can multiply. And, you know, false statements can cause people to say, "I don't want to work with that person. I don't want to see their stuff published." You know, maybe it gets to the point to where a funder will withdraw funding for their research. It is very serious.
And, you know, academia is not a huge universe. It's a very small universe to work in, and people know each other and talk. And it's -- false statements spread so -- you know, especially online. People will say, "Oh, gosh, you know, I

saw that on Facebook or I heard that on TikTok or that was on Instagram," and like I say, they don't stop to check at one of the fact checking sites.
Q. Generally speaking, how long can it take to rebuild a reputation after extensive negative publicity?
A. In my profession, in public relations, we say it takes a generation, which is 40 years. And my -- the primary case that we all point to now is the Three Mile Island case that happened in 1979. For those who are not familiar, partial meltdown of a nuclear reactor, radioactive material going into the air. Great problems for the industry as well as for the plant and the people in Pennsylvania around that site.
And the immediate reaction was so negative by the public that even though a billion dollars later and lots of cleanup, the plant finally had to be shut down permanently and abandoned because in '19 -- in fact, it was abandoned in 2019 simply because they couldn't get public support to restart. People still remembered and they were saying, "We don't want that in our backyard."
And so it happens. You know, there are lots of cases to where if you work really, really hard and really diligently, people can forgive sometimes later on down the road, but that's generally at least 20, 25 years down the road. That's why we say, as a general rule, it takes about a generation to, you know, get past that.

Q. Can prevailing in a defamation lawsuit help somebody restore their reputation?
A. Yes, because once you have been cleared in court, people say, "Oh, that's the good person. That's the good guy. You know, they were obviously wronged."
MR. CARONE: Thank you. No further questions at this time.
THE WITNESS: Thank you.
THE COURT: Cross-examination, Ms. Guillard.
MS. GUILLARD: Yes, sir.

CROSS-EXAMINATION

BY MS. GUILLARD:
Q. Good morning, Dr. Tallent.
A. Good morning.
Q. Can you explain your relationship with Professor Scofield.
A. I knew of Professor Scofield when she came to the University of Idaho. Again, academia's a small universe, and I knew of her. She and I did not get to know each other as individuals until late in 2023, and we became friends. And, now, I'm not going to say friends like we go shopping together or we go to dinner at each other's house. We're more work friends. We know each other, see each other, say, "Hi, how are you doing?" And we're friendly. I have respect for her research, and quite frankly, I'm a fan of her sense of humor, which is very much like mine.

Q. What do you know -- clarify if you know anything about Professor Scofield's career prior to the statements I made online.
A. I -- the only thing I know is that Professor Scofield was considered to be an excellent academic and a very good teacher.
Q. Clarify: Do you have any information regarding Professor Scofield's career after the statements I made online?
A. In terms of what?
Q. Do you know anything about her work progression and --
A. I do know that after the incident of her being defamed on TikTok, that -- I know that the university had to withdraw her information from the website. I know that there was a great deal of concern for her because -- you know, on campus because people were afraid that she might be in physical danger, you know, just being on campus.

It was a very difficult time. It was a very scary time because of, you know, the whole event that had happened and then the incident specific to Professor Scofield. A lot of us within the academic community in Moscow were very aware that she had been threatened and that she was in fear for basically her life. And it made -- it made it awkward for her and the university.
Q. You stated she had been threatened. By who?
A. I understand that she had been threatened by fans of your

TikTok. I do not have anything other than there were people who were talking a lot about the perceived threats.
Q. Do you have evidence of these threats?
A. I do not have evidence of the threats. I'm just saying that the atmosphere at the time -- you asked me about the atmosphere at the time and what I knew. That is what I know from the atmosphere at the time.
Q. How do you know this? Who made the threats? When were the threats made? And is there documented evidence that Professor Scofield was threatened by an alleged fan?
A. I do not have evidence. What I'm saying is -- is that in the community, in the Moscow academic community, we were told that there had been threats. And so that is all I know. It was something that was discussed repeatedly among the academics in Moscow, Idaho, at that time.
Q. Thank you.
Who told you that? You said, "We were told." Who made that statement?
A. I cannot remember who made that statement, but I do know that it was discussed routinely for, I'd say, three months in 2022, 2023. Probably early 2023, when I think back on the timeline. Because I'm retired, I was not on campus. But I still have a lot of friends, a lot of colleagues with whom I still write, with whom I still associate, and I do know that there was quite a bit of discussion. It was --

Q. Clarify -- I'm sorry?
A. It was an overarching discussion.
Q. So basically are you saying that it was a rumor that -- within academia that Professor Scofield was threatened but it was not substantiated by any evidence or -- and you have no person to point this specific rumor to?
A. I don't know if I would say rumor. I think that I would say that it was something that was acknowledged, because at that time there were a lot of things going on.
Q. As it pertains to Professor Scofield's safety, since the videos were posted, to your knowledge, has any of those alleged rumors or safety concerns manifested into actual danger for Professor Scofield?
A. I do not know.
Q. You stated that online, when a statement is made, it could take up to a decade, did you say, or generation --
A. A generation, 40 years.
Q. -- a generation for the person's name to be cleared. Are you aware that Professor Scofield has not lost any opportunities as it pertains to the statements that I made?
A. I would disagree with that statement. Professor Scofield I remember at the time was unable to research. A mutual friend had made a comment that she was unable to conduct her research. I cannot remember if she had withdrawn from her classes at that time, but I do know that it impacted her

research. She was not able to do that, and that is literally half your job as an academic.

Q. Okay. Thank you for that.

Her boss testified she had not lost any opportunities and in fact she has been promoted possibly multiple times since these videos. So my question to you was, are you aware that she has not lost any professional opportunities?

MR. CARONE: Your Honor, I'm going to object to the extent it misstates the prior testimony and is argumentative.

THE COURT: I'm going to sustain that objection, Ms. Guillard. You're summarizing the testimony, and it may or may not be exactly accurate, and this witness wasn't here for that testimony. So if you could rephrase your question.

MS. GUILLARD: Okay.

THE COURT: I'll sustain that objection.

Q. (BY MS. GUILLARD) So far, the evidence shows that Professor Scofield has published work, has been promoted, has the support of her colleagues and friends and family. With that being said, what is your opinion on a person who has not suffered any damages thus far but in the future could? Can you explain how a person can go from no damages as it pertains to an online statement and then in 100 years suddenly be damaged?

MR. CARONE: Same objections, Your Honor.

THE COURT: I'm going to sustain the objection again.

Ms. Guillard, you're summarizing -- attempting to summarize evidence in the record. If you'll just ask this witness what her personal knowledge is or what opinion she might have if somebody had not suffered, you know, a job loss or some professional consequence.
Q. (BY MS. GUILLARD) Okay. How long does it take for a person's reputation to be damaged after an online statement and suffering -- subsequent suffering to their professional career?
A. It can be pretty quick, fairly quick. It can also take a little bit of time depending on the platform on which it was issued. And the damage could, and as a general rule -- not specific to this case, but as a general rule, damage can range anything from an embarrassment to losing their job. So it's a quite -- quite a wide range that damage can cause.
Q. Would you say from your perspective that Professor Scofield had the support of the academia community that you were speaking of regarding the rumors?
A. I cannot in good conscience say yes or no to that because I was not on campus. I'm retired. I retired in 2019. I have not really been on campus since that time, so I don't know what the universal attitude at the University of Idaho was.
Q. So the rumors that you were stating that Professor Scofield had been threatened, you heard that from where?
A. It came from people that I was having coffee with or in

discussions with for my own research.
Q. You said it was in the community of academia; correct?
A. In academia, yes. These are academic friends.
Q. That work for the University of Idaho?
A. Some work for the University of Idaho. Some work for Washington State.
Q. You stated that online statements could cause a person to lose the trust of administration, colleagues, grants, funds, departments, et cetera. Are you aware -- I'm trying to phrase this so that I won't get objected to -- if a person has not lost the trust of their administration, if a person has the support of their boss, and if the person has not missed any opportunity for grants or funds after an online statement, let's say three years later, what could trigger any future damages within the next 100 years?
A. Oh, student gossip, flat and simple. "Do you know what happened to so-and-so?" That is not uncommon. Students -- bless their hearts -- love to gossip, and it's a common thing. So that would be the first thing that comes to my mind.
Q. Student gossip. You said that their work in academia was reviewed by peers. Does that include students?
A. No.
Q. So how would alleged student gossip in the future impact an academic's work?
A. Oh, student gossip would mean that the students would stop

taking the professor's class or that, you know, they would basically build up -- I don't know how to say this. They would basically get their friends to say, "Oh, let's not take that professor or, you know, let's make fun of that professor."

It is not uncommon for students to either build their own website or develop a social media page somewhere where they're making fun of that professor. I've had it happen to me. I've had other people have it happen to them. And there are -- then they can go to ratemyprofessors.com and make all kinds of remarks on that website, which can be damaging to someone. So, yes, there's, you know, students can actually create a great deal of difficulty for faculty.

Q. Are you aware of any students who made websites against taking classes with Professor Scofield?

A. I am not personally aware, no. But I'm saying it can happen.

Q. Are you aware of any students who refused to take any classes with Professor Scofield?

A. No. But then again, as I said, I'm retired and I am not -- I'm not in that student population anymore.

Q. So your statements today are speculative?

A. No. They're from my own experience.

Q. From your experience -- do you mind sharing your experience?

A. My experience of having a student develop a website against me?
Q. Yes.
A. A student got caught plagiarizing, and I gave them a zero grade for plagiarism. That student was angry because they didn't like being caught, so they developed a website and got some of their friends together to sign a petition saying that I was a terrible professor. My dean looked at it. My -- the director of my department looked at it, brought me in, talked with me, brought the students in, talked with them. And when it came down to basically me zeroing out a student's grade on a particular assignment because they had plagiarized it, everything was dismissed. That's my experience.
Q. And in your experience, everything was dismissed. Did it impact your career?
A. It did cause problems with -- for me for at least three, four years because some students would say, "Oh, she's so tough, don't even think about plagiarizing in her class." Personally, I thought it was a good thing. But, "Don't plagiarize." But it did create some issues for me down the road, yes.
Q. So the issues that it created for you, did it begin immediately after the website and continue on to the next three years, four years?
A. Three or four years, yes.

Q. So from your experience, after a student makes a statement online or a student develops a web page -- and this hasn't happened, but we're just playing pretend right now -- it can immediately and will immediately have an impact on your career and continue for the next three years, four years?
A. And possibly longer. It depends on how egregious it is. When I retired one of the -- one of the things that students said to me was, "Whew, now there's not going to be anybody so concerned about plagiarism." And I know it was a joke, but, you know, it was something that had carried on. And by the way, that case with me happened in 2013.
Q. Are you aware that despite it being three-plus years after the online statements I made, that that did not happen to Professor Scofield?
A. I'm sorry. What was the question? I didn't understand.
Q. Are you aware that there are not any student websites bashing Professor Scofield due to my statements?
MR. CARONE: Objection, Your Honor, in terms of relevance and outside the scope. Dr. Tallent is here as an expert witness, not a percipient fact witness. We've been trying to give Ms. Guillard some leeway here, but it's been going on for quite a while.
THE COURT: I'm going to overrule the objection.
Q. (BY MS. GUILLARD) Would you like me to --
A. I'm not aware, but again, I'm outside of academia now.

Q. So your expert testimony is not based on any facts; is that correct?
A. My expert testimony is based on facts as I have experienced them in my 50-plus-year career.
Q. So your facts are not directly related to this specific case; is that correct?
A. You are asking me questions about Professor Scofield that I have no knowledge.
Q. So that would be a yes; correct?
A. I disagree. I would say that that is a moot point because I have no knowledge.
Q. You have no knowledge on the facts of this case; is that correct?
A. I have no knowledge of what you asked about, about Professor Scofield in the last few years in terms of student reaction.
Q. You have no knowledge -- what damages do you have knowledge of that Professor Scofield experienced?
A. I do --
MR. CARONE: Your Honor, object again in terms of relevance and being outside the scope and really outside the purpose of Dr. Tallent's testimony today.
THE COURT: I will give you some leeway on redirect, but Ms. Guillard has asked questions that I think she's entitled to ask. But she may have opened a door for you to

ask other questions on redirect.
MR. CARONE: Thank you, Your Honor.
A. The damage to Dr. Scofield as I saw it -- and this is my opinion -- is that it caused her stress. It caused her strife. It caused, you know, tremendous emotional upset if not physical upset as what would happen if you had been defamed. And I can see -- and I do know that, you know, she did suffer from the stress of having to deal with being defamed in such a public forum as TikTok.
Q. (BY MS. GUILLARD) Dr. Tallent, are you a medical doctor?
A. No, I'm not.
Q. Dr. Tallent, are you a psychiatrist?
A. No, I am not.
Q. Dr. Tallent, can you diagnose Professor Scofield with any physical or mental illnesses?
A. I cannot diagnose, but I can observe.
Q. Your testimony today was -- your quote, unquote expert testimony today was for media and that impact; is that correct?
A. That is correct.
Q. I have a question regarding the nuclear reactor plant. You said that it could take -- it took about a hundred years or so for them to rebuild their reputation; is that correct?
A. It took from 1979 until the plant was closed in 2019.
Q. What happened -- is that the case -- and I briefly read

it -- read about it that people were killed on, like, a nuclear plant due to something like that? Can you explain that?
A. It was a nuclear meltdown, and the reporting at the time was focused very heavily on the fact that these are the things that happen in a nuclear reactor. These are the causes of a nuclear meltdown. These are the types of elements that are released into the air that can cause physical damage to human beings.
Q. Were human beings physically damaged in that nuclear plant's breakdown?
A. That was 1979. I cannot remember if anyone was killed or injured. I do know that the nuclear meltdown did create -- I understand that later people reported health issues because of the radioactive iodine that had been released into the air. But again, that was 1979. I cannot remember the exact specifics of that case.
Q. But you used it as an example.
A. I used it as an overarching example of how long it can take for people to remember and not trust something.
Q. Was that a defamation issue, or was that an issue of public safety and nuclear plants causing mental, physical, whatever, problems with the people in the area?
A. I was using it as an example of public relations and about how people's memories are long when it comes to issues that,

you know, tend to be negative as opposed to positive.
Q. But my question was regarding the example that you chose to use, the nuclear plant. Was that an issue of defamation, or was that a public relations issue of people being concerned with nuclear waste and negatively impacted by that?
A. It was a public relations issue, and I was using it as a public relations example.
Q. I would like to get the answer to my question.
A. That is the answer to your question.
Q. So it was not --
A. It was --
(Reporter interruption.)
Q. (BY MS. GUILLARD) Were you done? I didn't know you weren't done.
A. It was a -- it was a public relations case of public safety that shows the length of time that it takes people to remember when something happens.
Q. So correct, yes or no, it was not related to defamation?
A. It was not related to defamation, but it was related to people's memories.
MS. GUILLARD: Thank you. No further questions.
THE COURT: Thank you, Ms. Guillard.
Mr. Carone, redirect?
MR. CARONE: No, Your Honor.
THE COURT: May the witness be excused?

MR. CARONE: Yes, Your Honor.

THE COURT: Thank you, Dr. Tallent. You may step down.

Mr. Carone, call your next witness.

MS. OLSON: Your Honor, Professor Scofield calls Rebecca Bohn. I'm going to step outside and see if she's here.

THE COURT: Thank you, Ms. Olson.

MS. OLSON: Just one moment, Your Honor. That will give me enough time to lower the lectern after Mr. Carone was examining the witnesses.

And, Ms. Fifer, can we switch the evidence presentation system over to Ms. Bibb's computer?

THE COURT: Ladies and gentlemen of the jury, if you want to stretch your legs, stand up at all, we have a little time here.

MS. OLSON: Your Honor, apologies. It'll be about five minutes. She's here but needs a minute.

THE COURT: Ladies and gentlemen of the jury, we'll take a five-minute recess. We'll make sure that Ms. Bohn gets here and settled. So we'll take a five-minute recess.

(At 9:10 a.m., a recess was taken until 9:16 a.m.)

THE COURT: Let's bring in the jury.

(The jury entered the courtroom at 9:16 a.m.)

THE COURT: All right. Please be seated.

Ms. Olson, you can call Ms. Bohn.

MS. OLSON: Yes. Rebecca Bohn will be our next witness.

Ms. Bohn, if you will come forward into the well of the courtroom, where Mr. Gordon is.

(The witness was sworn.)

THE COURTROOM DEPUTY: Please state your full name and spell your last for the record.

THE WITNESS: Rebecca Bohn, B-O-H-N.

THE COURT: You may inquire.

MS. OLSON: Thank you, Your Honor.

REBECCA BOHN, PLAINTIFF'S WITNESS

DIRECT EXAMINATION

BY MS. OLSON:

Q. Good morning, Ms. Bohn.
A. Good morning.
Q. Ms. Bohn, what city do you currently live in?
A. I practice and live in Idaho.
Q. You practice and live in Moscow, Idaho?
A. Yes.
Q. Where did you live before you moved to Moscow, Idaho?
A. I lived in Spokane, Washington, and that's where I was born. I'm from Washington state.
Q. Ms. Bohn, what work do you currently do?
A. I'm sorry. Say that again.

Q. What work do you currently do?
A. I am in private practice, psychotherapist.
Q. How long have you been a psychotherapist in private practice?
A. About 32 years.
Q. As a psychotherapist in private practice, what does that mean you do?
A. I do individual counseling for individuals that are 18 and above.
Q. Do people sometimes then refer to you as a therapist or a counselor?
A. Yes.
Q. And I think you indicated you'd been in the area of psychotherapy for approximately 32 years; is that right?
A. Yes.
Q. Have you always been in private practice?
A. No, I have not always been in private practice. I graduated from Gonzaga University with my master's in counseling psychology in 1990 and from there went into Family Services, which is a community-based counseling agency, and worked for a year. And there I worked with adults and children in groups, individuals, and marital counseling.
Q. What did you do after your work at Family Services in Spokane?
A. That's -- I did all counseling with children and adults.

I did play therapy, that kind of thing.
Q. Did you also for a period of time work at the Spokane Mental Health Center?
A. From there I -- so I worked at Family Services for a year, and then I went to Spokane Mental Health Center and then was a county-designated mental health professional. And for five years I did assessments for suicide, homicide, and grave disability. I also facilitated voluntary and involuntary hospitalizations. So it's kind of trench work actually. It was good experience for me.
Q. When you worked at the Spokane Mental Health Center and worked on civil commitments, what was involved with that?
A. I had to work very quickly, determine if the individual was safe from themselves, hurting themselves or someone else, or could take care of themselves. It was 24-hour. I worked graveyard, evening shift, day shift, went out with the police when necessary if there were weapons in the home. And so it was a bit -- a major responsibility. I had to diagnose, of course, and do a full investigation, usually in the emergency room or in their home --
Q. And when --
A. -- or wherever they were.
Q. Sorry for talking over you. When you were doing that and doing those sorts of -- doing that work and doing those sorts of diagnoses, did you often have to make decisions in a

relatively quick --
A. Yes.
Q. -- period of time?
A. Yes, very big decisions. Well, I took it very seriously and compassionately. When I had to involuntarily -- when I had to write up a report and basically send them to the hospital's psychiatric unit at Eastern State Hospital or Providence, so I didn't take it lightly actually. But you have to -- no one wants to be hospitalized really, and so I had to do a very quick interview really and cover kind of all the -- all the circumstantial evidence, I guess, if they were going to be a harm.
Q. And then after that, did you start your own private practice in Spokane?
A. Yes. After working at the Mental Health Center for five years, I was working with another -- two psychologists in private practice, yes, in Spokane. Actually, I did kind of both. I married an individual who teaches at the University of Idaho, so moved there in 2013 when I was married. So, yes, psychotherapy, I did at the beginning some groups. I did behavioral education, psychoeducation, and stress management and women's groups and also individual counseling for adults.
Q. And what have you primarily focused on in your last 12 or 13 years in your private practice in Moscow?
A. Individual work. I've not done any classes. So working

with adults, a very full practice, full-time and doing a lot of individual work. There's a large diversity, I guess, population in Moscow. It was very interesting working with different cultures. And I basically did counseling.
Q. And you mentioned that you graduated with your master's degree in counseling psychology from Gonzaga in 1990. Do you also hold any licenses or certification to be a counselor?
A. Yes, I do. Well, I have a license both in Washington state and Idaho. I have clients in both. I offer -- I guess I should add too I did telehealth prior to the COVID lockdown. I did telehealth, so I did clients both in Washington and Idaho, and I'm currently licensed in both states.
Q. And what is your license called?
A. It's kind of different in each state. Basically mental health counselor.
Q. And, Ms. Bohn, in order to be a licensed mental health counselor in either Idaho or Washington, do you have to have any ongoing education or training in your field?
A. Actually, you have to complete -- Idaho is a little more strict as far as the continuing education credits compared to Washington. But I usually do over the amount needed, which is 40 units a year.
Q. And are you current on your licenses in both Idaho and Washington?
A. Yes.

Q. And on your continuing education credits?
A. Yes.
Q. Ms. Bohn, over the course of your -- I think you said 32 years in private practice -- or excuse me -- 32 years as a counselor, do you have any idea how many adults you have provided counseling services?
A. I wish I knew really. Really a fair amount. I saw a lot of clients at Family Services. Eight people -- it was a difficult job. Eight clients a day five days a week. I've seen hundreds of clients and diagnosed and treated.
Q. Do you have any experience providing counseling in crisis situations?
A. Yes, actually. Crisis-based care, trauma-based care. Yes, I've had a lot of training at the Mental Health Center level and in my private practice as well, PTSD, yes.
Q. Have you ever provided something called crisis debriefing?
A. Yes. I have provided crisis debriefing to organizations, companies where an employee has been injured or killed or some other kind of life transition. And so my job would be -- they would call me, like, the day before, two days before. And I would meet as a group and also individually to debrief, help debrief the situation.
Q. Ms. Bohn, in your work as a therapist, is there a particular tool or method that you typically use to diagnose and treat your clients?

A. To diagnose, I follow the criteria in the *Diagnostic and Statistical Manual*, *DSM-V*.
Q. What tools do you use to do that? Do you talk to them?
A. Yes, talking, talking therapy. And I also administer assessments when necessary. It's helpful for treatment and diagnosis.
Q. And I think you indicated over the course of the work that you've done, you have identified and diagnosed people with posttraumatic stress disorder, or PTSD; is that correct?
A. Yes.
Q. And have you sometimes used the tool of talk to initially make that diagnosis?
A. Yes. That is the main tool I use, is talking.
Q. Ms. Bohn, in the course of your psychotherapy private practice in Moscow, Idaho, did you treat Rebecca Scofield?
A. Yes.
Q. Do you recall when you first met or first started providing treatment to Professor Scofield?
A. I believe our first session was May 9. She had called in the first part of January, and my practice was full at that time. So I said, "No, I'm not able to help you." And then I had a few spaces there in May, so I called her back to see if she was still in need.
Q. And was that May of 2023?
A. Yes, it was in 2023.

Q. And did you begin working with Professor Scofield in May of 2023?
A. Yes.
Q. Prior to the time Professor Scofield reached out in January and then when you eventually began treating her in May of 2023, did you know Rebecca Scofield?
A. No, I didn't.
Q. Ms. Bohn, over what period of time or for how long have you been providing therapy services to Professor Scofield?
A. Since May 9 up to current time.
Q. Do you recall how often or how regularly you would see her?
A. How many times I've seen her?
Q. Or over what -- how often you would see her. Was there a particular schedule?
A. Usually twice a month, depending on her schedule and my schedule. It -- initially it was weekly, and then after a few months because of Becca's -- I call her Becca -- busy schedule being here, we went to twice a month. And that seemed to be -- she was very present, cooperative in session. I provided homework. So it seemed to suffice fine.
Q. Did -- what typically occurred during the sessions that you met with her?
A. I'm sorry. Could you --
Q. What typically happened? How did they work? What

happened when she arrived for a session? Did you talk with her?
A. We would go over -- basically kind of check in, what I call a check-in, see if there were any situations that have happened. I guess the highlights, the lowlights, what the current concerns are and thoughts.
Q. And that primarily concerned talking with her?
A. Yes.
Q. And approximately how long typically were those sessions?
A. They would last 60 minutes.
Q. And did you make notes or progress notes to record what happened during those meetings?
A. Definitely. I use SimplePractice, is the software program I use. And so, yes, I do chart.
Q. Ms. Bohn, I'm going to next ask you some questions about your initial meeting with Professor Scofield in May of 2023. What was the first step for Professor Scofield -- and you can call her Becca; I'll probably call her Professor Scofield -- when she was going to be a new patient of yours? Did she have to fill anything out?
A. Yes. First of all, it's just -- I think listening is really important to create a safe atmosphere, to develop that therapeutic trust, which is important. She filled out an intake before she came in, so I had a little bit of an idea what was going on.

Q. If I could just -- Ms. Bohn, you mentioned that intake questionnaire. And is it true that one of the questions on that questionnaire is, "What brings you to counseling at this time? Is there something specific, such as a particular event?" Is that one of the questions you have?
A. Yes. It was the TikTok situation. It was creating a lot of exposure. There already was safety fear in the community. Moscow is a small town.
Q. And so the thing that she identified in her intake questionnaire for why she was seeking your services was --
A. Yes.
Q. -- something about TikToks?
A. Yes, assistance in processing and coping basically with the TikTok.
Q. And then I think you said that she came in, and the first thing you do is you talk and you get to know her; is that right?
A. Yes.
Q. And when you met with Professor Scofield -- I think you said it was on May 8th or 9th of 2023 -- what was her initial complaint? Was it different from what she said in her questionnaire?
A. No. Basically she did a very good job with the questionnaire. I could tell it was done thoughtfully. Basically I think first on the list was personal safety,

safety for her family and extended family. She had two young children at the time and was -- and is married. And so safety was a concern. Emotional stability, that's something that we worked with. She exhibited signs of depression, anxiety, and obviously posttraumatic stress.

Q. What signs of depression, anxiety, and posttraumatic stress did she exhibit?

A. I would say extreme fear, anxiety, lack of trust after being wrongfully accused of four homicides. It was traumatic. And I was able to be objective as possible. I was objective, but I was part of the community in Moscow, so I think the anxiety, helping her to deal with the safety and the obtrusive -- intrusive thoughts about someone attacking herself or her family.

