IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

REBECCA SCOFIELD,

Plaintiff,

vs.

ASHLEY GUILLARD,

Defendant.

Case No. 3:22-CV-00521-REP

Volume IV of IV

Boise, Idaho

February 27, 2026
8:28 a.m.

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE RAYMOND E. PATRICCO
CHIEF UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff: MS. WENDY OLSON
MR. CORY MICHAEL CARONE
Stoel Rives, LLP
101 S. Capitol Boulevard, Suite 1900
Boise, Idaho 83702

For the Defendant: MS. ASHLEY GUILLARD
3262 Westheimer Rd, 942
Houston, Texas 77098

Court Reporter: MS. ANNE BOWLINE, RMR, CRR
Anne_Bowline@id.uscourts.gov

*Proceedings recorded by stenography; transcript produced by computer-aided transcription.*

# I N D E X


| DEFENDANT'S WITNESS | PAGE |
|---|---|
| ASHLEY GUILLARD | |
| Direct Examination by Ms. Guillard | 611 |
| Cross-Examination by Ms. Olson | 642 |
| Redirect Examination by Ms. Guillard | 674 |

| PLAINTIFF'S EXHIBITS | RECEIVED |
|---|---|
| 29 | 648 |
| 30 | 649 |
| 44 | 650 |
| 45 | 651 |

| DEFENDANT'S EXHIBITS | RECEIVED |
|---|---|
| 503 | 630 |
| 505 | 623 |
| 506 | 632 |
| 507 | 620 |
| 510 | 633 |
| 513 | 633 |
| 514 | 636 |
| 515 | 631 |
| 517 | 635 |
| 520 | 618 |

| MOTIONS | PAGE |
|---|---|
| motion to strike Juror Number 13 | |
| Mr. Carone | 598 |
| the Court | 599 |
| Ms. Guillard | 600 |
| the Court | 601 |

| JURY INSTRUCTIONS | PAGE |
|---|---|
| jury instructions read by the Court | 677 |
| final jury instructions read by the Court | 717 |

| CLOSING ARGUMENTS | PAGE |
|---|---|
| Ms. Olson | 685 |
| Ms. Guillard | 709 |
| rebuttal by Ms. Olson | 715 |

| THE VERDICT | PAGE |
|---|---|
| verdict read by the courtroom deputy | 723 |

(Proceedings commenced at 8:28 a.m., February 27, 2026.)

(The following took place outside the presence of the jury.)

THE COURT: Please be seated.

THE COURTROOM DEPUTY: The Court will now take up day four of the jury trial for Scofield versus Guillard, Case Number 3:22-CV-521-REP.

THE COURT: All right. Good morning, Counsel, Ms. Scofield, and Ms. Guillard. The first thing I want to take up before we get to plaintiff resting or if she has any other exhibits is Ms. Guillard's motion from last night to excuse Juror Number 13 for cause. I read the motion and reviewed a bit of the transcript.

Ms. Guillard, do you want to say anything more about that?

MS. GUILLARD: No, I don't have anything else other than what's already stated.

THE COURT: Ms. Olson, I know you haven't had a chance to respond in writing, but I'll hear any argument -- or Mr. Carone, any argument that you have.

MR. CARONE: Yes, Your Honor. We oppose the motion. During voir dire Juror Number 13 said that she would be fair and impartial, that she would listen to all of the evidence. Ms. Guillard, I believe, raised a motion for cause, which Your Honor denied. Your Honor also advised Ms. Guillard at that

time that she could use a peremptory strike on Juror Number 13 if she wanted to. She chose not to.

I think most of what's in Ms. Guillard's declaration are all things that came in at that time that she had full knowledge of when she chose not to use that peremptory strike. The only difference, I think, is paragraph number 5 and paragraph number 6 of Ms. Guillard's declaration. I personally have not observed that. I don't know if the Court has observed anything that's in this declaration, but there's certainly no record other than Ms. Guillard's declaration of any of those things happening.

Your Honor has also asked the jurors each morning at the beginning of trial if they've had any contact with anybody about this case, things of that nature, and they've all, including Juror Number 13, responded in the negative.

So our position is that there's no basis for this motion, and we ask that you deny it.

THE COURT: All right. Thank you, Mr. Carone.

Ms. Guillard, as it relates to your observation of a head nod that Juror Number 13 may have made towards Ms. Scofield, I'll note that you did not raise that at the time that it happened, and I did not notice it, and I've been paying very close attention to the jury as the testimony's come in. I'm not saying that you didn't perceive it happening, but it's hard for me to rule on that not having had

it raised at the time it happened.

So at least as it goes forward in this case, you'd have to bring that to my attention when it happens so that there's something I can do to ameliorate or address the problem in real time. Otherwise, I can't go back and say, "Two days ago, Juror Number 13, you nodded towards Ms. Scofield." She may not remember it or it -- you know, it may not have happened the way you perceived it according to her. So that's what I would advise you going forward.

Anything more you want to say about the motion?

MS. GUILLARD: Well, two days ago she was Juror Number -- she was, like, in the seventh position in my -- from my understanding, it's going to be six jurors who are voting --

THE COURT: She was -- she was there in the eighth position or --

MS. GUILLARD: She was the seventh position, so from my understanding, she wasn't going to be, like, a voting member.

THE COURT: No. All the jurors that are on the -- there are no alternates in this case. All the jurors vote.

MS. GUILLARD: So when I didn't raise it, that was my impression, that she wasn't going to be a voting member and once Juror Number 5 was excused yesterday, she then became a voting member. So what I observed her doing then became a

concern for me.

THE COURT: I understand, then, why you waited to raise it, so that makes sense. But as I mentioned at the beginning of the case -- and it may not have resonated with you -- that there are no alternates in this case. All of the jurors are voting members. But I certainly understand why it is you waited to raise this, because you believed that she was going to be an alternate; is that correct?

MS. GUILLARD: Yes.

THE COURT: All right. I understand what you're saying, Ms. Guillard.

All right. Well, I've reviewed the motion, the memorandum in support, Ms. Guillard's declaration, heard arguments of counsel, and also went back and reviewed the transcript of both what Juror Number 13 said during voir dire and then our -- Ms. Guillard's motion for cause up at the bench, and my ruling at the bench.

Based on all of those facts, I'm going to deny the motion to excuse Juror Number 13 for cause. I'll note that, you know, Juror Number 13 first raised this issue in the context of a question that I asked if any of the jurors had any religious or philosophical reasons why they could not sit in judgment.

Juror Number 13 effectively said that she is Catholic and she has a hard time believing in psychic medium stuff and

also referred to witchcraft. She did draw the distinction between, "I am a Catholic. I don't believe in witchcraft and none of that psychic medium stuff." So there was a distinction that she drew between witchcraft and psychic medium stuff. I advised her that this case is not necessarily going to be about whether psychic abilities are valid or invalid. That's not what the jurors are being asked to decide, that they're being asked to decide only damages.

Then Ms. Guillard made her motion up at the bench and expressed her concern about being called a witch. I advised that she didn't call -- the juror did not call her a witch; she just said it was witchcraft. And I also advised her that she -- the juror was making this comment in the context of her religion and that the case is not about Ms. Guillard's psychic abilities but that she was free to exercise a peremptory challenge if Ms. Guillard wanted to exclude her from the jury. Ms. Guillard did not exercise a peremptory challenge against Juror Number 13, and she remained on the jury -- remains on the jury.

In addition, Juror Number 13, when I explained to her that the case was not about the validity of psychic abilities, just monetary damages, she -- Juror Number 13 did say that she could -- that her religious beliefs would not interfere with her ability to decide the case about damages.

As it relates to punitive damages, yes, there will be

some element that Ms. Guillard's subjective belief in her psychic abilities might bear on her state of mind at the time the defamatory statements were made, but again, the jurors are not being asked to determine whether her psychic abilities were valid or not valid, just whether or not she subjectively believed them.

As it relates to the head nod, again, I have paid close attention to this jury throughout, and I have noticed no attempts to communicate with Ms. Scofield or either side -- or either party in this case. And I accept Ms. Guillard's reason for not raising it at the time, but I did not notice it in real time. But I will pay close attention to make sure that there are no attempts to communicate and admonish the jury as necessary. So that motion will be denied.

All right. Ms. Olson, where do we stand on plaintiff's case in chief?

MS. OLSON: Your Honor, we were able to confirm last night that the exhibits we intended to offer have been admitted, so we rest our case.

THE COURT: All right. Ms. Guillard, other than your motion to exclude Juror Number 13 for cause, which I've just denied, do you have any additional motions to make at this time?

MS. GUILLARD: No. No, sir.

THE COURT: All right. Then we will -- Ms. Guillard,

are you prepared, then, to go forward with your case in chief?

MS. GUILLARD: Yes, sir.

THE COURT: And you intend to call yourself as a witness?

MS. GUILLARD: Yes, sir.

THE COURT: All right. And you intend to introduce some of the other exhibits on your exhibit list?

MS. GUILLARD: Yes, sir.

THE COURT: Okay. All right. We're ready for the jury, Mr. Gordon.

(The jury entered the courtroom at 8:40 a.m.)

THE COURT: Please be seated.

All right. Good morning, ladies and gentlemen of the jury. It is now Friday, and I appreciate your patience throughout the week, and we've gotten to Friday.

I'll ask you the same questions I've asked throughout the week. Overnight, did any of you see, hear, or read any reporting relating to this case?

JUROR NUMBER 13: I did. I didn't read it, but I was on social media --

THE COURT: Let's -- let me do this. That's Juror Number 13?

JUROR NUMBER 13: Yes.

THE COURT: What I'm going to do is I'm going to excuse the other jurors, because I don't want you to tell the

other jurors what it is you saw, and we'll ask the other jurors to be excused for the moment.

(The following took place outside the presence of the remaining jurors.)

THE COURT: Please be seated.

And, Juror Number 13, I appreciate your candor. I just didn't want you to say anything that would affect the other jurors.

JUROR NUMBER 13: That's fine.

THE COURT: Please tell us what happened.

JUROR NUMBER 13: I just went on my regular social media, and as I was scrolling, a picture of the defendant with a news report. I don't remember, because I swiped right off. But it was from a news station, and it was just stating something about we being in court and deciding the fate of the defendant.

THE COURT: Okay. So was this -- what social media platform was this?

JUROR NUMBER 13: It was Facebook.

THE COURT: So just in your normal scroll through Facebook --

JUROR NUMBER 13: Yeah.

THE COURT: -- you saw --

JUROR NUMBER 13: Essentially, it was a picture of, like, one the videos we were seeing of the defendant's face,

and it had -- because I did not read the actual, like, writing other than the one that was on the actual picture. And it just stated, "Idaho law or Idaho jurors deciding the fate of famous TikToker regarding the case of the Idaho murders."

THE COURT: All right. And I'll ask you, even though it was nonsubstantive, does that affect your ability to remain fair and impartial in judging the evidence in the case, including the evidence that will come in in defendant's case in chief today?

JUROR NUMBER 13: No. Because, like I said, once it popped up on my feed, I just immediately scrolled away.

THE COURT: All right. Thank you, Juror 13.

Mr. Gordon, if you'll take Juror 13 back to the other jurors for the moment.

I'll ask that you not discuss what we just discussed here with your other fellow jurors, but again, I appreciate you raising that with me. That was the right thing to do, and I appreciate your candor.

(Juror Number 13 exited the courtroom.)

THE COURT: All right. Ms. Olson, Mr. Carone, do you want to address that?

MR. CARONE: Yes, Your Honor. We don't believe it's an issue. It sounds like she followed the Court's admonishment exactly like she was supposed to. As soon as she saw this image, she scrolled away immediately. She said that

she can continue to be a fair and impartial juror and continue to hear the evidence. There was nothing substantive about this contact. It just came up briefly on her news feed, and she immediately followed the Court's directive and scrolled away from it.

THE COURT: Ms. Guillard?

MS. GUILLARD: She didn't immediately scroll up, because she specifically just told us what the article said, and it referred to me as a famous TikToker. I appreciate her honesty, but I don't believe that she saw my picture and immediately scrolled. She read a little bit of it as well.

THE COURT: I don't think that's what she said -- and you can sit down. I think she said she was on Facebook, she was scrolling, saw your photograph, and then saw -- and it was the photograph of one of the TikTok videos, and then there was a caption on what the article was about, which was, "Idaho jurors deciding fate of famous TikToker." I don't think she -- she was clear that she didn't open the story that the -- I guess just the photo was about, that she didn't read the story. Do you disagree with that?

MS. GUILLARD: No. She read the caption. That's what I meant.

THE COURT: So just the caption. So what about the caption do you believe is prejudicial to her ability to be fair and impartial?

MS. GUILLARD: It just refers to me as famous, but I'm not sure if she has any animosity towards people who are perceived to be famous, so I wouldn't know if that impeded her ability. But she did say it did not.

THE COURT: Yeah. I mean, I think she's heard a lot in this courtroom about how much you've posted and about how many millions of people have viewed your posts, so the fact that she used the word -- the caption used the word "famous," I don't see how that would affect her ability to be fair and impartial here. And she said she didn't read the article. So I don't see any basis just from that limited interaction with a caption and a photo that she's already seen here in the courtroom as being prejudicial at all, so I don't think there's any basis to excuse her.

So, Mr. Gordon, we'll have the jurors come back in.

(The jury entered the courtroom at 8:48 a.m.)

THE COURT: Please be seated.

I'm going to go ahead and ask those questions again. Thank you again, Juror Number 13, for raising your response.

Again, jurors, with the exception of Juror Number 13, have -- did any of you overnight see, hear, or read anything related to the case, any reporting related to the case?

For all the jurors, overnight, did anyone try to communicate with you or communicate with you or did you communicate with anyone else about the case? No.

And then lastly, is there anything that any of you wish to bring to my attention about your -- that bears on your qualifications as jurors or ability to be fair and impartial? Everyone said no.

All right. Ms. Olson, does the plaintiff rest its case?

MS. OLSON: Yes, Your Honor.

THE COURT: All right. Ladies and gentlemen, the plaintiff has rested her case, so all of the plaintiff's evidence in her case in chief is now before you. Next we will proceed to defendant Ms. Guillard's case in chief.

Ms. Guillard, do you wish to call a witness?

MS. GUILLARD: I call myself as a witness.

THE COURT: All right. And I'm going to reswear you in to tell the truth here in the well. And do you need your laptop up at the --

MS. GUILLARD: Yes, sir.

THE COURT: All right. You can bring that up as well.

(The witness was sworn.)

THE COURT: If that notebook's in the way, you can put that elsewhere.

MS. GUILLARD: Oh, thank you.

THE COURTROOM DEPUTY: Can you state your full name and spell your last for the record again, please.

THE WITNESS: Ashley Guillard, spelled G-U-I-L-L-A-R-D.

THE COURT: Ms. Guillard, I've permitted you to bring your laptop up if you want to publish any exhibits to the jury, but I'll admonish you not to be accessing any other materials other than your exhibits in the case, nothing online. All right?

MS. GUILLARD: You mean on the computer?

THE COURT: Yes.

MS. GUILLARD: Yes, sir.

THE COURT: And what are the notes that you have up there with you? You have questions?

MS. GUILLARD: My questions and -- my questions for an exhibit.

THE COURT: Thank you, Ms. Guillard. It's just --

MS. GUILLARD: A notebook.

THE COURT: -- atypical for a witness to have to bring things to the witness stand, but you're both being counsel and witness at the same time.

MS. GUILLARD: Yes, sir.

THE COURT: Ms. Guillard, you may conduct your direct examination. And if you will please again do that -- say "question," ask the question, then "answer," give the answer.

You may proceed.

ASHLEY GUILLARD, DEFENDANT'S WITNESS

DIRECT EXAMINATION

BY MS. GUILLARD:

Q. Question: What do you do for work?

A. Answer: I have a business -- Ashley Guillard, LLC -- and I help small business owners or -- and low- to middle-income people save money on their taxes or tax consultations. Also for business owners if they need help with HR support for their businesses, I help them with that as well.

Q. Question: How much do you earn from work?

A. Answer: My business can do -- sometimes I make 20,000 in earned income from my business or wages depending on how I pay myself. And I can make more -- I've made more some years, but mostly it's within 20- to 30,000 a year.

Q. Question: Do you have any other sources of income, and how much do you earn from them?

A. I also -- answer: I also receive income from being a 100 percent disabled veteran that I receive from the Department of Veterans Affairs for being in an amount of approximately 40- to 50,000 a year.