Q. Did she report those --

A. Yes.

Q. -- intrusive thoughts to you?

A. Yes, right off the bat. It was reported she would check the windows frequently and the locks to make sure that no one would break in as a result of continual TikTok online statements being made that were totally untrue, accusing her of in some respect being tied to the murders.

Q. Did she report whether she was having any difficulty sleeping?

A. Yes. That was a major -- it still is. Medication has

been needed. At first it was over-the-counter. As Becca was afraid -- she wanted to be present for her children at night, and if someone did break in, she wanted to be there for them. So she was very cautious about antidepressants or sleep medication. But, yeah, she came in and she had not slept. Continuous fatigue is one symptom that she did mention definitely in her intake as well.

Q. And the things that you've just described, she described many of those in your first session with her?

A. Yes.

Q. And did she continue to report those symptoms over the period of the three years and --

A. Yes.

Q. -- excuse me -- two years --

A. Yes.

Q. -- and about nine months since you've been treating her?

A. Yes.

THE COURT: Ms. Bohn, if I could just ask you to try to wait until the question is complete so that we can get --

THE WITNESS: Oh, I'm sorry.

THE COURT: -- the question and answer. I know --

THE WITNESS: Okay.

THE COURT: -- it's sometimes hard. Thank you.

THE WITNESS: Thank you.

Q. (BY MS. OLSON) And I'll try not to pause in the middle of

my questions. That's probably causing the problem.
A. Yes.
Q. When she was there for that first visit, did you make any observations about her, about any of her particular behaviors?
A. This individual definitely showed all the signs, the criteria of posttraumatic stress disorder. There was no question in my mind.
Q. And did she do anything -- how was she in your office? Was she sitting still? How did -- how was she behaving?
A. As expected, she was agitated, nervous. I think difficulty -- she had no previous psychiatric history. It was difficult, I think, reaching out, but I think she knew that she needed the tools to work with, to manage and to cope with the stress, anxiety, and depression. But it was not easy for her to reach out and to be sitting in my office. So, yeah, she presented with all the symptoms, met the criteria, and I was able to make that diagnosis within several days.
Q. And that's the diagnosis of posttraumatic stress disorder --
A. Yes.
Q. -- correct?
A. Yes.
Q. Did you provide treatment over the time that you have seen Professor Scofield --
A. Yes.

Q. -- for her posttraumatic stress disorder?
A. Yes, yes. That is -- there was a treatment plan that I went over with Becca and would go over prior to seeing her in sessions and --
Q. I'm sorry. In particular, was there a kind of treatment you used called CBT?
A. Yes.
Q. What is CBT?
A. Okay. Primarily -- it's cognitive behavioral therapy, which is the most popular modality used to treat PTSD and anxiety, depression. Basically cognition -- the cognitive means cognition or thoughts. Behavior is tied to the actions, like sleep, exercise, diet, that kind of thing. So, yes, we needed to work with the cognitive behavioral therapy, which included some relaxation to help her with the stress and anxiety.
Q. Ms. Bohn, you testified that you diagnosed Professor Scofield with posttraumatic stress disorder within a few days of that first meeting and it was apparent and you could see it right away. Has your diagnosis of PTSD changed at all --
A. No.
Q. -- in the time you've been seeing her?
A. No.
Q. Is PTSD typically something that goes away?
A. No.

Q. Over the time that you've been treating Professor Scofield, did you administer any testing instruments to assess her ongoing mental health conditions?
A. Yes, I did.
Q. In April of 2024, did you administer something called the PHQ-9?
A. Right. That --
Q. What is that?
A. That is commonly given to clients in psychotherapy to check for depression basically and some suicidal ideation.
Q. Is it also used to assess PTSD?
A. There's kind of -- there's an overlap. There is a specific assessment that I use several times for PTSD, yes.
Q. And in that April of 2024 with the PHQ-9 test, did the results make you change your diagnosis at all with respect to whether Professor Scofield had PTSD?
A. No.
Q. In August of 2025, did you administrator another checklist or assessment for PTSD?
A. Yes.
Q. What did you administer in August of 2025?
A. Severe symptoms.
Q. What was the test that you administered in August of 2025?
A. It was a self-reported, which the PHQ is a self-report, and the PTSD is as well. And for each question, such as -- I

mean, there were a number of questions that fit the criteria. She answered yes to just about all of them.
Q. And in looking at her responses on the PTSD checklist, was it consistent with what you had observed over the by then two years you'd been treating her?
A. Yes. Observations, affect, and talking with her, yes. And it would worsen at times to seasonally --
Q. Let me stop you there for a second. You were talking about --
(Reporter interruption.)
Q. (BY MS. OLSON) Let's see if I can remember it. I stopped you there when you talked about something happening seasonally. So when you're talking about something happening seasonally, were there times when -- there were times when Professor Scofield's symptoms seemed to heighten or be triggered?
A. Yes, to be honest with you. I said seasonally, but that was not primarily. It was the TikTok online nonstop over the years of treatment basically saying that Rebecca was an accomplice, was connected to the murders, yes, and ongoing reporting on the TikTok online to thousands of people, individuals.
Q. And you would get your information about what was bothering Rebecca from Rebecca; right?
A. Yes.

Q. And she was providing that information to you so that you could continue to diagnose and treat her; is that right?
A. Yes. This is correct.
Q. And was there a particular time of year each year where Rebecca reported symptoms that increased?
A. Yes. And this -- this is what I was referring to as far as seasonally. The times of the murder prior, during the time -- which I believe was November 13 and post, after the murders, that time of year of fall, which normally was a really happy time with two young children, but not so after the murders in November. About October through January, it was very difficult for Rebecca because it was the anniversary.
Q. And was it the anniversary also of her first learning about the TikToks?
A. Yes.
Q. And is that one of the things she reported to you?
A. Could you repeat that, please.
Q. Sure. When her symptoms would increase in that period of time --
A. Yes.
Q. -- did she --
A. Yes. They would spike -- the PTSD diagnosis did not change. Her anxiety, yes, increased --
Q. And if I could just stop you --
A. -- not only seasonally.

Q. If I could just stop you there. So my question is, did she -- when this would increase seasonally, did she also report that it was increasing seasonally because it was about the same time that the TikToks were first published?
A. Exactly. I was going to add that.
Q. Sorry.
A. No, that's okay. The TikTok, it was consistently numerous, I believe, through -- through legal sources trying to get the individual involved in supplying the misinformation to stop. It was nonstop. It was continual. She had an individual, I think, who read these, did not inform Becca at the time fully because of feeling protective but also wanting to keep kind of a record of what was going on through TikTok. But that was very upsetting to Becca because basically it was -- they were lies. They were not true. And they continued up until just recently.
Q. And are those things that she would relate to you that then you had to provide this either CBT or some other therapy to help her work through?
A. Yes.
Q. Ms. Bohn, based on your experience and training, will Professor Scofield continue to need mental health treatment?
A. Yes.
Q. Why do you say that?
A. Why do I say that? Because PTSD -- November will not end,

the anniversary, living in Moscow. And actually it's -- yes, continued treatment will be necessary, yes.
Q. Ms. Bohn, when is the last time that you saw Professor Scofield?
A. I believe it was about two weeks ago.
Q. And was she exhibiting the symptoms that you described throughout your testimony?
A. Extremely, yes. Very anxious, very stressed.
Q. Ms. Bohn, is closure an issue for Professor Scofield?
A. Say that again, please.
Q. Is closure an issue for Professor Scofield?
A. To be honest, I don't think there is closure in this situation --
Q. Right. Thank you.
A. -- even with coping skills.
MS. OLSON: Thank you, Ms. Bohn.
THE COURT: Ms. Guillard, cross-examination.
MS. GUILLARD: Yes, sir.

CROSS-EXAMINATION

BY MS. GUILLARD:
Q. Good morning, Dr. Bohn. Is that how you say your name, bone or bon?
A. There's no "Dr." Master's level.
Q. Okay. So Mrs. Bohn? What would you like me to call you?
A. Ms. Bohn is fine.

Q. Ms. Bohn. Thank you. Good morning.
A. Good morning.
Q. You stated that during the time of the TikToks but before the TikToks, the murders, that the community was feeling afraid. Can you explain that statement you made.
A. Could you speak a little bit more clearly, please.
Q. You stated that you're a part of the Moscow community; correct?
A. Yes.
Q. And you stated that during the time of November 2022, there was a feeling of fear in the community?
A. Yes.
Q. Can you explain that.
A. Well, at the time the individual, who did later confess to the killings, it was unknown for almost a month. And so the community as a whole, yes, there was -- it was very disconcerting, stressful not knowing kind of who the murderer was.
Q. How did you feel during that time?
A. How I did feel?
Q. Yes.
A. I'd say it was a time where I really implemented what I teach, coping skills, watching my thoughts. This is what I hopefully taught Becca to do. It was easy, I think, for -- my clients were extremely -- they were upset. They were not

accused of murder, murdering and -- but they did demonstrate some stress, as well as I did.

Q. As a member of the Moscow community, when you heard about my TikTok videos, how did that make you feel?

MS. OLSON: Objection, Your Honor. Relevance as to her reaction to the TikToks. That's beyond the scope.

THE COURT: I'm going to sustain the objection, Ms. Guillard, about how she personally felt about your TikToks.

MS. GUILLARD: Well, she already stated that she's trying to be subjective but she's having a hard time because she's part of the community, in her testimony, which is why I asked her.

THE COURT: If you could rephrase the question.

Q. (BY MS. GUILLARD) Okay. You stated that in your treatment for Professor Scofield -- or, as you say, Becca -- you would try to remain subjective or objective but it was hard because you were part of that community. Can you clarify or explain that, please?

A. Actually, I did not treat or see Becca as a client any different than other clients that I work with. I maintain objectivity. I've had to be very good at that. It was not difficult. I kept my own kind of stress. I mean, it was stressful. I wouldn't say it was extreme as far as I was very sad. I did not know any of the victims. But I knew that with

TikTok, especially untrue information was being passed on to thousands of people and that it was extremely distressing to Becca and her physical safety ongoing. Even after the arrest and the confession of the murderer, the TikTok misinformation accusations continued, which did not help her PTSD at all. I feel very strongly about that.
Q. And I'll get back to that. I'll respond to that.
But do you normally refer to your clients by Becca or nicknames?
A. It's not a nickname. My name is Rebecca. I'm sensitive to if -- she right away made that clear that Becca was what I would be calling her. To me, yes, as a professional she was "Dr." She was chair. But when she walked into my room, she was a client just like any other client walking into my room, therapy room. I treat, and I do the best I can and maintain objectivity, which has not been difficult to do with my clients, and confidentiality.
Q. Back to what you stated regarding the recurring, you said, TikTok videos, when you made that statement that the TikTok videos were continuous up until -- you said now; correct?
A. To be honest with you, I don't have the date of the current status of TikTok, so I would find that difficult to answer.
Q. Well, I'm just asking based on what you testified to. You testified that the TikTok videos continued over the years and

ongoing. Did you say that?
A. Yes, as far as I know, I believe that's a fact, that they continued the TikTok. Initially Becca did receive death threats, questions from the staff she worked with and the students, the university, community members, which is actually one of the symptoms of PTSD, is avoidance, not wanting to talk about the trauma and event. But, yes, it was a fact that TikTok misinformation was continually even though the murderer confessed. There was no connection to the murders.
Q. Did you view any of those TikTok videos, and did you witness any ongoing TikTok videos that allegedly happened? Or is this just from things that your client told you?
A. Ethically, no, I do not Google my clients. Ethically we are not to do that as psychotherapists. Yes, it was self-report. A suit was filed, as you do know, against defamation, and a guilty verdict was found.
Q. Thank you.
A. And as far as I know, as best of my ability, it continued for years.
Q. You did not witness TikTok videos, but it is your perspective they continued because that's what Rebecca Scofield told you; correct?
A. Yes.
Q. The death threats, did you witness Professor Scofield -- or Becca -- sorry --

A. Not in my --
Q. -- receiving any -- did she provide you with anything or show you anything that she received death threats?
A. She demonstrated anxiety and fear and safety issues based on what had been said to her online, what had been said about her.
Q. How --
A. I do not go looking for, as a therapist, information regarding my clients and what they report.
Q. So the death threats were self-reported but not verified; correct?
A. I did not see the statements made, no.
Q. Did you see evidence that a statement was made, like an email?
A. No.
Q. So you took her word for it; yes?
A. I'm sorry. Say that again.
Q. You took Professor Scofield's word for receiving death threats; correct?
A. There were safety issues involved because the public wanted to know who the murderer was. These were gruesome murders and there were four of them in a small town, sleepy town Moscow. No, I did not see the death threats, but I definitely could see and understand, best of my ability, why Becca was feeling unsafe --

Q. Just --
A. -- for herself and her family.
Q. Just to clarify, I just wanted to know if the death threats that you said -- that you testified to Rebecca Scofield receiving was self-reported and you accepted that as true; is that correct?
A. That's right. Self-report.
Q. Thank you.
You stated that -- you testified that Rebecca Scofield had questions from staff. Can you clarify that statement?
A. Say that once more, please.
Q. Please clarify your statement that Rebecca Scofield -- around the time you testified about the death threats, you also said that she was questioned by her staff. Clarify that. Maybe I was wrong. Can you clarify that statement you made?
A. I think Becca -- okay. As best as I can recall, yes, Becca was asked about this -- the murder situation, if she was connected, if she had known the students that were involved in the murders. And as best as I know, Becca did follow all of the protocol with the police and that kind of thing. There was no investigation. The university -- it's understandable, I think. Yes, I believed Becca when she would say students, community members, and staff that she worked with, yes, would ask her about the case.

Q. Clarify "they asked her." She was -- did they ask her about the civil case that she filed, or did they -- were there issues from the TikTok videos and they questioned her? I'm just trying to clarify. You said questions from staff. Were the questions from her colleagues about the civil case she filed, or were the questions about her involvement with the murders? Is it true? Please clarify that.
A. I find this confusing a little bit. I don't think it's clear.
Q. Let me make it clear for you, because it's your statement. So I'm asking you about your statement, and I'm confused about your statements. The questions from staff, can you clarify that. You said that.
A. All of my sessions are self-report. It was confirmed. The criteria for PTSD was confirmed and verified. Depression and anxiety was verified. What I was seeing and hearing from Becca, the PTSD was verified through her report and was confirmed through the assessments that I made.
Q. So you're unclear about the questions from staff?
A. I was not with Becca 24 hours a day, so what I can say is that based on Becca's report, yes. I was not present nor would I be expected to be present, to be honest, when these comments were made. It was just a reminder between the community asking Becca, because she had been accused so publicly, and the ongoing TikTok wrongful accusations

continued that, yes, she was questioned by people that cared for her and people that wanted to know -- that had their own issues of safety and stress, wanted to understand what was going on. So it's understandable that she would be probably questioned.

I don't know if that's -- if that clarifies --

Q. Do you know who questioned her at work?

A. I'm sorry?

Q. Do you know who questioned Rebecca Scofield at work?

A. No specific information really is needed or necessary, in my opinion.

Q. Thank you.

You took her word for it; is that correct?

A. I go by self-report, just as all my clients I do and my assessments and my experience, which is extensive in diagnosing and active listening. Yes, that's what I go by.

Q. Are you retired now, or are you currently working? Sorry if I missed that, if you already testified to that.

A. I'm sorry. Say that again.

Q. Are you currently working? Are you retired?

A. I am in the process of retiring, yes, after 32 years. I'm 73 years old. Yes, I think it's about time that I kind of enjoy other aspects of my life, yes. I'm in the process of retiring.

Q. Can you tell me more about the PHQ-9. It's a patient

questionnaire and self-report tool for PTSD, and you said there was another self-report tool that you use for diagnosis; is that correct?
A. Self-reporting information, the questionnaires that I used -- there were three of them -- are all self-report. There's no way -- there's no diagnostic tool, instrument, MRI scan that will confirm the diagnosis. It has to be, from my experience, the criteria of the *DSM-V*, which I go by, and self-report, yes.
Q. Do you recall what the -- what Rebecca Scofield reported on that self-reported patient health questionnaire?
A. I'm sorry. That is not a clear question to me.
Q. When you diagnosed Professor Scofield with PTSD based on the self-reported questionnaire, do you recall what was on it?
MS. OLSON: I object. Misstates the evidence. The initial diagnosis was not based on the questionnaire.
MS. GUILLARD: Okay. Let me rephrase the question.
Q. (BY MS. GUILLARD) What was the initial diagnosis based on, the initial diagnosis of PTSD?
A. The initial diagnosis was made, first of all, on my experience as a therapist, 32 years. I've seen a number of PTSD clients. Her self-report and talking, that is the main tool I used, is talking with clients. And the assessments that I provided definitely confirmed as well. The criteria for PTSD includes -- I think you were asking this -- intrusive

thoughts about the event, reminders of how that can be upsetting.
Q. We can get to that. Can I stop you there? That's -- you're going into another question. Can we go back to the question that I asked on the initial diagnosis of PTSD for Rebecca Scofield. I just got an objection that said it wasn't based on the self-reported tool, but then you just said it was based on self-report and talking with clients. Please clarify what tools or what made you diagnose Mrs. Scofield with PTSD initially.
A. Initially, yes, I used self-report, what was said, answering questions. I'm very good at asking questions. You have to be -- it's a skill I've developed over the years, specific questions. The PTSD diagnosis is not something that's impulsively done. She fit the criteria as far as her self-report. The assessments I made confirmed the diagnosis, and I've diagnosed hundreds of people, so I guess I've said this before. I did the best I could. In my professional opinion, I have no doubt.
Q. Thank you. So the answer to the question was self-report and talking; is that correct?
A. Yes.
Q. You stated you're familiar and you work with the *DSM-V* diagnostic criteria guide; is that correct?
A. Yes.

Q. How often do you use the *DSM-V* in your work in the past, you said, 30 years?
A. I -- in every diagnosis.
Q. Every diagnosis? You follow the *DSM-V* for every diagnosis? Is that what you just said? I'm sorry.
A. I'm sorry. Say that again.
Q. Clarify that you -- did you say that you use the *DSM-V* in every diagnosis that you make?
A. I have to diagnose because -- especially -- well, even if their insurance or if they're paying out of pocket, yes. They -- it has to be medically necessary. Yes, the diagnosis -- there always is a diagnosis. It's part of the treatment plan, objective, goals. The diagnosis is not just for insurance purposes. It is needed, but it also helps guide my treatment plan.
Q. How often do you deviate from the standards and the guidelines and suggestions of the *DSM-V* diagnostic criteria for PTSD?
A. How often do you deviate?
Q. Do you deviate? Have you ever had a case where --
A. No. Do I deviate from the diagnosis criteria in the *DSM-V*? No.
Q. Yes, ma'am.
A. No.
MS. GUILLARD: May I present Defendant's Exhibit

Number 501?

THE COURT: Can you identify that for the record.

MS. GUILLARD: For the record, it is *DSM-V* diagnostic criteria for PTSD, and it is from the National Library of Medicine but also the *Diagnostic and Statistical Manual*, *Fifth Edition*, *DSM-V*.

THE COURT: Any objection, Ms. Olson?

MS. OLSON: I think she can certainly use it to examine Professor Bohn, but I don't think it needs to come in as an exhibit. So, yes, I -- if she's going to use it to question her about it, it's fine.

MS. GUILLARD: I would like to introduce it as an exhibit.

THE COURT: I'm going to overrule the objection and admit Defendant's Exhibit 501.

(Defendant's Exhibit 501 received.)

MS. GUILLARD: And may I present it to the jury?

THE COURT: You may publish it to the jury.

MS. GUILLARD: Publish. Sorry. Publish.

A. Uh-huh.

Q. (BY MS. GUILLARD) Ms. Bohn -- I'm saying that right; correct?

A. Yes.

Q. Do you recognize Exhibit 1.3-4 as it is stated on the *DSM-V* diagnostic criteria for PTSD?

A. Rebecca -- yes. I'm familiar with the criteria for PTSD.
Q. Thank you.
Can you read to the Court A, part A of this diagnostic criteria for PTSD, just A. Just A.
A. Can I read the criteria?
Q. Just number -- or letter A, and we can get to the rest of them.
A. In my expert -- this is one assessment. This is not an assessment tool. I mean, this is the diagnosis, yes, 1 and 4 definitely.
THE COURT: Ms. Bohn, she's asking you to just read what letter A says audibly to the jury.
A. Exposure to actual threatened death, serious injury, directly experiencing the traumatic event.
Q. (BY MS. GUILLARD) Ma'am, I can read it for you. Is that okay?
A. Yes.
Q. *DSM-V* diagnostic criteria for PTSD. Mrs. Bohn, do you recognize that it says, "Exposure to actual or threatened death, serious injury, or sexual violence in one or more of the following ways"? Just stop there. Do you recognize that it says that? Do you acknowledge?
A. Based on the -- especially on the TikTok experience, yes, number 4, experiencing repeated or extreme exposure to adverse details of the traumatic event.

Q. Ms. Bohn --
A. She was accused --
Q. -- can we go one at a time?
A. I'm sorry.
Q. Can we just go one at a time? You can -- I'll ask you further questions afterwards, but can we go through this one at a time so the jury can see it?
A. To read number 4?
Q. A, letter A. I read it for you. You read it as well. Number A, can you state it again.
A. "Exposure to actual or threatened death, serious injury, or sexual violence in one or more of the following ways."
Q. And can you read number 1.
A. "Directly experiencing the traumatic event."
Q. Did Rebecca Scofield in my TikTok videos directly experience death, actual death, serious injury, threatened death, or sexual violence from my TikTok videos?
A. She -- yes. She experienced repeated exposure to the details of the death -- the deaths involved, yes.
Q. Mrs. Bohn, as it pertains to the murder of the four University of Idaho students, am I responsible for the murder of the four University of Idaho students?
MS. OLSON: Objection, Your Honor; relevance.
THE COURT: Sustained.
Mrs. Bohn, don't answer that. The objection's

sustained.
Q. (BY MS. GUILLARD) Okay. The TikTok videos, you state -- you said Professor Scofield directly experienced exposure to actual or threatened death, serious injury, or sexual violence. How did she directly experience actual or threatened death, serious injury, or sexual violence?
A. This is a unique case. I feel there were two crimes involved, the murders -- and they're both connected -- and the repeated TikTok misinformation to thousands of people. So experiencing repeated or extreme exposure to adverse details, yes.
Q. We're not there yet. We're just on number 1. So the answer would be no for that number 1 because you keep going to number 4. Please clarify number 1. Did Rebecca Scofield directly experience the traumatic event of death, serious injury, or sexual violence?
A. She was not present when the murders took place, no.
Q. Ms. Bohn, do you realize that this civil case is about TikTok videos and not actually about the murders?
MS. OLSON: Objection, Your Honor; argumentative.
THE COURT: I'm going to ask counsel and Ms. Guillard to approach, please.
(At sidebar.)
THE COURT: Ms. Bohn has twice referred to guilty verdict and now the fact that there were two crimes, the

murders and false statements. I'm concerned that the jury may believe that there's something else beyond this civil case based on that, so I'm going to ask you to redirect to cover that to -- go ahead, Ms. Olson.

MS. OLSON: Your Honor, I'm not sure she actually knows the difference. And this is information that Ms. Guillard has elicited on cross-examination.

THE COURT: Yes, but she volunteered that twice, so I'm going to ask you on redirect examination to make sure that you clarify with her that any reference to a guilty verdict or a crime as it relates to defamation, that she understands that it's just involved in this civil case. Ask her if she understands it's involved in the civil case and does she have any basis for saying that there is any criminal involvement here.

MS. OLSON: I don't know what her answer to that will be, because I don't think that she understands the difference.

THE COURT: Would you like me to instruct the jury when she's done, then, that there's no evidence in this record of any criminal violations as it relates to Ms. Guillard?

MS. OLSON: I may ask her some questions to clarify her understanding, Your Honor, but these are questions that Ms. Guillard is asking. There was none of that elicited on direct.

THE COURT: And Ms. Guillard is asking proper

questions as it relates to her diagnosis of PTSD, asking her to interpret the criteria of the *DSM* manual, and she's not being very responsive to those questions, so it's a little difficult here. So I'm going to give her leeway to continue to ask questions as it relates to the diagnosis because that goes directly to the damages in this case.

MS. OLSON: I think she can ask her questions, then, about the diagnosis. But what she's asking her is -- are questions like -- I'm sorry if I'm pointing. She just asked her, for example, about, you know, does she know facts around the underlying case. She doesn't know facts about the underlying case. What she knows is what she's been told by Professor Scofield and how she reacts to all of that.

So when she asks her those questions, she's asking a lot of questions that are well beyond the scope of any direct examination and asking questions about what she knows about the facts of the case, what she --

THE COURT: I think she was trying to get -- we don't need to discuss this too much longer, but I think she was trying to get at whether the diagnosis was based on simply self-reports of your client or any other information. I think she did that as well as she could given the responsiveness of the witness. Now she's into how she diagnosed PTSD and the criteria that she used, and I'm hoping she can be a little more responsive to those questions.

MS. OLSON: Your Honor, I think part of the problem is she is 73 years old and she is nervous.

THE COURT: I completely understand that, and that's why she kept answering your questions before you finished.

MS. OLSON: And Ms. Guillard is being argumentative. I would ask that the Court show as much grace to the witness as it's showing to Ms. Guillard.

THE COURT: And I did. I sustained your argumentative objection last time, and I will continue to monitor that.

Ms. Guillard, do you have anything to respond to what I'm saying?

MS. GUILLARD: I understand what you're saying.

THE COURT: And you are free to ask her questions about the diagnoses. I'd counsel you not to ask her to read from it. Maybe you read and ask your question. I think that would go --

MS. GUILLARD: My concern was if I read it, would it be a part of the jury or --

THE COURT: No. It's in the record. It's been admitted as an exhibit, so you can read from it and then ask her a question about it.

MS. OLSON: She also, I don't think, hears very well, which I think is part of the problem.

THE COURT: I understand that, and I know we have a

witness who's of some age and is having some difficulty tracking. So we're going to try to address that. But I do want you to address -- or I can do it just in an instruction, however you wish --

MS. OLSON: I'll probably ask her some questions, Your Honor.