Q. Question: What is your background? What led you to your business and also tarot?

A. Answer: After high school I joined the military and immediately was sent over to Korea, and from Korea I got deployed to Iraq. While I was -- while I was deployed to

Iraq, I was a member of Team Lioness. We went on combat missions with Army, engineer and infantry, Marines, and soldiers, so Army and Marines. And we were there primarily to help with searching the women. Because of Iraqi culture, they weren't allowed to touch the women.

We were stationed or settled at Ramadi, Iraq, and during that time -- it was 2004 to 2005ish, and it was a lot of combat activity. I witnessed many -- I witnessed many -- please bear with me, please. I witnessed many soldiers on base -- sorry. I witnessed many soldiers on base lose their life while we were there between 2004 and 2005. There were also while we were on combat mission even some Iraqi soldiers that I witnessed to be harmed and killed, and there were also attempts on my life as well.

After our deployment to Iraq, we returned -- we did not return back to Korea. We returned to Fort Carson, Colorado. During that time at Fort Carson, Colorado, I was stationed there probably less than a year. It was time for another deployment, but at that time I had my son. He was just born when the unit was already deployed again. His dad, who then became my husband and then my ex-husband but who then -- was soon to become my husband but wasn't my husband at the time, was deployed already. So at that moment we made a decision that he would remain in the Army and that I would get out after approximately four years of serving and go to

college.

At that time I had no idea that -- that the things that I witnessed had impacted me in any kind of way. I moved on with my life, and I began college and took care of my son as a mom in Chicago. Afterwards I decided, once he was returned from deployment and stationed in Georgia, we were -- he was moving to Georgia, and I decided to move with him, and at the time we were in Georgia for a few years, and I was in college. He was deployed again. We decided to get married, and we were then stationed in Alaska.

During this time I was working for the federal government as an HR specialist and after as a finance -- I'm sorry -- finance specialist. And then we moved to Indiana, and I worked as an HR specialist for the federal government. During that time I was really good at my job. I worked as a classification specialist --

MS. OLSON: Your Honor, I object as to the narrative. I think this is supposed to proceed question and answer.

THE COURT: If you could just break it up a little bit more with questions and answers. But you may proceed.

Q. (BY MS. GUILLARD) Question: At that point in Indiana, when you were working for the federal government, what was your life like and what led to spiritual journey?

A. Answer: When I was working for the federal government, I was doing very well, had senior executive mentors, helped

about 13 people get promoted who were trying to get accretion promotion for years and helped many middle or lower-middle class people get jobs into the federal government. During this time it was also people complaining about issues at the -- in the federal government with the Department of DFAS, which is Defense Financing and Accounting Services, and I advocated on their behalf.

During that time something that -- I just decided that I wanted something different from myself, so I decided to start my spiritual journey and quit my job. I had at that time no money. I was only getting about $400 a month from the VA for disability, and I just took a leap of faith to start my spiritual journey.

Q. Question: What led you to tarot during your spiritual journey?

A. Answer: During my spiritual journey, I learned about kabbalistic tarot. I learned different religions, like Hinduism, Buddhism, Christianity, nosism, and gematria, numerology. And I began to study all of these different things just to learn about spirituality and my connection with God. During this time I also wrote books about spirituality, *DR3AM: The Spirituality Pathway to Success* and *Live in Fantasy Land*.

Q. Answer -- I mean question: What events took place again during your spiritual journey?

A. Answer: During my spiritual journey, at that point I decided to leave my husband and pursue spirituality full-time. I moved to Georgia and eventually stayed by myself. And at that point my disability increased to 100 percent for posttraumatic stress disorder, because during that time of my husband's, but now my ex-husband's, deployment, that's when it was discovered that I wasn't okay as I thought I was and that I had posttraumatic stress disorder from witnessing when the -- witnessing all the soldiers being killed during war.

So at that point I was getting 100 percent disability and writing my books and focusing on my spiritual journey and also being a mother. During that time I learned about tarot cards, which I'll ask another question.

Q. When did you begin using and reading tarot cards?

A. Answer: During that time I started watching YouTube videos, but also the books that I was reading was about divine masculinity and divine femininity and teaching about the dualities of the mind -- the left brain, the right brain -- and a priori knowledge and knowledge gained from experience, numerology, the meaning of numbers, dreams, the meaning of dreams. And I was also watching YouTube videos of other people pulling cards and doing tarot cards.

Q. Question: How did you train yourself on the cards, slash, readings?

A. Answer: I trained myself by practicing on myself. For

example, if I was in an emotional state, crying, and I pulled some tarot cards to get a message for myself, the message will be, "You're crying or in a highly emotional state," and then give advice.

I would also watch, like, reality TV or some type of show. I would do a predictive reading on what I would believe would happen. For example, I believe it was, like, "The Bachelorette," is what it was called, like "The Bachelor" but a female version, and I would do a reading on who's going to win and what's going to happen. And then the answer one time was one person was going to be picked and then they would switch over to another person. And then I would watch the show, and that's exactly what happened.

So I would train myself using the cards on myself and also on television, by watching television, or doing readings for other people.

Q. Question: How did you test the accuracy of your readings and messages?

A. Answer: I also get messages just randomly, intuitively, and in dreams in addition to the cards. Sometimes it's -- I can't test the accuracy of this message, so I'm forced to learn through experience. For example, one day I was driving and I was using GPS because it was very -- navigation is not my thing, so I was using GPS. And my intuition told me to go a different way, but logically I didn't know another way to

go. So I didn't listen to my intuition and went the other way, and it ended in a dead end. So that's one example.

Another example is my intuition tells me I need to check my tire, that something's wrong with my tire. And again, the car is telling me my tires are fine, so logically I don't listen to it, and the next day I wake up to a flat tire.

So a lot of my experiences are -- I've learned through experience to trust my intuition and trust the cards.

MS. GUILLARD: I want to introduce -- I want to introduce Exhibit Number -- Defendant's Exhibit Number 520.

THE COURT: Can you identify what that is, please.

MS. GUILLARD: Exhibit Number 520 is a text message -- a text message to my aunt.

THE COURT: Any objection, Ms. Olson?

MS. OLSON: Yes, Your Honor. I object on the grounds of relevance, hearsay, and improper character evidence.

THE COURT: Can you please scroll that up.

MS. GUILLARD: There's nothing else.

THE COURT: Ms. Olson, how is this any different than the testimony that she just elicited?

MS. OLSON: Your Honor, I recognize that I didn't object to the earlier evidence, but I'm objecting here because it's also getting cumulative, Rule 403. This is an issue that has the potential to confuse the jury. She's vouching for herself.

THE COURT: All right.

MS. GUILLARD: I'm not --

THE COURT: I'm going to give Ms. Guillard some latitude here and deny the objection.

Ladies and gentlemen of the jury, you're about to see an exhibit that's a text message between Ms. Guillard and her aunt about -- in regards to either a dream or a premonition. You're not to consider what's in the text message for the truth of the matter asserted therein or for the validity of Ms. Guillard's spiritual beliefs or abilities. You're only to consider it as it went -- or goes to her state of mind, her subjective beliefs during the time that she was making false statements in this case.

One of the issues you'll be asked to decide is whether she had a bad state of mind when she was making those statements about Ms. Scofield, and her subjective belief about her spiritual abilities is relevant to that state of mind. That is the only reason I'm allowing this exhibit and for you to consider it on that purpose -- for that purpose only.

With that, Defendant's Exhibit 520 will be admitted.

(Defendant's Exhibit 520 received.)

THE COURT: Do you wish to publish that to the jury?

MS. GUILLARD: Yes, sir.

Q. (BY MS. GUILLARD) Question: What is -- or explain what Exhibit Number -- Defendant's Exhibit Number 520 is.

A. On January 20, 2022, I had a dream, either that evening or early morning, that -- it was a dream that I took over a lease in my aunt's house or something like that. And I looked up the meaning, and it referred to an eviction. So I text-messaged my aunt, "Good morning. I'll be contacting Metro Greenway to see what I need to do to be removed from your lease. This was an obvious mistake, and I don't want no evictions or anything on my record due to someone else."

My aunt responded, "You're not going to have an eviction. Why would you say that? But okay."

I answered, "I had a dream I took over the lease."

She said, "Okay. You don't want an eviction on my record either," meaning, "I don't want an eviction on my record either."

And it's blurred, but I took her word for it, and I did not remove myself from the lease.

Q. Question: What does this text message mean?

A. Answer: This is just an example of me receiving a spiritual message and someone telling me that, essentially, "What are you talking about?" or gaslighting me about the message and me believing them after being gaslit about the message.

MS. GUILLARD: I would like to introduce Exhibit Number 507.

THE COURT: Can you identify that exhibit, please.

MS. GUILLARD: Exhibit Number 507 is a document of an eviction dismissal.

THE COURT: Any objection?

MS. OLSON: Yes, Your Honor. I'm going to object on authenticity grounds. I'm going to object on relevance grounds, improper character evidence, and hearsay.

THE COURT: All right. Those objections will be overruled. Again, this is apparently an eviction filing that goes to this text message with her aunt and her vision about the eviction.

So again, ladies and gentlemen, this is not to be considered for any other purpose other than Ms. Guillard's ultimate subjective beliefs about whether she believed what she was saying at the time about Ms. Scofield.

All right. Exhibit 507 will be admitted.

(Defendant's Exhibit 507 received.)

MS. GUILLARD: I'd like to publish it to the jury, please.

THE COURT: You may.

MS. GUILLARD: Thank you.

Q. (BY MS. GUILLARD) Question: Explain what Exhibit -- Defendant's Exhibit Number 507 is.

A. Answer: Around August -- the end of August 2022, I was looking to move back to Louisiana. My son's dad was leaving Louisiana. He was stationed there. He was moving to New

York, so I had to find a place for me and my son in Louisiana because that's where my son wanted to stay in school. During that time I found out that there was indeed an eviction that was filed against me and my aunt, but I was not served. Hence, this is an unofficial copy of it because I was not served or told about the eviction.

This was, again, August 23, 2023, so I had the dream in January warning me of an eviction, warning me to take my name off the lease. I didn't listen because my aunt told me that there was no eviction, and ultimately this is the eviction that was filed in my name and my aunt's name.

THE COURT: Ms. Guillard, would you please read that date again.

MS. GUILLARD: This was for the order of dismissal, which was after my aunt filed an appeal.

THE COURT: Can you please just reread the date. I think you misstated it earlier.

MS. GUILLARD: The date is August 23, 2022.

THE COURT: Thank you.

MS. GUILLARD: Sorry about that.

A. And as you can see, this was Metro Greenway, LLC, with Latoya Robinson, which is my aunt, and Ashley Guillard.

Q. (BY MS. GUILLARD) Question: What led you to solving mysterious deaths?

A. Answer: I believe I became passionate about, well, death

first from my military service and witnessing soldiers being killed. Additionally, my grandmother passed away in 2012, and I began having dreams with my grandmother and felt like the conversations we were having in those dreams were very -- they felt real, where she would ask questions like, "How is Lamar doing?" That's my son's name. "Is he still mourning my death?"

The questions felt so real in the dreams, and I do believe them to be real. And so I realized that, in my opinion, people were still around after death or their spirits were still around after death and we could communicate with them.

Also, I would like to give more information on what led me to solving mysterious deaths. That is written in my first published book, *Solving Mysterious Deaths: Solving the Mystery of the Death of Tamla Horsford*.

MS. GUILLARD: I would like to introduce Exhibit Number 505.

THE COURT: And this is an excerpt from that book?

MS. GUILLARD: Sorry, yes. This is an excerpt from my first book on the *Solving Mysterious Deaths* series, pages 1 through 15.

MS. OLSON: Your Honor, I would object on the grounds of relevance, hearsay, improper character evidence, Rule 403, substantial danger of unfair prejudice arising from confusing

the issues that are to be tried to this jury.

THE COURT: All right. Thank you, Ms. Olson. Those objections will be overruled. Defendant's Exhibit 505 will be admitted.

(Defendant's Exhibit 505 received.)

THE COURT: I'm going to instruct the jury for the limited purpose that you're going to be able to consider this exhibit. This exhibit is an excerpt from Ms. Guillard's -- a book she wrote back in 2022. Generally an out-of-court statement is inadmissible hearsay if it's offered for its truth. This excerpt of this book contains a number of statements about Ms. Guillard's spiritual abilities in connection with another murder case. You're instructed not to consider those statements for their truth, meaning that you're not to consider them as proof of Ms. Guillard's spiritual abilities or the fact that she used them to solve that case. The validity of Ms. Guillard's spiritual abilities are not an issue that you're being asked to decide in this case.

However, as I said before, Ms. Guillard's good or bad state of mind when she made the defamatory statements against Ms. Scofield is relevant to your decision on punitive damages. So you may consider statements in Exhibit 505 about her spiritual abilities only for the purpose of evaluating whether at the time she made the defamatory statements against Ms. Scofield that she subjectively believed those defamatory

statements were true and, therefore, did not make them with a bad state of mind. You may not consider anything else in this exhibit or the previous exhibit for any other purpose than that.

All right. Ms. Guillard, would you like that to be published?

MS. GUILLARD: Yes, sir. Please publish to the jury. Thank you.

Q. (BY MS. GUILLARD) Explain Defendant's Exhibit 505.

A. This is *Solving Mysterious Deaths, Part One*. It's when I first began using tarot and my intuition to solve mysteries. It is solving the mystery of the death of Tamla Horsford. It was published in 2022, specifically March of 2022, and it was dedicated to the friends and family of Tamla Horsford and to those who care.

Q. Question: Read pages 1 through 2, paragraph 1 of the excerpt of this book.

A. Introduction -- or answer: Sorry. Introduction: "People that secretly commit heinous crimes do so with the intent to get away with it. That's made increasingly possible in a masculine-driven world that is blinded by sight and a crippled insight. This creates the opportunity for criminals to use this systemic deficiency to their benefit. This systemic disadvantage makes it easy for criminals to manipulate the judicial system, fool the general public, who on average is as

dumb as a box of rocks, and to ultimately kill without consequence.

"Due to the fact that the world is blind, spiritually inept, and mentally limited, killers are able to use the failing system to repeat the same actions as previous offenders and get away with it. Demonic murderers aren't smarter than the average person. They just know how to use and manipulate the system to their advantage. What they haven't predicted, however, is my ability to tell exactly what they did even though I wasn't there."

Q. Question: Read excerpt two, page 2, paragraph 2.

THE COURT: And, Ms. Guillard, the jury will have this back in the jury room to read it themselves. So you can select another excerpt or two, but I don't want you to just read the entire introduction.

MS. GUILLARD: Okay. I guess I'll read this one, page 2 paragraph 2.

A. Answer: "I am Ashley Guillard, also known as Ashley God. I have many spiritual gifts, one being the gift of -- the spiritual gift of a priori knowledge. I have access to information that I otherwise wouldn't have unless I was there to experience it. I have used that gift to learn the mystery of life, to cure personal illnesses, to prophesy the future, and to solve mysterious deaths.

"I've decided to use my gift to bring clarity and

closure to families who are victims of an inept justice system, families who never found out what happened to their loved ones, and families who never got criminal justice."

Q. (BY MS. GUILLARD) Question --

MS. GUILLARD: I have one more excerpt.

THE COURT: All right. You may.

Q. (BY MS. GUILLARD) Read excerpt page 5.

A. Answer: "It has been made obvious that we can't sit back and wait for the federal or state government to get justice. It seems more practical to use the judicial system to get to the facts for cases that involve mysterious deaths. However, in cases like Tamla's and countless others who have not received the justice they deserve, I will use my spiritual gift of insight, a priori knowledge, and discernment coupled with logical reasoning to get the justice she deserves. Her family, friends, and the community that cares should know the truth about what happened to her."

MS. GUILLARD: Thank you. You can unpublish.

Q. (BY MS. GUILLARD) Question 8: When you began the Solving Mysterious Deaths series on the Idaho four, what did you expect to have happen?

A. I expected to get some type of investigation, to raise awareness on what I believed happened to them, and for the proper authorities to take that information and investigate the validity of it.