THE COURT: Okay. I just -- the reason I say this is because I noticed some furrowed brows with the jurors when a guilty verdict was mentioned, and I don't want to leave any impression with this jury.

(End of sidebar.)

THE COURT: All right. Ms. Guillard, you may continue your cross-examination.

Q. (BY MS. GUILLARD) Please clarify, Mrs. Bohn --
A. Yes.
Q. -- Professor Scofield did not experience -- in your assessment of her directly experience actual death, threatened death, serious injury, or sexual violence; is that correct?
A. She was not present when the stabbings took place. She was not present at the location, no.
Q. It --
A. That isn't --
Q. My questions, just to clarify, will be about the TikTok videos and not about the unfortunate murder of the four students. Do you understand that?

A. This is interpreted through my experience. This is -- she meets the criteria, in my mind, in my experience, in the *DSM-V*, in the assessments, and in the self-report.
Q. Let's go back to -- I believe this question was objected to, but I want to clarify again another word. When you were doing your reporting or assessment of Professor Scofield and diagnosing her with PTSD, were you influenced or thinking about the traumatic event of the murder of the four students?
A. Was I influenced --
Q. Was that a part of your thought process when diagnosing Professor Scofield?
A. No.
Q. When I'm asking you questions today regarding the diagnostic criteria and you refer to the murder of the four students, is that impacting the way you answer my questions?
A. I'm sorry. Please say -- please repeat that.
Q. Okay. When I'm asking my questions regarding the TikTok videos and your assessment of PTSD and connecting PTSD to the TikTok videos that I posted, are you considering also the murder --
A. I can understand --
Q. -- of the four students?
A. -- that the electric -- the electronic media, I understand that, unless it is work related.
Q. We're not there yet, Mrs. Bohn. We're only on number 1.

We're trying to get past number 1, and number 1, I asked you the diagnostic criteria, which is exposure to actual or threatened death, serious injury, or sexual violence.

Based on your assessment of Professor Scofield and when you diagnosed her, did she experience directly death, sexual violence, or serious injury, yes or no?

A. Yes.

Q. How did Professor Scofield as it pertains to this civil case of a TikTok video experience direct death, serious injury, or sexual violence?

MS. OLSON: Your Honor, I'm going to object as to the form of the question. Her diagnosis is based not on the civil lawsuit but it is based on her treatment of Professor Scofield and things that Professor Scofield discussed with her, not this existence of the civil lawsuit.

THE COURT: You can rephrase the question and just ask it again, Ms. Guillard.

Q. (BY MS. GUILLARD) You answered yes to the *DSM-V* diagnostic -- right? -- for PTSD number 1, and by yes you stated that Professor Scofield directly experienced the traumatic event of actual or threatened death, serious injury, or sexual violence. So my question to you was, what event did Professor Scofield experience?

A. I'm sorry?

Q. Why did you say yes?

A. She meets the criteria. Yes, she was experiencing -- yes, there's just one that is needed here. Okay? And, yes, she experienced repeated -- she was not present -- this is true -- at the time of the stabbings, but there was misinformation. TikTok in itself is not bad, is not enough for a PTSD diagnosis. But what is being said, especially murder, a quadruple murder homicide, yes, is damaging to all the people that have -- it reached thousands, at least two million people.

Q. Thank you. Let's clarify your statement. You said TikTok is not enough for a diagnosis of posttraumatic stress disorder; is that correct?

A. In itself. That's --

Q. In itself --

A. -- a statement --

Q. -- did it --

(Reporter interruption.)

Q. (BY MS. GUILLARD) Go ahead. Your turn. Sorry. Go ahead. It's your turn. And I'm not intending to disrespect you in any way. I respect you and your work. I'm just asking questions for the facts for the jury.

MS. OLSON: Your Honor, I'm going to object and move to strike. Ms. Guillard is testifying from the lectern.

MS. GUILLARD: She's troubled. That's why --

THE COURT: Overruled, Ms. Guillard. You're just

here to ask questions, not to narrate.

MS. GUILLARD: Yes, sir.

THE COURT: You can ask your next question.

Q. (BY MS. GUILLARD) So the answer was yes to that last question, TikTok is not enough for a PTSD diagnosis?

A. That can be interpreted. It depends on how you're interpreting it. Okay? I trust my judgment. She fit the criteria. Her self-report fit. She has PTSD. I have absolutely no doubt about that.

Q. Okay. Let's -- we'll continue on with the list, because you said -- correct me if I'm wrong. You said it can be one or more of number -- or letter A; correct? So it doesn't have to be 1, 2, 3, and 4? It could be just one; is that correct?

A. You don't have to be physically present in order to fit the diagnosis. Really directly experiencing the traumatic event can be interpreted in -- I trust my diagnosis. I don't know -- specifically to TikTok, repeated accusations is experiencing repeated harm physically, mentally, psychologically, emotionally.

Q. Let's move on to number 2.

A. I'm sorry?

Q. Can we -- are you ready to move on to number 2? I'll read it for you. Is that okay? Number 2 --

A. Are you talking about B?

Q. We're still --

A. Witnessing --
Q. -- on A.
A. Witnessing --
THE COURT: One at a time.
Q. (BY MS. GUILLARD) We're still on A, Ms. Bohn.
THE COURT: Let's do this. Let's take our midmorning break now, and we'll resume --
THE WITNESS: Yes, let's do.
THE COURT: -- the testimony in approximately 20 minutes. The jurors can be excused.
(The jury exited the courtroom at 10:27 a.m.)
THE COURT: Ms. Bohn, you may step down, and you can go to the witness room if you wish.
Please be seated.
MS. GUILLARD: I'm going to grab this from up here.
THE COURT: Ms. Bohn, if you'll retire to the witness room.
All right. We're going to take our midmorning recess. I want to try to get our arms around the testimony and try to make sure that the questions are as precise as they can be so that the witness can fully understand them. I will direct the witness as necessary to listen carefully to the question and answer it, knowing what we discussed at sidebar.
But try, Ms. Guillard, to ask as precise a question as you can, as short of a question as you can. I think you'll

have better luck getting the answers that you're asking about.

MS. GUILLARD: Yes, sir.

THE COURT: Ms. Olson, anything that you want to raise at this point?

MS. OLSON: No, Your Honor. Thank you.

THE COURT: All right. Ms. Guillard?

MS. GUILLARD: No, sir.

THE COURT: All right. We'll take our 20-minute break. Let's come back at quarter to 11:00.

(At 10:29 a.m., a recess was taken until 10:45 a.m.)

(The following took place outside the presence of the jury.)

THE COURT: All right. Please be seated.

First, I want to take up a matter as it relates to observers in the gallery. I just want to remind members of the public and gallery that you're permitted to have laptops and cell phones in the courtroom. However, you are not permitted to record any of the proceedings or to take any photographs inside the courtroom. Please don't have your cell phone up high so that either the witness or members of the jury might think that you're doing that. So please keep that low and do not do either of those two things.

Ms. Bohn, if you'll resume the witness stand. So, Ms. Bohn, I spoke with counsel and Ms. Guillard, and I asked Ms. Guillard to try to ask shorter, more precise questions. I

know that testifying is nerve-racking, and sometimes it's difficult to be on the same page with somebody who's cross-examining you, through no fault of yours and through no fault of the questioners. Sometimes ships are just passing in the night.

But I want to make sure that Ms. Guillard asks shorter, more precise questions, and if you could do your best to try to listen carefully to the question, answer the question that's been asked either with a yes or a no, and then you have every opportunity to explain yourself if you wish. And also know that Ms. Olson will have the opportunity on redirect examination to have you explain any of your answers further that she wishes you to explain further.

But I want to make sure that Ms. Guillard's asking a precise question and you're giving a precise answer to that question so that the jury can follow it best. All right? Any questions about that?

THE WITNESS: No. Thank you.

THE COURT: All right. Ms. Olson, anything for me to take up now?

MS. OLSON: No. Thank you, Your Honor.

THE COURT: All right. Ms. Guillard?

MS. GUILLARD: No, sir.

THE COURT: All right. Then we'll bring back the jury and resume cross-examination.

(The jury entered the courtroom at 10:48 a.m.)

THE COURT: All right. Please be seated.

Ms. Guillard, you may resume your cross-examination.

Q. (BY MS. GUILLARD) I am reposting -- publishing -- thank you -- Defendant's Exhibit Number 501.

Ms. Bohn, when you diagnosed Professor Scofield with PTSD, did you determine that Professor Scofield's PTSD is caused by TikTok videos? Yes or no.

A. It was the repeated experience of TikTok report that she had murdered or was an accomplice in some way connected with the murders. These were wrongful accusations, and that was traumatic. Yes, PTSD does fit.

Q. To clarify, are you stating, yes or no, Professor Scofield's PTSD diagnosis is caused by TikTok videos? Is that correct?

A. It was the repeated exposure of TikTok saying that she was connected with the murders that was traumatic. Yes, so she did, number 1, directly experience -- the traumatic event was the impact TikTok had on her as it continued.

Q. Let's take a step back. The *DSM-V* states in its guidelines to psychotherapists and therapists and psychiatrists the definition of a traumatic event. A traumatic event, according to the *DSM-V* here, is actual or threatened death, serious injury, or sexual violence. Is that correct? Yes or no.

A. Yes.
Q. Okay. The -- is a TikTok video actual or threatened death, serious injury, or sexual violence? Yes or no.
A. Yes.
Q. How is a TikTok video actual or threatened death?
A. Continual accusations of murder was traumatic. That was the trauma.
Q. Let's go to the definition of actual or threatened death. In your -- in the *DSM-V* what does it mean to experience actual death?
MS. OLSON: I'm going to object, Your Honor, as it misstates the first criteria or number A -- letter A.
THE COURT: Overruled.
Q. (BY MS. GUILLARD) I'll restate the question, Ms. Bohn. As it -- as it relates to the *DSM-V*, what is the definition of actual death?
A. In cases of actual or threatened death --
Q. Just actual.
A. As I said, she directly experienced the continual trauma of being wrongfully accused of murder. That in itself over and over and over again, over two or three years --
Q. Ms. Bohn --
A. -- is the trauma.
Q. -- the question is what -- and I'm quoting to the *DSM-V*. We're not talking Professor Scofield. We're just talking

about the *DSM-V*. What is the definition of actual death? Does that -- does actual death mean that a person is killed? Yes or no.
A. Yes.
Q. Threatened death, does threatened death mean that a person is threatened to be killed? Yes or no.
A. Say it once more, please.
Q. Threatened death, according to the *DSM-V*, does that mean a person is threatened to be killed? Yes or no.
A. Yes.
Q. Serious injury, does -- serious injury according to the *DSM-V* is that the person is seriously injured physically in their body? Yes or no.
A. Yes.
Q. Sexual violence, does sexual violence, according to the *DSM-V*, mean that a person has experienced sexual assault, as in rape, et cetera? Yes or no.
A. What this is stating --
Q. Sexual violence, does sexual violence mean that a person has experienced, for example, rape or sexual assault? Yes or no.
A. Yes.
Q. Okay. The traumatic event that the *DSM-V* requires the person to have -- and this is a question. Sorry. Let me rephrase it. I'm asking you, according to the *DSM-V*, does the

traumatic event have to be actual or threatened death, serious injury, or sexual violence? Yes or no.
A. One is necessary --
Q. Yeah, either/or, it --
A. -- for a traumatic event. Yes.
Q. Do you need me to rephrase it? Or the answer is yes, it has to be either death, threatened death, serious injury or sexual violence? And I think you said yes. Is that correct?
A. Repeated accusations on TikTok was the trauma.
Q. Thank you, but I'm asking yes or no --
A. Traumatic event, yes.
Q. The *DSM-V* -- so -- okay. Earlier your testimony was that your diagnosis aligned for all of your patients with the guideline of the *DSM-V*; is that correct?
A. Yes.
Q. You also stated you never deviate from the *DSM-V*; is that correct?
A. Correct.
Q. Okay. You've also stated a PTSD diagnosis cannot stem from a TikTok video; correct?
A. Trauma can be impactful from continuous, repeated accusations of murder. That is the trauma.
Q. Does that trauma fit in being actually killed? Yes or no.
A. No.
Q. Does that TikTok video accusation fit in being physically

threatened with death? Yes or no.

A. Yes.

Q. How does a TikTok video kill you?

A. It informs people. What is said is not a passive action. What is said on TikTok, people read that -- thousands, two million -- and come to some conclusion. They are influenced by that, and that can lead to safety issues.

Q. So the traumatic event in that case would be threatened death in person; for example, someone coming to Professor Scofield physically and threatening them?

A. Yes.

Q. So the traumatic event is not the TikTok video but, again, according to the *DSM-V*, threatened death, meaning she can be killed; correct?

A. She could be injured or a family member could be injured as a result of the accusations of murder on TikTok.

Q. But right now we're focusing on a PTSD diagnosis, not made-up scenarios of what could but has not happened.

MS. OLSON: Objection, Your Honor; argumentative. Move to strike at least the reference to made-up scenarios.

THE COURT: I'm going to sustain the objection, Ms. Guillard. That was argumentative. So just reask the question.

And the jury's instructed to disregard the question.

A. One has to --

THE COURT: Hold on, Ms. Bohn.
Ms. Guillard, ask another question, please.
Q. (BY MS. GUILLARD) Okay. The TikTok video -- does a TikTok video kill people? Yes or no.
A. Yes.
Q. How can a person die from watching -- or how does a person die from a TikTok video --
A. This is --
Q. -- the actual TikTok video, not -- nothing else? Sorry. Go ahead.
A. I trust my expert experience in this that she directly experienced the traumatic event, not the murders, no. But the ongoing accusations were injurious to her mentally, physically, professionally.
Q. Which one of the traumatic events did Professor Scofield experience? Was it actual or threatened death, serious injury, or sexual violence?
A. That is a difficult question to answer. She was threatened, yes, and the repeated accusations were threatening.
Q. She was -- okay.
A. Yes.
Q. Professor Scofield was threatened in person? Yes or no.
A. Say that again, please.
Q. Was Professor Scofield threatened in person or in any

other way? How was she threatened? Did someone threaten to harm Professor Scofield?
A. Yes.
Q. Who was this person?
A. I don't have specific names.
Q. Okay. Did Ashley Guillard, which is me, are you aware that I threatened to kill Professor Scofield?
A. You personally?
Q. Yes, on the TikTok videos.
A. From the accusations that she was the murderer, yes.
Q. So did I accuse Professor Scofield of being involved with the murders, or did I threaten to kill Professor Scofield?
A. Becca was threatened by reading the accusations of murder, yes. She was impacted. I'm answering as best --
Q. I'll rephrase it. I'll do my best to rephrase it so that you may understand.
Is -- let's start over. It is my understanding of the *DSM-V* criteria that in order to be diagnosed with posttraumatic stress disorder, the first step is a traumatic event; correct?
A. Yes.
Q. And according to the *DSM-V*, traumatic events are actual death, meaning someone being killed; correct? Yes or no. We've determined that already.
A. The word "exposure" is very important here in the

interpretation. Exposure to actual or threatened death, serious injury.
Q. Yes, ma'am. But let's get to that, but right now I'm asking you actual -- we're defining the traumatic events. Actual death means being killed or anyone being killed; correct? Yes or no.
A. That is a difficult question to answer from my experience.
Q. I'll break it down for you. What does it mean to die?
A. Rebecca is alive.
Q. But we're not talking about --
A. She --
THE COURT: One at a time.
Q. (BY MS. GUILLARD) We're not talking about Ms. Scofield right now. What is the meaning of death?
A. Repeat that, please.
Q. Can you explain to us, from your understanding as a psychotherapist, what does the word "death" mean as it pertains to the *DSM-V*?
A. It's actual or threatened.
Q. We're just focusing on the word "death" right now. What does it mean by "death"?
A. Death is -- to define it, is not alive.
Q. And actual death means?
A. That's not how I interpret these criteria. I'm the mental health specialist, and I've had years of experience.

Q. Yes, and I'm asking you questions.
A. Okay. I don't quite understand. Exposure, she had multiple exposures.
Q. But can we get there? I just want to ask you one question at a time, and then can we focus on just that one question and then go to the next without the other words?
A. Okay.
Q. Thank you. We've determined that death means to die.
A. Yes.
Q. And actual death means that anyone, a person -- what does that mean to you?
A. Yes. Four people died, yes.
Q. No specific person, but actual death, the meaning of actual death, meaning someone is killed or dies; is that correct?
A. Yes.
Q. Okay. Threatened death, what does the word "threatened" mean to you?
A. Being threatened means potential for injury, either mental, physical injury.
Q. No. We're talking about death.
A. There are different -- okay. I really am -- I think we're talking about two different things. The exposure, repeated exposure, to the TikTok accusations of four deaths was threatening.

Q. Ms. Bohn, can we focus on one question at a time, please. I want to get your expert opinion, and I want to break it down for people who are not therapists, who do not understand the *DSM-V*, who don't have your experience. Can we please do that?
A. I appreciate that.
Q. Thank you.
Threatened death, does that mean someone is threatened to be killed? Yes or no.
A. Yes.
Q. Serious injury --
A. Yes.
Q. -- what does serious injury mean?
A. Serious injury in this particular context --
Q. No, just the definition of serious injury as it pertains to the *DSM-V* from your --
A. Yes. Serious injury, yes.
Q. What does that mean?
A. It means injury. It could be physical. It could be psychological. It could be emotional. It could be professional.
Q. What is an event? What is an event? Is it something that happens? Is that correct? An event is something that happens; is that correct?
A. An event, yes.
Q. So the event of a serious injury, could that be, let's

say, someone is hit by a car and is seriously injured? Would that be an event of a serious injury?
A. Yes.
Q. If someone's stabbed but does not die, would that be an event of a serious injury?
A. Yes.
Q. Let's move on to sexual violence.
A. Yes.
Q. What is sexual violence?
A. Those examples that you -- as you defined it: assault, sexual assault, rape.
Q. Exposure to actual threatened death, based on what you told us, means exposure to actual or threatened people being killed or threatened to be killed; is that correct?
A. Threatened death, yes.
Q. And does that event means that a person is witnessing someone on the receiving end of being killed or threatened to be killed? Yes or no.
A. Repeat that, please.
Q. Yes, ma'am. Exposure to actual or threatened death, does that mean a person is exposed to themselves or someone else being killed or threatened to be killed? Yes or no.
A. Yes.
Q. Exposure to serious injury, would that mean someone is exposed to someone being -- serious injury, whether it be

themselves being seriously injured, as in a car accident, or witnessing someone else, let's say, being hit by a car? Is that exposure to a serious injury? Yes or no.
A. Yes.
Q. The same for sexual violence. If a person experiences a sexual assault or knew someone experiencing a sexual assault, is that exposure to sexual violence?
A. Yes.
Q. Based on those definitions, did Professor Scofield directly experience being killed? Yes or no.
A. Yes.
Q. She's right here.
A. She was not killed, but that -- she could be threatened.
Q. So that's -- let's focus on one question at a time.
A. Yes.
Q. Professor Scofield, did she experience actually being killed? Yes or no.
A. She was not actually killed, no.
Q. Thank you.
A. But she was threatened.
Q. Okay. That's -- okay. Professor Scofield, was she threatened to be killed by Ashley Guillard? Yes or no.
A. That is a difficult -- yes. It wasn't just words. It was accusations of murder. That is a threat. That's going to create a threat. You don't have an individual that writes

about that online and people -- two million people read that. A threat, yes, it is -- it is threatening with that information, and that's what this is about, I believe.

Q. Clarify if I'm correct. Ms. Bohn, what you're referring to is the TikTok videos regarding my accusations involve -- of Professor Scofield's involvement in the murder, are you saying that the threat is perhaps someone watches that video and then they decide to create a traumatic event, like murder or threatening serious injury? Is that what you're saying?

A. Yes.

Q. So the actual threatened death would be from this imaginary person committing that crime to Professor Scofield; is that correct? That would be the traumatic event; correct?

A. Say that once more, please.

MS. OLSON: Your Honor, I object to the word -- as to the use of the word "imaginary."

MS. GUILLARD: It hasn't happened.

THE COURT: Overruled.

Q. (BY MS. GUILLARD) Did you clarify that you stated the TikTok videos may have the possibility of someone watching it and then taking action and causing harm to Professor Scofield by a serious injury or actual --

A. Yes.

Q. -- or threatened -- okay.

In that case, if Professor Scofield experiences

actual death or the death of her family members, would that then be the traumatic event, or is the TikTok video the traumatic event?

A. Say that once more, please.

Q. In that case that you created or that scenario that you created, what is the traumatic event? Is it the person which is then -- it hasn't happened, but is it the person committing the crime of killing someone or threatening to kill someone? Is that the traumatic event? Or is the TikTok video the traumatic event?

A. It's false information. And we're talking about murder. We're not talking about -- we're talking about murder. It's very serious, and it has impact, physical, mental, psychological, yes. It's damaging misinformation; it's not just misinformation. It's been described as -- I mean, it's untrue information, accusations.

Q. Thank you for that. Let's -- let's -- we can come back to that if we need to.

Did Professor Scofield witness in person being killed or someone else being killed? Yes or no.

A. No.

Q. Did Professor Scofield experience serious injury or sexual violence in person or in person as it happened to others? Yes or no.

A. Yes.

Q. That's -- what did she witness? And if it has nothing to do with this, you may omit it. But are you saying that in regards to this case, Professor Scofield witnessed in person someone being killed?
A. Somebody can have PTSD that is in a car accident. This is extreme, being you cannot be accused of murder, multiple murders, and not be injured by that in itself is impactful to one's profession, one's family relationship, yes. A car accident, a person doesn't have to actually die or be injured necessarily and have PTSD. She fit the criteria, and I used my judgment.
Q. So are you now stating that you used your judgment but you did not use the diagnostic criteria for --
A. I used both.
Q. Okay. Let's go back to *DSM-V*, then.
A. I use my judgment, and I also follow the criteria, which she met.
Q. Okay. Let's go back to your statement. You said Professor Scofield witnessed in person murder. You said --
A. I'm sorry?
Q. What did she witness in person? I'm sorry. You said she witnessed in person actual death.
A. I -- I am having difficulty concentrating here on what you're saying. The point is I have answered as correctly and as honestly as I can. For two and a half years I have heard

and seen on assessments that PTSD is confirmed by her self-report and the assessments.

Q. Yes, ma'am. What did Professor Scofield witness in person? Did she witness a car accident? Did she witness someone being killed? Did she witness someone threatened to be killed?

A. Rebecca Scofield witnessed over and over and over again being accused of something she was innocent of, and it was proven.

Q. Thank you.

So Professor Scofield witnessed not in person but on her phone electronically a TikTok video; correct?

A. Please --

Q. Let's focus on -- you're saying -- you're testifying that Professor Scofield witnessed, you said in person, but it's over the phone. Because a TikTok has to be on the phone; it's not in person. But you're saying she's experienced in person a TikTok video? Yes or no.

A. Yes.

Q. What does in person mean to you? Is -- if you're on the phone with someone, if someone calls you, are you talking to that person in person? Yes or no.

A. This is a personal attack. Accusing her of murder is a personal attack. That's going to have impact, multiple, severe, long-lasting effect.

Q. Can you answer the question?
A. All of her --
Q. Can you answer the question, please? Is -- in person, to you, does that mean -- if someone calls you over the phone, is that defined as in person to you? Yes or no.
A. To be honest, I think this is nonsense. You know, I don't know the point that you're trying to make. She was repeatedly --
THE COURT: Ms. Bohn --
A. We're talking about murder.
THE COURT: Ms. Bohn, if you'll do your best to please answer the question and not narrate.
THE WITNESS: Okay.
A. Please repeat the question.
Q. (BY MS. GUILLARD) Yes, ma'am. Is -- by in person, if someone calls you over the phone, is that in person?
A. If someone calls you on the phone --
Q. Yes. If you talk to someone over the phone, is that in person?
A. Yes. That's -- to talk to someone on the phone and you are responding, yes. If on the phone -- well, it depends on how you define -- how you define in person.
Q. Are we talking in person right now?
A. Yes.
Q. If I leave out of here and go to my Uber and I call you,

would that be in person?
A. No.
Q. So over the phone, if someone has a video on the phone and they're viewing it, are they witnessing something over the phone or are they witnessing something in person?
A. Rebecca was repeatedly exposed to false accusations of murder.
Q. Ms. Bohn, can you answer the question, please, because --
A. In person by talking on the phone.
Q. Or viewing a video over the phone, is that witnessing something electronically or is that witnessing something in person?
A. It is not in person.
Q. Thank you. So that would be no?
A. Correct.
Q. Number 3 of the *DSM-V* diagnosis criteria for PTSD is learning that a traumatic event occurred to a close family member or close friend. This is in cases of actual or threatened death of a family member or friend, and the events must happen violent or accidental. Did -- is that correct? Is that your understanding of number 3, *DSM-V* criteria?
A. Yes. As it is stated, yes. In this context, no. It only takes one.
Q. Right. So we're just talking about number 3 right now. We've already canceled out number 1 and 2.

MS. OLSON: Objection, Your Honor --
A. I don't know. This is confusing.
THE COURT: Wait. Wait a minute, Ms. Bohn.
Objection sustained. The jury will disregard Ms. Guillard's last question --
MS. GUILLARD: I'll rephrase the question.
THE COURT: -- that we've already canceled out 1 and 2.
MS. GUILLARD: I'll rephrase the question.
Q. (BY MS. GUILLARD) Has Professor Scofield -- just number 3 only --
A. Uh-huh.
Q. -- by watching my TikTok videos, did she learn that a traumatic event occurred to a close family friend or a close family member or close friend, specifically related to a close family friend or family member --
A. No.
Q. -- violent or accidental death?
Sorry. You said "no" when I was talking. Has Professor Scofield experienced learning of a traumatic event to a close family member?
A. No.
Q. Has Professor Scofield experienced learning a traumatic event of a close friend?
A. No.

Q. Okay. Number 4 of *DSM-V* diagnostic criteria for PTSD, experiencing repeated or extreme exposure to adversive details of the traumatic events. For example, this'll be first responders who collect human remains, police officers who are repeatedly exposed to child abuse. And note this does not apply to exposure through electronic media, television, movies, or pictures, unless this exposure is work related, very long, a police officer who has to look at evidence of body parts repeatedly.