Q. Question: What point -- at what point did you perceive that Scofield -- or Professor Scofield wouldn't be investigated?
A. Answer: On December 27, 2022, and when MPD wrote a statement that they did not believe she was involved, I kind of lost a little bit of hope that she would be investigated. But something in me would not allow me to give up.
Q. Question 10: What did you do -- what did you decide to do when you realized Rebecca Scofield would not be investigated?
A. Answer: At that time I was already sued. I was sued December 21, 2022. So I decided to use this as an opportunity to access evidence that could prove that Rebecca Scofield was involved with the murders.
Q. Question: What was the first thing that you did to get objective evidence regarding Rebecca Scofield and others' involvement with the murders?
A. Answer: The first thing I did was prior to the website -- the lawsuit. It was December 10, 2022, which is when I submitted my email to the FBI tip line.
MS. GUILLARD: That was already admitted, but I would like to republish to the jury.
THE COURT: What exhibit was that, Ms. Guillard?
MS. GUILLARD: Exhibit Number 512, Defendant's Exhibit Number 512.
THE COURT: Defendant's Exhibit 512 has been admitted

and will be published to the jury.

A. First I submitted this email to FBI tip line, giving them the information that I felt I had about who did it and the motive and what happened to them and the involvement -- or the lack of involvement of the roommates, and I sent that again December 10, 2022.

Q. (BY MS. GUILLARD) Question: After that, what was the next thing that you did?

A. Answer: The next thing I did was post a YouTube video regarding -- I was already sued at that time, so I reached out to the public and posted the YouTube video about what I believed happened to the students, again in hopes that someone would see it and do something about it.

MS. GUILLARD: This is the Plaintiff's Exhibit Number 12 but also Defendant's Exhibit Number 511, the YouTube video.

THE COURT: And, Ms. Olson, any objection to the admission of --

Ms. Guillard, do you want to just use Plaintiff's Exhibit 12 or do you want to admit your own?

MS. GUILLARD: The Plaintiff's Exhibit 12.

THE COURT: And you wish to publish that?

MS. GUILLARD: Yes, sir.

THE COURT: All right. May we please publish Plaintiff's Exhibit 12.

Q. (BY MS. GUILLARD) Question: What is Plaintiff's Exhibit 12?
A. Answer: This exhibit is a video that I posted around February 2023 regarding -- again reiterating what I believe happened to the students, who was involved, in hopes that I'd receive -- I mean that someone would watch it and do something about it.

MS. GUILLARD: I'll play just a small clip of it so that it's not 37 minutes of watching this video.

THE COURT: And before you do, Ms. Guillard, can you just identify the time at which -- on the video at which you're starting it so we have that for the record.

MS. GUILLARD: I'm starting at 37:25 and ending at 39:04.

THE COURT: Thank you.

(Playing video.)

MS. GUILLARD: Unpublish, please.

MS. OLSON: Your Honor, just for the record, that is not the full Exhibit Number 12.

THE COURT: Correct. And that's why I asked her to identify the time that she's played from it.

Q. (BY MS. GUILLARD) Question: What else -- what is the third thing you did to get answers?
A. Answer: Next I subpoenaed Meta Platforms to find the connection between Rebecca Scofield and the victims.

MS. GUILLARD: I would like to present Exhibit Number 503. The Exhibit Number 503 is a subpoena to Meta Platforms requesting information.

THE COURT: Any objection?

MS. OLSON: No, Your Honor.

THE COURT: All right. Defendant's Exhibit 503 will be admitted.

(Defendant's Exhibit 503 received.)

THE COURT: Do you wish to publish that to the jury?

MS. GUILLARD: I wish to publish that to the jury.

THE COURT: You may.

Q. (BY MS. GUILLARD) Question: What is Exhibit Number 503?

A. Answer: This is when I decided -- I subpoenaed Meta Platforms, which is Facebook -- and I'm sorry I'm going so fast, but this is just information regarding this subpoena. And I requested the production of documents regarding Professor Scofield and any connection with Jack DuCoeur and all four victims and students through Facebook Messenger at the University of Idaho.

MS. GUILLARD: You may unpublish.

Q. (BY MS. GUILLARD) Question: What became of that subpoena to Meta Platforms regarding the production of documents?

A. Answer: Meta Platforms refused to comply with the request for the subpoena.

MS. GUILLARD: I would like to present Exhibit

Number -- Defendant's Exhibit Number 515. I would like to present Defendant's Exhibit Number 515.

THE COURT: Any objection, Ms. Olson?

MS. OLSON: No, Your Honor.

MS. GUILLARD: Sorry.

THE COURT: Defendant's Exhibit 515 will be admitted.

(Defendant's Exhibit 515 received.)

MS. GUILLARD: I would like to publish it to the jury, please. Thank you.

Q. (BY MS. GUILLARD) Question: Explain Exhibit Number 515.

A. Meta Platforms responded to my subpoena request for more information regarding Rebecca Scofield's connection with the students stating that legally they -- basically, legally they did not have to respond due to me being -- Professor Scofield being a user and this is a civil case and not a criminal case. They quoted the federal Stored Communications Act as to the reason why they did not have to respond to my request for documents.

MS. GUILLARD: Thank you.

Q. (BY MS. GUILLARD) Question: What was the next thing you did to get more information regarding Rebecca Scofield's involvement with the murders of the students?

A. Answer: I then submitted a request to Moscow Police Department.

MS. GUILLARD: I'd like to introduce Defendant's

Exhibit Number 506.

THE COURT: Any objection?

MS. OLSON: One moment, please, Your Honor. I don't think so, but I need to check.

No objection, Your Honor.

THE COURT: All right. Defendant's Exhibit 506 will be admitted and published for the jury.

(Defendant's Exhibit 506 received.)

MS. GUILLARD: Thank you.

Q. (BY MS. GUILLARD) Question: What is this request to the Moscow Police Department?

A. Answer: I requested MPD to a copy of all documents and reports and records in their possession related to the King Road homicides, and I asked to please include video recordings, audio recordings, phone calls, and radio traffic.

Q. Question: What became of that request to Moscow Police Department?

A. Answer: Moscow Police Department denied the request.

MS. GUILLARD: I would like to present Defendant's Exhibit Number 510 and publish --

THE COURT: Any objection?

MS. OLSON: No objection.

MS. GUILLARD: I would also like to publish to the jury.

THE COURT: Defendant's Exhibit 510 will be admitted

and published to the jury.

(Defendant's Exhibit 510 received.)

A. This exhibit --

Q. (BY MS. GUILLARD) Question: What is Defendant's Exhibit Number 510?

A. Answer: This is the City of Moscow responding to my public records request stating that my request is vague and they want it to be more specific, which is the reason why they were denying my request for the production of public records.

MS. GUILLARD: Thank you.

Q. (BY MS. GUILLARD) Question: What did you do next to get more information regarding Professor Scofield's potential involvement with the students and the murders?

A. Answer: I then requested for access to sealed documents from -- I believe it's ADA County or Ada County.

MS. GUILLARD: I would like to present Defendant's Exhibit Number 513.

THE COURT: Any objection?

MS. OLSON: No, Your Honor.

THE COURT: All right. Defendant's Exhibit 513 will be admitted and published for the jury.

(Defendant's Exhibit 513 received.)

MS. GUILLARD: Thank you.

Q. (BY MS. GUILLARD) Question: What is this petition for access?

A. Answer: This is a petition for access to redacted and sealed documents in a case. It states, "I'm Ashley Guillard. I'm currently being sued by Rebecca Scofield in U.S. District Court for alleged defamation of character regarding my accusation that she is involved with the King Road homicides, the exhibits and evidence in the quadruple homicide case, provide factual support that substantiates the claims I made. However, they are largely redacted, sealed, and suppressed due to the gag order. Is it possible for me to have access to the sealed and suppressed files, documents, exhibits, and evidence now? If so, what do you need from me? A petition? If not, why not? I have a pending motion in the District Court that relies on your response. Thank you for your assistance in this matter."

MS. GUILLARD: Thank you.

Q. (BY MS. GUILLARD) Question: What was the response to that petition for request for redacted and sealed documents?

A. Answer: There was no response.

Q. Question: What did you do next to get more objective evidence and information regarding Rebecca Scofield's connection to the murder of the students?

A. Answer: Next I submitted a formal motion for access to documents to ADA or Ada County. Excuse me if I'm saying it wrong.

MS. GUILLARD: I would like to present Defendant's

Exhibit Number 517.

THE COURT: Any objection?

MS. OLSON: No, Your Honor.

THE COURT: Defendant's Exhibit 517 will be admitted and published to the jury.

(Defendant's Exhibit 517 received.)

MS. GUILLARD: Thank you.

Q. (BY MS. GUILLARD) Question: What are you motioning for access to?

A. Answer: I wrote this motion to gain access to the sealed documents. I gave Ada County, ADA County, a synopsis of what was happening, the standard, and I requested specifically AT&T phone records for Mr. Kohberger. I believe that could give objective information regarding his connection to Rebecca Scofield. I requested Discover financial records and other financial records for one of the victims and T-Mobile phone records that I believe connected Rebecca Scofield to one of the victims.

I requested Jack DuCoeur's interview with law enforcement and phone records which I believe connected him to the victims, the records, and Professor Scofield. I requested surviving roommates' text message extraction, the 911 call, and the interview with law enforcement because at this time I believe it aligned with the videos I posted regarding their actions the night of the murders.

I requested a statement from Peace Officer Brett Payne with Latah County and crime scene photos. I requested bank records of the victims -- one of the victims. I requested autopsy reports. I requested DNA evidence, and I requested abandoned -- information on the abandoned white Elantra found in Oregon.

MS. GUILLARD: Thank you.

Q. (BY MS. GUILLARD) Question: What was the result of the request for those records?

A. The motion requesting access to those records was denied and stricken from the record.

MS. GUILLARD: I would like to present Defendant's Exhibit Number 514.

THE COURT: Any objection?

MS. OLSON: No, Your Honor.

THE COURT: I'll admit Defendant's Exhibit 514 and publish it to the jury.

(Defendant's Exhibit 514 received.)

Q. (BY MS. GUILLARD) Question: What is Defendant's Exhibit 514?

A. Answer: Basically it was an order from Judge Hippler stating that I am not a proper party to the case and cannot file pleadings herein and it's therefore -- the motion is denied and stricken from the record.

MS. GUILLARD: Thank you.

A. Additionally, I also --
Q. (BY MS. GUILLARD) I mean question: Is there anything else you also did to get access to documents or information regarding Rebecca Scofield's involvement with the murders of the students?
A. Answer: These exhibits were already admitted yesterday, Exhibit Number 508 and 509, which was -- I requested access from the University of Idaho for any -- I requested any records from the University of Idaho regarding Rebecca Scofield's communication with the students. And that resulted in no information as well.
Q. Question: Absence of any evidence. What has Scofield done for you to continue to distress her?
A. Answer: Since the onset of litigation, it has been, in my opinion, nothing but lies spread about me --
MS. OLSON: Objection, Your Honor. This is opinion evidence and not about belief --
THE COURT: Objection sustained. It's also argumentative.
Ms. Guillard, you just have to ask who, what, when, where, why questions about the facts of this case, not insert any opinion or argument into your answers.
MS. GUILLARD: Okay. I'll restate the question.
Q. (BY MS. GUILLARD) Why were you not satisfied with not receiving any objective evidence to support your claims?

A. Answer: I am not against my ability to be wrong. I can be wrong. Everybody in the world can be wrong about anything. My issue was the limited access to documents, the continued denial of requests. And in my opinion, any of these people could have responded to me and proved to me that I was wrong. So the evidence that I was requesting, again, could not only prove that Rebecca Scofield was involved, but it could also prove with evidence that she was not. However, nobody would listen. Nobody would investigate. And nobody would provide me from -- with documents and evidence for me to investigate myself.

MS. GUILLARD: I would like to present Plaintiff's Exhibit Number 13 and publish it to the jury.

THE COURT: It's already in evidence and may be published.

Q. (BY MS. GUILLARD) Question: The plaintiff -- Plaintiff's Exhibit Number 13 displays screenshot photos of videos that they say you posted. What is your -- let's go over the first ten pages of this exhibit.

Question: Is the first video about the plaintiff, Rebecca Scofield?

A. Answer: The first video is not about the plaintiff, Rebecca Scofield. It is instead just a 15-second video about the students -- about introducing Solving Mysterious Deaths on the students.

Q. Question: The second video, is the second video about the plaintiff?

A. Answer: The second video is a five-second clip about the plaintiff and what I believe her role to be regarding the murder of the students.

Q. Question: The third and fourth video, is that about the plaintiff?

A. Answer: The third and fourth video are about Rebecca Scofield and what I believe to be her role in the students, each one about 55 seconds each.

Q. Question: Page 3, are any of these videos about the professor?

A. Answer: Page 3, again, is about two videos regarding -- the first video is regarding Professor Scofield and her alleged role in the murders, less than 60 seconds. The second video on that page is not about Professor Scofield.

Q. Page 4, question: The videos on that page 4, is that about Rebecca Scofield?

A. Answer: The videos on page 4 are not about Rebecca Scofield, neither one.

Q. Page 5, question: Are any of the videos on page 5 about Rebecca Scofield?

A. Answer: None of the videos on page 5 are about Rebecca Scofield.

MS. GUILLARD: I believe I said "answer."

Q. (BY MS. GUILLARD) Question: Page 6, are any of the videos on page 6 about Professor Scofield?
A. Answer: None of the videos on page 6 are about Professor Scofield.
Q. Page 7, question: Are any of the videos on page 7 about Professor Scofield?
A. Answer: Page 7 looks like a repeated video that was already on this list and another video, but neither one of them are about Professor Scofield.
Q. Page 8: Are any of the videos on page 8 about Professor Scofield?
A. Answer: None of the videos on page 8 are about Professor Scofield.
Q. Page 9: Are any of the videos on page 9 about Professor Scofield?
A. Answer: None of the videos on page 9 are about Professor Scofield.
Q. Page 10: Are any of the videos on page 10 about Professor Scofield?
A. Answer: None of the videos on page 10 are about Professor Scofield.
MS. GUILLARD: Thank you.
Q. (BY MS. GUILLARD) Question: Did you recruit a vigilante to cause harm to Professor Scofield and her family?
A. Answer: I did not recruit a vigilante nor did I ask any

of my followers or anybody watching my videos to cause harm to Professor Scofield or her family.

Q. Question: Did you contact Rebecca Scofield and threaten her in any kind of way?

A. Answer: No, I did not contact Professor Scofield and contact her in any kind of way or threaten her in any kind of way.

Q. Question: Are you aware of any connection to an alleged email of a random person who has no name and you?

A. Answer: I have no connection to any emails Professor Scofield received threatening her, whether real or fake.

Q. Are you responsible for Professor Scofield's health? Did you cause any physical harm to Professor Scofield?

A. Answer: I did not cause any physical harm, diabetes, or anything to Professor Scofield.

MS. GUILLARD: No further questions.

THE COURT: All right. Thank you, Ms. Guillard.

I think this is a good time for a quick comfort break, so we'll take about ten minutes as Ms. Olson gets set up for cross-examination, and we'll be back here right about 10:00 a.m. The jurors will be excused for approximately ten minutes.

(The jury exited the courtroom at 9:52 a.m.)

THE COURT: Ms. Guillard, you may step down.

You can leave your -- you can leave it up there for

cross-examination, but you can step down. If you need your laptop for the next ten minutes, you can take it. Otherwise, just step down.

MS. OLSON: Your Honor, I don't anticipate she'll need her laptop for cross-examination. We have her exhibits loaded into TrialDirector, and I can use those.

THE COURT: Then you can take your laptop and put it back at the trial table. Watch your step.

All right. The court will be in ten-minute recess.

(At 9:53 a.m., a recess was taken until 10:01 a.m.)

THE COURT: Please be seated.

Ms. Guillard, if you'll please retake the witness stand.

We're ready for the jury, Mr. Gordon.

(The jury entered the courtroom at 10:03 a.m..)

THE COURT: All right. Please be seated.

Ms. Olson, you may inquire.

MS. OLSON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. OLSON:

Q. Good morning, Ms. Guillard.

A. Good morning.

Q. I want to start, Ms. Guillard, by talking to you about your Exhibit 505, that *Solving Mysterious Deaths, Part One: Solving the Death of Tamla Horsford.*

MS. OLSON: And, Your Honor, I'd ask that Exhibit 505 be published to the jury.

THE COURT: It may.

MS. OLSON: If you would turn to page 2 of the exhibit and zoom in on the very bottom, on the copyright.

Q. (BY MS. OLSON) So this book you copyrighted in 2022; correct?

A. Yes.

Q. And what is the name of the LLC that you copyrighted it under?

A. Live in Fantasy Land, LLC.

Q. Ashley Guillard Live in Fantasy Land, LLC; correct?

A. Yes.

Q. And if we could look at -- I think it's on page 9 of the exhibit, but if you turn then to page 10, which is page 2 of the book, the heading at the top of page 2 and all of the even numbers, what is the name of that? What words are there?