Is that your understanding of number 4?

MS. OLSON: Your Honor, I'm going to object only to the extent she clearly added to what's said in number 4.

THE COURT: I'll sustain the objection. Ms. Guillard, if you're going to quote from that criterion, try to quote as faithfully as you can and then ask the question.

MS. GUILLARD: Okay.

Q. (BY MS. GUILLARD) I'll repeat it for you, Ms. Bohn. Number 4 states experiencing repeated or extreme exposure to adversive details of the traumatic event; for example, first responders collecting human remains, police officers repeatedly exposed to details of child abuse. Note: Criterion A-4 does not apply to exposure through electronic media, television, movies, or pictures unless this exposure is work related.

A. No.
Q. No what? Is that what that says? Is that what *DSM-V* A-4 states, Ms. Bohn?
A. You only need one.
THE COURT: But, Ms. Bohn, first answer her question about whether she --
THE WITNESS: I said no.
THE COURT: -- accurately read criterion number 4? Did she accurately read it?
THE WITNESS: No.
Q. (BY MS. GUILLARD) Okay. Please, what did I get wrong on A-4?
A. Number one, it's a no for number 4.
Q. What's no? You said that I did not accurately reflect what it says, so we were just clarifying -- I was just clarifying what number 4 -- what did I get wrong with number 4? Would you like me to repeat it?
A. No. It's not needed to repeat it. I'm saying that it does not apply, no. What it's saying is --
Q. You're saying --
A. Apparent -- it's a no.
Q. Did I read it right? Yes or no.
A. Yes.
Q. Thank you.
But explain what you're saying, it does not apply.

Explain -- explain what you just said. It does not apply to what?

A. It does not apply. Number 4 does not apply to Rebecca Scofield.

Q. Does --

A. It's accurate as it is saying, and it does apply in that experience, first responders, police officers for an example.

Q. Thank you. Were you still talking --

A. You're welcome.

Q. Number 3, you confirmed that you also said number 3 does not apply; is that correct?

A. Correct.

Q. We also -- did you also say number 2? Let's clarify this one because that one was -- we need clarity on that one.

MS. OLSON: Your Honor, I'm going to object as asked and answered as to this one.

THE COURT: I'll overrule that at this time, but we're only going to go through this one last time.

Q. (BY MS. GUILLARD) Number 2, did you state that number 2 applies to Rebecca Scofield?

A. Witnessing in person the event as it occurred to others? No, she did not.

Q. And number 1?

A. No.

Q. Thank you.

A. And number 1, yes.
Q. Number 1, you're saying Professor Scofield directly experienced a traumatic event?
A. Yes.
Q. Okay. Thank you for that.
Which one of these traumatic events did Professor Scofield experience? I'm going to start with the first one. Did she experience directly actual death? Yes or no.
MS. OLSON: Your Honor --
A. It doesn't say that.
MS. OLSON: -- objection; asked and answered. We've gone over this literally for at least the last half hour.
THE COURT: Overruled. Last time.
Q. (BY MS. GUILLARD) Did Professor Scofield directly experience actual death? Yes or no.
A. No.
Q. Did Professor Scofield experience directly threatened death?
A. If you're referring to -- are you referring to 3?
Q. I'm referring to number 1, directly experiencing something. If you would like for me to -- would you like to clarify what directly means?
A. Directly experiencing the traumatic event.
Q. Can we clarify what directly experiencing means?
A. It means repeated, continuous accusations, wrongful

accusations.

Q. We're not talking about accusations --

THE COURT: Ms. Guillard, we're going to ask her if she directly experienced --

THE WITNESS: Did she directly experience the --

THE COURT: Ms. Bohn --

THE WITNESS: I'm sorry.

THE COURT: We're going to ask her if she directly experienced each of those traumatic events, and then we're going to accept her answer at this point.

MS. GUILLARD: Yes, sir.

THE COURT: Go ahead.

Q. (BY MS. GUILLARD) Did Professor Scofield directly experience actual death?

A. No.

Q. Did Professor Scofield directly experience threatened death?

A. Say that once more.

Q. Did Professor Scofield directly experience threatened death?

A. Yes.

Q. Did Professor Scofield experience serious injury?

A. Serious injury? Yes.

Q. Did Professor Scofield experience sexual violence?

A. No.

Q. Did Ashley Guillard threaten to kill Professor Scofield?
A. No.
Q. Did Ashley Guillard threaten to seriously injure Professor Scofield?
A. No.
Q. Who threatened to cause threatened death and serious injury to Professor Scofield?
A. Based on what was said? Would it be what was written?
Q. Yes, ma'am.
A. Yes.
Q. Who -- who threatened -- do you know who threatened actual death or --
A. Do I have their names? No.
Q. Thank you so much.
Let's move on from PTSD to anxiety. Did you diagnose Professor Scofield with anxiety disorder?
A. Yes.
Q. When did you diagnose --
A. It was with the PTSD, and it's also part of depression.
Q. At the same time?
A. Yes.
Q. Did you work directly with Professor Scofield's primary care manager in November 2022 or December 2022 regarding her mental health diagnosis?
A. I didn't see Rebecca until 2023.

Q. Did Professor Scofield inform you of nerve issues she was having physically with her nerves in her body?
A. Yes.
Q. Did you diagnose Professor Scofield with anything mental as it pertains to those symptoms of nerve damage and physical challenges?
A. Yes.
Q. What did you --
A. That's -- it is -- somatic complaints such as this definitely accompanies PTSD.
Q. So Professor Scofield's nerve damage and physical challenges with her body is directly related to PTSD? Yes or no. Sorry if I'm repeating it. Please clarify.
A. I'm concentrating so hard that I can't -- please say it again.
Q. I'm almost done. The nerve damage that Professor Scofield told you about, you stated that it was directly related to PTSD; correct?
A. Yes.
Q. Did Professor Scofield tell you about her headaches that she was having?
A. Yes.
Q. Did you diagnose Professor Scofield with any mental disorders regarding her headaches?
A. I do not diagnose physical complaints, other things, which

her primary care physician did rule out getting an MRI scan, et cetera. Headaches are common in PTSD. It's a symptom of stress.
Q. Yes, ma'am.
A. So is neuropathy.
Q. Anxiety you said was directly tied to PTSD. Is it a separate condition that she has, or is it a part of the PTSD?
A. It's -- it overlaps depressive. I diagnosed her major depressive episode, recurrent, which often is a combination of anxiety and depression. Both were present. Anxiety was more primary, and PTSD can have elements of depression and anxiety.
Q. So it's one diagnosis, one big diagnosis, or three diagnoses?
A. They're overlapping, and they're distinct as well.
Q. But Professor Scofield, it is both overlapping and distinct from each other? Yes or no.
A. I'm sorry. Say that again.
Q. Can you explain that, please?
A. I'm sorry. Say that --
Q. As it pertains to Professor Scofield, can you explain each -- is it distinct from each other -- for example, three different things caused by three different things -- or is it just all one big diagnosis in one?
A. They are two distinct diagnoses. As far as major depression and PTSD, they both are present. The one that

you're treating -- obviously, when I diagnose -- it's not obvious, but to a therapist it is. You have to have one or the other, as the first outlined. Both were present, PTSD and major depression, which included anxiety. So they're two diagnoses.

Q. You clarified that Ashley Guillard did not cause Professor Scofield -- did not threaten to kill or cause serious injury to Professor Scofield; correct? You did. I just want to preface the question.

The question is, what is your testimony today? If Ashley Guillard did not cause actual or threatened to kill Professor Scofield, why are you here testifying for PTSD as it pertains to Ashley Guillard?

A. PTSD is present. This is -- I'm answering the question as correctly as I possibly can. She has PTSD, yes.

Q. But you stated that PTSD is from threatened -- directly experiencing a traumatic event of actual or threatened death or serious injury; correct?

(Reporter interruption.)

A. Yes.

Q. (BY MS. GUILLARD) You said yes? Okay.

And then you said Ashley Guillard did not directly actually kill or threaten to kill Professor Scofield and that Ashley Guillard did not cause serious injury to Professor Scofield; correct? You said that; correct?

A. That is a difficult answer.
Q. Well, you already -- you said it; correct?
THE COURT: Ms. Guillard, just can you please ask a question.
A. You did not directly -- yes. You didn't kill her directly.
Q. (BY MS. GUILLARD) I wrote the notes. You said that Professor Scofield -- and clarify if this is correct, that someone -- according to the self-report that you received when you had her fill out the questionnaire, you said Professor Scofield experienced directly actual or threatened death by someone that you don't know; is that correct?
A. That perhaps she didn't know necessarily. But, yes, she did receive death threats, harm, yes, injury, yes, threats.
Q. Okay. Is that person here today?
A. I couldn't say.
Q. Is that person the defendant on this case?
A. Is that person --
Q. That threatened, directly threatened --
A. I don't have that information, nor would I have that information.
Q. I'm the defendant, Ashley Guillard.
A. Specific --
Q. It's me. My question is --
A. Is that person here? If you don't have a name, I don't

have a name. So could I identify if that person is here? No.
Q. Is that person me? You don't have a name, so you wouldn't know; right?
A. As a TikTok writer, which you have written, yes, is threatening. It's potentially threatening. Let's say that, yes. Has it actually -- did you threaten her with death in person, personally? No. But you -- there were numerous accusations of murder, that she was a murderer.
Q. Did I accuse Professor Scofield of orchestrating the murder of the four students?
MS. OLSON: Your Honor, at this point I'm going to object. It's --
THE COURT: Sustained.
MS. GUILLARD: Okay.
THE COURT: Ms. Guillard, we're going far beyond what Ms. Bohn has testified in terms of her treatment of Ms. Scofield.
MS. GUILLARD: When I -- okay.
Q. (BY MS. GUILLARD) Ms. Bohn, I'm trying to understand your testimony, why you're here today. You stated that Professor Scofield has PTSD and you diagnosed her, and you -- yes. And you said that she directly experienced the traumatic event of death and serious injury, and that's why you diagnosed her. Yes?
A. Yes.

Q. And then you stated that Ashley Guillard did not cause Professor Scofield to be killed or threatened to be killed or a serious injury. You said that; correct?
A. I don't --
MS. OLSON: At this time, objection; asked and answered. We're plowing the same ground.
THE COURT: Sustained.
Q. (BY MS. GUILLARD) Okay. So why -- what is your testimony today? Why are you testifying --
A. I'm testifying --
Q. Please let me finish. Are you claiming Professor Scofield has PTSD and eligible or, in your opinion, entitled to damages for PTSD from Ashley Guillard?
THE COURT: Sustained.
MS. OLSON: Objection, for the record, Your Honor.
THE COURT: It's argumentative, Ms. Guillard. Do you have any additional questions?
Q. (BY MS. GUILLARD) What is your testimony -- what is your testimony, Ms. Bohn?
A. My testimony --
MS. OLSON: Your Honor, I'm going to object. Ms. Bohn has testified for two and a half hours now.
MS. GUILLARD: That's not my fault.
THE COURT: The objection's overruled. What is your precise question, Ms. Guillard?

Q. (BY MS. GUILLARD) Why are you here today, Ms. Bohn?
A. To testify that Rebecca Scofield has been diagnosed by me with posttraumatic stress disorder as a result of repeated accusations -- misaccusations of murder that placed, according to my client, safety issues for her family, for herself.
Q. Thank you.
A. That's what my testimony is.
MS. GUILLARD: No further questions.
THE COURT: Thank you, Ms. Guillard.
Any redirect?
MS. OLSON: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. OLSON:
Q. Ms. Bohn, can threats be made by the phone?
A. Yes.
Q. And did Professor Scofield, when you saw her, exhibit symptoms related or consistent with someone who had received death threats?
A. Yes.
Q. Ms. Bohn, when you use the *DSM-V*, do you use it on, like, a word-by-word-by-word-by-word application?
A. It's defined by the individual that reads it. It's -- it is -- I use the *DSM-V* --
Q. My question is, when you use it, do you go word by word?
A. No.

Q. And do you use your judgment and your experience for 32 years when you apply the *DSM* criteria?
A. Yes.
Q. You testified early on in response to questions that Ms. Guillard had asked you that this was a unique case; is that right?
A. Yes.
Q. Why is this a unique case? What is unique about it?
A. I'm sorry. Say that again.
Q. Sure. I think you said this was a unique case. What was unique about the information you were getting from Professor Scofield? What made it unique?
A. It's unique because not -- let's just say it's uncommon to be accused of murdering four people.
Q. And in --
A. In that way it's unique.
Q. And when Professor Scofield came to you in May of 2023, you talked to her for about an hour; is that correct?
A. I -- yes.
Q. And that's the tool that you typically use to diagnose people; correct?
A. Yes.
Q. And did you then look at the *DSM-V* and identify the diagnosis that, in your professional judgment, fit?
A. Yes.

Q. Just a couple of other questions. What does the term "self-report" mean? I think that was used a lot both on direct and in your responses on cross-examination.
A. Self-report means how she -- it's an expression of how she feels. It's not necessarily based on fact. Self-report is exactly that, it's self-reporting how she feels, her thoughts, her interpretation.
Q. So then she made reports to you, but you're the one who made the diagnosis; correct?
A. I make the diagnosis, yes.
Q. And, Ms. Bohn, you understand that this is a civil lawsuit? It's not a criminal lawsuit?
A. Yes.
Q. And you're not a lawyer and don't have any particular legal training; is that correct?
A. Correct.
Q. Is it your understanding that at an earlier phase of this civil lawsuit, there was some kind of order or judgment entered against Ms. Guillard and in Professor Scofield's favor?
A. Yes.
Q. And I think you may have used the term "guilty verdict" or something like that, but you understand that this is not a --
A. Yes, I do understand that.
Q. It's not a criminal proceeding. You understand that?

A. Yes.
Q. It's a civil lawsuit?
A. Yep.
Q. And you did not mean to suggest in your testimony that there was any kind of a criminal proceeding; correct?
A. Correct.

MS. OLSON: All right. That's all I have. Thank you, Your Honor.

THE COURT: Thank you, Ms. Olson. May Ms. Bohn be excused?

MS. OLSON: We would request that she be excused, Your Honor.

THE COURT: Thank you, Ms. Bohn, for your testimony. You may be excused. You may step down.

Mr. Carone, Ms. Olson, do you want to call your next witness?

MR. CARONE: Yes, Your Honor. Our next witness is Chris Hanson.

THE COURT: All right.

(The witness was sworn.)

THE COURTROOM DEPUTY: Please state your full name and spell your last for the record.

THE WITNESS: Christopher Hanson, H-A-N-S-O-N.

THE COURT: Mr. Carone, you may inquire.

MR. CARONE: Thank you, Your Honor.

CHRISTOPHER HANSON, PLAINTIFF'S WITNESS

DIRECT EXAMINATION

BY MR. CARONE:

Q. Mr. Hanson, where do you live?

A. I live in Portland, Oregon.

Q. Are you employed?

A. I am.

Q. Where do you work?

A. I work for Providence Health Care.

Q. What do you do for Providence Health Care?

A. I do IT, so I work with the medical records system.

Q. How long have you worked in IT?

A. I've worked in IT for 15 years.

Q. Do you know Rebecca Scofield?

A. I do.

Q. When did you meet Rebecca Scofield?

A. I met her in 2004. We met at Willamette University freshman year.

Q. How did you meet in college?

A. We met at a social event at the start of the school year. She had indicated that she was a *Lord of the Rings* fan. I had asked her -- tried to make conversation about that with her, and in the conversation she revealed how much more of a *Lord of the Rings* fan she was than I was.

Q. Did you guys spend a lot of time together in college?

A. Yes, we did.
Q. Did you keep in touch after college?
A. Yeah, we did.
Q. How often have you spoken with her after college?
A. We would usually talk once a week, usually on Friday.
Q. And would you visit each other?
A. We would, yeah.
Q. Do you consider Professor Scofield to be a close friend?
A. Yes. I would consider her my best friend.
Q. How would you describe Professor Scofield personally?
A. She's a warm and funny person, just very dedicated to what she does. She's always been super driven. In college we joked that I was the A-minus student whereas she was the A-plus student. And she's always talked about, even in college, how much she wanted a family. So that was always an important part to her, and life after college was having a family and putting down roots.
Q. Prior to November 2022, did you ever observe Professor Scofield struggle with depression or extreme anxiety?
A. No. She went to -- you know, she went to school and was very driven by school and would have stress about school, but when we would talk, there was never things that lasted more than to, you know, our next conversation.
Q. I would direct your attention to November 12, 2022.
A. Uh-huh.

Q. Do you remember what you were doing that day?
A. Yes, I do.
Q. What were you doing?
A. Becca was visiting, Becca and John. So they'd gone to a wedding the previous night of one of John's friends, and they were -- they were finishing with that friend. And so the day was spent -- Becca and John and I, we went out to an art installation in Portland. And then we got dinner later in the evening, went to a brewery, had dinner and drinks. And then I -- we left probably about 9 p.m., and I, you know, walked them to their car, and they went to their hotel room.
Q. I think you mentioned this, but was this in Portland?
A. This was in Portland, yeah. The wedding that they went to was in Portland, and this was in Portland.
Q. What was Professor Scofield's mood like that evening?
A. She was really happy. She had a good time at the wedding. She was in a really good mood and, you know, a great time to see her. It was the first time she'd visited me in Portland. I usually went out to Moscow or wherever she had lived in the last, you know, 20 years. So it was the first time seeing my place and being in my city.
Q. Okay. And then moving about two weeks later, do you remember Thanksgiving Day in 2022?
A. I do.
Q. Did Professor Scofield call you that day?

A. Yeah. She called me that night. She called me at 9 p.m., So I'd finished Thanksgiving dinner with my parents and friends. And she called me at 9 p.m., so I answered because Becca usually tries to be in bed by 8 p.m., and I knew that that wasn't a great sign that she was calling me that late.

She called me -- when I answered the phone, she was -- sounded like she was in tears and sounded really distraught. She was able to tell me that someone had posted videos on TikTok accusing her of the murders that had happened two weeks prior, and we had a short conversation about it.

I was also with other friends and I was about to leave my parents' house, so I promised her that I was going to look at all the videos once I got home. And then we talked briefly after I got home and after I had looked at what she had referred to, the videos online.

Q. Okay. And I want to unpack that a little bit. So you said you looked at the videos online. What exactly did you do?

A. Yeah. So Becca told me the name of the account, so I looked that up online and watched the videos that were available on that account. It took a few minutes to figure out what the account was based on what Becca had told me. And so I watched the videos to understand what they were talking about, what connection was being attempted to be made by these videos.

MR. CARONE: Okay. Ms. Bibb, can you please pull up Exhibit Number 40.

And, Your Honor, this is one that has already been admitted. May it be published?

THE COURT: It may be published.

(Playing video.)

Q. (BY MR. CARONE) Mr. Hanson, is Exhibit 40 one of the ones you saw on Thanksgiving of 2022?

A. Yes, it is. This is the first video that I saw.

Q. Could you tell if people were watching the video?

A. Yes, I could.

Q. How could you tell?

A. On TikTok there's icons for how many views a video has. There's an icon for how many likes a video has. There's an icon for how many comments a video has. So I could see that it had many likes, and I could see that it had quite a lot of views.

Q. And you mentioned that there were other videos you watched on Thanksgiving as well?

A. Yes.

MR. CARONE: Ms. Bibb, can you please pull up Exhibit Number 41.

Your Honor, this one has also been admitted already.

THE COURT: Thank you. It may be published.

(Playing video.)

Q. (BY MR. CARONE) Mr. Hanson, was that another video you saw on Thanksgiving Day 2022?
A. Yes, it was.
Q. Could you tell if this video was being watched in the same way as Exhibit Number 40 was?
A. Yes, I could, and it was.
Q. Were you afraid for Professor Scofield at this point?
A. I was very afraid for her.
Q. Why?
A. I could tell how many people were viewing it. I could tell how far the reach was based on how many people were viewing it. And in this time period -- this was two weeks after the murders had occurred, I believe -- the amount of online sleuthing about this murder case and speculation by the public online, I had been aware of it, and these videos caused me to start monitoring a lot of the discussion online about this.
And I saw how disturbing some of the discussions were, how many accusations were flying, how many people's lives were being investigated by people online from out of state, around the world, everywhere. People were paying attention to this case, and the amount of attention that it was getting scared me with these videos, in my view, putting a target on Becca.
Q. After Thanksgiving day 2022, did you start tracking

Ms. Guillard's posts about Professor Scofield?
A. Yes. Especially then I was tracking it multiple times a day. I would go into her account and view the videos, take screenshots, save the videos. This was kind of my own coping mechanism in a way that was also a way to help Becca. This was a situation that felt so out of our control, out of my control.
This was my method of trying to help and do something, to track the online discussion and just know what's happening and know if there's something especially threatening, especially scary. Because the online -- the online ecosystem around this was just kind of furious at that time. There was so little information from the police about the murder investigation that online discussion was basically filling the void, and creators like Ms. Guillard were happy to provide videos to fill that void.
Q. Okay. And focusing on this kind of November-December 2022 time frame, how many videos was Ms. Guillard posting about Professor Scofield?
A. It would sometimes be 10 to 15 a day. It seemed like it was at least once a day. Because this was a time where the news cycle was just absolutely rampant for more, looking for more information. People online, people on TikTok were looking for more information.
Q. Would you report to Professor Scofield each time there was

a new video or post?
A. I would report the ones I found especially threatening or scary.
Q. About how many times would you report something to Professor Scofield because it was particularly concerning or scary?
A. I would say in the period immediately after, it was probably three or four times a week I would specifically bring up a specific video that Ms. Guillard had posted.
Q. Did you notice anything about Professor Scofield's tone or demeanor when you would make these reports to her?
A. Yeah. She was very distraught about it. She was very scared. She sounded -- she just sounded very scared, and this was basically the entirety of what we would talk about. We used to talk about our weeks. We used to talk about work, relationships, and just normal everyday things. And this is all we would talk about because it was scary and it was so far outside of our control.
Q. Around this time -- again, November-December 2022 -- were you aware of any theories online about an ex-boyfriend being involved with the murders?
A. Yes.
MR. CARONE: And, Your Honor, I'm not going to play it just for sake of time, but I'd like to publish just the opening screen of Exhibit Number 2, which has already been

admitted into evidence.

THE COURT: You may.

Q. (BY MR. CARONE) Mr. Hanson, can you please just read the text on that first screen aloud for the jury.

A. "The two people who partnered to kill the four University of Idaho students: Rebecca Scofield and Jack DuCoeur."

Q. Do you know who Jack DuCoeur was -- or is? Excuse me.

A. I'm aware of who he is.

Q. Who is he?

A. He was an ex-boyfriend of one of the victims of the murders.

Q. From what you were seeing, was Ms. Guillard taking an existing theory that was online and then connecting Professor Scofield to that theory?

A. Yes, she was. There was a lot of speculation that I saw about Jack DuCoeur online, so there were other creators making videos that implicated him as well.

MR. CARONE: Next, Your Honor, I'd like to publish Exhibit Number 10, which has already been admitted into evidence.

THE COURT: You may.

MR. CARONE: And, Ms. Bibb, can you go to the second page. Can you focus in on the hashtags, Ms. Bibb.

Q. (BY MR. CARONE) I should back up first. Mr. Hanson, do you recognize Exhibit 10?

A. Yes, I do.
Q. Is that a screenshot of a video that you saw back in November or December of 2022?
A. Yes, it is.
Q. I'd like to direct your attention to the hashtags. Do you see that there's a hashtag "Rebecca Scofield"?
A. Yes.
Q. Is this a hashtag specifically for content about Professor Scofield at this time?
A. Yes, it is. The hashtags on the TikToks are a way to organize the content for users who use the platform. There was a lot of material on the website about the Idaho murders, so other hashtags here were to connect these videos with other content that was being made about the murders that happened. Rebecca Scofield's name was being added into this.
Something that I was tracking at the time was you could click on the hashtags and see how many views were associated with videos that had that hashtag. I believe Ashley Guillard was the only person putting hashtag "Rebecca Scofield" on her videos. And if I recall, by December 1 there were a million views on the videos that fell under hashtag "Rebecca Scofield."
MR. CARONE: You can take down Exhibit 10, Ms. Bibb.
Q. (BY MR. CARONE) Mr. Hanson, do you remember when Bryan Kohberger was arrested for the murders at the University of

Idaho?
A. Yes, I do.
Q. Do you remember the date he was arrested?
A. December 30.
Q. And did Ms. Guillard's videos ever mention Bryan Kohberger prior to his arrest?
A. No, they did not.
Q. I said December 30. December 30th of 2022.
A. 2022.
Q. Did Ms. Guillard start mentioning Bryan Kohberger after his arrest?
A. Yes, she did.
Q. Were those videos also about Professor Scofield?
A. Yes.
Q. Can you maybe elaborate on what you were perceiving about how Ms. Guillard was connecting Rebecca Scofield to Bryan Kohberger.
A. Yeah. So when the news of Bryan Kohberger's arrest came out, Ashley Guillard would incorporate new material that was known in the news cycle into her videos because these would be the current issues being discussed online. These would be the popular issues. Obviously, when Bryan Kohberger was arrested, this was a huge change in the news story of this murder and the investigation. So in the videos Ashley Guillard incorporated into her narrative a story about how Bryan

Kohberger was somewhat involved in the murder plot that she had been fabricating but ultimately was not the one that committed the murder.

Q. Okay. Was Ms. Guillard connecting Professor Scofield to Bryan Kohberger in the same way she had connected Professor Scofield to Jack DuCoeur back when that was kind of the hot topic online?

A. Yes, she was. She claimed that they had had a contact with one another.

Q. And I know we've watched a couple videos or at least some screenshots of videos. Is that everything that Ms. Guillard posted about Professor Scofield?

A. No, not at all.

MR. CARONE: Your Honor, this exhibit's not yet been admitted, but I'd like to present to Mr. Hanson Exhibit Number 13.

Q. (BY MR. CARONE) Mr. Hanson, do you recognize Exhibit Number 13?

A. Yes, I do.

Q. What is Exhibit Number 13?

A. Exhibit Number 13 is a number of screenshots of videos, each screenshot representing one of the videos that Ms. Guillard posted, also including the date that it was posted on to TikTok.