MS. OLSON: I'm sorry. Past the introduction, Ms. Bibb, page 2.

Q. (BY MS. OLSON) Do you see that now?

A. Yes.

Q. What words are there above all of the text on page 2?

A. "Ashley God."

Q. And that's the case on all of the even-numbered pages; correct?

A. It probably is.
Q. Well, we can turn and look at page 4 of the text, which is page 12 of the exhibit. Does that also have "Ashley God" at the top?
A. Yes.
Q. If we go to the next page, which page 5 of the book and page 13 of the exhibit, on the odd-numbered pages, it says *Mysterious Deaths, Part One: Tamla Horsford*; correct?
A. Yes.
Q. And if we go to the first full paragraph, it says, "Due to the magnitude of my spiritual gifts, I was able to solve the case in less than 24 hours. I was able to do what Forsyth County Sheriff's Office, Georgia Bureau of Investigation, the Federal Bureau of Investigation, and the Department of Justice couldn't or wouldn't do within the previous three years in less than 24 hours." Correct?
A. Correct.
Q. Ms. Horsford died in 2018; correct?
A. Correct.
Q. Initially, after an investigation in 2019, it was ruled accidental; correct?
A. That's what they said.
Q. That's what the result of that investigation was, initial investigation was; correct?
A. That's what the record says.

Q. Yeah. And you had -- you looked at that record before you wrote your book; right?
A. I read, like, general knowledge on the case that was available to the public.
Q. And then the case was reopened in 2020 after public outcries from celebrities such as 50 Cent and T.I.; correct?
A. I don't know who -- I was trying to get awareness for her, but, yes, I did remember hearing about another investigation.
Q. And there was a second investigation that began in June of 2020?
A. They investigated themselves and found themselves not liable.
Q. Yeah, that wasn't my question. The second investigation began in June of 2020; correct?
A. I don't know the date it began.
Q. And that second investigation was closed in July of 2021; correct?
A. It's possible. I don't know when it was closed.
Q. And no criminal charges have ever been brought; correct?
A. Correct.
Q. And no person has ever been charged; correct?
A. I don't believe so.
Q. And so as far as law enforcement and the actual way things go in court is concerned, no person has been charged with the death of Tamla Horsford; correct?

A. Correct.

MS. OLSON: You can take that down.

Q. (BY MS. OLSON) Ms. Guillard, you testified about that email you had with your aunt and then the fact that there was an -- ended up being an eviction that was dismissed; correct? We saw those exhibits?

A. Correct.

Q. And that was a conversation between just you and your aunt; right?

A. Correct.

Q. And it was not a public accusation that somebody had committed a quadruple homicide; correct?

A. Correct.

Q. And you knew the difference between the two; correct?

A. It's unrelated.

Q. Right. But you know the difference between having a private communication with someone you know and dealing with a personal event and publicly accusing someone of a quadruple homicide; correct? You know the difference between those two?

A. Talking to different people, correct.

Q. Ms. Guillard, you have a master's -- a combined two bachelor's degree in human resources; is that right?

A. I have a bachelor's in business administration and a master's in human resource management.

Q. You talked a little bit about your work with tarot cards;

right?
A. Yes.
Q. And you would describe yourself as self-trained on those tarot cards; correct?
A. Correct.
Q. And I think you testified that you have been diagnosed with PTSD; right?
A. Correct.
Q. And so you're familiar factually with diagnoses of PTSD; correct?
A. Well, correct, but I didn't diagnose myself.
Q. I'm not -- I'm not -- I didn't mean to suggest that. But that's one of the things that allowed you to then know about the *DSM-V* and a PTSD diagnosis; correct?
A. False. I was diagnosed by a medical doctor and a psychiatrist. So I didn't look up anything. Like I said, I did not know what was wrong.
Q. Well, when you cross-examined Rebecca Bohn, by then you had -- is that when you looked up the *DSM-V*?
A. Correct. When she -- right.
Q. And you were able to factually read that information and decide what questions to ask her in support of your case here; correct?
A. Correct.
Q. All right. Ms. Guillard, I'd like you now to look at an

exhibit that I think has not been admitted yet, Exhibit 29. And do you recognize Exhibit 29?
A. Yes.
Q. And is Exhibit 29 a social media post you made regarding some of your travels?
A. Yes.
Q. And the -- I take it you paid for your travels?
A. Sometimes I pay. Sometimes other people pay.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 29.
THE COURT: Any objection?
MS. GUILLARD: No objection.
MS. OLSON: May it be published, Your Honor?
THE COURT: Yes. Plaintiff's Exhibit Number 29 will be admitted and published for the jury.
(Plaintiff's Exhibit 29 received.)
(Playing video.)
Q. (BY MS. OLSON) And I'd now like you to take a look at Exhibit Number 30, which I do not think has been admitted. And recognizing the first page -- or a screenshot of Exhibit Number 30, do you recognize that?
A. Yes.
Q. And is that also a social media post that you made regarding some of your travels?
A. Yes.

Q. And is that another travel that you had where either you paid or somebody else paid for you?
A. Yes.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 30.
THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit Number 30 will be admitted and published for the jury.
(Plaintiff's Exhibit 30 received.)
(Playing video.)
Q. (BY MS. OLSON) Ms. Guillard, that video that we looked at in Exhibit Number 30 from your social media post, that reflects purchases you made on a trip to Italy and France; is that right?
A. I believe that was Italy, France, 2020- -- I don't know -- this year or last year, probably last year.
Q. So 2025 or 2024?
A. One of these years.
MS. OLSON: If we could next look at Exhibit 44, which is not yet in evidence.
Q. (BY MS. OLSON) And, Ms. Guillard, do you recognize the first page of the -- or the screenshot for Exhibit 44?
A. Yes.
Q. And is that another social media post you made while you

were traveling outside of the United States?
A. Yes.
Q. And where were you in that particular post, if you recall?
A. Thailand.
MS. OLSON: Your Honor, at this time I'd offer Exhibit Number 40. I'm not going to play the whole thing but just show the front page -- well, I'll offer it and then say what I'm going to show..
THE COURT: You said 40. Do you mean 44?
MS. OLSON: I do mean 44, Your Honor. Thank you.
THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit 44 will be admitted and published for the jury.
(Plaintiff's Exhibit 44 received.)
Q. (BY MS. OLSON) And so, Ms. Guillard, it says at the very top Dior Gold House. What does that refer to?
A. That is Christian Dior's Gold House, which is a cafe that they have in Thailand in the Ploenchit area.
MS. OLSON: If we could next look at Exhibit 45, which is not yet in evidence.
Q. (BY MS. OLSON) And do you recognize Exhibit 45?
A. Yes.
Q. Is that another social media post that you made while traveling out of the United States?

A. Yes.
Q. And what year is reflected in this social media post?
A. 2025.
MS. OLSON: Your Honor, at this time I'd offer Exhibit 45.
THE COURT: Any objection?
MS. GUILLARD: No objection.
THE COURT: Plaintiff's Exhibit 45 will be admitted and published.
(Plaintiff's Exhibit 45 received.)
MS. OLSON: And will you please play that one, Ms. Bibb.
(Playing video.)
Q. (BY MS. OLSON) And, Ms. Guillard, in Exhibit 45, what is that that you're holding up to the camera and fanning at the end?
A. That would be my rent money. And it's in bahts, which would mean that -- 30 baht is 1 U.S. dollar. So that was a compilation of the amount of money I needed to pay my rent in Thailand.
Q. And you did rent an apartment in Thailand; correct?
A. Correct.
Q. And was the cost of that apartment $2,000 a month?
A. It is 65.5 thousand baht a month, which ranges depending on the exchange rate. It could be 2,000. And unfortunately,

because of the fluctuation of the dollar, it could go up to about 21-something.
Q. And, Ms. Guillard, while you were in Thailand, you continued to post to your social media accounts; correct?
A. Correct.
Q. And you posted trips of you on the beach?
A. Correct.
Q. And you posted trips of you on -- I think it's the -- a sea? Not an ocean but a sea?
A. Correct.
Q. And you only came back to the United States for this trial; correct?
A. Correct, and to check my mail.
Q. Ms. Guillard, when you testified in your case in chief, you introduced a number of documents that you testified showed when you were trying to get additional information regarding the murders of the four University of Idaho students and Professor Scofield's potential involvement in them; correct?
A. Correct.
Q. And I think the -- well, strike that.
You posted your first TikTok specifically naming Professor Scofield on November 24, 2022; correct?
A. Correct.
Q. And then I think if we look at Exhibit Number 503, which is already in evidence, that's the subpoena that you issued to

Meta; correct?
A. Correct.
Q. And what is the date of that document?
A. It appears July 13, 2023.
Q. And that's after this lawsuit had been filed; correct?
A. Correct.
Q. And that's approximately nine months after you first stated publicly on TikTok that Professor Scofield had orchestrated the murders; correct?
A. About eight months, correct, during discovery. I don't have control over discovery time.
Q. All right. I guess it's your business degree that makes your math a lot better than mine. I apologize for misstating the number of months.
And then Exhibit -- I think it was -- let's see. The exhibit -- response from Meta was Exhibit 515; correct?
A. Correct.
Q. And Meta explained to you why it could not provide you the information that you were seeking; correct?
A. Correct.
Q. It said that you had -- if you're wanting content of a user's electronic communications, you had to follow federal law in order to get that information; correct?
A. Correct.
Q. And it said if you wanted information from the user's

accounts, you had to direct that information to the user; correct?
A. Correct.
Q. And you knew that in discovery you had the ability to serve additional subpoenas; correct?
A. Correct.
Q. You didn't take any steps to follow up on this particular subpoena and to follow the law that Meta directed you to in order to get that additional information; correct?
A. False.
Q. Did you issue additional subpoenas, as they had suggested, to the users?
A. No, but they emailed -- I believe that was a period of silence, of waiting. This was an automatic email. Then there was a period of silence where they didn't respond. And then I believe Scofield filed a motion to quash my subpoena to Meta Platforms, and Meta emailed me stating they would respond based on the result of that motion to quash the subpoena. And once the motion was ordered on, it was ordered not to respond to the motion -- I mean the subpoena was quashed, meaning they did not have to respond to it no longer.
Q. And that was an order that Judge Patricco entered; correct?
A. Correct.
Q. And Judge Patricco also informed you about the ways that

you could follow up in order to get the information that you were requesting; correct?
A. Correct. I think it was, like, another motion or something like that.
Q. And you didn't file that motion?
A. Correct.
Q. All right. Ms. Guillard, you next pointed to Exhibit 506; correct?
A. Correct.
Q. And Exhibit 506 was your August 13, 2025, public records request to the Moscow Police Department; correct?
A. Correct.
Q. And that was certainly after Mr. Kohberger had pleaded guilty, admitted to killing the students, and been sentenced; is that right?
A. I'm not sure what dates he did that, but just by this public records request, it must have been around that time when they started releasing documents.
Q. Which they only did after Mr. Kohberger was sentenced; correct?
A. I think so, yes.
Q. And we entered a stipulation yesterday where you agreed, among other things, that Mr. Kohberger was sentenced in July of 2025; right?
A. That's a fact. There's nothing to agree to. He was

sentenced.
Q. Well, you agreed that the date was in July of 2025; correct?
A. Correct.
Q. All right. And so this request is in August of 2025, nearly three years after you first made statements that Rebecca Scofield had orchestrated the murders of four University of Idaho students; correct?
A. In three years, everything was under seal. So, yes, correct. That wasn't under my control.
Q. That wasn't my question, Ms. Guillard. This is a request that you made three years later; correct?
A. And I'm explaining that I could not request for three years access to those documents that were under seal in a criminal case that I was not a party to. So the dates of 2025 was when I could, correct, three years later.
Q. Let's look at Exhibit 513. Exhibit 513, this is when you made a request -- right? -- to get information regarding the criminal case? Correct?
A. Correct.
Q. And this was filed on -- or submitted by email on April 9, 2025; correct?
A. Correct.
Q. Also two and a half years after you first accused Rebecca Scofield of orchestrating a quadruple homicide?

A. It's when it was available on or I thought it could be available, correct.
Q. Which was two and a half years after you first accused Professor Scofield; correct?
A. Two and a half years was not my control. That is in the control of the government, not mine.
Q. Well, you were in control of when you could make a request; right?
A. I was not in control of the criminal documents and access to them in a criminal case that I am not a party to.
Q. But you're in control of when you can ask for things; right?
A. I perceive I could have asked when they were not providing access to documents when everything was under gag and seal, yes.
Q. Well, let's look at Exhibit 517. In Exhibit 517, this is that formal motion you made when your email didn't get responded to; is that correct?
A. Correct.
Q. And you filed this on the public docket or in the court in the Bryan Kohberger case; correct?
A. Correct.
Q. And you were telling them that you wanted certain information; correct?
A. Correct.

Q. And this lawsuit was already filed?
A. Correct.
Q. This lawsuit had already been made public?
A. Correct.
Q. Bryan Kohberger was represented by defense attorneys; correct?
A. Correct.
Q. And you might imagine that if Bryan Kohberger's defense attorneys thought that there was any evidence that Mr. Kohberger was not the sole party responsible for the murders, they would absolutely have reached out and tried to get that evidence; correct?
A. They did, but their motion was denied. They had an alternate perp theory, and it was denied by Judge Hippler, from my understanding of that case that I am not a part of.
Q. But they didn't reach out to you and say, "Hey, tell me everything you know about Rebecca Scofield"; correct?
A. No one reached out to me.
Q. Including Bryan Kohberger's defense attorneys, whose sole job it was to defend him; correct?
A. They had their hands full with thousands of tips and documents. Why would -- they were not thinking about me.
Q. Well, that was their sole job; you would agree?
A. Their sole job, and they explained that they were overwhelmed already. I don't expect them to reach out to me.

Q. Well, how many times did you reach out to them?
A. I never reached out to them.
Q. Ms. Guillard, with respect to this alternate perp theory and these other documents you couldn't get access to, you know that Bryan Kohberger's lawyers had access to all of those documents; correct?
A. Correct. And they explained that they were overwhelmed. They could not go through all of the evidence.
Q. Oh, so you think that Bryan Kohberger's lawyers, whose sole job it was to defend him, didn't go through all of the evidence?
A. That is my understanding of what they said. It was too much for them to go through before trial, from my understanding of a case that I have nothing to do with.
Q. At any rate, Ms. Guillard, you didn't file this document that we see in Exhibit 517 until after -- more than years after, May 6, 2025, you made the statements about Rebecca Scofield; correct?
A. Correct.
Q. And you testified earlier that you don't have control of when documents are released; correct?
A. Especially from Ada County, Latah County, Moscow PD. I don't have control over any of those organizations.
Q. Do you have control over when you make public statements?
A. Yes.

Q. Do you have control over what efforts you make prior to making any public statement to get information?
A. Yes.
Q. Do you have control of whether you would make statements without having any facts to support those statements?
A. From my understanding, if I believe I'm telling the truth, I didn't need to hold a document while I'm talking and exercising my freedoms.
Q. That wasn't my question, Ms. Guillard.
A. Well, you asked about facts, and it was my understanding that I did not have to hold evidence in a document for me to exercise speech.
Q. You didn't need to have any facts before you accused someone of murder? Is that your position?
A. Not when doing a tarot reading, correct.
Q. That wasn't my question. It was your understanding that you didn't have to have any evidence before making a statement of fact that someone was responsible for a quadruple homicide?
A. I didn't make a statement of fact. I rendered a reading, a tarot reading, which I don't believe can be a fact. Tarot and oracle card readings are opinions at best.
Q. Well, the Court has ruled differently; correct?
A. I don't know about that.
Q. And the jury has seen the TikToks where you state that Rebecca Scofield is the murderer; correct?

A. Correct.

Q. And particularly that Exhibit Number 12, where even after Mr. Kohberger is arrested, you describe in detail how she orchestrated and planned the murders; correct?

A. I was trying to help.

Q. And that was on February 9, 2023; correct?

A. That could be.

Q. You posted that first TikTok on November 24, 2022, the one accusing Professor Scofield of orchestrating the murders; correct?

A. Or the 23rd. I think so.

Q. And you didn't submit your FBI tip line until December 10, 2022; correct?

A. Correct.

Q. So the first thing you did was, for 16 days, you submitted -- or you posted on TikTok about the murders, and anytime you ever identified the murderer, it was Professor Scofield; correct?