Q. Did you personally watch all of the videos that are

included on this chart in Exhibit Number 13?
A. Yes, I did.
Q. How do you know that?
A. I watched all of the content that she had posted on her TikTok account from the time that Becca had called me and going back to previous content as well on her account.
Q. And do you see that there are file names on the left side of the chart?
A. Correct, yes.
Q. Were those files that you had had the opportunity to watch those videos prior to this trial --
A. Yes.
Q. -- to make sure they were the videos you saw back in November and December of 2022?
A. Yes, I did.
MR. CARONE: Your Honor, at this time I'd move to admit Exhibit Number 13 as a demonstrative exhibit under Rule 1006.
THE COURT: So you're admitting it because the videos that it summarizes are too voluminous to present here in court?
MR. CARONE: Yes, Your Honor.
THE COURT: And are they all videos made by -- or attributable to Ms. Guillard?
MR. CARONE: Yes, Your Honor.

THE COURT: So they've been available to her?

MR. CARONE: Correct, Your Honor. I think yesterday she said she has them all, all her videos, on her phone still.

THE COURT: Ms. Guillard, any objection to Plaintiff's Exhibit Number 13?

MS. GUILLARD: No objection.

THE COURT: All right. Plaintiff's Exhibit Number 13 will be admitted under the rule of evidence 1006 as a demonstrative exhibit.

(Plaintiff's Exhibit 13 received.)

MR. CARONE: May I publish it, Your Honor?

THE COURT: You may.

Q. (BY MR. CARONE) Mr. Hanson, how many pages are there on Exhibit Number 13?

A. There are 57 pages, I believe. 58 pages.

Q. 58 pages.

MR. CARONE: And, Ms. Bibb, you can just show a couple of the earlier pages for the jury.

Q. (BY MR. CARONE) And so except for the last page that has one video, do each of those, I guess, 57 -- remaining 57 pages follow this format of two videos and two files?

A. That's correct.

Q. So how many videos in total are there on the chart?

A. I believe that meant it was 115.

Q. 115 videos.

And you said earlier that the information on the left is the name of the video -- the file name of the video?
A. That's correct.
Q. And the information in the central column is the date the video was posted?
A. Yes.
Q. And then the information on the right is the opening, like, thumbnail or screenshot of the video itself?
A. Yes.
Q. What date do the TikToks videos on Exhibit 13 end? I think that's going to be on page 57.
A. I believe it's in August of --
Q. What's the date of that last video on page 57?
A. The date is 12/19/2022.
Q. And Ms. Guillard started posting on November 24, 2022?
A. That's correct.
Q. So between November 24, 2022, and December 19, 2022, there's 114 videos that she posted?
A. That's correct.
Q. Are the videos or the screenshots of the videos on Exhibit 13 all of the videos that Professor -- that Ms. Guillard posted about Professor Scofield?
A. No. This is just a subset of them.
Q. And then what platform was the last video on Exhibit 13 posted on?

A. The last one is from YouTube.
Q. Did Ms. Guillard eventually start posting on YouTube instead of TikTok?
A. Yes, she did.
Q. For how long did Ms. Guillard continue to post on YouTube about Professor Scofield?
A. I believe it's until August of last year.
Q. August of 2025?
A. That's correct.
Q. Okay. Could it be later than that? That's just the last one you remember?
A. That's the last one I remember.
Q. I think I misspoke earlier. Is the date of the first video on Exhibit 13 November 23, 2022?
A. Yes, it is.
Q. I think I said November 24, so I apologize for that.
Obviously, a lot of videos that you've seen of Ms. Guillard are about Professor Scofield. What effect have you seen those videos have on Professor Scofield?
A. The sort of unceasing nature of them really seemed to wear down Becca. When we would talk, I would bring up -- there were periods of time where Ms. Guillard would stop posting but would then restart again. It was never predictable when she would be posting. And so I would see this unpredictability and this ultimately unceasing nature of these videos wear

Becca down just in the way that she would talk about them and the exhaustion that I could hear in her voice.
Q. Did you ever observe Professor Scofield seeming scared or afraid because of these videos?
A. Yes, absolutely.
Q. Have you seen her seem anxious because of the videos?
A. Yes.
Q. And how could you tell these things?
A. Since we were talking daily on the phone, I could hear in her voice that these were causing a lot of anxiety for her. There was a lot of fear around -- something that I was thinking about at this time was that these videos were seen so widely and could be the grounds for someone to take action against Becca if they believed these videos. And that is the fear -- the main fear that I felt that Becca was expressing around the videos, how they would never stop and that, you know, they just -- there was no way to -- there was no way to feel in control in this situation.
MR. CARONE: Thank you.
Your Honor, I have no further questions at this time.
THE COURT: Thank you, Mr. Carone.
Ms. Guillard, cross-examination.
MS. GUILLARD: Yes, sir.

CROSS-EXAMINATION

BY MS. GUILLARD:

Q. Good afternoon, Mr. Hanson. You've been -- clarify: You've been watching my content since November 24, 2022, multiple times a day every day up until the current?

A. That's correct.

Q. Do you have a day job?

A. I do.

Q. What are your hours at work?

A. My hours are 9:00 to 5:00.

Q. 9:00 to 5:00 at work, are you browsing my content?

A. Sometimes.

Q. When you go home, are you browsing my content?

A. I work from home.

Q. Oh, you work from home. Cool.

Are you browsing my content after work hours?

A. Yes.

Q. What else do you do when you're viewing my content? Do you make comments?

A. No.

Q. Do you share? Do you -- what do you do?

A. I save the videos, save screenshots of comments. And, I mean, there were times when I would annotate the notes that I would take about the screenshots or the videos themselves. I was never interacting on the platform.

Q. But you took good notes on them; correct?
A. I believe so.
Q. Great. You stated that in my videos, I posted 113 of them. Did you watch all 113 videos?
A. I did.
Q. And you're stating that all 113 videos were about Rebecca Scofield or about the Idaho murders?
A. The videos in total were about the Idaho murders.
Q. How many of those 113 videos are actually specifically about Professor Scofield?
A. I couldn't give an exact number, but it was the majority.
Q. So when you said that there was 100 videos of Professor Scofield, did you misspoke -- misspeak or you meant to say it was about the Idaho four?
A. The exhibit did not include all the videos that you have made about Rebecca Scofield.
Q. I'm asking about your statement that I made 113 videos about Professor Scofield. I'm just asking if you misspoke. Did you mean that I made 113 videos about Professor Scofield or about the Idaho four?
A. I would still say that you made 113 videos, because the exhibit did not include all the videos that you made about Rebecca Scofield.
Q. Did you testify just now that you did not know how many videos I made regarding Rebecca Scofield?

A. I don't know the exact number.
MS. GUILLARD: I would like to preview Plaintiff's Exhibit Number 13.
THE COURT: You'd like to publish it?
MS. GUILLARD: Publish it, please, yes. Sorry.
THE COURT: Okay. You may.
Q. (BY MS. GUILLARD) Mr. Hanson, what is this first video?
A. This first video is about your post about solving the mysterious deaths of the Idaho four.
Q. Do you recall how long that video is?
A. I don't.
Q. On this video do you recall anything being said about Professor Scofield?
A. I don't believe there would have been.
Q. Is this video a part of the 113 videos that you claim are about Rebecca Scofield in Exhibit 13?
A. It is part of the grouping in the exhibit.
Q. Is it -- go ahead. You're still talking?
A. This is part of the videos that you posted about the Moscow murders, which you later attributed to my friend Becca.
Q. But this specific video did not mention Rebecca Scofield; correct?
A. That's correct.
Q. So that would mean I did not make 113 videos about Professor Scofield as it pertains to the evidence you

presented in this exhibit; is that correct?
A. I don't agree with that statement.
Q. Is it 113 videos presented -- did you -- were you able to view this exhibit?
A. Yes, I was.
Q. Is it 113 videos on this exhibit?
A. Yes.
Q. And this first exhibit -- on this first video you clarify Rebecca Scofield was not mentioned; correct?
A. Uh-huh, yes.
Q. So is it even possible for all 113 to be about Professor Scofield if even the first one is not? Correct? Is it possible?
A. (No response.)
Q. What's 113 minus one?
A. 112. I'm not here to do math.
Q. Thank you.
So that means all 113 of these videos are not about Rebecca Scofield?
A. That is not true.
Q. The first video was about who?
A. It's about the Idaho murders.
Q. Is there any further content on this first video? Do you recall?
A. Can you clarify?

Q. What is the video? Do you know what it is? Do you recall what the first video is?
A. Do I recall what the first -- I'm sorry. I don't understand what you're asking.
Q. What did I do on this first video?
A. You introduced that you were going to be supposedly solving the Idaho four murders.
Q. Did I mention Rebecca Scofield on that video?
A. No.
Q. You mentioned that you view my content three to four times a day every day and that you reported when they were threatening or scary videos; correct?
A. Can you break that down? I did not state that I view your content three to four times per day every day. I go to your accounts this many times. If you do not have new content, I'm not viewing old content. I would just view if there's new content.
Q. Okay. Well, let me break down the question. You said that there were threatening or scary videos that I posted?
A. Yeah.
Q. Can you explain what threats I made in videos.
A. You stated that Becca will regret this decision when she filed the lawsuit. There were videos that used her picture in memes seemingly to mock her. The entirety of these videos is about you accusing her of a quadruple murder.

Q. Thank you.
In the video where I said Professor Scofield will regret this decision, did I threaten her with physical harm?
A. No.
Q. What was the threat?
A. I can't say. I don't know.
Q. So is that a part of the alleged threatening videos that you claim I posted?
A. I would say that it was threatening.
Q. What is the threat?
A. I don't know what the threat is.
Q. But you're calling it a threat, so you would know what is a threat; right?
A. I don't know what you're capable of, Ms. Guillard.
Q. But the video -- you said I posted threatening videos. The memes, let's go to those.
A. Sure.
Q. What was the meme that I posted?
A. You posted a meme -- I can't remember the context, but it's Becca's face and she's sailing off into the water.
Q. On that meme of Professor Scofield sailing on a boat, what threat did I make towards her?
A. I would not say that that one was threat. I would say that that is mocking her.
Q. Okay. Back to the threatening videos that you allege I

posted --
A. Sure.
Q. -- what videos came -- are there any videos on this exhibit of me threatening Professor Scofield?
A. I feel that accusing someone of a quadruple murder counts as a threat when they're innocent of that.
Q. Did I threaten to kill Professor Scofield?
A. No.
Q. Did I threaten to harm Professor Scofield by physical means?
A. Not by physical means.
Q. Did I threaten to contact the police regarding her alleged role in the murders?
A. Did you threaten to contact the police?
Q. Yes.
A. I think you stated that you did contact the police eventually.
Q. So what was the threat in the videos? Was the threat me posting that I believe she was involved with the murders?
A. You would post that she was going to spend her life in prison, and you would post videos mocking her. You would post videos that included her address at work and her phone number. Do you know what happens to phone numbers and addresses that are posted online?
Q. I do. But the phone number and address that I posted, are

you aware that it's on a public website already prior to me posting it? Yes or no.
A. Yes.
Q. So is it fair to say her address at the school and phone number was already online? Yes or no.
A. Yes.
Q. So me posting what is already online, how does that do anything to Professor Scofield?
A. Do you think thousands of people had seen that address and phone number prior to your videos?
Q. Do you have the metrics for University of Idaho's website and traffic? Yes or no.
A. No, I don't. But I know that thousands of people watched video that you posted that included that address and phone number.
Q. Do you know how many -- you stated you don't have their metrics. Do you know before my video how many people viewed University of Idaho's website with the information of all their professors' names, phone numbers, and address?
A. No.
Q. Do you know after I posted the TikTok video with public information that they had increased traffic of people viewing public information on the university's website? Do you have that information?
A. No.

Q. You stated that during this time you would speak with Professor Scofield, that you perceived her to have anxiety; is that correct?
A. Yes.
Q. Are you a psychiatrist?
A. No.
Q. Is it correct that you said you're IT?
A. That's correct.
Q. Can you diagnose Professor Scofield with a mental illness?
A. No.
Q. Can you prescribe Professor Scofield medicine for mental illness?
A. No.
Q. Do you have any experience in the mental health field?
A. No.
Q. Is it safe to say you don't know, if any, if Professor Scofield has mental disorders?
A. I've been friends with her for 22 years. I can tell when there's a difference in her demeanor.
Q. You can tell a difference in her demeanor, but can you diagnose her with a mental illness?
A. No.
Q. You stated that hashtags regarding the videos on Rebecca Scofield had millions of views; correct?
A. That's correct.

Q. Those videos, were they about Rebecca Scofield or the Idaho four?
A. You put the hashtags on the videos, so in some sense they have to be about Rebecca Scofield.
Q. The hashtags on the videos, it was multiple hashtags on the videos; is that correct?
A. Yeah.
Q. So when you click on a hashtag, one of those videos could be about the Idaho four and not Rebecca Scofield. Does that add to the amount of views under that hashtag?
A. Can you clarify that one.
Q. The millions of views that you suggest around videos regarding Rebecca Scofield, were those millions of views only about Rebecca Scofield or were those about --
A. That's exactly what I'm saying. A million views on just the hashtag "Rebecca Scofield."
Q. Do you have evidence to support, outside of your testimony, that there were millions of views on videos regarding Rebecca Scofield?
A. That's not part of the exhibit. That's my own testimony.
Q. Did you send 113 screenshots of videos to Professor Scofield?
A. No.
Q. When you were researching my page every day, maybe multiple times a day sometimes from then until now, did you

update Professor Scofield on your findings?
A. I would tell her in very general terms because I did not want to give her the full brunt of this information.
Q. Did you help create this document by providing any screenshots, videos, insight?
A. No.
Q. You saw this document; correct?
A. I saw this document.
Q. How did you help?
A. I verified that the videos represent videos that I saw.
Q. And the millions of views, did you provide Professor Scofield with any evidence to suggest you have evidence to support that statement of millions of views only for Rebecca Scofield?
A. That was something that I told her at the time.
Q. Did you take a screenshot?
A. I did.
Q. Did you send that screenshot to Professor Scofield?
A. No.
Q. Do you have that screenshot?
A. I have it on my personal computer.
Q. We don't have it. Is there a reason why you didn't bring that?
A. That's not part of the exhibit.
Q. Okay. You stated that there was very little information

from police, and content creators were filling that void; is that correct?
A. That's right.
Q. That means on Idaho four, there were other content creators making videos; is that correct?
A. Yes.
Q. How many views on their videos did they have?
A. I'm not sure. I was not tracking other content creators.
Q. Is it safe to say they had millions of views as well?
A. I think you could assume so.
Q. Was the Idaho four a popular topic prior to November 23, 2022?
A. Yes.
Q. Were there content creators already posting videos on the Idaho four prior to November 23, 2022?
A. Uh-huh, yes.
Q. Were you keeping an eye on those content creators?
A. No. I had no reason to.
Q. But you have general knowledge that videos were being created regarding the murders?
A. Yes.
Q. Is your testimony biased in any way?
A. No.
Q. Are you Professor Scofield's best friend?
A. Yes.

Q. What are you here today for? What would you like to help her with?
A. I want her to win this case because I believe that she's been wronged.
Q. You want her to win this case, and she has already been deemed -- I've already been deemed liable for defamation; correct?
A. Yes.
Q. So you're here for damages?
A. Yes.
Q. What specific damages do you think Professor Scofield is entitled to?
MR. CARONE: Objection, Your Honor. I think the relevance is ultimately the jury's to decide.
THE COURT: Sustained.
Q. (BY MS. GUILLARD) Why are you here today in addition to -- she's already won.
A. To offer my testimony as to the damage that you caused her.
Q. What damage?
A. The damage to her reputation, the damage to her mental health.
Q. Are you aware of the support Professor Scofield received from family and friends?
A. Yes.

Q. Are you aware that Professor Scofield has not been deemed ineligible for work?
A. Yes.
Q. Are you aware that she's received the support of her professional community?
A. Yes.
Q. Are you aware that -- obviously she's received the support of her friends. You're her friend; correct?
A. Yes.
Q. Are you aware that she has received the support of her friends?
A. Yes.
Q. What specific damages are you --
MS. GUILLARD: Well, he just mentioned damages.
Q. (BY MS. GUILLARD) What were you referring to?
MR. CARONE: Objection, Your Honor. It's the same. Relevance, as well as asked and answered at this point.
THE COURT: I'm going to sustain the objection. I think there's a miscommunication between damage and legal damages. So I think that may be --
MS. GUILLARD: I'll specify.
THE COURT: All right.
Q. (BY MS. GUILLARD) Outside of legal damages, what damages did you perceive that Scofield experienced?
A. The anxiety, the stress, the worry, the fear around

vigilante violence against her.
Q. So mental health damages; correct?
A. Yes.
Q. And you admit that you are not a psychiatrist?
A. Yes.
Q. You said there was fear of a vigilante?
A. Yes.
Q. Did Professor -- are you aware of any vigilante that caused harm to Professor Scofield?
A. Not that I'm aware of.
Q. Are you aware of any vigilante that threatened to cause harm to Professor Scofield?
A. I'm aware of threats.
Q. Who is the vigilante that caused or threatened to cause harm to Professor Scofield?
A. The threats were sent to her.
Q. By who?
A. I don't know.
Q. How were the threats sent to her? Was it an email, text, call, in person?
A. I know there was an email threat.
Q. Did you view with your own eyes an email threat of a vigilante?
A. (No audible response.)
Q. I'm sorry. I didn't hear you.

A. No.
Q. Is this basically testimony from what you heard from other people?
A. Yes.
Q. You heard from other people that there was a vigilante threatening Professor Scofield?
A. I was aware of a threat against her.
Q. By email; correct?
A. Yes.
Q. But you did not see this email; correct?
A. I did not see the email.
Q. And you do not know who this person is?
A. No, I don't know who it is.
Q. Do you know if this person is connected to Ashley Guillard, me?
A. No. I don't know who it is at all.
Q. So you're here because the fear that you were receiving was not necessarily from the TikTok videos but from the vigilante that could cause harm to Professor Scofield?
A. Can you clarify that? I'm not --
Q. I'm just -- you stated that the fear stemmed from a vigilante may come and do something to Professor Scofield; correct?
A. Yes.
Q. And I stated the fear, is it related in any way to Ashley

Guillard?

A. This threat came directly after your videos were posted.

Q. How did you know when the threat came if you did not see it?

A. Because Becca told me about it.

Q. Your testimony is now that Professor Scofield told you about an email she received?

A. Yes.

Q. And that it came after the videos; correct?

A. Yes.

Q. But there's no correlation between me and this person who's a vigilante; correct?

A. I don't know who it came from, so, no, I don't know what the connection would be between you and the person that sent this, other than they probably viewed your videos.

Q. But you don't know the person; correct?

A. Correct.

Q. So you don't know what they know; correct?

A. No.

Q. Do you know their motivations? Correct? You don't know their motivations; correct?

A. No, I do not know their motivations.

MS. GUILLARD: Thank you. No further questions.

THE COURT: Any redirect?

MR. CARONE: Yes, Your Honor. And the evidence needs

to be moved back over to Ms. Bibb, please.

Ms. Bibb, can you please pull back up Exhibit 13.

Your Honor, may I publish it to the jury?

THE COURT: You may.

REDIRECT EXAMINATION

BY MR. CARONE:

Q. Mr. Hanson, you remember the questions you received from Ms. Guillard about Exhibit Number 13?

A. Yes.

Q. Okay. And the first video, you described that as a video where Ms. Guillard said that she had solved the murder?

A. Yes.

Q. Was it kind of like a teaser for videos to come?

A. Yes. It was the first video in the series that she was going to be starting to do.

Q. Okay. And then the second video, is that then the first video that you saw of Professor Scofield that Ms. Guillard posted?

A. I think it's one of the first two videos.

Q. And that was the day after she had posted this teaser about solving the murders?

A. Yes.

Q. Did Ms. Guillard go on to continually post videos about the Idaho murders and her theories about those murders?

A. Yes, she did.

Q. Did many of those videos reference Professor Scofield directly?
A. Yes.
Q. And when the videos did not directly reference Professor Scofield, were they still part of this ongoing series that Ms. Guillard was publishing on a daily basis?
A. Yes.
Q. And for those videos Ms. Guillard was using the hashtag "Rebecca Scofield"?
A. Yes.
Q. Regardless of whether the video directly referenced Professor Scofield or not?
A. That's correct.
Q. And this was all part of Ms. Guillard creating content and getting attention for her page?
A. That's right.
Q. In your view, did Ms. Guillard put a spotlight on Professor Scofield that did not exist prior to November 24, 2022?
A. I'm sorry. Can you state that first part of that.
Q. Yeah. I'm just trying to understand, in your view, did Ms. Guillard's posts put a spotlight on Professor Scofield?
A. Yes. They absolutely did. They included her picture. They included her address at work. They included information about her and spun out a fabricated story about her.

Q. And that spotlight was in relation to the murder of the four University of Idaho students?
A. Yes.
Q. And the spotlight was put on Professor Scofield at a time when there was a lot of fear and uncertainty about what had happened or who the killer was?
A. Absolutely, yes.
Q. Is that why you were afraid for Professor Scofield?
A. Yes, I was.

MR. CARONE: No further questions, Your Honor.

THE COURT: All right. Thank you. May the witness be excused?

MR. CARONE: Yes, Your Honor.

THE COURT: Thank you, Mr. Hanson.

Ms. Olson, I think now's a good time for our next comfort break. I know the jury's been sitting for a while, so we'll take five to ten minutes now for a comfort break, and then we'll return. So the jury may be excused.

(The jury exited the courtroom at 12:41 p.m.)

THE COURT: Please be seated.

Ms. Olson, who is the next witness?

MS. OLSON: Your Honor, the next witness will be John Carlsen. Mr. Carone is going to do that examination. And then our last witness will be Margie Scofield, and I'll be doing that examination.

THE COURT: And about how long do you think each is going to be on direct?

MR. CARONE: Your Honor, I would expect probably about the same as it was for Mr. Hanson, maybe a half hour or so -- well, on direct, less for Mr. Carlsen. The cross-examination obviously is hard for me to predict how long that'll go.

THE COURT: All right. So probably, conservatively speaking -- you can sit down. Conservatively speaking, maybe we have an hour or so left of plaintiff's case in chief; is that fair?

MS. OLSON: Yes, Your Honor. I think probably less, quite frankly. 45 minutes.

THE COURT: So, Ms. Guillard, you should be prepared then -- after that hour the government -- the plaintiff will rest their case, any motions you wish to make, and then be prepared to begin your case in chief, meaning, I think, calling yourself as a witness. Do you still intend to do that?

MS. GUILLARD: Yes, sir.

THE COURT: Okay. So just be prepared for that, with, again, the admonition that we're going to try not to present evidence that is cumulative of what you said on the witness stand on cross-examination.

MS. GUILLARD: Yes, sir.

THE COURT: All right. Anything for me to take up right now, Ms. Olson?

MS. OLSON: Just briefly, Your Honor. We filed a motion for judicial notice, and I think at this point if the Court could just take judicial notice -- I don't think we have to put the exhibits in -- but that Bryan Kohberger was charged by way of indictment in May of 2023, entered a plea agreement in June of 2025, and then was sentenced in July 2025. I can look up those dates, but that's my best memory. I know there's been a lot of testimony about it, but I'm a little -- that's actually not a fact technically in the record.

THE COURT: Yes. And, Ms. Guillard, instead of admitting those three exhibits -- the indictment, the guilty plea, the sentence -- what is typically done is I can instruct the jury that these are facts that have been stipulated by the parties, meaning the parties agree that these are facts that can be put in evidence. We can do it that way, or we can admit the three documents. It's -- again, if you're willing to stipulate to that, I'll put something together.

I guess, Ms. Olson, you could put together a stipulation, if Ms. Guillard is willing, with those three facts. If you want to present that to her and see if she's willing to stipulate to that. If not, I'll handle it another way.

And, Ms. Guillard, you don't have to make up your

mind right now, but the option is either those three exhibits come into evidence, because I've taken judicial notice that they're accurate and not subject to dispute; or Ms. Olson could draft a very brief three-sentence statement that gets to the heart of each of the documents, and I would instruct the jury that those are facts that both parties agree to or admit to.

MS. GUILLARD: You can take judicial notice.

THE COURT: So then, Ms. Olson, if you'll just draft that stipulation. And it's something I can just read to the jury that -- that these are facts stipulated to by the parties.

All right. Anything else, Ms. Olson?

MS. OLSON: No. Thank you, Your Honor.

THE COURT: Ms. Guillard?

MS. GUILLARD: No, sir.

THE COURT: We'll take about a five-minute-more recess.

(At 12:45 p.m., a recess was taken until 12:55 p.m.)

THE COURT: Please be seated.

Let's bring in the jury.

(The jury entered the courtroom at 12:56 p.m..)

THE COURT: Mr. Carone, call your next witness.

MR. CARONE: Yes, Your Honor. John Carlsen is our next witness.

(The witness was sworn.)

THE COURTROOM DEPUTY: Please state your full name and spell your last.

THE WITNESS: My name is John Joseph Thomas Carlsen, C-A-R-L-S-E-N.

THE COURT: Mr. Carone, you may inquire.

MR. CARONE: Thank you, Your Honor.

JOHN JOSEPH THOMAS CARLSEN, PLAINTIFF'S WITNESS

DIRECT EXAMINATION

BY MR. CARONE:

Q. Mr. Carlsen, do you know Rebecca Scofield?

A. I do. She's my wife.

Q. You call her Becca?

A. I do call her Becca.

Q. Mr. Carlsen, where are you from?

A. I was born and raised in Emmett, Idaho.

Q. Did you meet Becca in Emmett?

A. I did.

Q. When did you first meet your wife? I know she wasn't your wife at the time, but when did you meet her?

A. I feel like we were early teens. We went to different elementary schools. I was probably in high school when I first started to know her, 13, 14.