A. False.

Q. Anytime you ever identified the person who orchestrated the murder by name, it was Professor Scofield; correct?

A. False. My initial tarot readings were general. It stated a teacher and a student combination. And then once I dug more, did more readings, and started looking on the website, that's when I did the readings on all of the people on that

web page and what I perceived -- when I perceived to be Professor Scofield to be involved. And then after that is when I began to post about Professor Scofield.
Q. Your first TikTok was on November 23, 2022; is that right?
A. Regarding the Idaho four, yes.
Q. And then the very next day, November 24, is when you posted the initial TikTok about Professor Scofield; correct?
A. Correct.
Q. All right. Let's take a look at Exhibit Number 13, which is already in evidence. And, Ms. Guillard, you would agree that Exhibit Number 13, that demonstrative exhibit, has a total of 58 pages; correct?
A. Correct.
Q. And I think -- I don't know if the binder is up there still, but the evidence binder has a hard copy. And if you want to look at that, it might be easier to tell how many pages are in there.
A. 58 pages.
Q. And the very last page, that's the February 9, 2023, YouTube video; correct?
A. Correct.
Q. And if we flip back one page to page 57, that's the end of the TikToks within that exhibit; is that right?
A. Correct.
Q. And the last one of those is dated December 19, 2022;

correct?
A. Correct.
Q. So you would agree that if you multiply 57 times two -- and I tried the math again -- that's 114; correct?
A. I think you guys said 113 yesterday.
Q. That's not my question. So my question is, if you multiply 57 times two, that's 114; correct?
A. That math is correct.
Q. All right. If we go back to page 1, on page 1 the first TikTok is the one on November 23, 2022; correct?
A. Correct.
Q. And then the very next one, November 24, 2022, that's Professor Scofield; correct?
A. Correct.
Q. And then if we look into the file name, her name is in the file name there as well; correct?
A. That's your file name.
Q. Does that file name include the hashtags you were using?
A. I'm not sure about your file names.
Q. The second question I asked you is, does that file name include the hashtags that you were using?
A. I don't know. This is your file name. I don't know where you got the information.
Q. Well, you're not contending that any of these TikTok screenshots don't reflect posts that you made on social media;

right? These are all -- you agree you posted all the TikToks you can see in Exhibit 13?
A. Some of them are duplicates. Some of them I don't have access to right now, but it looks to be my TikToks.
Q. So let's look next at page 3 of the exhibit -- strike that -- page 2 of the exhibit. Those two are also both on November 24, 2022; correct?
A. Correct.
Q. And those are you in the same shirt that we saw in the earlier videos?
A. Correct.
Q. And both of those show Professor Scofield and have her name in them; correct?
A. Correct.
Q. And then if you go to page 3 -- and I think you asked yourself about this one.
A. I did.
Q. The one at the bottom, "The killer who killed the four University of Idaho students will go to jail," do you see that?
A. I do.
Q. And later in one of your later TikToks you talk about Professor Scofield will go to jail; correct?
A. In a different video, correct.
Q. And then if we go to page 4 of the exhibit, you testified

that neither one of those refers to Professor Scofield; correct?
A. Correct.
Q. And -- but part of the story that you've told throughout this is that Professor Scofield, working with that young man Jack DuCoeur, orchestrated the murders, initially were only going to kill two of the victims, and the other two just got caught up in it; is that right?
A. Some of the videos were before I had more information regarding names. Some of the videos were just after general tarot readings.
Q. Well, that wasn't my question here. The text on the top one says, "Xana and Ethan weren't targeted but were killed because they were there, Idaho University murder." And your story is that their killings were not intention -- originally planned, that the focus was on the other two; correct?
A. Correct. But --
Q. And in your other videos you attribute that path, that plan, to Rebecca Scofield; correct?
A. In other videos when they were about her. These were not.
Q. And then the next one down, the bottom one on page 4, the text says, "University of Idaho killer was consumed with thoughts about Kaylee, potentially an ex." Do you see that?
A. Correct.
Q. And your story became -- and even in that video, the first

one we looked at on November 24 -- that Professor Scofield orchestrated the murders because of her prior relationship with that particular victim; correct?
A. False. Everything is not about Professor Scofield. This -- Kaylee had other exes.
Q. And then if you look at page 5, the top one on page 5, the type says, "The University of Idaho killer, the one who orchestrated the murders, was jealous of Madison." Correct?
A. Correct, but then not about her.
Q. And then on one of your subsequent TikTok videos, you said precisely that Rebecca Scofield was jealous of the role that this person, Madison, had in Kaylee's life; correct?
A. And this video was not about her. It was a general reading first, just getting general information with no names. So, no, this was not about Professor Scofield. All of my videos were not about Professor Scofield. The ones that I mentioned Professor Scofield were about her. If I did not mention her, it was four victims, two roommates, and other people being accused. All of the videos were not about her.
Q. Well, Ms. Guillard, you anticipated that people who got caught up with your first videos, the teasers and the one on November 24, they would start following your TikToks; correct?
A. It was a story line.
Q. And you had hashtags so that people could find and organize that content; correct?

A. I attempted to organize the content, yes.
Q. And the very first one on November 24, 2022, had Professor Scofield's picture, had her address at the University of Idaho, and stated that -- are you -- you're looking at the exhibit?
A. Yes.
Q. -- and stated that Professor Scofield orchestrated the murders, likely because she was involved with one of the students; correct?
A. I don't think that was first. It couldn't have been first. It wasn't in my -- it wasn't in the order of being first. The general readings were first. Then I sought more information, did the readings on all of the people on that page, and then Professor Scofield became a part of the readings. I don't think that was first.
Q. That was the story line; correct?
A. Part one, part two, part three of 60-second-or-less videos, correct.
Q. And then if we look at page 9, and there in the first video on page 9 you say, "The killer who paid to have Kaylee murdered was worried about losing respect and possessions." Correct?
A. Correct.
Q. And in one of your later videos you say Professor Scofield was worried about losing her respect and her possessions;

correct?
A. But this video was not about Professor Scofield. It was a general reading getting general information. I did another reading on Professor Scofield, and the same information came out. So that was a separate reading. This one was general.
Q. And then if we look at page 11 of Exhibit 13, in the top one on the screen, posted on November 25, 2022, "When Rebecca Scofield sees my videos exposing her as the co-killer of the four University of Idaho students," and then that was your theme from then on for sure about who was responsible for the murders; correct?
A. She was one person.
Q. Well, the other person was Jack DuCoeur; correct?
A. Correct. But my --
Q. You've never seen a single piece of evidence or a single fact that corrects -- that connects that young man to the quadruple homicides; correct?
A. False. During this time there was no evidence or facts. Nobody was charged. There was nothing to get from public records. It was a tarot reading, no other information from anyone. Nobody was giving information other than the public press release from Moscow PD.
Q. That wasn't my question, Ms. Guillard. There has never -- you have never seen a single fact or piece of evidence or anything that a court or people in the public or anything

anyone could rely on connecting that young man, Jack DuCoeur, to the quadruple homicide; correct?
A. False. He was also investigated, and I did see that eventually they released the documents. And he was also living right next to them, and he was also her ex. But again, on November 25, 2022, that information was not released.
Q. And so you went ahead and accused Professor Scofield and accused Mr. DuCoeur with no facts?
A. Again, it was a tarot reading, oracle card reading. That's intuition, not facts.
Q. Ms. Guillard, if I can direct your attention to page 46 of Exhibit Number 13. On page 46 of Exhibit Number 13, the bottom TikTok screenshot is one from December 18, 2022; correct?
A. Correct.
Q. And that was after you had received the cease and desist letter; correct?
A. Correct.
Q. And then you started to post in detail about Professor Scofield; correct?
A. I don't know what you mean by "in detail," but I did tarot readings on her to figure out more about her.
Q. But my question was, you posted in detail about her; correct?
A. What do you mean by "detail"? I posted tarot readings and

oracle reading messages about her, seeking spiritual details about her, correct.
Q. You posted numerous TikToks about her; correct?
A. In that series there was probably ten 60-second videos, so six minutes of quote, unquote numerous videos.
Q. Well, let's look at page 47. And page 47, the top reference is, "Connecting the evidence to Rebecca Scofield and Jack DuCoeur re murder of the four University of Idaho students." Correct?
A. People were requesting evidence at that time. That's why that was captioned that.
Q. That wasn't my question, Ms. Guillard.
A. Oh, yes.
Q. That is what the caption is about; correct?
A. Correct.
Q. And so this was your attempt to use facts to connect Mr. DuCoeur and Professor Scofield to the murders?
A. False. I believe this is a video explaining that law enforcement have access to evidence. I'm not -- I don't -- no, this wasn't me. I didn't have evidence that was available to connect them.
Q. But you knew where evidence would be. Law enforcement would have evidence and facts; correct?
A. Yes.
Q. And you knew that you didn't have evidence and facts;

correct?
A. Again, I never -- that wasn't -- it was a tarot reading, correct.
Q. And you continued to state that Professor Scofield was responsible for orchestrating the murders; correct?
A. I continued to state the message of the tarot and oracle cards that she was involved, correct.
Q. Not that she was involved but that she had orchestrated the murders; correct?
A. In my opinion, that would mean involved.
Q. And that she did it because she was having an affair with a student; correct?
A. Correct.
Q. And if we keep going on -- turn to page 47 and then 48, and one of those starts with -- on the top of page 48, the caption is, "Rebecca Scofield and Kaylee met at the University of Idaho as an adviser/mentor basis." Correct?
A. Correct.
Q. And there's never been any fact whatsoever supporting that assertion; correct?
A. As you see from the evidence, I requested it, and they denied me access to that because I'm a party to this case.
Q. And that was a request you made in the fall of 2025; correct?
A. Correct.

Q. And that was not quite three years after you made the statements that we see on page 47; correct?
A. Correct.
Q. And then on the next one, "Who is Rebecca Scofield, part three. She opens up about desiring women and wants to find her truth." Correct?
A. Correct.
Q. And that was a theme of a lot of what you said about Professor Scofield, is that she wanted to experience a relationship with a woman; correct?
A. Correct.
Q. And that was not based on a single fact; correct?
A. It was based on a tarot reading.
Q. And it was also after you had read her biography that described what her area of research was; correct?
A. No. Her reading -- the readings regarding her involvement with or interest in women were first. I didn't know anything about her when I was doing the readings on her at first. I read her -- more information on her later on down the line.
Q. Well, Exhibit 40, the very first TikTok that we looked at, that has in the background what her research interests were, and I think you referred to that in Exhibit 40; correct?
A. Correct. But I didn't know anything about her.
Q. And then if we go to page 49, page 49, the top caption says, "Who is Rebecca Scofield, part four. Rebecca is living

the dream with Kaylee: passion, love, travel, emotions." Correct?
A. Correct.
Q. And that is more about what you posted about Professor Scofield; correct?
A. That would be part four, so six, 12, 18, two minutes, four minutes.
Q. But many parts; right?
A. Correct.
Q. And in fact, you got up to part 16; is that right?
A. I thought it was ten. I don't see 16, but I see eight here, which would be --
Q. How about page 55 on December 19, the next day?
A. Okay. There we go.
Q. And on page 55 it's actually part 15 -- correct? -- the bottom one?
A. Correct.
Q. And the caption on that it says, "Who is Rebecca Scofield, part 15. Their death is the only thing that'll keep her secret safe." And there's a little emoji there; correct?
A. A little gay pride flag, correct.
Q. And that was the secret you were referencing; correct?
A. Correct.
Q. So after the cease and desist letters, for nearly two days you posted about Professor Scofield and her involvement in the

murder; correct?
A. Correct.
MS. OLSON: Thank you, Ms. Guillard.
I'm sorry, Your Honor. Just gathering up my things.
THE COURT: No worries. Any further questions?
MS. OLSON: No, Your Honor. Sorry.
THE COURT: All right. Ms. Guillard, you have an opportunity to conduct any redirect examination based on the scope of what Ms. Olson just asked you. So if you want to ask yourselves -- ask yourself any questions based on what she asked you, you may.
MS. GUILLARD: Yes, sir.

REDIRECT EXAMINATION

BY MS. GUILLARD:
Q. Question: Why did it take a couple years to request documents in evidence regarding Scofield's involvement or potential involvement in the murder of the students?
A. Answer: For three and a half years, the records were sealed. There was a gag order, and the public did not have access to those documents. I did everything I could to get access to whatever I could using the -- this case, also public records, and I submitted a tip to the FBI tip line. I don't perceive that there was anything I could have done further to gain access to documents regarding potential evidence that Scofield was involved with the murders.

Q. Question: As it pertains to -- question: The videos regarding Rebecca Scofield that you posted, how many or how long do you perceive those videos to be?
A. Answer: I may have posted maybe a combination or a total of -- it could be 20, 30 videos regarding Rebecca Scofield. But they were 60 seconds or less, so that would mean over the past three, four years, I posted or -- about Professor Scofield a total of 30 minutes.

I believe I said "answer."

MS. GUILLARD: No further questions.

THE COURT: All right. You may step down and return to counsel table.

Ms. Guillard, do you have any additional evidence to present in your case in chief?

MS. GUILLARD: No, sir.

THE COURT: So then do you rest your case?

MS. GUILLARD: I rest my case.

THE COURT: All right. Thank you.

Ms. Olson, does plaintiff have any rebuttal case to present?

MS. OLSON: Your Honor, Professor Scofield does not.

THE COURT: All right. Then, ladies and gentlemen of the jury, we will take our morning recess until about 11:15. When you return, I will provide you with some jury instructions as it relates to your deliberations. You'll then

hear closing arguments of both plaintiff and defendant. I'll give you a couple of quick post-closing argument instructions. We'll then swear Mr. Gordon as the bailiff for your deliberations, and you'll then retire to the jury room to begin your deliberations. The jury administrator has taken your lunch orders, and they'll have lunch for you in the jury room when you begin deliberations, I believe.

All right. I'll excuse the jury at this time.

(The jury exited the courtroom at 10:54 a.m.)

THE COURT: Please be seated.

Counsel, before I let you-all go, I want to have you go ahead and consult with Ms. Fifer, Ms. Trumbull, and Mr. Gordon about the exhibits that have been admitted in the case by both parties and make sure we have an accurate list of exhibits that have been admitted by both parties and make sure that's in order before we break for the midmorning break. So I'll have you do that. The Court will be in recess.

(At 10:56 a.m., a recess was taken until 11:18 a.m.)

THE COURT: Please be seated.

All right. Ms. Olson, Mr. Carone, Ms. Guillard, are we ready to bring the jury back in and give them the post-proof instructions?

MS. OLSON: Yes, Your Honor.

MS. GUILLARD: Yes, sir.

THE COURT: All right. Let's get the jury.

(The jury entered the courtroom at 11:19 a.m.)

THE COURT: All right. Please be seated.

Members of the jury, I think all of you saw the instructions on your chair. I don't think anyone sat on them. They are a copy of the post-proof jury instructions that I'm now going to read to you. You can read along with me on that piece of paper or you can simply listen. It's going to be the same exact content. And these will be the instructions that I give to you before the parties will give their closing arguments. And again, I'll give you a couple brief instructions after they complete their closing arguments, swear in Mr. Gordon as the bailiff, and then you'll retire to the jury room to deliberate the case.

All right. Let's begin. Members of the jury, now that you have heard all of the evidence, it is my duty to instruct you on the law that applies to this case. Each of you has received a copy of these instructions that you may take with you to the jury room to consult during your deliberations.

It is your duty to find the facts from all of the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not, and you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means you must decide this case

solely on the evidence before you. You will recall that you took an oath to do so. Please do not read into these instructions or anything that I may say or do or have said or done that I have any opinion regarding the evidence or what your verdict should be.

To help you follow the evidence that you received, I'll again give you a brief summary of the positions of the parties in this case. On December 21, 2022, plaintiff Rebecca Scofield filed this civil lawsuit alleging defamation. She alleged that defendant Ashley Guillard's statements on TikTok about plaintiff's romantic relationship with one of the victims and her participation in the murders were false and defamatory.

Earlier in this case it was resolved that defendant's statements on the subject TikTok videos were false. Thus, defendant is liable to plaintiff for defamation. So that issue will not be decided by you. The only question that you will be asked to decide is whether plaintiff has proven that she was damaged by those false statements and, if so, by what amount.

Plaintiff claims that she is entitled to compensatory damages to compensate her for the harm to her professional reputation, present and future mental and emotional pain and suffering, present and future medical expenses, and present and future lost earnings and professional opportunities.

Plaintiff has the burden of proving compensatory damages by a preponderance of the evidence. Defendant denies that plaintiff is entitled to compensatory damages.