Q. Did you date Rebecca at all in high school?

A. I did. We went to prom twice.

Q. And then did you attend college after high school?
A. I did. I went to Boise State, and I was a year ahead of her in school.
Q. Okay. Did you and Professor Scofield, Rebecca, date throughout college?
A. Uh-huh.
Q. And then at some point did -- I'm sorry. You said yes?
A. Oh, I'm sorry. We did not date each other while we were in undergrad, no.
Q. Okay. And did you then reconnect with her at some point after college?
A. Yeah. We were both done with undergrad, and we started dating again.
Q. When was that?
A. 2009, spring of 2009. She had just graduated, and I was living in Boise at the time.
Q. Have you two been together since then?
A. We have, since the spring of 2009.
Q. Did you eventually get married?
A. We did, in October of 2012.
Q. Where were you living at that time?
A. We were living in Cambridge, Massachusetts, when we got married. We came back to Idaho to get married.
Q. So you got married in Idaho but then continued to live in Cambridge?

A. We lived in Cambridge, yes.
Q. Did you later move back to Idaho?
A. In 2014.
Q. Okay. Why did you move back to Idaho?
A. She was done with all of her coursework for her graduate degree, and we wanted to be closer to family, and she had research trips she needed to do that were closer to the U.S. West.
Q. Did Professor Scofield start at the University of Idaho shortly after you moved back to Idaho?
A. A year and a half-ish.
Q. Do you remember when she started working at the University of Idaho?
A. January 2016.
Q. Did you two have your first child around that time?
A. In late April of 2016.
Q. When did you have your second child?
A. February of 2019.
Q. Is that when you moved to your current home in Moscow?
A. Yeah, just around Labor -- or Memorial Day of 2019.
Q. Around June of 2019, you moved to your home?
A. Yes.
Q. Prior to November 2022, how would you describe your wife as a person?
A. Really motivated, very professional but still really

focused on family. That's why we moved back to Idaho. I feel like she has always had really good balance in her life between work and family. But at that point, you know, she was very, very professionally focused, very driven, very interested in making sure that she was performing to her own expectations and being in the top of her field while at the same time, you know, raising two kids. We had two kids under five at that point, which is wild being far from family. So, yeah, real good balance.

Q. Are your families still living in Emmett?

A. They both are.

Q. And does Professor Scofield make it a point to keep in touch with everyone in Emmett while you guys are living in Moscow?

A. Oh, yeah.

Q. How does she do that?

A. She talks to her parents on the phone almost every day, and we go to Emmett and the Boise area often, and a lot of people come up to see us as well.

Q. Prior to November 2022, did you observe your wife experience stress or anxiety related to work?

A. Nothing out of the ordinary. You know, everybody who's really dedicated to their career has stressful moments, but Becca's always really used them as motivation to kind of drive her to excellence. I think, you know, nothing that was ever

really detrimental to her health or family, just what she used to drive herself professionally and get fulfillment out of her career.

Q. Were you living in Moscow in November 2022, when Bryan Kohberger murdered four students?

A. Yes.

Q. Was there a lot of information about the murders right after they occurred?

A. No.

Q. Was there a lot of fear in the Moscow area?

A. Yes.

Q. With that combination of fear and a lack of information, did you observe the community responding to theories on the Internet about the murders?

A. Yeah. I mean, there was really no other source of information besides whatever you could find scouring the Internet at that point. Law enforcement was very tight lipped, and nobody knew anything, and everybody really wanted to know what was going on. So that was kind of one of the only sources of information.

Q. Can you remember any examples of how the community was responding to theories online?

A. Yeah. I mean, obviously the kids -- the roommates who were in the house and the ex-boyfriend were really getting a lot of attention, and people were coming up with theories

about them. And then there was all the way to, like, hoodie guy at the food truck. People were trying to find this guy in a white hoodie because somebody saw him on a video. Everybody was, like, trying to find something to point to.

Q. Do you remember Thanksgiving Day in November 2022?

A. I do.

Q. Was that the day you first saw Ms. Guillard's posts about your wife?

A. Yes.

Q. Did you watch the post first?

A. I did.

Q. What do you remember about that?

A. We were out on a walk, my sister and Becca and all of our kids, and she checked her work email while we were out. And someone had forwarded one of the videos to her, and she asked me to review it just to make sure it wasn't spam or something that she shouldn't open on her phone. And I watched the video and saw what was in it and said, "No, I don't think it's spam, but I don't think you should watch it."

Q. Did she then go on to watch the video?

A. At some point later she did with my sister, yeah.

Q. What did you observe about your wife after she first watched the video?

A. She was very distracted the rest of the day, very distraught. You know, it's Thanksgiving Day. It's difficult

to not be engaged with family. But she -- she was very kind of taken out of the moment in the holiday and, you know, reviewing the video a couple other times, talking with my sister, who she shared it with.

Q. I want to focus kind of on the November-December 2022 time frame. Did you observe your wife seeming afraid during that time?

A. Absolutely, yeah. I mean, I think, you know, we -- she reached out to the university soon, I think the same day, and I believe they got her picture taken off the history department page. She acted quickly in anything that we could control, but absolutely. There was just a lot more fear in the house for sure because it just -- you know, we didn't -- these videos were getting more and more views.

It kind of took us out of this community that had been part of this tragedy and kind of put us more in a spotlight in everything that was going on. That was really scary. So, yeah, and just, you know, that time of year the focus is always the holidays and travel and family, and it was definitely, like, a big -- like, we were all disengaged from that a lot.

Q. Did you observe anything unusual about your wife's behavior during that time?

A. Yeah. I mean, she wasn't sleeping much at all at that point, starting that evening. When everybody left our home,

when my parents left and it was just our family in the house especially, I would wake up and she would not be in bed. We would be sitting at dinner. She would get up to get a drink, and she would check to make sure the door was locked and go to the front door and make sure it was locked, and then she would come back and sit down. I'd find her in -- our son's bed was closest to the stairs to the second floor, where we all sleep. She'd sleep in there a lot or lay in his bed a lot. But oftentimes, I'd wake up in the night and she wouldn't be there.

Q. Was that -- was that behavior something you observed about her prior to November 2022?

A. No.

Q. You mentioned earlier that you -- previously, your wife, she would have stress from work, but that was something she kind of channeled professionally or in a positive way. Did you notice anything different about the stress she was experiencing in November and December of 2022?

A. Yeah. I mean, it's -- it's just very detrimental. Everything's so unknown. You don't know what's going to happen, what's coming next, and what to do with that stress and that energy. And, like, it was just draining and draining, and that along with not sleeping, she was very tired and having a really hard time staying motivated and focused. And, like, we were all just -- you know, that stress was just

so different because she couldn't use it in the way that, you know, so many other things would energize her previously.
Q. Did Ms. Guillard's posts affect your family's routine at all?
A. Yeah. I mean, we -- you know, the city of Moscow has a great park system, and we definitely didn't go to the parks as often. We started locking all of our doors and windows, which is not something that we had traditionally done. That's just a thing that Becca and I believe. But the doors were always locked any moment we were in the house. We did not go out. We did not go out to eat as often or at all. We didn't go to parks.
And we changed the kids' pickup schedule a lot at school. You know, we were really worried about people lingering around at the schools or the playground connecting them to us or to Becca. So drop-off and pickup was different at that point.
Q. Why did you make these changes to your family's routine?
A. We were just -- we had a lot more fear for the family just because of the focus that this had put on us during this time. I mean, everybody in the community and outside the community was looking for information, for answers somewhere. And, you know, there's thousands of families with kids in Moscow, but this information put ours at the front, saying, "Oh, these people might know something. Dr. Scofield might have

something to do with it," and that's scary.

Q. Were you concerned for your family's safety?

A. I was. I was. I mean, we lived in Boston during the 2013 marathon bombing, and there was just all sorts of online speculation going on at that point. And the city was very scared, and people were being accused of things just because they had a similar backpack. And I connected a lot of that moment with that instance of us living in Boston during that time of just -- you know, people, when they want information, they will find small, small glimmers of detail and run with it, and people got hurt then.

Q. You mentioned some of the changes to your family's routine. Did you do anything else to address that security concern?

A. Yeah. We purchased door sensors and security cameras for the house just so that we could see people coming and going and knowing when the doors are being opened just because of that new fear.

MR. CARONE: Your Honor, this exhibit's not yet been admitted, but I'd like to show Mr. Carlsen Exhibit Number 37.

Q. (BY MR. CARONE) Do you recognize Exhibit 37?

A. Yes.

Q. What is Exhibit Number 37?

A. It's a receipt for security cameras and door sensors that I had installed -- that I installed at the house.

Q. Is Exhibit Number 37 a true and accurate copy of those receipts?
A. Yes.
MR. CARONE: Your Honor, at this time I'd like to offer into evidence Exhibit Number 37.
THE COURT: Any objection, Ms. Guillard?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 37 will be admitted and published, if you wish, to the jury.
(Plaintiff's Exhibit 37 received.)
MR. CARONE: Yes, Your Honor. Thank you.
Q. (BY MR. CARONE) Mr. Carlsen, I think on the first page of Exhibit Number 37, do you see how much you spent -- I should back up.
So you mentioned the security system. Is that what's reflected on this receipt in Exhibit Number 37?
A. Yes.
Q. And what was the cost of the equipment you bought at that time?
A. $328.51.
Q. What's the date of this receipt?
A. November 27.
MR. CARONE: And then if we go to the second page of Exhibit Number 37, Ms. Bibb.
Q. (BY MR. CARONE) Mr. Carlsen, is this additional security

equipment you bought?
A. Yeah. That's an additional camera and the door sensors.
Q. What was the cost of that equipment?
A. $137.78.
Q. When did you make that purchase?
A. December 28.
MR. CARONE: You can take down Exhibit Number 37, Ms. Bibb.
Q. (BY MR. CARONE) Mr. Carlsen, do you remember when your wife sent a cease and desist letter to Ms. Guillard?
A. I think the first one was November 28.
Q. I'm just asking if you remember that happening.
A. Yes. Yes, I do.
Q. Did Ms. Guillard continue to post about your wife after that --
A. Yes, she did.
Q. -- cease and desist letter was sent?
And do you remember when Bryan Kohberger was arrested for the murders?
A. Yes.
Q. Was that after this lawsuit was filed?
A. Yes.
Q. Did Ms. Guillard stop posting about your wife at that time?
A. No.

Q. Did you notice anything different about Ms. Guillard's posts at that time?
A. Yeah. I mean, after Bryan Kohberger had been arrested, him as a character began to appear in some of these videos. You know, we were -- we were very elated, as the whole community was. But for us personally, our hope was that with a suspect, most of this would stop because it was -- you know, the story being told in those videos was separate from this person. But then Bryan Kohberger became a character in a lot of these videos, and the narrative changed a little bit. So that was really frustrating and, you know, made us all very fearful.
Q. You mentioned there was a hope that this would all stop. Is that in reference to Ms. Guillard's posts about your wife?
A. Yes.
Q. And when that hope didn't come to fruition, how did that affect your wife?
A. Yeah. I mean, it was -- it was one of the hardest moments throughout the entire ordeal just because, you know, we had seen the potential apprehension of a suspect in this case as the end of it, like, oh, that's got to be the end of it. We'll be -- there won't be any more videos. But then when they persisted, it really created so much uncertainty of this may never end. This could never end. These will just continue, and it'll be something we have to deal with forever.

Q. Did you ever see any videos where Ms. Guillard mentioned Bryan Kohberger prior to him being arrested?
A. No.
MR. CARONE: Your Honor, I'd like to -- this one's already been admitted, Exhibit Number 17. I'd like to publish that to the jury.
THE COURT: You may.
Q. (BY MR. CARONE) Mr. Carlsen, do you see the date of this first -- this first image on Exhibit Number 17?
A. Yeah --
Q. What is --
A. -- yes.
Q. What is that date?
A. August 28, 2025.
MR. CARONE: Ms. Bibb, can you please play it to the second slide.
(Playing video.)
Q. (BY MR. CARONE) Do you recognize that picture, Mr. Carlsen?
A. I do.
Q. What is that picture?
A. That's a picture of Becca and I buying a new car at Rogers Subaru in Lewiston, new to us.
Q. Do you remember when you made that purchase?
A. March of 2019.

Q. Is there a particular reason why you remember that date?
A. Because I wrecked our previous car in March of 2019.
Q. And is this a picture that the dealership posted about you guys buying the car?
A. Yes.
Q. And so Ms. Guillard found a picture of you and your wife from 2019 on the dealership's website then posted that on August 28, 2025?
A. Yes.
Q. Would this be an example of kind of the deflating nature of these posts just continuing on and on even after Mr. Kohberger had pleaded guilty to the crimes?
A. Yes.
Q. Did you observe -- so at this point now we're in 2025. Did you observe your wife continue to experience symptoms of anxiety or distress as Ms. Guillard continued to post about her?
A. Yes. Yeah, I mean, you know, it's -- so much of her stress and anxiety is around managing relationships and managing her career, you know, talking with publishers. If she needs to publish a new article, she needs to make sure that everybody is aware that the case is still ongoing. We have friends and family who are constantly checking in about the case. Like, it's -- it just hasn't ever really gone away, and it's something that creates extra effort and stress every

day to manage relationships.

Q. And have you at all seen Professor Scofield need to take a step back on her research or her attendance at conferences and things like that because of the anxiety and experiences she was having related to Ms. Guillard's posts?

A. Yeah, absolutely. I mean, the research itself, you know, Becca didn't want to travel soon after the videos started. But the research itself was challenging because, you know, working with publishers, whether it's, you know, something like an op-ed or a book or an article, like, it kind of has to be the first thing that she mentions in the conversation, that, "This is something that's kind of following me that's part of my current reputation." And that created scenarios where she didn't necessarily want to continue to submit things to not have to deal with that.

I think the classroom was particularly challenging. You know, the potential of having to answer questions from students about the case or, you know, relationships that she didn't have with the students. You know, she has had a very, very different attitude towards the classroom since this all started. You know, it's really challenging to go in there every day and wonder, you know, do these kids follow the case? Do they think any of these things are true?

And she's definitely taken steps back in teaching as far as her teaching and engagement with the students. Nothing

that would be detrimental at all, but her personal investment in the classroom has changed, and research is challenging, yeah.

Q. And I apologize to kind of bring you back in the timeline here, but where were you working in November of 2022?

A. I was working at METER Group, Incorporated, USA in Pullman, Washington.

Q. Were you traveling a lot for work at the time?

A. No.

Q. Are you aware of Ms. Guillard posting videos saying that you were traveling a lot and that's when your wife would have her rendezvouses with one of the victims?

A. Yes.

Q. And is there any truth to that?

A. No.

MR. CARONE: No further questions at this time.

THE COURT: Thank you, Mr. Carone.

Ms. Guillard, cross-examination.

MS. GUILLARD: Yes, sir.

CROSS-EXAMINATION

BY MS. GUILLARD:

Q. Good afternoon, Mr. Carlsen.

After the murders, November 13, 2022, what was it like in your household? Was there fear?

A. Yeah. I mean, the whole -- the whole town was kind of on

edge. It was a tragedy that happened in our community, so, sure, we all had a modicum of fear.
Q. How close do you live to 1122 King Road?
A. It's across town, a few miles at the most.
Q. So ten minutes?
A. Yeah.
Q. After the murders did you continue to have your doors unlocked, windows unlocked in your house?
A. Yeah -- yes.
Q. Were you aware that a suspect was not arrested on November 13 to the date of my videos?
A. Yes.
Q. Why, even though four quadruple homicides occurred, did you not have a security system or even lock your door even though you lived ten minutes away from what happened?
A. Yeah. I mean, it wasn't routine for us. We haven't traditionally locked our doors or had cameras on or anything else on your home. The moment was scary, but it's a large community. There's thousands of houses. There's thousands of homes. We felt like we were part of a community and this was a weird one-off tragedy. We didn't feel that kind of personal, direct fear towards us.
Q. But you did not know who committed the murders, and that person was still out; correct?
A. Yes.

Q. When you decided to put security monitors around your home, what drove that decision? What fear were you experiencing?
A. Yeah. I mean, our relationship with the tragedy changed once, you know, Becca's name and picture and job was kind of connected with the murders, to the point to where we felt much more in the spotlight in our connection to or perceived connection to these murders. I think it definitely created a scenario where we felt like people could come to our home. People could look for our kids. People could call us, you know, slow-roll by the house. It just -- it just really put our home and our family in a different spotlight than previously. We were just part of the community before that.
Q. And did you receive any threats from the people you feared could come to your home?
A. I did not receive any threats.
Q. So the people -- or the fear came from perhaps scenarios that you created in your head that someone could come to your home?
A. Yeah. I mean, I think -- like I said, my history living in Boston at the moment and just, you know, knowing that people will -- people will take shreds of information and they will find somebody and, you know, try to exert vigilante justice on them. And that was a thing that we just wanted to avoid. We didn't want people to look at us in the middle of

this tragedy like we were information or vengeance or anything.

Q. Why were you more afraid of a made-up vigilante that had not threatened you than an actual killer who killed four people ten minutes away from your home?

A. Well, like I said, I feel like, you know, when those murders happened in our community, we were part of that community. There's thousands of families that live in Moscow. I don't feel like we felt any less fear the rest of them did. But once -- once we were put into a small number of people who were being talked about in association with this tragedy, it became a lot more personal for us. It connected us to this tragedy in a very specific way that a half a dozen people were at that point, mostly students at the time. But, like, it -- we were front and center at that point just because of how wildly the videos were spreading, and that's why we had more fear.

Q. You stated you were front and center. Are you suggesting you were and your wife were more front and center than, let's say, Grub Truck guy?

A. I mean, Grub Truck guy was the guy in the white hoodie, and Rebecca had her picture on the Internet with her office number and -- her office number and her email address. Like, that's -- people can see that and know, oh, okay there's a person. The white hoodie guy is interesting, but nobody knew

as much about him. And people were chasing that lead, but all of information -- all the information about my wife is public because she's a public historian.

Q. Was your wife's home address posted?

A. No.

Q. Was her work address posted?

A. Yes.

Q. And was it posted prior to me posting it? Was it already public information?

A. Yes.

Q. You stated Grub Truck guy just was a guy with a hoodie, but are you aware that his picture was also posted?

A. Yes. Well, yes.

Q. Are you aware that there were also other people who were being accused around that time who were also being posted online?

A. Yes.

Q. What made you feel your wife was special, more so than those other people?

A. Oh, I felt like those people were just as at risk as our family was.

Q. So your wife was not -- you-all were at the forefront --

A. Yes.

Q. -- is that what you're saying? Thank you for clarifying that.

The fear about the vigilante or anybody randomly coming to your home, did you ever experience anyone coming to your home?
A. You know, cars would drive by slow. That's a thing that you notice. Becca would get calls and emails from numbers or names we didn't know. We never had anybody try to enter our home.
Q. Do you know who sent emails?
A. I don't.
Q. Do you know what was in these emails?
A. I never saw any of them. She worked with her enterprise IT department with most of that and the security at U of I.
Q. They were sent to her work email?
A. Yes.
Q. After December 27, 2022, and Moscow Police Department posted that they did not believe Professor Scofield was involved with the murders, how did you feel after that? Were you still afraid?
A. Yeah. I mean, people still didn't have anything tangible, you know. Even when the police department acknowledged that she was not a person of interest, there still was no better information. They didn't -- they didn't say who a person of interest was. So things hadn't really changed for us in that, you know, we were still connected to the tragedy in that way.
Q. Were you ever worried about the killer that was still on

the loose at that time?
A. Yes.
Q. The killer that -- but you still had your doors unlocked until my videos?
A. Yeah. And like I said, I feel like we probably shared a similar amount of fear as the rest of our community of thousands. The fear changed once the videos came out.
Q. After Bryan Kohberger was arrested, you -- first you stated that you remember when Kohberger was arrested; is that correct?
A. Yes.
Q. When did you find out Bryan Kohberger was arrested?
A. We were in Emmett for the holiday. I think it was the 29th or so. My father-in-law was in the hospital with RSV, and Becca was driving her mom to a doctor's appointment. And the news started to come out that they had apprehended a suspect, and throughout that day there was lots and lots of additional information that came out.
Q. Did your sense of fear or perception that a vigilante would come to your home, was it the same after Bryan Kohberger was arrested?
A. Like I said, immediately on that day, we were feeling positive in the same way the whole community had. But personally, you know, we were hopeful that this would distance us from the tragedy. But then following videos just kind of

appended Bryan Kohberger to the narrative that had been established already, and that just kind of, you know, was really demoralizing at the time.
Q. When you say distanced you, are you referring to me, or are you referring to, like, the concern of the community? Were you ever concerned that the community would take my videos seriously?
A. Yes.
Q. So when you said -- what part of the community were you concerned with, the community in your neighborhood?
A. Just anybody in Moscow who was desperate for answers, anybody who may have potentially been involved in the tragedy who was disgruntled that Rebecca was getting that sort of notoriety, yeah.
Q. Explain what you said, Rebecca getting that sort of notoriety. What do you mean by that?
A. Sometimes people who commit egregious crimes don't like other people to get credit for their crimes. That's a thing I've heard. I didn't -- I didn't want anybody to -- you know, there was so much unknown at the time.
Q. And after Bryan Kohberger was arrested, you still had that fear of a vigilante that doesn't want her to be getting the credit for his or her crime?
A. Yes.
Q. Why did you still have a fear of a vigilante going after

Scofield for having notoriety if the alleged perp was in prison or jail?

A. There were videos that came out after Bryan Kohberger was arrested that said that Becca was still involved in the crime itself.

Q. But my question is, you stated that your fear stemmed from the vigilante being upset that Rebecca Scofield would get credit for his crime. You acknowledge that Bryan Kohberger -- you know that he was -- when he was arrested and he was the alleged person who committed the murders. With that being said, with the vigilante or the person who committed the crimes in jail, why were you still afraid of a vigilante coming after you and your family for taking credit for his crimes?

A. I -- I think the scenario that continued to give us fear is just people in the community who thought that Rebecca was still involved regardless of who they were. If anybody thought that Rebecca was still involved with this case, you know, that she either directed Bryan Kohberger or was in league with Bryan Kohberger, like the videos that persisted were saying that, and we were afraid of anybody still in the community or outside the community or anywhere who were connecting Rebecca to the murders.

Q. Do you know any specific people in your community -- it's a small community; is that correct?

A. Yes.
Q. In your small community of Moscow, Idaho, University of Idaho town, do you know of any people who you were afraid would take my videos seriously?
A. Yes.
Q. Who?
A. I don't know anybody personally who would, but I believe it's possible in our community that somebody would.
Q. So you don't know anyone personally? It's just something that you made up in your head?
A. I don't know anyone personally who would have taken the videos seriously.
Q. You stated that you and your wife, Professor Scofield, went out less after my TikTok videos. Did that -- were you able to go back outside after an arrest was made?
A. No. I mean, our presence in the community was a lot less for, you know, six, nine months after the videos started.
Q. Are you aware that Professor Scofield was largely supported by family and friends?
A. I am aware that she has a lot of support from family and friends.
Q. Are you aware that she was supported by the University of Idaho and its community?
A. Yes.
Q. Are you aware that even outside of the community, other

people, strangers give her words of support and encouragement and even donated to her GoFundMe?

A. Yes.

Q. Even with all of that support after my TikTok videos and with an arrest made, why were you still in fear of going outside?

A. Yeah. I mean, we have people who love us and support us, and they can't necessarily be with us at all times. I think the thing that you fear is the uncertainty. And it is -- you know, we certainly have a big community of people who love us and support us.

Q. Did any of your fears manifest? Did any of your fears come true? For example, did anybody come to your home to cause harm to your family?

A. No one came to our home to cause harm to our family.

Q. After the first year after my videos were posted, did anyone come to your home to cause harm to your family?

A. No.

Q. At that point did you still have the same fear that something would occur?

A. We had more fear than we had before.

Q. You had more fear than you had before when?

A. Before the videos started pointing to Rebecca as having something to do with the murders.

Q. Your fear over the years increased? Is that what you're

saying?
A. No.
Q. I'm trying to understand. Please restate --
A. We have more fear in our home today than we did before the TikTok videos connecting Becca to the murders started. We lock our doors. We still have our security cameras up.
Q. Is security cameras and locked doors a normal routine to do for any family?
A. There are lots of families who do that. Our family did not prior to this.
Q. Would you say that's a normal thing to do?
A. I don't know.
Q. Outside of locked doors and security cameras, is there anything else you did outside of the normal home security things?
A. Like I said earlier, we did a lot in regards to dealing with our kids and their daycare and their school to make sure that everybody there knew to be on the lookout for anything unusual, to limit who can drop them off and who can pick them up. Those were some big changes.
Q. When you enrolled your kids in daycare, did you have to write a list of people who can drop them off and pick them up?
A. Yes, and we adjusted that list after the videos came out.
Q. After the videos came out, did you take a specific person off that list?

A. We just made sure that it was only people that picked them up every day so that nobody could say, "Oh, I'm John's mom or I'm this cousin." We had a big community of people, and we just wanted it to be Becca and myself for the most part just to be safe.
Q. Prior to my videos, who did you have on your list to pick up? And you can say mom, dad, cousin, friend. Who did you have on the list to pick up your children?
A. I don't know what the list was in fall of 2022. I do know that after the videos came out, we adjusted it to myself and Rebecca and possibly our baby-sitter Jessie.
Q. But you're unaware of what it was prior to?
A. I know we took names off of it.
Q. Did those people threaten you because of my TikTok videos?
A. No, no. We just wanted the list to be smaller.
Q. You stated that Professor Scofield's work changed after my videos; is that correct?
A. Yeah.
Q. Do you work with Professor Scofield?
A. I do not work professionally with my wife.
Q. Are you at the University of Idaho when she's teaching?
A. I am not.
Q. Are you around her when she's interacting with students?
A. No.
Q. When you said that her interaction with students changed,

how can you make that statement if you were not there?
A. Yeah. I mean, the number of stories and anecdotes and things that she would share about her lecture that day or an advising session that day started to decrease, were less common. That -- that behavior I interpreted as her just kind of disengaging with students more. She would love to come home and tell me about a lecture or a question a student had or an advising session, and that decreased.
Q. So your testimony is not based on direct evidence?
A. I don't have any, you know, information about her performance in the classroom, just kind of my opinion of what her engagement must be.
Q. You said she has to answer questions in class. Did you witness her answering any questions in class regarding my TikTok videos?
A. I did not.
Q. You stated my videos continued. Do you know -- were you aware of my videos being posted and when?
A. I was not consuming them every day, and I stopped -- I tried to stop watching them in the spring of 2023.
Q. When you stopped watching the videos, did your fear continue?
A. My fear was higher than it was prior to when the videos started.
Q. So your fear stayed the same despite an arrest being made?