Plaintiff also claims that she is entitled to punitive damages because defendant's conduct was oppressive, fraudulent, malicious, or outrageous. Plaintiff has the burden of proving punitive damages by clear and convincing evidence. Defendant denies that plaintiff is entitled to punitive damages.

When a party has the burden of proving damages by a preponderance of the evidence, it means that you must be persuaded by the evidence that the claim of damages is more probably true than not true. You should base your decision on all of the evidence regardless of which party presented it.

When a party has the burden of proving punitive damages by clear and convincing evidence, it means that the party must present evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the damages are true. This is a higher standard of proof than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

You have heard testimony from certain witnesses who testified to opinions and the reasons for their opinions. This opinion testimony is allowed because of the education or

experience of the witness. Such opinion testimony should be judged like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves considering the witness's education and experience, the reason given -- the reasons given for the opinion, and all other evidence in the case.

Those exhibits received in evidence that are capable of being displayed electronically will be provided to you in that form, and you will be able to view them in the jury room. A computer, projector, printer, and accessory equipment will be available to you in the jury room. A court technician will show you how to operate the computer and other equipment, how to locate and view the exhibits on the computer, and how to print the exhibits. You will also be provided with a paper list of all exhibits received in evidence. You may request a paper copy of any exhibit received in evidence by sending a note through the bailiff.

If you need additional equipment or supplies or if you have questions about how to operate the computer or other equipment, you may send a note to the bailiff signed by your foreperson or by one or more members of the jury. Do not refer to or discuss any exhibit you are attempting to view.

If a technical problem or question requires hands-on maintenance or instruction, a court technician may enter the jury room with the bailiff present for the sole purpose of

assuring that the only matter that is discussed is the technical problem. When the court technician or any nonjuror is in the jury room, the jury shall not deliberate. No juror may say anything to the court technician or any nonjuror other than to describe a technical problem or to see information about operation of the equipment. Do not discuss any exhibit or aspect of the case.

The sole purpose of providing a computer in the jury room is to enable jurors to view the exhibits received in evidence in this case. You may not use the computer for any other purpose. At my direction, technicians have taken steps to ensure that the computer does not permit access to the Internet or to any outside website, database, directory, game, or other material. Do not attempt to alter the computer to gain access to such materials.

If you discover that the computer provides or allows access to such materials, you must inform the Court immediately and refrain from viewing such materials. Do not remove the computer or any electronic data from the jury room and do not copy any such data.

The Court has previously determined as a matter of law that the statements at issue were defamatory per se. That issue will not be decided by you. The only question for you to deliberate about and decide is whether plaintiff was damaged by those statements and, if so, the amount of damages.

It is the duty of the Court to instruct you about the measure of damages. By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

Again, plaintiff has the burden of proving compensatory damages by a preponderance of the evidence. Compensatory damages means the amount of money that will reasonably and fairly compensate plaintiff for any injury you find was caused by the defendant. You should consider the following:

The harm to plaintiff's professional reputation; the mental and emotional pain and suffering experienced and that with reasonable probability will be experienced in the future; the reasonable value of necessary medical care, treatment, and services received to the present time; the reasonable value of medical care, treatment, and services that with reasonable probability will be required in the future; the reasonable value of earnings and professional opportunities lost up to the present time; and the reasonable value of earnings that with reasonable probability will be lost in the future.

It is for you to determine what compensatory damages, if any, have been proved. Your award must be based on evidence and not based upon speculation, guesswork, or conjecture.

The law that applies to this case authorizes an award

of nominal damages. If you find for plaintiff but you find that plaintiff has failed to prove compensatory damages as defined in these instructions, you must award nominal damages. Nominal damages may not exceed $1.

Plaintiff has a duty to use reasonable efforts to mitigate damages. To mitigate means to avoid or reduce damages. Defendant has the burden of proving by a preponderance of the evidence first that plaintiff failed to use reasonable efforts to mitigate damages and, second, the amount by which damages would have been mitigated.

If the plaintiff proves by clear and convincing evidence that defendant's acts which proximately caused injury to plaintiff for extreme deviation from reasonable standards of conduct and that these acts were malicious, fraudulent, oppressive, or outrageous, you may in addition to any compensatory damages to which you find plaintiff entitled award to plaintiff an amount which will punish defendant and deter defendant and others from engaging in similar conduct in the future.

Punitive damages are not a matter of right but may be awarded in the jury's sound discretion, which is to be exercised without passion or prejudice. The law provides no mathematical formula by which such damages are to be calculated other than any award of punitive damages must bear a reasonable relation to the actual harm done, to the cause

thereof, to the conduct of the defendant, and to the primary objective of deterrence.

You have been permitted to hear evidence relating to the defendant's wealth and financial condition. This evidence was submitted for your consideration only with reference to the question of punitive damages in light of all other evidence before you if you determine that such an award should be made in this case.

Any award for future economic damages must be for the present cash value of those damages. Noneconomic damages, such as for mental and emotional pain and suffering, are not reduced to present cash value. Present cash value means the sum of money needed now which, when invested at a reasonable rate of return, will pay future damages at the times and in the amounts that you find the damages will be returned. The rate of return to be applied in determining present cash value should be the interest that can reasonably be expected from safe investments that can be made of a person of ordinary prudence who has ordinary financial experience and skill. You should also consider decreases in the value of money that may be caused by future inflation.

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the law clerk,

also bailiff, Mr. Gordon, that you are ready to return to the courtroom.

Before you begin deliberations, elect one member of the jury -- no, I'm sorry. That's going to be our next jury instruction once closing arguments are given. So I skipped a little forward.

All right. Those are the preclosing-argument instructions as a matter of law. We'll first hear from plaintiff's counsel, Ms. Olson, with plaintiff's closing argument.

MS. OLSON: Thank you, Your Honor. If we could have the screen turned on, we intend to publish some exhibits that have been admitted.

THE COURT: You may.

MS. OLSON: May it please the Court, Ms. Guillard, ladies and gentlemen of the jury, good morning.

Rebecca Scofield's nightmare began on November 24, 2022. Her nightmare began because Ashley Guillard posted that TikTok in Exhibit 40.

(Playing video.)

MS. OLSON: And as you saw through the evidence in this case, Professor Scofield's nightmare has never ended. On November 24, 2022, Ashley Guillard told her TikTok audience that Professor Scofield orchestrated the murders and that Professor Scofield did so because she was having a sexual

relationship with one of the female murdered students.

And in the next 25 days, Ms. Guillard made 112 more TikToks about the University of Idaho murders, including Professor Scofield's role in them and Professor Scofield's motive for arranging the murder. And as late as August 28, 2025, she posted a TikTok connecting Professor Scofield to the murders. You saw that in Exhibit 17.

(Playing video.)

MS. OLSON: And as Ms. Guillard herself admitted, she had done no due diligence, and she had never acquired or looked for a single fact connecting Professor Scofield to the murders, not when she posted that first video. And she never -- has never had or acquired a single fact suggesting that Professor Scofield ever had a relationship, let alone a sexual relationship, with one of the murdered female students.

As Ms. Guillard told you, she didn't need facts. As a matter of law, as His Honor has instructed you, those statements are false. So your job now, having heard all of the evidence, is to determine in what amount Ashley Guillard's false statements damaged Professor Scofield. And to be certain, the conduct that damaged Professor Scofield was the TikToks and subsequent social media statements made by the defendant, Ms. Guillard.

Those false statements where Ms. Guillard accused Professor Scofield again and again of orchestrating the

murders and accused Ms. Guillard -- excuse me -- Professor Scofield again and again of having an affair with one of the murdered female students, you saw that evidence over and over again. And as I said at the outset, you saw several of the TikToks but not all of them. For example, you saw Exhibit Number 1. This is the one accusing Professor Scofield of violating the university policy that makes it inappropriate to date a student. You also saw that in Exhibit 27.

Exhibit Number 2, you saw that Ms. Guillard used the frenzy around poor Jack DuCoeur to get more attention for her videos. And you saw Exhibit 4, where Ms. Guillard described colorfully the relationship between Professor Scofield and one of the murdered students.

(Playing video.)

MS. OLSON: And certainly if there were other people who knew about it, there would be other people to interview and to have facts to corroborate Ms. Guillard's accusations, but there were none.

And you saw Exhibit Number 8. That's the front page there. There were many TikToks that Ms. Guillard put out about the relationship between Professor Scofield and one of the murdered students. That was an essential part of Ms. Guillard's story.

And you saw Exhibit Number 10, which you may recall was the screenshot of the TikTok video that is also in Exhibit

Number 6. And it shows the likes, the shares, and at the bottom all of those hashtags that helped organize the content so that people who are interested in the University of Idaho murders could find Ms. Guillard's TikToks and could find the things that she said about Professor Scofield. And of course, you saw Exhibit 40. That was the first one we looked at already, and Exhibit 41, the TikToks that started it all.

Ladies and gentlemen of the jury, as I stated in my opening and as you have seen through the evidence, Professor Scofield is seeking two kinds of damages: Compensatory damages, which are damages for the harm done to her and doesn't involve evidence about whether or not Ms. Guillard subjectively believed her false statements; and second, punitive damages, damages in an amount that will punish Ms. Guillard and deter her and others from engaging in similar conduct in the future.

Let's talk first about compensatory damages. As His Honor has instructed you, Professor Scofield must prove her compensatory damages by a preponderance of the evidence. And as he also has instructed you, that means you must be persuaded by the evidence that the claim of damages is more probably true than not true. That's Jury Instruction Number 3.

And I would submit to you that the evidence on Professor Scofield's claim of compensatory damages is

overwhelming. Every witness Professor Scofield called, with the exception of Mr. Rytter, the general counsel from UI who just introduced some documents, but every other witness Professor Scofield called testified about the damages caused to Professor Scofield.

As His Honor has instructed you in Jury Instruction Number 8, compensatory damages means the amount of money that will reasonably and fairly compensate Professor Scofield for any injury you find was caused by Ms. Guillard. Professor Scofield presented evidence and asked you to award her compensatory damages in three ways: for the harm to her professional reputation; the mental and emotional pain and suffering experienced and that with reasonable probability will be experienced in the future; and the reasonable value of necessary medical care, treatment, and services received at the present time.

At the outset of the trial, we referred to those as economic and noneconomic damages, and that's what you saw in the evidence. And I'll start with the reasonable value of necessary medical care, treatment, and services to the present time. Her economic damages, the evidence that you saw there was in the exhibits that had various receipts for medical care, for her sessions with Dr. Bohn, for the massage therapy, and the installation of the security system. Those were Exhibits 32, 34, 35, and 36, which came in through Professor

Scofield, and 37, which came in through her husband, John Carlsen.

These damages are plainly the lowest component of Professor Scofield's compensatory damages. We didn't have Professor Scofield or Mr. Carlsen total up those receipts, and you can do that in the jury room, but here is the math that we got.

From Exhibit 32, the receipts from physical therapy, $1,274.05. That was the patient payment part. For Exhibit 34, which had additional receipts from the visits to Gritman Medical Center between February 24, 2023, and March 26, 2024, $180 in patient payments. For Exhibit 35, the invoice for counseling therapy services from Rebecca Bohn between May 9, 2023, and September 24, 2025, a total of $680. Exhibit 36, for the massage therapy services, the services that Professor Scofield began on December 8, 2023, and continued until July -- June 21, 2024, when she could no longer afford them because they weren't covered by her insurance, a total of $1,930. And Exhibit 37, for the security equipment purchased the weekend after Thanksgiving and at the end of December, a total of $466.29.

And the total of all of those is $4,530.34, and we submit that as the sum of her out-of-pocket necessary medical care and treatment and services. So that's the economic component of her compensatory damages. No evidence disputes

the amounts in any of these or that they were incurred for necessary medical care, treatment, and services. And we know this is a conservative figure. After all, it doesn't cover Professor Scofield's therapy sessions after September 2025, and it does not cover medical visits after August of 2025. It only shows her out-of-pocket costs.

The second component of her compensatory damages is that first kind of noneconomic damages, the harm to her professional reputation. The testimony of Dean Sean Quinlan and Rebecca Tallent provides clear evidence that Ashley Guillard's repeated statements that Professor Scofield orchestrated the murders and had a sexual relationship with one of her students harmed Professor Scofield's professional reputation.

As you heard from Dean Quinlan and Dr. Tallent and Professor Scofield herself, an academic reputation is everything. Dean Quinlan testified that prior to November of 2022, prior to the time Ms. Guillard made her false statements, the sky was the limit for Rebecca Scofield. She was an excellent researcher, teacher, and colleague. But now after Ms. Guillard's false statements, and based on his experience as a dean, he knows what it looks like when universities are trying to hire and promote people. There are always concerns about how bad publicity, even if untrue, needs to be discussed, can be an obstacle, or something that is

always there.

He testified that he himself continues to be asked about a doxxing event many years after it happened. He worries that through no fault of her own, Rebecca Scofield will always need to be prepared to answer those questions or, worse, have the questions asked about her behind the scenes, when she cannot address them.

Dr. Tallent testified that based on her experience and training in more than 50 years in journalism, public relations, and mass media -- that was the basis of her testimony -- she testified that an academic's reputation is everything. It affects who will publish their work, who will take their classes, how they are viewed at their universities. And she testified that false statements and negative publicity can take a generation, which she described as up to 40 years, to repair. She also testified that prevailing in a defamation lawsuit can help fast-track that process.

Professor Scofield testified at length about how, after the false statements were made, she was no longer able to promote her work through her network and social media. She had no real online presence. When she does interviews, she has to explain to people why they can't find her on the web. Her ability to promote her work, which requires her appearance at conferences and professional networks, was affected. She has to tell everyone she works with -- marketing teams,

potential collaborators, and publishers -- that they will need to field additional inquiries, additional questions. The students who take her class and look up their teachers will walk into the classroom the first day with questions.

These false allegations will always be a part of her work as a professor. They will always be a part of what she has to deal with in her professional reputation. The reputation she testified to you that she worked so hard and so carefully to build was then attacked by Ms. Guillard's false statements. And unmistakably, the false statements are statements connecting Rebecca Scofield to the murders through her place of work, through her job. And as she testified, shortly after Ms. Guillard began posting her false statements, if you Googled her name, "Moscow murders" came up right away in the search results.

The third component of her compensatory damages and the second part of the noneconomic damages is the mental and emotional pain and suffering experienced and that with reasonable probability will be experienced in the future. That is what the Court has instructed you.

There is nothing in that instruction that requires you to find that Professor Scofield had any kind of mental health diagnosis, although she did. What she has to show is that she experienced mental and emotional pain and suffering, and I would submit that the evidence overwhelmingly proved

that she experienced mental and emotional pain and suffering and that she has every day for three years and three months since November 24, 2022, when Ms. Guillard first posted the false statements on TikTok.

Professor Scofield testified at length -- she was on the stand for more than four hours -- about the mental and emotional pain and suffering she experienced from Ms. Guillard's false statements. Professor Scofield testified that Ms. Guillard's statements impacted every part of her life. The first day, Thanksgiving Day, when she saw the TikTok and the link attached to the email from a former U of I person, she was in shock. She was afraid. She felt like she was having a panic attack: racing heartbeat, sweating. And that night she lay on her son's bed at the top of the stairs terrified, terrified that someone would come in her house.

She described for you a nightmare situation she couldn't stop. The fear manifested itself in changes in security, including that she let her parents bring a gun when they came to visit a week later. She testified that after her surgery, she began getting random and strange messages and phone calls from people she didn't know, from journalists.

When the TikToks became more outlandish and more elaborate, she became more fearful. She wandered the hallways near her kids' rooms. She didn't sleep. She cried a lot. She felt like she was dissolving under the weight of the

accusations and the rapid spread to even her small town of Emmett, Idaho.

As a result of all the emotional pain and suffering, she began experiencing physical symptoms: debilitating headaches, nerve problems, tingling. She worried about the impact on the relationship between her colleagues and her student and her family. She eventually began receiving counseling services, and she has continued receiving those counseling services. She takes sleeping medication and antidepressants. She was diagnosed with PTSD and has been receiving treatment for PTSD for nearly three years.

Ms. Bohn, a licensed counselor in practice for over 30 years and who has treated hundreds of patients -- including people involved in crisis situations, including people under the trauma of having to be civilly committed -- she treated and diagnosed Professor Scofield. Ms. Bohn testified that she used the same tools and techniques she always used when she assessed Professor Scofield and diagnosed her with PTSD.