A. Yes.
Q. Your fears stayed the same despite the Moscow PD making a public statement on behalf of Rebecca Scofield?
A. Yes. As long as -- as long as people were saying that -- as long as a person was saying that Rebecca was tied to these murders, that creates an amount of fear.
Q. Are you aware when my TikTok was banned?
A. No.
Q. My TikTok was banned July -- are you aware -- okay. I'll rephrase the question. I'll ask again. Are you aware that my TikTok was banned July 2023?
A. No.
Q. In July 2023, did you have fear?
A. Yes.
Q. Why did you have fear?
A. As far as I knew, the videos were out there, and people were consuming them.
Q. So your fear was because you still believed the videos were being posted even though my TikTok was banned?
A. Yeah. It's my understanding that they're consumed on other platforms. I don't know that. I've never seen them anywhere else, but I've heard that. Our friend Chris lets us know if there's anything we should know about that's in them.
Q. Did your friend Chris let you know that my TikTok was banned?

A. I don't remember hearing that.
Q. You stated stress was present in Professor Scofield prior to my videos; yes?
A. Yes, I did.
Q. And that the -- your understanding of stress was related -- and anxiety -- correct? -- was related to work?
A. Small amounts of stress and anxiety when you're very driven in your career. I have it as well.
Q. Are you trained to -- as a psychiatrist to measure levels of stress and anxiety?
A. No.
Q. Are you aware of any medications Professor Scofield was taking for stress and anxiety prior to my videos?
A. No.
Q. How did you manage -- or how did Professor Scofield manage stress and anxiety prior to my videos?
A. Most of it's -- you know, most career stress is easy to channel back into your work. Becca's always been very driven, and if something's particularly stressful for her, she doubles down in the particular thing that she's doing. And that's her way of dealing with it, and it's always worked before.
Q. You stated Professor Scofield would leave the bed at night; yes?
A. Yes.
Q. Do you know why she left the bed?

A. She -- you know, I knew that she left the bed because she was afraid that someone would come into the home or that something would happen to the family. We talked about it as well, and she said that she was afraid.
Q. Are you aware of what she was doing when she left the bed?
A. Sometimes she would walk around the house to see if she saw anybody outside, to double-check locks. Sometimes she would just lay in my son's bed because his is closest to the stairs if someone were to come into our home. Our family all lives upstairs.
Q. How long did this occur?
A. Months.
Q. Did this occur after an arrest was made?
A. Yes.
Q. Why?
A. The fear persisted past that.
Q. Last question: That fear of someone coming to your home never happened; correct?
A. No one came to our home to harm our family.
MS. GUILLARD: Thank you. No further questions.
THE COURT: Any redirect?
MR. CARONE: No, Your Honor.
THE COURT: All right. I think this is a good time for our final midafternoon break, so I'll excuse the jury until about, say, about 2:10 -- or 2:05. So with that, we'll

be in recess for the jury.

(The jury exited the courtroom at 1:42 p.m.)

THE COURT: Thank you, Mr. Carlsen. You may step down.

Please be seated. All right. I have an issue that I want to take up with counsel and Ms. Guillard for which I'd like to close the courtroom. So, Mr. Court Security Officer, if you would escort members of the gallery outside the courtroom.

We received -- Mr. Gordon did -- right before Mr. Carlsen came on the stand a note from a juror that was privately passed to Mr. Gordon.

I'm mindful of the First Amendment right of public access to civil proceedings in closing the courtroom right now, and I cite to *Richmond Newspapers v. Virginia* and *Press-Enterprise Company v. Superior Court*. I find because this issue involves juror anonymity and perhaps juror safety that there's a compelling interest to close the courtroom. I'm going to narrowly tailor this courtroom closure to that interest. It's going to be a short duration while I provide the note to the parties and then discuss how we address it, and I don't find that there's any alternatives to closing the courtroom other than that.

Mr. Gordon, if you'll pass the note -- we made photocopies of it -- to both parties.

Who is that? The courtroom is closed. Can you lock the courtroom door?

COURT SECURITY OFFICER: Yes, sir.

THE COURT: Thank you.

I'm going to read the note into the record. Again, the note was provided by Juror Number -- that's a 5, Mr. Gordon?

MR. GORDON: I'm not sure, Your Honor.

THE COURT: It appears to be -- Juror Number 5 is the juror in the suit sitting in the front row, and he provided it to Mr. Gordon in the hallway prior to Mr. Carlsen's testimony about 1:05, 1:10 p.m.

The note states, "I would respectfully request that the Court instruct the defendant to refrain from similar disparagement toward the jury, slash, jurors. There is a growing fear in my mind that a large verdict in favor of -- and it's plaintiff symbol -- may result in retaliation."

Ms. Olson, I'll hear first from you on how you suggest I should address this. And if you want to take some time -- I know this is --

MS. OLSON: I've been doing this for a long time, Your Honor, and this is quite a new issue.

THE COURT: Yes. And I've had notes and certainly surprises come up in trial before, but it is definitely an issue that we have to address. I can give you my preliminary

thoughts about on how I digested this and think we should address it.

I want to make sure, even though he said there's a fear in his mind, that this has not been discussed with the other jurors and so -- because the evidence is still going in and I admonished all the jurors not to discuss this case, including with each other, prior to deliberations.

So I intended to bring in Juror Number 5 and ask him the following questions: First, have you abided by my instruction not to discuss the case before deliberations with your fellow jurors? Two, does this note express only your personal view? Three, did you share the view expressed in your note with your fellow jurors? And four, have you already made up your mind about the result of this case, or are you willing to consider evidence not yet introduced?

And so, you know, I think this is the best way to address it, but I'm certainly open to other suggestions.

MS. OLSON: Your Honor, I think that is -- those are all appropriate questions, and I would not recommend anything else at this point depending on his answers. There obviously may be more to do.

MS. GUILLARD: I would like to know what similar disparagement was, what he meant by my behavior. It says, "Defendant to refrain from similar disparagement."

And I also have concerns that this is the same juror

that worked for the firm that works closely with Stoel Rives and that he's now causing problems, and he has also decided a large verdict in favor of the plaintiff without me even being able to testify on my behalf. And I think that's an issue for due process.

THE COURT: And those are certainly fair concerns, Ms. Guillard.

MS. GUILLARD: Also, I haven't done anything to anyone.

THE COURT: I think -- without interpreting his intent, I think the disparagement he's referring to is what you essentially said on the TikTok videos. So he's fearful, it seems, that if a -- this is my interpretation -- fearful that if the jury was to award a large verdict in favor of Ms. Scofield, that the jurors would then be the subject of similar TikTok videos by you.

MS. GUILLARD: Well, that's irrational thoughts.

THE COURT: And I understand that, and that's again just my opinion on this.

Ms. Olson, what is your opinion, beyond asking the four questions that I proposed?

MS. OLSON: Well, Your Honor, depending on the answer, obviously, he could be -- I didn't know if we were dismissing two as alternates or eight are deliberating, quite frankly. But that -- there may be -- there may be a basis to

just -- at the end the Court could say, you know, "You are an alternate. I'm sorry. You're being excused."

I would also just for the record make clear that Ms. Guillard had the opportunity to use a peremptory strike against Juror Number 5. She had peremptory strikes, and she elected not to do that.

THE COURT: And the record is clear on that.

I would also like -- if the court security officers could help me with that. I would like to cover the windows there when we break for a moment, because I want to preserve this juror's anonymity, and I don't want --

COURT SECURITY OFFICER: May I approach to grab --

THE COURT: You may, Patrick.

I want to preserve as much anonymity when we ask these questions.

And, Ms. Guillard, after we ask him the questions, you can make any motion you wish as it relates to him, and I'll consider that motion. All right?

MS. GUILLARD: Yes, sir.

THE COURT: Okay. Mr. Gordon, if you'll bring that juror back into the courtroom.

Another issue, Ms. Olson, Ms. Guillard, is how to do this in a way that doesn't raise the other alarm bells of the other jurors as to why one of those fellow jurors are being brought back into the courtroom, but I don't know any way

around that.

MS. OLSON: Your Honor, certainly this could take a little bit of time, but you could say this is an opportunity for everyone to go outside and stretch their legs and then sort of get -- or let [redacted] -- Juror Number 5 know that there is an issue that -- or a question someone has or something like that. He will probably expect it, I think.

THE COURT: Yeah, I'm sure he does. I just don't know --

MS. OLSON: I mean, the Court could say there's a phone call, tell the other jurors there's an outside matter that Juror Number 5 needs to address.

THE COURT: Ms. Guillard, I'll ask you as well if you have any thoughts on that. I could have Mr. Gordon just go in and say, Mr. Juror Number 5, there is a telephone call that -- or there's a matter, you know, outside of the court that you need to address," or something.

MS. GUILLARD: Sounds good.

THE COURT: All right. Just say, "A matter unrelated to the court, to what's going on with the court, for you to address." I don't want to lie, but I don't want the other jurors to be alarmed.

MR. GORDON: Can I just say, "The jury administrator received a message that requires your attention"?

THE COURT: That's fine.

(Juror Number 5 entered the courtroom.)

THE COURT: Please be seated. You're Juror Number 5; is that correct?

JUROR NUMBER 5: Yes, Your Honor.

THE COURT: You're not in trouble. We're just here to address the note that you gave to Mr. Gordon. And I've given it to the parties. They're aware of it and what you said. I just want to ask you a few questions about that.

The first question is that I admonished you at the beginning of the case do not discuss the case with anyone, including your fellow jurors. Have you abided by that admonishment?

JUROR NUMBER 5: Yes, Your Honor.

THE COURT: All right. And this note mentions that you have a -- "There is a growing fear in my mind." Did this note express only your personal view?

JUROR NUMBER 5: It did, Your Honor.

THE COURT: And did you share that view expressed in your note with any of your fellow jurors?

JUROR NUMBER 5: No, Your Honor.

THE COURT: And then lastly, have you already made up your mind about the result of this case, or are you willing to consider evidence not yet introduced?

JUROR NUMBER 5: First part of the question, no, Your Honor, I have not made up my mind. And, yes, I am willing to

be a fair and impartial judge of -- trier of the remaining facts in the case.

THE COURT: All right. Ms. Olson, do you have anything else that you think you'd like me to ask Juror Number 5?

MS. OLSON: No, Your Honor.

THE COURT: Ms. Guillard?

MS. GUILLARD: I would like to know what specific fears he have that I would do.

JUROR NUMBER 5: Your Honor, to that question, I don't have specific fears, but the accumulation of evidence has created a particular fear that any one of us may also be subject to the same conduct.

THE COURT: What do you mean by "the same conduct"?

JUROR NUMBER 5: Being targeted by social media, and not necessarily by the defendant but by anybody, due to our engagement in the case.

THE COURT: All right. And you're aware that your identity is anonymous to everyone outside the people in the courtroom now?

JUROR NUMBER 5: Yes, Your Honor.

THE COURT: Okay. All right. Do you think that your fear of potential retaliation by anyone is going to distract you from your fair and impartial consideration of the evidence in this case?

JUROR NUMBER 5: No, Your Honor, and it hasn't until this point. I've been very attentive the entire time.

THE COURT: You say "until this point." Have you been attentive since providing the note?

JUROR NUMBER 5: Very much so, yes, Your Honor.

THE COURT: All right. Okay. Anything else, Ms. Olson?

MS. OLSON: No, Your Honor.

THE COURT: Anything else, Ms. Guillard?

MS. GUILLARD: He made a statement that he projects a large verdict in favor of the plaintiff. Why is he already thinking about large verdicts in favor of the plaintiff despite not hearing all of the evidence in the case?

THE COURT: He -- Mr. Juror Number 5, if you want to respond to whether or not you've already made up your mind or whether you are willing to consider the evidence not yet introduced despite the fact that you have a fear that a large verdict in favor of plaintiff may result in retaliation.

JUROR NUMBER 5: Yes, Your Honor. I have no prediction one way or the other whether there will be a large jury verdict, strictly limiting to what I said in my note.

THE COURT: All right. Anything else, Ms. Guillard?

MS. GUILLARD: No, sir.

THE COURT: All right. Thank you, Juror Number 5. You may be excused. Mr. Gordon will bring you back to the

jury room.

(Juror Number 5 exited the courtroom.)

THE COURT: All right. Does either party have any motions?

MS. OLSON: Professor Scofield does not, Your Honor.

MS. GUILLARD: I do motion to remove him as a juror, and the reason is because he already had -- it was already a concern of him having a bias because he worked with a firm that also works with Professor Scofield's attorneys' firm, Stoel Rives. He came up to the bench and he stated that he could be an unbiased juror. I believed him.

But then now today he's presenting a note first that presents me in a light that isn't true and accurate to me and also presenting a note that shows bias, that he's already thinking about a large verdict in favor of the plaintiff. So with those two things together, I think it's best to remove him as a juror completely.

THE COURT: Ms. Olson, do you have a response to that?

MS. OLSON: Your Honor, I understand Ms. Guillard's concerns, but what we have on the record is a juror who indicates he's been very diligent, and he answered the Court's questions to indicate that he could be fair and impartial. It will be the Court's decision, but that's our position.

THE COURT: All right. Thank you, Ms. Olson.

I will take a brief recess and go discuss the matter with Mr. Gordon and make a decision on Ms. Guillard's motion.

The Court will be in brief recess.

(At 2:01 p.m., a recess was taken until 2:16 p.m.)

THE COURT: Please be seated.

Ms. Olson.

MS. OLSON: During, Your Honor, the break and having a chance to talk about it in more detail with our client, we do not oppose Ms. Guillard's motion to excuse Juror Number 5.

THE COURT: All right. That's what we'll do, then. I will grant Ms. Guillard's motion to excuse Juror Number 5. My thought is to bring him back into the courtroom. Again, Mr. Gordon's telling him that there's an issue with the jury administrator at this time. This time it's accurate. She's out there waiting to escort him after the jury comes back in back into the jury room to get his stuff so we don't have to do it in their full view.

I'll bring him back into the courtroom, let him know that Ms. Guillard made a motion to excuse him, and that in the interests of the -- both the fairness of the proceedings and the perception of the fairness of the proceedings, that I think I'm going to grant that motion and excuse him and thank him.

I'm going to ask him to refrain from discussing the case with anyone unless and until we get a verdict in the

case. I don't know how much power I have to do that once he's been excused as a juror, but I'm going to tell him that just to make sure that we don't have other issues and he doesn't contact any of the other jurors that he might have made friends with or anything along those lines.

Does anyone have a problem with that?

MS. OLSON: No, Your Honor.

MS. GUILLARD: No, sir.

THE COURT: All right. Mr. Gordon.

MS. GUILLARD: Is today a 3:00 day?

THE COURT: Yes. I don't want to -- jurors may have made plans already, pick up kids and things of that nature. So we'll -- when we're done with this, we will have the next plaintiff's witness, and then I imagine that'll take us to the end of the court day and that we'll start with your case in chief tomorrow.

MS. GUILLARD: Yes, sir.

(Juror Number 5 entered the courtroom.)

THE COURT: Please be seated.

All right. Juror Number 5, I wanted to thank you again for how upright and truthful you were in giving me your thoughts at this stage. I 100 percent believe in your answers to me in the questions that I asked of you, but one of the parties made a motion to excuse you as a juror that I'm going to grant, not because I believe you would do anything unfair

in the case but primarily because of the perception of unfairness that there might be if someone were to be looking at this case and scrutinizing it later as to whether or not someone had made up their mind prior to all of the evidence coming in. Again, there's nothing ever wrong with telling the truth, especially in this context, and I appreciate your thoughts.

So I'm going to excuse you with the thanks of the Court and appreciate your service in the case. I'll ask that you not discuss the case unless and until there is a verdict in the case and that you refrain from contacting any of your fellow jurors until after the case is over. Can you abide by that?

JUROR NUMBER 5: Yes, Your Honor.

THE COURT: And again, I apologize because I don't normally like meeting truthfulness with some repercussion like this, but I've got a bigger issue to concern myself with, and that is the perception of unfairness that could be had at this stage. And so I'm going to grant that motion and excuse you again with the thanks of the Court.

Ms. Richter, our jury administrator, will be out in the hallway to sit with you in an office here as the other jurors come back into the courtroom. Then you can go back into the jury room and collect your belongings, and she'll escort you in a way that I don't want you to be out in the

public on this floor, that you can just take an elevator from one floor down and then be on your way.

Again, I don't do this because you need to be embarrassed in any way by anything. Never be embarrassed about telling the truth. I just don't want any personal repercussion to you by way of there's maybe people in the gallery that might see you or recognize you as you leave.

All right. Again, my sincere thanks both for telling me what you did and also for your service over the past few days. Thank you, Juror Number 5.

(Juror Number 5 exited the courtroom.)

THE COURT: Please be seated.

I intend to tell the other jurors that Juror Number 5 when we pulled him back into the courtroom has been excused for a personal matter with the thanks of the Court for his service and that the other jurors should not speculate or discuss what that reason might be, just chalk it up to a personal matter that involved him. And we will go forward now with seven jurors in the case.

Anything else you'd like me to say, Ms. Olson?

MS. OLSON: No, not with respect to the jurors as they come back in, Your Honor.

THE COURT: Anything else that you wish me to say? Ms. Olson, anything else? You said "not with respect to the jurors."

MS. OLSON: We do have the stipulation. I imagine you want us to do that when the public -- when the court is unsealed, but I also want to make the Court aware that we've got that now.

THE COURT: I'll review it if you want to give it to Mr. Gordon. And then what I'll do is -- please remind me if I forget, but at the end of your last witness, prior to resting your case, if you'll say, "Your Honor, we have a stipulation of fact that we wish to read to the jury," and I'll just ask you to read it to the jury from the podium.

MS. OLSON: Okay.

THE COURT: Unless you think that I should read it.

MS. OLSON: No, Your Honor, I'm ready to read it. We have one copy because we have no printer here or anything and we had to handwrite it, but I'm sure that someone with good handwriting -- not me -- wrote it.

THE COURT: Ms. Fifer, can you grab that from Ms. Olson, and I'll just read it. It's a stipulation from the parties --

MS. OLSON: And I've shown it to Ms. Guillard.

THE COURT: Ms. Guillard, what I intend to say to the jurors, any problem with that?

MS. GUILLARD: No, sir.

THE COURT: Okay. All right. Randy, Chad, as soon as -- why don't we take those off, and we can let the gallery

back in before the jurors come back in. I don't want the jurors to see that --

MR. GORDON: Judge, do you want them in their original seats, like the seats that they were in -- there's an empty chair -- or to move up?

THE COURT: They can do what they wish. They can move up so it doesn't look like somebody died.

(The jury entered the courtroom at 2:27 p.m.)

THE COURT: All right. Please be seated.

Members of the jury, thank you very much for your patience. As you'll notice, one of your fellow jurors is not in the courtroom now. He had a personal matter for which he is being excused from the jury. I excused him with the sincere thanks of the Court.

Now we'll just have seven jurors in the case, and the seven of you will decide it. I ask that you not speculate as to the reasons for his being excused. It was simply a personal matter and nothing anyone did wrong.

All right. Ms. Olson, will you call your next witness.

MS. OLSON: Yes. Professor Scofield calls Margie Scofield.

(The witness was sworn.)

THE COURTROOM DEPUTY: Please state your full name and spell your last for the record.

THE WITNESS: Margie Elena Scofield, S-C-O-F-I-E-L-D.

THE COURT: Ms. Olson, you may inquire.

MARGIE ELENA SCOFIELD, PLAINTIFF'S WITNESS

DIRECT EXAMINATION

BY MS. OLSON:

Q. Mrs. Scofield, you're Rebecca Scofield's mother; is that right?

A. Yes.

Q. Do you have other children in addition -- besides Professor Scofield?

A. Yes. I have two sons.

(Reporter interruption.)

Q. (BY MS. OLSON) I think you were saying you have other children in addition to Professor Scofield?

A. I have two older sons.

Q. Are you married, Mrs. Scofield?

A. Yes.

Q. What is your husband's name?

A. Clay Scofield.

Q. Do you have any grandchildren?

A. Yes.

Q. How many grandchildren do you have?

A. A total of six.

Q. And are some of them Professor Scofield's children?

A. Yes, two of them are.

Q. And when you talk about your daughter, do you call her Professor Scofield?
A. No. I call her Becca.
Q. Mrs. Scofield, where do you live?
A. In Emmett, Idaho.
Q. How long have you lived in Emmett, Idaho?
A. I was born and raised there.
Q. And did you drive to the courthouse this morning from Emmett?
A. Yes.
Q. About how long of a drive is it?
A. About an hour.
Q. Mrs. Scofield, where does your daughter, Becca, work?
A. For the University of Idaho in Moscow.
Q. Do you know how long she has worked there?
A. I believe it's ten years.
Q. Turning back to the first few years Becca worked at the University of Idaho, how often did you communicate with her?
A. Usually we either text or talk several times during the week.
Q. And was that true for the period of time from when she first started there up until approximately November of 2022?
A. It's pretty much always.
Q. And in the first few years that Becca lived in Moscow and worked at the University of Idaho, how often did you see Becca

in person?
A. We would usually -- every couple of months, six weeks to eight weeks, we would either go up or they would be down.
Q. When you say "they would be down," who are you referring to?
A. John and Becca would drive down.
Q. With their kids usually?
A. Yes, with G.C. and J.C.
Q. Mrs. Scofield, were you and your husband in Moscow, Idaho, the weekend of November 12th and 13th of 2022?
A. Yes, we were.
Q. Why were you in Moscow?
A. We went up to take care of G.C. and J.C. so that Becca and John could attend a wedding.
Q. Do you recall what day of the week you arrived?
A. I think we went up on the Thursday before.
Q. And in the time you were there taking care of the children while Becca and John traveled, did you -- did that involve taking the children to or from school or daycare?
A. Yes, it did.
Q. What was your routine for doing that at the time?
A. Becca -- sorry -- G.C. was in preschool, and so I was able to just take her and drop her off, make sure she could get into the door. And then J.C. we would just drop off in a car line, and he would go into school.

Q. Mrs. Scofield, do you recall when Becca and John got back to Moscow from the wedding they had attended?
A. Yes. They got back approximately noon on Sunday the 13th.
Q. When they arrived in Moscow, did you learn about anything that had happened at or near the university?
A. Yes. Becca told us that she had gotten a campus-wide alert to shelter in place.
Q. And did -- in that time period, did she relay or did you learn what the shelter in place was related to?
A. I did not, no.
Q. Did you come to learn that the shelter in place was related to murders that had occurred on or near the campus?
A. Yes.
Q. Mrs. Scofield, how much longer did you and your husband stay in Moscow after John and Becca returned from the wedding?
A. Just a couple of days.
Q. And then did you go back to Emmett?
A. Yes.
Q. At the time you left a couple of days after November the 13th, did you have any specific plans for when you were going to return to Moscow?
A. Yes. We had planned to go back up prior to December 1.
Q. And why was December 1 the date that you recall you would be going up there, at or near that time?
A. Rebecca was scheduled for a surgery and asked us to come

up and help with getting the kids to and fro.
Q. Mrs. Scofield, I'd like to next direct your attention to the Thanksgiving holiday weekend in November of 2022, the following week, I guess. Where did you celebrate Thanksgiving weekend in 2022?
A. We were in Emmett.
Q. Was Becca there with you?
A. No, she was not.
Q. Did you talk to her on Thanksgiving Day?
A. I think we texted just, "How was your Thanksgiving?"
Q. Routine conversation?
A. Yes.
Q. Did you also talk to her or hear from her two days later, on the Saturday after Thanksgiving?
A. Yes, we did.
Q. Was that conversation or that communication different from your communication on Thanksgiving Day?
A. Yes, it was very different.
Q. How was it different?
A. She called us and was upset. She told us that there was a couple of posts that had been made on TikTok accusing her of murder and that we should be aware that this had happened.
Q. You said that Becca sounded upset.
A. Yes.
Q. How could you tell that Becca was upset?

A. Well, the tone of her voice. But in our family we -- ever since the kids were little, we always said, "How does that make you feel?" And we talk about our feelings and we share our feelings. And her voice was very tremulous and upset, but when she shared it, she -- she talked about how scared she was and how this might impact her family.
Q. I think there's some tissues up there, Mrs. Scofield.
A. I'm sorry.
Q. Mrs. Scofield, have you seen the TikTok videos?
A. No. I've never seen them.
Q. Do you have a TikTok account?
A. No.
Q. Did you talk to Becca any more over the next few days after the 26th?
A. We had several conversations, both text and talking, concerns about what to do, how to help, how to go forward, those kinds of things.
Q. Could you tell if she was still upset?
A. Yes. She was very upset. Her -- everything was very disjointed, and she really couldn't communicate how things were going with herself or with the kids. There was a lot of moving parts, and she was trying to figure out what to do with her students and with her immediate family, with G.C. and J.C. and John and, frankly, how to protect the rest of us. She was very concerned about that.

Q. Mrs. Scofield, did you and your husband travel to Moscow as planned to help your daughter get the kids to and fro after her planned surgery?
A. Yes. We went up earlier than we planned. I think we went up on the 29th to help out, yes.
Q. Why did you go up earlier?
A. We were really concerned with Rebecca's state of mind, how she was dealing with it, and -- yeah, we were just concerned with how -- with her.
Q. So you arrived before the surgery; is that correct?
A. Yes.
Q. When you arrived at Becca and John's house before the surgery, did you observe any changes with the security at their house?
A. Yes.
Q. What changes did you observe?
A. Well, they were locking their doors, which none of us have ever done. They were doing that. She was very concerned about making sure that the blinds were pulled, especially at night. We have two small dogs that we take with us, and any noise they hear, they would bark, and she would jump at that. And she's used to dogs, so that was very different. She cried a lot.
Q. Was there any kind of additional security equipment at the house?

A. Yes. There -- John had installed a camera up at their garage, and I know that because it has an automatic light that when you walk in front of it, when I take the dogs for a walk, that would come on and it would notify them on their phones that someone was there.