She testified that she uses her judgment and experience and the criteria of the *DSM-V*, and she used that to diagnose Rebecca. She said it was clear that Rebecca had PTSD, and she has confidence in her diagnosis. Ms. Bohn testified that Rebecca's case was unique, but there was no doubt in her mind that the repeated and false accusations of orchestrating a quadruple homicide was a traumatic event and

that Rebecca was exhibiting the symptoms and signs of PTSD and that she had depression and anxiety as well. And then Ms. Bohn treated Professor Scofield for PTSD for more than two and a half years, and she confirmed her PTSD diagnosis through the administration of assessments or tests, as she testified, once in April of 2024 and again in August of 2025.

And Professor Scofield's testimony about the emotional pain and suffering that she endured was corroborated by other people who knew her well. Chris Hanson, her friend of 22 years, who had seen her only two weeks earlier when she was in Portland for a wedding, he knew right away something was wrong when she called that night. He could hear how scared and upset she was, and he has heard that fear and the strain in her voice for more than three years.

Dean Quinlan testified that Professor Scofield had been strong and resilient, but he could see the strain and exhaustion on her face, how hard she had to work to keep performing while she was also dealing with the nightmare that Ms. Guillard had unleashed.

Professor Scofield's husband, John, testified about how Ms. Guillard's accusations on TikTok completely upended Rebecca's family life. The fear manifested itself in those changes and security measures and protocols with their home and their children. He observed that Rebecca wasn't sleeping and that she would often be in their son's bedroom at the top

of the stairs.

And then there was her mother, Rebecca's mother, Margie Scofield, who watched her daughter become a different person after Ms. Guillard's TikToks with the false accusations. And you remember Mrs. Scofield didn't ever see the TikToks, but she did see her daughter and she did hear her daughter. Mrs. Scofield heard the tremors in her daughter's voice when she first called and knew she had been crying.

Mrs. Scofield saw her daughter, who she called Becca, lose her ability to sleep, ability to get things done. She was checking doors, making security changes, jumping from sentence to sentence. She saw that lack of sleep and the fatigue. She saw the person who had been the glue in their family dissolve. And Mrs. Scofield testified that even now, after three years and three months, she sees no signs that Becca will ever be free of those emotional and physical harms. She is not the same Becca. That is the mental and emotional pain that Ms. Guillard's false statements caused every day for three years and three months.

Professor Scofield also asks you to award punitive damages in this case. She must -- we submit that she has -- prove punitive damages by clear and convincing evidence. Clear and convincing evidence is evidence that leaves you with a firm belief that it is highly probative -- excuse me -- highly probable that the factual contentions of the damages

are true. That's Jury Instruction Number 4.

And His Honor has instructed you in Jury Instruction Number 11 what you have to find for an award of punitive damages. Professor Scofield must show that Ms. Guillard's acts which proximately caused injury to Professor Scofield were an extreme deviation from reasonable standards of conduct and that these acts were malicious, fraudulent, oppressive or outrageous. Punitive damages are in addition to any compensatory damages, and they're an amount that will punish Ms. Guillard and deter or discourage Ms. Guillard and others from engaging in similar conduct in the future. That is punitive damages.

Of course, the evidence is undisputed that Ms. Guillard's acts that injured Professor Scofield were an extreme deviation from standards of reasonable conduct. What could be a more extreme deviation from the standards of reasonable conduct than falsely accusing a person whom you have never met and about whom you have no actual facts, accusing that person of orchestrating the murders of four students who attended the university where you taught? What could be a more extreme deviation from reasonable standards of conduct than falsely stating that a person you've never met and about whom you have no actual facts had a sexual relationship with one of her students in clear violation of university policies? And make no mistakes, the evidence is

clear that is what Ms. Guillard did.

The evidence that Ms. Guillard's false statements were acts that were malicious, fraudulent, oppressive, or outrageous is just as clear. From the outset Ms. Guillard had no facts to support her false statement. She knew that, and she said she didn't feed facts. That is outrageous. How can you make a false, fact-free statement that someone committed a quadruple homicide? How can that be anything but outrageous and fraudulent? How can you call making a false, fact-free statement that a professor had an affair with one of her students anything about malicious?

But certainly Ashley Guillard's ongoing acts in the face of repeated requests to stop, in the face of repeated facts showing her her statements were false, and in the face of her own clear timeline that she went to the police only after she posted on TikTok is more than clear and convincing evidence that her repeated false statements were malicious and fraudulent and oppressive and outrageous.

Here's that timeline. On November 24, 2022, Professor Scofield saw Exhibit 40. On November 28, 2022, after learning from the police and her friend Chris and others that Ms. Guillard was posting more and more TikToks, Professor Scofield sent Ms. Guillard the cease and desist letter you saw in Exhibit 19. She just wanted Ms. Guillard to stop. Ms. Guillard didn't stop.

On December 8, 2022, after learning that Ms. Guillard was continuing to post TikTok content accusing her of the murders and of having a sexual relationship with one of her students, Professor Scofield sent Ms. Guillard a second cease and desist letter, the one you saw in Exhibit 20. Again, she just wanted Ms. Guillard to stop. Ms. Guillard didn't stop.

Instead, when Ms. Guillard got the cease and desist letter dated December 8, 2022, she posted another TikTok, Exhibit Number 9. She told her audience that she had received the cease and desist letter, and she displayed in type on the screen that Rebecca Scofield could KMA. And in her testimony she told you what that meant. And then she posted Exhibit 43, putting that letter on a roll of toilet paper and she said she would wipe herself with it. That's how she treated Professor Scofield's request that she just stop.

And then she posted more videos. And if you have any question about how many more videos just in those six days after she posted the TikTok in Exhibit 9, consider the evidence that you saw in Exhibit 13. That's the demonstrative exhibit. Now, you won't have this exhibit when you go back to deliberate, but you've seen it plenty. You can consider the information on it. It's 58 pages long. The TikToks ran in this exhibit from November 23, 2022, to December 19, 2022.

On December 18, 2022, page 46, she posted a teaser: "Who is Rebecca Scofield? More to come." That's on the

bottom. And then on that day she posted 12 more TikToks on that topic, "Who is Rebecca Scofield?" And on the next day, December 19, 2022, she posted ten more videos with all but two of them referring in the text to Professor Scofield. She did a 16-part series she entitled "Who is Rebecca Scofield?" And she did all of that after receiving the cease and desist letter and after telling Rebecca Scofield she could KMA. That conduct was malicious and oppressive. The sheer volume was malicious and oppressive.

And you saw in Exhibit 21 the Moscow Police Department press release in which the Moscow Police Department on December 27, 2022, more than a month after the first TikToks appeared, said Professor Scofield was not a suspect. And you heard in testimony that Bryan Kohberger was arrested on December 30, 2022. But as Professor Scofield testified and as John Carlsen testified and as Margie Scofield testified, the false statements didn't stop. And all you need to confirm that is Exhibit 12. You'll have that in evidence. We've both played parts of it, and in fact it's the last thumbnail on Exhibit 13 showing the date it was posted.

The excerpts that we showed from Exhibit 12 showed that, as Ms. Guillard agreed, on February 9, 2023, after Mr. Kohberger was arrested, she was still saying that Rebecca Scofield had a relationship with one of the murdered female students; and that on February 9, 2023, she was still saying

that Rebecca Scofield had come up with a plan to murder the four students and; that on February 9, 2023, Bryan Kohberger was now a part of that story. But he wasn't the murderer. That was still poor Jack DuCoeur.

These posts were fraudulent. Ms. Guillard had facts, and she chose to ignore them and she kept making false statements. You can look at Exhibits 14A and 14B from her appearance on The Nerd Report on June 9, 2023, after Mr. Kohberger was indicted. She was being interviewed in her Maserati and continuing to say that Professor Scofield was responsible.

And you can look at Exhibit 28, the December 21, 2023, response from the University of Idaho to Ms. Guillard's subpoena: no evidence of conduct and no evidence of an attempt to alter -- no evidence of connection and no evidence of an attempt to alter or delete communications.

And again, you can look at Exhibit 17. You may remember on that one there's a picture on page 2 of that of Professor Scofield and her husband, John, on the first page. You can see that Ms. Guillard posted this on August 25, 2025, after Mr. Kohberger pleaded guilty and after he was sentenced. And she was trying to purport that Professor Scofield still had a connection. And she said on the first page of that that the connection, the first page of Exhibit 17, was that, according to a sorority sister, the student she allegedly had

an affair with recently sold a white Subaru sedan prior to getting her Range Rover. And she said, "Guess who had a white Subaru sedan?" and shows the picture of Professor Scofield and her husband with the car that Mr. Carlsen told you they bought in 2019 from a dealership in Lewiston.

And then if you look at the last page, which is purportedly that police report, what the police report in her own post says is that the report was that student who was murdered had recently -- not in 2019, recently -- sold the white Subaru sedan and sold it to a man on Facebook Marketplace. So in 2019 -- excuse me -- in 2025 Ms. Guillard is intentionally posting a connection between Professor Scofield and the murder based on what even her own post displays is false information.

Ms. Guillard is a smart woman. Everything you have seen from her in this trial shows that she knows what facts are, that she knows what facts are true. So her decision to keep posting TikToks or YouTube videos falsely stating that Professor Scofield had orchestrated the murders and falsely stating that Professor Scofield had an affair with one of the students in the face of all the facts to the contrary cannot be anything other than conduct that is malicious, fraudulent, oppressive, and outrageous. So we submit that the evidence proves by clear and convincing evidence that Professor Scofield should be awarded punitive damages.

Let me next address what I anticipate you'll hear from Ms. Guillard. First, let's be clear. Professor Scofield is not asking you to award damages to compensate her for the reasonable value of earnings and professional opportunities lost up to the present time, and she's not asking you to award damages to compensate her for the reasonable value of earnings that with reasonable probability will be lost in the future. She's not asking you to award her damages because her second book didn't sell as well as her first book. She's not asking you to award her damages based on not getting a raise or a promotion. She got those things.

She did not put on any evidence of that. She's not asking you to make that a part of your damages calculation. But keep in mind that those things are different -- and in the instruction it tells you that -- different from professional reputation and the ongoing harm to her professional reputation.

Second, there is no doubt that Professor Scofield's emotional harm was caused by Ms. Guillard's TikTok videos and, more specifically, by the false statements in them, the false accusations that Professor Scofield orchestrated the murders and that she had an affair with one of the murdered female students.

Ms. Guillard tried and tried with Professor Scofield, with her husband, with her mother, and the dean, even with

Ms. Bohn, to suggest that Professor Scofield's fear was tied to the murders themselves and living in close proximity to the house where the students were killed. But every single witness again and again rejected those suggestions and emphatically testified that all of the changes for Professor Scofield came only after Ms. Guillard's false accusations.

Third, this isn't about Ms. Guillard's subjective -- subjectively believing she could solve mysterious deaths. Take a look at Exhibit 505, that *Solving Mysterious Deaths* document that she introduced when she testified, and in particular take a look at page 5 of that. She says she was able to solve the case in less than 24 hours, something that law enforcement couldn't do, and that she's the person who's identified who is responsible for Tamla Horsford's death. But we also know that there are no facts behind that. No one has ever been arrested or charged with any crime involving poor Ms. Horsford.

So what Ms. Guillard knew when she posted this or when she wrote this book was that she could say these things and she could say them and there didn't need to be facts and she hasn't solved that mysterious death, just like she never once between November 24, 2022, and today solved the mysterious death of the four University of Idaho students. That was done by law enforcement.

Third, this isn't about tarot or oracle card

readings. This was about getting an audience. Remember her use of hashtags and the use of the "Rebecca Scofield" hashtag that you saw in Exhibit 10. Remember that she went on TikTok for more than two weeks before she ever sent in her tip line tip to the FBI, and that was also after the dates of the cease and desist letters. And when she sent that in, she never once mentioned to the tip line that her evidence was from a tarot card reading because she knows those are not facts.

When you decide how much to award Professor Scofield using the Court's jury instructions and the evidence you have heard, you will complete this special verdict form. On the verdict form there are questions that you will have to answer. One, was she damaged? Did you find by a preponderance of the evidence that defendant's false statements that plaintiff had an inappropriate romantic relationship with a student damaged plaintiff? Questions 1, 3, 5, and 7 each ask you to determine whether Professor Scofield has proved the level of damages required under the jury instructions. We submit the evidence shows that Professor Scofield has met her burden of proof on each of those and that you should answer those questions yes.

And then you will have to address how much money to award her. Again, the economic damages, that's clear. That was that relatively small number when you add up the exhibits, the receipts. But how much money will begin to compensate Professor Scofield for the fear, anxiety, stress,

sleeplessness, that fatigue, mental strain, impact on her professional reputation that she has experienced every day for the last three years and three months? How much money in damages will begin to compensate her for Ms. Guillard over and over and over again accusing her of murdering four students at the place she taught and accusing her of doing that because she was having an affair with one of the murdered students?

How do you compensate and how much will it take to compensate Professor Scofield for the fear and anxiety and stress that caused her that first night to lay in her son's bed at the top of the stairs because she was afraid that -- she was worried that someone would see those videos and the atmosphere of Moscow, Idaho, in November of '22 would decide she was the murderer and that they would do what the police hadn't yet been able to do, that they would do to her what hadn't been done by the police, find the person responsible?

And how much money will compensate Professor Scofield for the anxiety, stress, PTSD, depression, and the physical manifestations of those that will follow her in the foreseeable future and have not changed in three years and three months? Certainly no amount of money can undo that harm, and certainly any amount of money can only begin to compensate her for her life being completely different and damaged. We would ask that you make an award of at least $1 million in compensatory damages.

And how much in punitive damages will it take to get Ashley Guillard to stop or deter her from ever again posting online under the guise of solving mysterious deaths that Professor Scofield was responsible for orchestrating the murders and was having an affair with one of the murdered female students?

And to be certain, these punitive damages are an important component of the damages award. If you accept Ms. Guillard's proposition that clairvoyants or psychics don't need facts, if you accept that proposition, then a person in her position could say whatever they want about Professor Scofield or anyone else no matter how heinous or how awful or how untrue, and they would never have to pay punitive damages. They could just say, "I believed it. I didn't need any facts. I know what facts are, but I don't need those facts when I make my false accusations." If there's not a significant punitive damages award, then she can keep doing that and other people can keep doing that.

And if that were true, why would she stop, and why would anyone else hesitate to do the exact same thing? This is precisely the case and the facts that punitive damages are made for, and Professor Scofield will leave it to you to decide what that amount is. Thank you.

THE COURT: Thank you, Ms. Olson.

Ms. Guillard, your closing argument.

MS. GUILLARD: Members of the jury, plaintiff Rebecca Scofield, the Court, audience.

Sometimes people do things we do not like. Sometimes they have, in my case, good intentions. However, despite how we feel about them and what they did, you cannot award damages where damages do not exist.

Professor Scofield's professional reputation and career was not negatively impacted by my 30 minutes of content. Dean Quinlan, her boss, testified that not on his watch would anything negative happen to Scofield's professional career, and she has been promoted one to multiple times since the posting of my TikTok videos.

Scofield's expert, Rebecca Tallent, testified that, speculatively perhaps, in ten years Professor Scofield could suffer damages. But again, there was absolutely no evidence or proof to suggest that my TikTok videos has right now or in the past or in the future will negatively impact Professor Scofield's career. It simply hasn't.

There has been no evidence from a medical professional that suggests Scofield's neuropathy, migraine, or diabetes was caused by a TikTok video. What you have is testimony from her family and friends, who are here to help her get multiple millions of dollars in damages that do not exist.

In the general public, Professor Scofield's

reputation positively increased. The evidence shows that strangers all over the world donated to Professor Scofield after my TikTok videos a year later -- less than a year later, 22-plus thousand dollars. They also offered her words of encouragement. The evidence also show that Professor Scofield was supported by her union, her family, the community, the bigger union, the University of Idaho, friends, and strangers.

Unfortunately, no one believed my statements. There is no evidence to prove that I made an intentional false statement. In fact, the evidence proves that I believed my tarot and oracle card reading messages. Whether they are true or not has no bearing on the fact that I believed it. The evidence shows that once I had the opportunity to prove my statements to be true or false, I diligently sought information from law enforcement, the University of Idaho, the State of Idaho, the City of Moscow, Facebook. Any and everyone I could I reached out to to get objective evidence that the statements I made were true. They could also prove that the statements I made were false.

No one believed me. No one answered. No one provided any documents. That is not my fault. My job was to do the best that I could, in my opinion, to get justice for the four students who were murdered. The military taught me selfless service. My spiritual journey taught me to use my spiritual gifts to serve the public. I decided to serve the

public by solving mysterious deaths and just to help people and spirits and families get justice for people who have been killed.