Q. Did you and your husband, Clay, take any additional precautions or bring anything different with you when you traveled to Moscow right before Becca's surgery?

A. We did. For the first time we -- we took a handgun with us in a lockbox.

Q. Why did you bring the handgun in the lockbox?

A. We were really scared. We were terrified that something might happen. The threats were so personal, and we just wanted to be able to help out, and for some reason we -- the thought was maybe that would add an extra measure of safety.

Q. Did you check with Becca and John to make sure that was okay before you took the handgun?

A. Yes.

Q. Mrs. Scofield, did you have any new protocols or things you needed to do in taking care of Becca and John's two children, your grandchildren?

A. Yes. Rebecca and I had to go into both of the schools. With G.C., I had to physically go in with my driver's license when I dropped -- both when I dropped her off and when I picked her up and show the license, and then they had to have

me sign her out, and about the same procedure with J.C. at his school. I'd have to go into the office and show them the proof. I couldn't just drive through the line anymore, and to drop him off I had to walk him into the school.

Q. While you were in Moscow before Becca's surgery, did you learn that the TikToks accusing your daughter of being involved in the Moscow murders were circulating more widely in Emmett, your hometown?

A. Yes, I did.

Q. What did you learn?

A. I got a call from my best friend that she had heard that the school -- that there were several people at the school that had seen the TikToks and of course knew her name. Becca has the same last name, and we have grandchildren that go to those schools.

Q. Did you have other family members or extended family members who also worked in the schools?

A. Yes.

Q. Do you know if Becca also received that information that the TikToks had hit Emmett?

A. Yes, she did.

Q. And did you observe or see any reaction from her when she received that information?

A. Well, she was embarrassed. She felt like she had shamed our family and she had put us all at risk, and she loves her

nieces and nephews so much, and she was terrified of what all this might mean. And we weren't sure what was going to happen, and so now you've brought -- you've brought these other kids and their mom and dads into the same situation.
Q. While you were in Moscow with Becca and her family before Becca's surgery, had you planned to go to a campus event at the University of Idaho?
A. Becca and I had talked about going to the vigil for the students.
Q. Is that for the students who had been killed?
A. Yes.
Q. Did you go?
A. No.
Q. Why not?
A. We -- well, Becca received word that it would be better for her own safety that we not go.
Q. When you were in Moscow with Becca and her family for her surgery, what did you observe about Becca's emotional state?
A. I'm sorry. Will you repeat that?
Q. Sure, sure. When you were in Moscow with Becca and her family before Becca's surgery, what did you observe about Becca's emotional state?
A. She would start a sentence and forget it halfway through. She would -- she was very good at making lists, and it was something we share. You make a list and go through it during

the day, and she would get maybe two things out of ten done in a day. She was jumping in and out of conversations and was -- she wasn't sleeping, wasn't eating very well. She just -- emotionally she just was scattered and just pushed. It just felt like she just -- I don't know. She just wasn't Becca. She's always been strong, and she wasn't strong.
Q. Was that different from how she appeared when you had seen her just two weeks earlier, I guess, when you went up to take care of the kids and when they came back from the wedding?
A. Oh, yes. She had all kinds of plans of what they were going to do over Thanksgiving, and she had plans for hosting different events. And now there was just -- there was just pulling in from everything and trying to keep her family together and safe.
Q. Were there -- in that time period when you got up there before her surgery, were there any topics or events in her life that she focused on?
A. I'm not sure I understand.
Q. Sure. You were having conversations with her; correct?
A. Correct.
Q. And you described her emotional state. Did she talk about what concerns she had that put her in that emotional state?
A. We continued to talk about the posts, and she -- she would not even describe them to me because, again, she's trying to shield us from that. But she would talk about how many there

were and that they weren't stopping and that she was unable to be of any use to her students, you know, and wasn't able to be the professor and the colleague that she needed to be on campus or the partner that she needed to be with John.
Q. Mrs. Scofield, how long did you stay in Moscow around the time of Becca's surgery?
A. We were there, I think, a little over two weeks, because we celebrated Christmas with them before we came home.
Q. So you -- did you celebrate Christmas in Emmett or did you celebrate Christmas in Moscow?
A. We did both, but we always do an early one with them. I think we came home about the 16th or so, the 15th or 16th, somewhere in there, two weeks.
Q. When is the next time that you saw Becca after you left -- strike that.
In the time that you were there with Becca, both before and after her surgery and when you had celebrated that early Christmas, did Becca's emotional state remain the same?
A. Yes.
Q. Did you make any observations about whether or not she was sleeping?
A. She was not sleeping.
Q. How did you know she wasn't sleeping?
A. Because my husband doesn't sleep a lot either, and they would meet in the living room.

Q. Mrs. Scofield, when is the next time you saw Becca after you left about the 16th of December?
A. They came down to spend Christmas with the families after Christmas Day.
Q. When you say "they," who are you referring to?
A. John and Rebecca and G.C. and J.C.
Q. What was Becca's emotional state like when she arrived in Emmett the day after Christmas in 2022?
A. We just hugged her, tried to reassure her, tried to let her know that she was safe and her family would be safe. We tried not to dwell on things outside of family.
Q. Were you -- did you continue to observe some of the emotional strain that you had observed when you were in Moscow before and after her surgery?
A. I think the thing I saw the most was that she really needed the family connection. Her grandmother was there for Christmas, and we spent time together. We're a pretty small family, but we just spent time together and tried to find things for G.C. and J.C. and just celebrate that time together.
Q. How did Becca appear physically?
A. Drained, fatigued, emotionally sad. She didn't really want to see anybody outside of the family and was just pretty much -- Becca has always been our glue. She has always been the one that's out there pulling other people in and helping

them and doing all of this, and she was taken away from her students that she could be with. She was removed from these connections that she's made, and she -- so I think she was feeling very isolated. And at that point she saw a couple of close friends maybe, but it was very not -- not the "I'm out and about."
Q. Different from other times she was in Emmett and --
A. Very different.
Q. Do you know if Professor -- excuse me -- if Becca was sleeping when she came down to visit at Christmastime?
A. No, she wasn't sleeping.
Q. And how could you tell that she wasn't sleeping?
A. Her and her dad would meet in the living room.
Q. Mrs. Scofield, when Becca was in Emmett after Christmas, did you learn that someone was arrested or taken into custody in relation with the murders?
A. Yes, we did.
Q. Do you recall what you were doing at the time when you learned that information?
A. Yes.
Q. What were you doing?
A. Becca and I had just dropped her dad off at the ER because he was having breathing issues, and her and I were -- she was driving me in for an important doctor's appointment.
Q. So Becca was with you when you learned that information?

A. Yes.
Q. What was Becca's reaction when you learned that someone had been taken into custody in connection with the murders of the students at the University of Idaho?
A. We looked at each other and we said, "Oh, it's over. It's done. It's okay. They have who did it." And it was like this weight was lifted off of us that, okay, it's going to be okay.
Q. Why did you think -- or why was the weight lifted or why did you think it was going to be okay?
A. Because they have the person that did it, and so this poster that kept calling her a murderer and everything would know that that's wrong and the person that did it was found.
Q. Did the TikTok posts accusing your daughter of murdering the four University of Idaho students stop after you-all learned that information?
A. No. No, we were wrong. It didn't.
Q. When did -- if you recall, when did you learn that the TikTok posts hadn't stopped? Maybe I should ask it this way. Was Becca still in Emmett?
A. Yes. Yes, she was.
Q. And were you able to observe Becca when she learned that there had been additional TikTok posts connecting her to the four University of Idaho students?
A. Just sat and cried. We just sat and cried because how do

you -- you're so helpless and out of control and life has changed forever and you think -- you think somebody stopped. And it just feels like it'll never stop. It'll never go -- never be right again.
Q. Do you recall when Becca and John and their kids left Emmett after that visit?
A. Yes.
Q. When was that?
A. On the 31st.
Q. Of December?
A. Yes.
Q. Mrs. Scofield, in the three years since that Christmas in Emmett and the events that you just described, have you continued to have regular contact with your daughter, Becca?
A. Yes.
Q. Have you observed any lasting impacts from the false allegations made against her, the allegations accusing her of being involved in the murders of four University of Idaho students?
A. Yes.
Q. What are the lasting impacts? What have you continued to observe in those three-plus years?
A. She continues to have headaches, and they're quite severe at times. She has neuropathy in her feet, sometimes her hands. She has developed diabetes. And none of those things

have gotten any better. You know, trying to do weight loss and trying to do eating correctly and all of those things and the different techniques that she has tried has mitigated them, but it's not ever going to go away.
Q. Have you continued to hear strain in her voice when she talks?
A. Yes. Yes, I have.
Q. What -- have you made any observations about her level of energy or her tiredness?
A. What I've -- when we go up, what I've observed mainly is that she just hits a wall. She used to be the Energizer Bunny and she could do everything all the time, all day. Now by 2:00 or 3:00 in the afternoon, she's done. And I don't believe that her workload has changed any. With the kids, with G.C. and J.C. getting older, it's just that she just doesn't have that anymore, and that fatigue just pulls her down.
Q. And is that different from the Becca that you observed prior to November 24, 2022, when she first learned about the TikTok videos?
A. Yes, yes. It's changed a lot.
Q. Did you notice any -- have you noticed any differences about Becca's ability to stay on track?
A. She takes multiple notes, and that, I think, helps her. But again, she does not have the ability anymore to just go

through -- she has a very difficult time sequencing through daily events. It takes more out of her to do that than it did before.
Q. Mrs. Scofield, over the last three years, have you seen anything that makes you think that these impacts on your daughter, Becca, will stop?
A. No. I think we've all decided that, you know, this is -- this is her new life. This is what she'll have to live with.
MS. OLSON: Thank you, Mrs. Scofield. That's all the questions I have.
THE COURT: Cross-examination.
MS. GUILLARD: Yes, sir.

CROSS-EXAMINATION

BY MS. GUILLARD:
Q. Good afternoon, Mrs. Scofield. You stated that you had concerns about Professor Scofield's safety and that you decided to carry a weapon when you visited her after the TikTok videos; is that correct?
A. Yes.
Q. Is it true that you had concern about Professor Scofield and your family's safety after the murder of the four University of Idaho students?
A. No.
Q. Were you aware that a quadruple murderer had not been caught between November 13 and before the posting of my

videos?
A. Please restate.
Q. Were you aware that the murderer of the four University of Idaho students was still on the loose between November 13, 2022, and November 23, 2022?
A. Yes.
Q. With a murderer on the loose -- scratch that.
Were you aware that Professor Scofield lived approximately ten minutes away from the murders?
A. I know where she lives proximarily to the campus, yes.
Q. Were you aware that she was close to where the homicides took place?
A. That it's all within Moscow, yes.
Q. With that being said, you had no fear for your family's safety with a murderer on the loose within ten minutes away from your family?
A. That is a different kind of fear in that I had belief that the Moscow Police Department and the other agencies were dealing with that threat.
Q. But the killer was still on the loose, and you were aware of that; correct?
A. Yes.
Q. You stated that you didn't feel safe for your -- for Professor Scofield, and you brought a weapon after my TikTok videos; correct?

A. Yes.
Q. Why is that?
A. Because they were directed at her.
Q. You said the threats were so personal. What threats are you speaking of?
A. I have not watched any of the TikToks, so I do not know. I only know that I was told that the posts said that Rebecca was a murderer.
Q. Did you know of any posts that I threatened the safety of Professor Scofield directly, like physical harm to her?
A. I have not watched any of the TikTok videos.
Q. So when you said the threats were so personal, you didn't mean threats to her physical safety by means of causing harm to her, me causing harm to her physically?
A. When I think about that, from what I understand from the posts, when you put something out there and name someone as a murderer, there is the fear of a mom that someone is going to read that post and take it into their own mind that they should go neutralize that threat. So therefore, I held you accountable for naming her that.
Q. You held me accountable for a vigilante that you created in your mind that was going to harm Professor Scofield? Is that what you're saying?
A. I'm saying that you created the threat by calling her a murderer when she was not.

Q. And what threat are you speaking of?
A. Again, the threat that you were posting that she is a murderer and someone, whoever, may pick that up and decide to act on that post.
Q. For the past -- since November 23, 2022 -- it's now 2026 -- did Professor Scofield -- did someone pick up my videos and decide to harm Professor Scofield?
A. She's been harmed in so many ways. She's been harmed beyond accounting. Physically, have they shown up at her door and killed her or taken her children, G.C. and J.C., or John or any of us? No. But, yes, they've done harm. Yes, they -- do you not understand how much harm you can --
MS. GUILLARD: Objection.
A. -- do to a person?
MS. GUILLARD: Objection.
THE COURT: Overruled.
Q. (BY MS. GUILLARD) Did anybody come to the home of Professor Scofield to threaten to harm Professor Scofield and her family?
A. Not to my knowledge.
Q. In the past -- it's almost three and a half, four years -- there was no vigilantes that came to the house to threaten or to cause harm to you or your family, Professor Scofield or her family; correct?
A. Not physically. No one has shown up at her door.

Q. So that thought you had about someone is going to come and do something to Professor Scofield and her family, that thought was not real; is that correct?

MS. OLSON: Objection, Your Honor; misstates her testimony. It's the thought she had.

THE COURT: It's also been asked and answered, Ms. Guillard.

Q. (BY MS. GUILLARD) You stated that Professor Scofield's life has charged forever. How has her life changed forever?

A. She has mental difficulties in being able to perform her job as an academic, as a teacher. She steps back from people instead of embracing them. She has physical harm to her body between the neuropathy and the headaches and the diabetes that will not be reversed. And I view all of these things are from stress and from trying -- trying to deal with this threat that you've thrust upon her.

Q. What threat that I've thrust upon her? Did I threaten Professor Scofield?

MS. OLSON: Your Honor, asked and answered.

THE COURT: It has been asked and answered.

MS. GUILLARD: Okay.

Q. (BY MS. GUILLARD) You stated that she has headaches, neuropathy, diabetes, and fatigue. Are you a medical doctor?

A. No. I'm just her mom.

Q. And as her mom, can you diagnose her with headaches

neuropathy, or diabetes?
A. I leave that to her doctors.
Q. And so is it safe to say that her doctor diagnosed her with headaches, neuropathy, and diabetes and she told you about that?
A. Yes.
Q. Did her doctor also -- did she also tell you that her doctor stated that her diabetes was caused by Ashley Guillard, me?
A. I'm sorry?
Q. What was -- when was Professor Scofield diagnosed with diabetes?
A. It was in the spring of 2023; right? No?
Q. Her diagnosis --
A. I'm not sure. Let me just say I'm not sure.
Q. What caused her diabetes?
A. Once again, we're back to stress.
Q. You have -- you're testifying that Professor Scofield, your daughter, got diabetes due to the stress of the vigilante that might come and cause harm to her; is that correct?
A. No. I am saying that Dr. -- Dr. Scofield, my daughter, has stress-caused illnesses caused by your posts calling her a murderer. She did not have these difficulties prior to those posts.
Q. Thank you for that.

Prior to my posts, had Professor Scofield ever faced any other criticism or reviews from others or opinions of strangers?
A. Yes.
Q. How did those opinions of strangers affect her and you?
A. I think all of us have a coping mechanism for our -- for our jobs or our family conflicts or any of those kinds of things, but this is beyond anything that would have come up in a normal situation.
Q. So would you say that outside opinion or reviews from strangers is a normal part of life for a professor?
A. Yes.
Q. In those opinions, have they caused diabetes to Professor Scofield?
A. Once again, you caused all of this from your posts, from calling her a murderer. You put her under this stress. You did these things, not somebody that says maybe you should have taught a class differently. There's a difference.
Q. My posts which accused her of being involved with the murders, did my posts accuse -- I'm sorry. Did my posts call for an action of someone to cause harm to Professor Scofield?
A. I don't know. I haven't seen your posts.
Q. You haven't seen my posts, but you're testifying that my posts are causing Professor Scofield diabetes?
A. Yes.

Q. Are you -- you've already stated you're not a medical professional; correct?
A. Thanks. No.
MS. GUILLARD: No further questions.
THE COURT: Thank you, Ms. Guillard.
Any redirect?
MS. OLSON: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. OLSON:
Q. Mrs. Scofield, prior to Ms. Guillard's posts, to your knowledge, had anyone ever accused Professor Scofield of murder?
A. No one.
MS. OLSON: That's all I have, Your Honor. Thank you.
THE COURT: All right. May the witness be excused?
MS. OLSON: Yes, please, Your Honor.
THE COURT: Thank you, Mrs. Scofield.
THE WITNESS: Thank you for your time.
THE COURT: All right. Ms. Olson, I understand that the parties have reached a stipulation as to a few facts in the case.
MS. OLSON: Yes, Your Honor. And I think Ms. Fifer currently has the version of it, so if I could get that from her, I'll read it at the podium, please.

THE COURT: Let me instruct the jury about that. Ladies and gentlemen of the jury, the parties, plaintiff and defendant, have agreed to certain facts that Ms. Olson will now read to you. Because the parties have agreed to the facts, you must therefore treat them as having been proved.

Ms. Olson.

MS. OLSON: Thank you, Your Honor.

The parties agree and stipulate that the following facts are true: One, on May 16, 2023, Bryan Kohberger was indicted and charged with the murders of four University of Idaho students. Two, on July 2, 2025, Bryan Kohberger pleaded guilty to the murders of the four University of Idaho students. Three, on July 23, 2025, Bryan Kohberger was sentenced for the murders of the four University of Idaho students.

Thank you, Your Honor.

THE COURT: All right. Thank you, Ms. Olson.

Ms. Olson, do I understand, with that last stipulation, the plaintiff rests its case in chief?

MS. OLSON: Yes, Your Honor, subject to just double-checking that we have offered all the exhibits we intended to offer.

THE COURT: What we'll do is I will excuse the jury for the evening and let you overnight check on those exhibits. You can rest your case first thing in the morning. Then right

after the plaintiff rests their case first thing in the morning, Ms. Guillard will be able to present her case in chief right after that. And I expect that we'll have the evidence done sometime in the morning tomorrow.

With that, I appreciate everyone's attention today. And I'll admonish you, as I do every night, to not read, watch, or talk about the case in any way. If anyone attempts to communicate with you about the case, tell them you can't and just make sure that you don't expose yourselves to anything that would jeopardize your ability to serve as a juror.

With that, the jury will be excused for the day. Thank you.

(The jury exited the courtroom at 3:10 p.m.)

THE COURT: Please be seated.

All right. We're going to have -- Mr. Gordon has printed out the final copy of the post-proof and post-closing jury instructions. He's got a couple of hard copies in case, Ms. Guillard, you didn't have access to a printer, and same to you, Ms. Olson. We'll give them to you. I think he emailed them to you last night. There are no changes from what he emailed them -- from his email, but I want to make sure I put on the record any objections that the parties may have to them.

Mr. Gordon, we were just discussing jury

instructions. If you'll provide to the parties that printout if they want to take another quick look at them. But, Mr. Gordon, I'm correct in representing that we -- the set of instructions and special verdict form that you emailed to the parties last night are the same as this hard copy and have not been changed?

MR. GORDON: That's correct, Your Honor, except I did add "post-proof" at the top along with numbered instructions.

THE COURT: All right. So then other than the fact that all the instructions are now designated as either post-proof, post-closing, or post-verdict instructions, and now each have numbers, there are no changes from yesterday's email.

Do the parties need some time to digest any of that, or were you able to read them last night?

MR. CARONE: Your Honor, the plaintiff does not need any additional time. We've reviewed what was sent over last night.

THE COURT: And, Ms. Guillard, do you need any additional time?

MS. GUILLARD: No.

THE COURT: Mr. Carone, does the plaintiff have any objection to the jury instructions or special verdict form?

MR. CARONE: Your Honor, for the jury instructions, not really an objection. I know we were supposed to do this

yesterday, but I did see a couple of typos, just for the Court if it's helpful to flag. On the burden of proof for the clear and convincing evidence --

THE COURT: Which instruction number is that?

MR. CARONE: Yeah. The copy I have is from last night, so it's not --

THE COURT: So number 4; is that right?

MR. CARONE: It looks like it's number 4. On the second line, it reads "that they party." I think it should be "that the party."

THE COURT: All right. Thank you for that.

MR. CARONE: And then it looks like -- Jury Instruction Number 10, just a typographical thing, it looks like the first paragraph is single spaced and the second paragraph is indented and double spaced. I assume that wasn't intentional, so I just wanted to flag that one as well.

THE COURT: I think that one might have been intentional. They may have been one-sentence paragraphs.

MR. CARONE: I see. Okay. I just wasn't sure if you were trying to bring some sort of special attention to that indentation for some reason.

THE COURT: We can change that. I don't know if that's how that jury instruction is or not, but we can certainly change that.

All right. Anything else, Mr. Carone?

MR. CARONE: Yes, Your Honor. For the special verdict form, we do object to it as drafted. Specifically for question number 1, we believe it should just read, "Do you find that defendant's false statements that plaintiff had an inappropriate romantic relationship with a student damaged plaintiff?"

And then for question number 3, we believe it should just say, "Do you find that defendant's false statements that plaintiff had an inappropriate relationship with a student warrant punitive damages?"

For question number 5, this is going to be repetitive at this point, but we believe it should say, "Do you find that defendant's false statements that plaintiff orchestrated the murder of four students at the University of Idaho damaged plaintiff?"

And for question number 7, our position is that it should read, "Do you find that defendant's false statements that plaintiff orchestrated the murder of four students at the University of Idaho warrant punitive damages?"

The reason for those objections are all the same. A special verdict form is supposed to be a simple, straightforward submission to the jury. I understand that Your Honor's putting the burdens of proof in there. We believe that's something that's already covered in the jury instructions, both what those burdens are as well as which

claims or theories the different burdens apply to. So it's unnecessarily duplicative and confusing to have that repeated in the verdict form when it's already covered in the jury instructions.

THE COURT: All right. Thank you, Mr. Carone. I certainly understand the plaintiff's objection to those and in a typical case that does not have two different standards of proof, I would agree with you and not have them in there. But in this case I wanted to remind the jurors as they fill out the special verdict form that there is two different standards of proof. So that objection will be overruled, and we'll keep the special verdict form as is.

Anything else, Mr. Carone?

MR. CARONE: Your Honor, I understand your ruling. It was just for the record. I don't mean to ignore the fact that you already ruled on it. But I do think the jury instructions can specify themselves which standards apply to which claims.

It's kind of a unique situation, but I actually just finished a two-week trial last week where we had the same situation where we had to prove damages under one standard and then punitive damages under another standard, and we did just cover it by having that spelled out in the jury instructions, and the special verdict form just asked the questions that flowed from the jury instructions. So I understand your

ruling, but just for the record I wanted to make that clear.

THE COURT: Thank you, Mr. Carone.

Ms. Guillard, do you have any objections to the jury instructions or special verdict form?

MS. GUILLARD: No objection.

THE COURT: Okay. All right. Ms. Olson, Mr. Carone, anything more for me to take up on the case today?

MS. OLSON: I just want to check on scheduling tomorrow. I anticipate that when Ms. Guillard is done, that we will proceed to closing arguments.

THE COURT: Unless you have a rebuttal case at all.

MS. OLSON: Right.

THE COURT: But, yes, that's my intention and hope, that we get there sooner rather than later, so yes.

My intention for tomorrow is 8:30 here. You'll rest your case unless there's any other exhibits that you neglected to enter and want to enter, then take up any motions. And then, Ms. Guillard, you'll have your case in chief, and I assume you just have yourself as a witness that you intend to call.

MS. GUILLARD: Yes, sir.

THE COURT: Okay. And then again this time around you'll have to ask yourself nonleading questions, so who, what, when, where, why questions. You did a fine job of saying "question," asking the question, "answer," giving the

answer. So my preference is you do it that way as well. And then Ms. Olson or Mr. Carone will have the opportunity to cross-examine you. And then based on the scope of their cross-examination, you will then have the opportunity to redirect yourself, which is ask questions on issues that they cross-examined you about. Does that make sense?

MS. GUILLARD: Yes.

THE COURT: Any questions about that?

MS. GUILLARD: No.

THE COURT: And then once you're done with your testimony, if you have nothing else, you'll rest your case. And then the plaintiff will have an opportunity to put on a rebuttal case to anything that you may have said that they wish to rebut. I don't know if that's going to happen. Sometimes it happens, sometimes it doesn't, but we'll see.

And also remember that if there's any exhibits that you wish to introduce in your case in chief to do that certainly during your testimony or before you rest your case. Because once you rest your case, you will not be able to reopen it to introduce any other exhibits. You understand that?

MS. GUILLARD: Yes, sir.

THE COURT: Ms. Olson, anything more for me to take up today?

MS. OLSON: Not on behalf of Professor Scofield, Your

Honor.

THE COURT: All right. Ms. Guillard?

MS. GUILLARD: I just have a question about do you foresee this being done tomorrow, or should I extend my stay?

THE COURT: Well, that certainly will depend on how long the jury deliberates. I don't know how long you intend to testify, and I don't know how the cross-examination is going to be. And then I have jury instructions to read, these jury instructions to the jury. They shouldn't take too long. They're not too voluminous. And then the case will go to the jury.

Sometimes they have questions that we have to come back into court to answer. I'll ask that the parties stick around the courthouse during deliberations. You can leave a cell phone number with us if you want to go out and get lunch or something like that, but you need to be close to the courthouse in case there is a question of the jurors while they're deliberating.

The way I handle that, the question is given to Mr. Gordon in writing. We bring the parties back into the courtroom, give you any written question that they have, give you my thoughts on how I plan to respond, and then I respond in writing to the jurors, and Mr. Gordon delivers that in writing. That all can take a little bit of time.

So my hope is that we'll be done tomorrow and that

you don't have to change your plans, but there's no guarantee.

MS. GUILLARD: Thank you.

THE COURT: All right. Okay. With that, the court will be in recess.

(Proceedings concluded at 3:21 p.m., February 26, 2026.)

C E R T I F I C A T E

I, ANNE BOWLINE, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing 230 pages constitute a full, true, and correct transcript.

Dated this 20th day of May, 2026.

/s/ Anne Bowline

ANNE BOWLINE
Registered Merit Reporter
Certified Realtime Reporter