It is reasonable, in my shoes, that I believed Scofield to be a part of these murders. She was not arrested. She was a member of the community and still teaching students. It is reasonable for a person to want to warn the public if they think a killer is on the loose and still a part of the community. It is reasonable to continue and diligently reach out to others in order to get proof, in order to warn the public and the community that something is not right and justice has not been served for the four students.

It is ridiculous to suggest that just because I'm a psychic, that I can't speak unless law enforcement provides me with documents. No one had documents when a TikTok user, a member of the Moscow community reached out to me and said, "I am reaching out to you because I'm waiting on you to do a reading on the murder of the four University of Idaho students." No one had information. Everyone had fear. Well, except Professor Scofield and her family, who didn't even lock those doors after people were killed ten minutes away from them. The rest of the community, though, were afraid and anxious to find out who did this and why.

When the member of the community reached out to me, I made it my duty to find out and to serve the city of Moscow,

the community of Moscow, to find out what's happening. Why? Because the law enforcement wasn't releasing information. There was nowhere else to get information, so I did the best I could to get any and every information that I felt was related to the crimes and release it to the public.

The evidence shows that I did so to get the attention of law enforcement so that they can -- and these are the people who have the authority to get evidence. I did it so they can get evidence and use their authority to find what happened to these students and put the real culprits behind bars.

There is no evidence to suggest that my efforts to solve or help solve these crimes and get justice for the students actually ruined Professor Scofield's life or in any least bit caused her harm. Putting a lock on a door is a normal thing to do. Getting security cameras on your house is a normal thing to do. Professor Scofield has not been targeted by vigilantes. Her family has not been targeted by vigilantes. She did not lose her job. In fact, they didn't believe it. They did not even investigate her according to the general counsel, who testified that she was not investigated. Professor Scofield, any -- any suggestion that her life was interrupted was her own choice. No force from her job, no force from vigilantes, no force from general public, whom all supported her.

The plaintiff is going to ask you -- and she just did -- to award $1 million in compensatory damages. There is no evidence to suggest that from my TikTok videos she lost any revenue from her job, that -- no evidence to suggest that even her alleged PTSD had anything to do with me. In fact, her expert testified she cannot get PTSD from a TikTok video. If Professor Scofield has symptoms of PTSD, it is from a traumatic event that she experienced which has nothing to do with a TikTok video.

Can I use this?

THE COURT: You may.

MS. GUILLARD: If you recall, in addition to Ms. -- Dr. -- sorry -- Mrs. Bohn stating that Professor Scofield cannot get PTSD from a TikTok video, the *DSM-V* from the American Psychiatric Association, who creates the diagnostic criteria for PTSD, literally states, if you look at part 4, experiencing repeated or extreme exposure to adverse details of traumatic events, which relates to first responders, police officers, people who actually experience traumatic events. That criterion A-4 does not apply to exposure through electronic media, television, movies, TV, et cetera.

Thank you.

Without damages to her professional career, without damages that can be attributed to me, Ashley Guillard, for a TikTok video to her mental health and without evidence to

support that her diabetes and neuropathy was directly caused by Ashley Guillard, you cannot reward -- award -- whichever word I'm supposed to use -- damages and compensatory damages to Professor Scofield.

As it pertains to punitive damages, I have provided substantial evidence, clear and convincing, that I did not make an intentional false statement. I provided books that I wrote with my intent on how I was going to serve the public written in March 2022, way before the murder of University of Idaho students. I provided evidence that -- from videos and from reaching out to law enforcement and FBI tip lines that I was simply trying to help get justice for the students.

Punitive damages should not exist in this case and are not required. When you're filling out the verdict form, you already -- you must file "no" after you deliberate to compensatory damages because I did not cause any to Scofield and "no" to punitive damages. The only thing on those forms and according to the law that Professor Scofield is entitled to is $1 in nominal damages.

Thank you.

THE COURT: Ms. Olson, rebuttal argument.

MS. OLSON: Yes, please, Your Honor.

THE COURT: Ladies and gentlemen of the jury, because the plaintiff bears the burden of proof, she has the last word in closing arguments. So Ms. Olson has the opportunity to

conduct a rebuttal argument.

You may argue.

MS. OLSON: Thank you, Your Honor.

Ms. Guillard's arguments are exactly what I forecast they would be in my opening and closing remarks, so I'll touch on a few things.

First, when she tells you that she is just trying to do justice and to help the families of the murder victims, I invite you to watch all of Exhibit Number 12 and to watch all of the TikToks and look at the content, particularly in that video. And when you watch all of Exhibit Number 12 -- we only played the portions in open court where she made the false statements and excluded Bryan Kohberger. But if you watch all of that -- it's about 40 minutes long -- then ask yourself if Ashley Guillard had the interests of those students and their families and justice in mind or if what she had in mind were the likes and the shares and the number of viewers and the hashtags and the viral comments.

And if you have any question about that -- if we could have the screen turned on take a look at Exhibit Number 11. You may remember this as the one that she posted after TikTok put down -- took down her original posts. She said "hey" and waves. "I can't post comments or videos on my main page right now. I'm okay." And she wanted her followers and the people for whom she was providing the viral content to

come see her again, and this is what she posted.

Ms. Guillard testified that, look, she just wanted to put this information out there so it could be followed up on. She didn't need facts. And she said, "Look, I reached out for information afterward, and I couldn't control that no one would give me anything."

But what she could control was whether to make false statements. She could control when she made her statements. She could control what she said. And her choice was to make those statements, to say Professor Scofield orchestrated the murders, to say that Professor Scofield had an affair with one of her students. That was within her control, and she made that before she had a single fact -- and she knows what facts are -- and then she started chasing them afterwards. But if you're going to post something on TikTok accusing someone of murder, shouldn't you have those facts first?

You heard in Ms. Guillard's closing that she is not remorseful. You heard when she testified that she will not apologize to Professor Scofield. She will keep making her false statements about Professor Scofield, and if not about Professor Scofield, about somebody else. And only a punitive damages award and only a significant punitive damages award will stop her.

Thank you.

THE COURT: Thank you, Ms. Olson.

Ladies and gentlemen of the jury, before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court. You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you've considered all of the evidence, discussed it fully with the other jurors, and listened to their views. It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you, but do not come to a decision simply because other jurors think it's right or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

And because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not consider any other information about the case or to the issues it involves except for discussing the case with your fellow jurors during deliberations.

Other than deliberations with fellow jurors, do not

communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone, tablet, computer, or any other means; via email, via text messaging; or any Internet chat room, blog, website or application, including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media. This applies to communicating with your family members, your employer, the media, the press, or people involved in the trial.

If you're asked during deliberations or approached in any way about your jury service or anything about this case, you must respond that you've been ordered not to discuss the matter and report the contact to the Court.

During deliberations do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it. Do not consult dictionaries, search the Internet, or use other reference materials. And do not make any investigation or in any other way try to learn about the case on your own. Also, do not do any research about this case, the law, or the people involved -- including the parties, the witnesses, or the lawyers -- until you have been excused as jurors. During deliberations if you happen to read or hear anything touching on the case in the media, turn away

and report it to me as soon as possible.

Again, these rules protect each party's right to have this case decided only on the evidence that has been presented here in court. Witnesses here in court took an oath to tell the truth, and the accuracy of their testimony was tested through the trial process. If you do any research or investigation during deliberations or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial.

Remember, you've taken an oath to follow the rules, and it's very important that you follow these rules. A juror who violates these instructions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire process to start over. Again, if any jurors are exposed to outside information during deliberations, please notify the Court immediately.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the law clerk and bailiff, Mr. Gordon, signed by one or more of you. No member of the jury should ever attempt to communicate with me

other than by signed writing. I will not communicate with any member of the jury except in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time. Remember that you are not to tell anyone, including the Court, how the jury stands, whether in terms of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

All right. Ladies and gentlemen, I'm now going to ask either Ms. Fifer or Ms. Trumbull to swear Mr. Gordon in as the bailiff in this case.

(Oath administered.)

THE COURT: All right. Ladies and gentlemen of the jury, in a moment I will excuse you to begin your deliberations. You each have a hard copy of all the instructions that I just read to you, and Mr. Gordon will provide you with a single verdict form.

And then at some point soon a laptop with a thumb drive with exhibits will be provided to you, and I believe one of our IT professionals will come into the jury room to show you how that works. Again, do not be deliberating when that person comes in. Do not ask him or her any questions except as it relates to the workings of the computer and accessing the exhibits.

With that, the jury's excused to deliberate.

(The jury exited the courtroom at 12:40 p.m.)

THE COURT: Please be seated.

Thank you, Counsel, Ms. Scofield, Ms. Guillard, for an orderly trial. I appreciate the parties' diligence in being prepared and in abiding by instructions and my rulings.

I will ask that the parties or counsel and Ms. Guillard stay within close proximity of the courthouse. You're free to go out and get lunch or something. Please give a cell phone number to Ms. Fifer or Ms. Trumbull so that we can contact you immediately if there is a question from the jury. Please don't stray too far because I'd like you to be able to get here quickly if there is a question of the jury. There is right -- down the road is the co-op. It's kind of like a Whole Foods supermarket and place to get lunch if you wish. I don't think there's anything else really within walking distance right now, so that's what I would suggest.

And other than that, Ms. Olson, anything that you wish to take up with me?

MS. OLSON: No. Thank you, Your Honor.

THE COURT: Ms. Guillard?

MS. GUILLARD: No, sir.

THE COURT: All right. With that, the court will be in recess.

(At 12:42 p.m., a recess was taken until 2:44 p.m.)

(The following took place outside the presence of the

jury.)

THE COURT: Please be seated.

All right. I understand that the jury has a verdict. Just for the benefit of the parties, here's how this will go. We'll have the jury brought back into the courtroom. I'll inquire of the foreperson, "The jury has reached a unanimous verdict?" I'll instruct the foreperson to hand Mr. Gordon the special verdict form, and he'll hand it to Ms. Trumbull. Ms. Trumbull will then hand it to me. I'll look at it to make sure it's completely filled out and filled out correctly. I'll hand it back to Ms. Trumbull. I'll have her read the verdict aloud.

Then I will ask the jurors collectively if this is their verdict and get their acknowledgment with shaking of their heads or verbal "yes." I'll state that on the record. Then I'll ask both parties if they want me to poll the jury, to ask each of the jurors if this is their individual verdict. And that's something you can all decide. If the answer to that is yes by either party, I will poll each of the jurors -- let me make sure I have the juror numbers -- and I'll ask each of the jurors their verdict. And then I'll direct the court clerk to file that verdict and the prevailing party, whoever that may be, to submit the judgment to the Court. And then I'll discharge the jury and adjourn court for the day.

Does anyone have any questions about that procedure?

MS. OLSON: Not on behalf of Professor Scofield, Your Honor.

THE COURT: All right. Ms. Guillard?

MS. GUILLARD: Not right now.

THE COURT: You're sure? You look a little --

MS. GUILLARD: About what the procedure that's about to happen right now? No, sir.

THE COURT: All right. Then we'll bring in the jury.

(The jury entered the courtroom at 2:47 p.m.)

THE COURT: Please be seated.

By juror number only, which juror is our foreperson?

JUROR NUMBER 15: (Indicating.)

THE COURT: And you are Juror Number 15?

JUROR NUMBER 15: (Nodding head.)

THE COURT: All right. Madam foreperson, can you please provide the special verdict form to Mr. Gordon.

Juror Number 15, has the jury unanimously agreed on the verdict?

JUROR NUMBER 15: Yes.

THE COURT: All right. I've reviewed the verdict. All appears to have been answered correctly and in order.

Ms. Trumbull, would you please publish the verdict.

THE COURTROOM DEPUTY: Yes, Your Honor. Special verdict form for Rebecca Scofield versus Ashley Guillard, Case Number 3:22-CV-521-REP.

We, the jury being duly empaneled and sworn to try the above-entitled case, do find our verdict as follows.

Question 1: Do you find by a preponderance of the evidence that defendant's false statements that plaintiff had an inappropriate romantic relationship with a student damaged plaintiff? Answer: Yes. If you answered yes to question 1, then answer question 2.

Question 2: State the amount of compensatory damages related to the defendant's false statements that plaintiff had an inappropriate romantic relationship with a student. Dollar amount: $1 million. Go to question 3.

Question 3: Do you find by clear and convincing evidence that defendant's false statements that plaintiff had an inappropriate romantic relationship with a student warrant punitive damages? Answer: Yes. If you answered yes to question 3, then answer question 4.

Question 4: State the amount of punitive damages related to defendant's false statements that plaintiff had an inappropriate romantic relationship with a student: $2,500,000. Go to question 5:

Question 5: Do you find by a preponderance of the evidence that defendant's false statements that plaintiff orchestrated the murder of four students at the University of Idaho damaged plaintiff? Answer: Yes. If you answered yes to question 5, then answer question 6.

Question 6: State the amount of compensatory damages related to defendant's false statements that plaintiff orchestrated the murder of four students at the University of Idaho: $1,500,000. Go to question 7.

Question 7: Do you find by clear and convincing evidence that defendant's false statements that damages -- I'm sorry -- false statements that plaintiff orchestrated the murder of four students at the University of Idaho warrant punitive damages? Answer: Yes. If you answered yes to question 7, then answer question 8.

Question 8: State the amount of punitive damages related to defendant's false statements that plaintiff orchestrated the murder of four students at the University of Idaho: $5 million.

Signed by the foreperson, dated February 27, 2026.

THE COURT: All right. Thank you, Ms. Trumbull.

Jurors collectively, is this your verdict?

All of the jurors have answered in the affirmative. Do either of the parties request individual polling of the jury?

MS. OLSON: Professor Scofield does not, Your Honor.

MS. GUILLARD: Yes.

THE COURT: All right. Juror Number 1, is this your verdict?

JUROR NUMBER 1: Yes, Your Honor.

THE COURT: Juror Number 7, is this your verdict?

JUROR NUMBER 7: Yes, Your Honor.

THE COURT: Juror Number 9, is this your verdict?

JUROR NUMBER 9: Yes, Your Honor.

THE COURT: Juror Number 10, is this your verdict?

JUROR NUMBER 10: Yes, Your Honor.

THE COURT: Juror Number 11, is this your verdict?

JUROR NUMBER 11: Yes, Your Honor.

THE COURT: Juror Number 13, is this your verdict?

JUROR NUMBER 13: Yes, Your Honor.

THE COURT: And Juror Number 15, is this your verdict?

JUROR NUMBER 15: Yes, Your Honor.

THE COURT: All right. All of the jurors have answered that this is their individual verdict and their collective unanimous verdict. I direct the Clerk of the Court to file and record this verdict.

And, Ms. Olson, I'll ask that you, as the prevailing party, file the judgment in this case.

Ladies and gentlemen of the jury, you have now completed your duties as jurors in this case and are discharged with the sincere thanks of this Court. The question may arise as to whether you may discuss this case with the attorneys or anyone else.

For your guidance, the Court instructs you that

whether you talk to the attorneys or anyone else is entirely your own decision. It is proper for you to discuss the case if you want to, but you are not required to do so. You may choose not to discuss the case with anyone at all. If you choose to talk to someone about this case, you may tell them as much or as little as you would like about your own deliberations or the facts that influenced your own decisions.

You are not to discuss, however, the deliberations, comments, and analysis of your fellow jurors. That is a private matter for each juror, and each juror should be permitted to determine how much to reveal.

No one other than the jury administrator has your contact information.

If anyone persists in discussing the case over your objection or becomes critical of your service, either before or after any discussion has begun, you may report it to me.

Also, I will remind the parties that federal law Title 28 United States Code Section 1863 and this court's jury plan require that the identities of the jurors be kept confidential. So I will order the parties not to make any public disclosure of the names or identities of the jurors.

All right. With that, I discharge the jury and again thank you with the sincere thanks of this Court and all involved in this trial for your service in this case. The jurors may be excused.

(The jury exited the courtroom at 2:55 p.m.)

THE COURT: Please be seated.

Ms. Olson, anything else that you wish to address?

MS. OLSON: No. Thank you, Your Honor.

THE COURT: You're welcome.

Ms. Guillard?

MS. GUILLARD: Nothing right now.

THE COURT: All right. Then the court will be adjourned.

(Proceedings concluded at 2:56 p.m., February 27, 2026.)

C E R T I F I C A T E

I, ANNE BOWLINE, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing 134 pages constitute a full, true, and correct transcript.

Dated this 20th day of May, 2026.

/s/ Anne Bowline

ANNE BOWLINE
Registered Merit Reporter
Certified Realtime Reporter